**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

RICHARD WALTER,

              Plaintiff,

      v.

DAVID GAUVEY HERBERT, et al.

              Defendants.

Case No. 3:23-cv-02166-MEM
(Hon. Malachy E. Mannion)

**EXHIBITS IN SUPPORT OF
MOTION TO DISMISS BY DEFENDANTS
<u>DAVID GAUVEY HERBERT AND NEW YORK MAGAZINE</u>**

<u>**Exhibit No.**</u>

David Gauvey Herbert, *The Case of the Fake Sherlock*, New York Magazine (Apr. 11, 2023) ...................................................................................... 1

Deposition of R. Walter, *McGuffin v. Dannels*, 20-cv-01163-MK (D. Or. June 30, 2022) .................................................................................... 2

Exhibit 1



*Richard Walter in 1992.*

PHOTOGRAPH: DETROIT FREE PRESS/ZUMA PRESS

*FEATURES*

### How Stormy Daniels Sees It Ending

She spent the night with a tacky reality-television star. The rest is now American history.
*By Olivia Nuzzi*

**20**

### Emma Tucker's Deadline

The newly appointed *Wall Street Journal* editor steers the paper through a stakes-couldn't-be-higher diplomatic crisis.
*By Shawn McCreesh*

**26**

### The Case of the Fake Sherlock

How Richard Walter used phony credentials and a bogus work history to secure convictions.
*By David Gauvey Herbert*

**32**

**Richard Walter** was hailed as a genius criminal profiler at murder trials, at forensic conferences, and on true-crime TV. In reality, he was a fraud. How did he get away with it for so long?

# The Case of the Fake Sherlock

**By David Gauvey Herbert**

*Illustration by Adam Maida*





**C**OQUILLE, ON the Oregon coast, is a two-stoplight town where mist rolls off the Pacific and many of the 4,000 residents work in lumber and fishing. On the night of June 28, 2000, a 15-year-old named Leah Freeman left a friend's house and set off on her own. She was seen walking past McKay's Market, the credit union, and the high school, but she never made it home. At a gas station, a county worker found one of Leah's sneakers.

The local paper published Leah's school photo: big smile, mouthful of braces. Police and a donor put together a $10,000 reward for information leading to her safe return. K-9 units swept the school grounds, and police set up roadblocks and interviewed motorists. On its sign, the Myrtle Lane Motel posted a description of Leah. A month later, the message was replaced with Job 1:22: "The Lord gives. The Lord takes." A search party had found Leah's body at the bottom of an embankment, severely decomposed. "We prayed for her to return," the motel manager told a reporter. "And now we can pray for whoever did this to be caught."

But the killer was not caught. The police had initially treated Leah as a runaway before mounting a search, and when the FBI and state police finally arrived, investigators were too far behind. They never recovered. As months turned into years, Coquille police dwelled on one suspect whose story never quite made sense to them: Nick McGuffin, Leah's 18-year-old boyfriend. Friends had seen them argue. Police said he switched cars the night she vanished and flunked a polygraph. The hunch was there, but the physical evidence wasn't.

In January 2010, a new team of detectives and a prosecutor flew to Philadelphia to pursue a last-ditch option: to present the case to a league of elite investigators called the Vidocq Society, which met once a month to listen to the facts of cold cases and sometimes venture instant insights. The group's co-founder, Richard Walter, was billed as one of America's preeminent criminal profilers, an investigative wizard who could examine a few clues and conjure a portrait of a murderer.

Walter was tall and gaunt with a hard-to-place, vaguely English accent. He favored Kools and Chardonnay, and he was never photographed in anything but a dark suit, a tiny smile often curling at the corner of his mouth. His public profile was about to explode. A publisher was finalizing a book about the Vidocq Society, *The Murder Room,* which detailed Walter's casework on four continents and claimed that at Scotland Yard he was known as "the living Sherlock Holmes."

In Philadelphia, members of the Coquille team presented Leah Freeman's murder to the Vidocq Society. Later, at a private dinner, Walter dangled before them a tantalizing profile that suggested the killer was indeed McGuffin, the boyfriend they had suspected all along. Soon, Walter traveled to Coquille and examined crime scenes with the police chief, trailed by a camera crew from ABC's *20/20.*

Building on the momentum of Walter's visit, the authorities arrested McGuffin and charged him with killing Leah. As he awaited trial, he watched the *20/20* episode about his case from the Coos County jail. There on TV was Walter, a man he had never met, all but accusing him of murder. "It's sweet revenge," Walter said with a grin. "And I take great personal satisfaction in hearing handcuffs click." McGuffin was convicted and sentenced to a decade in prison. In the years to come, he would often sit in his cell and wonder: Who *was* that thin man smoking on the screen?

Richard Walter is many things and little that he claims. Since at least 1982, he has touted phony credentials and a bogus work history. He claims to have helped solve murder cases that, in reality, he had limited or no involvement with—and even one murder that may not have occurred at all. These lies did not prevent him from serving as an expert witness in trials across the country. His specialty was providing criminal profiles that neatly implicated defendants, imputing motives to them that could support harsher charges and win over juries. Convictions in at least three murder cases in which he testified have since been overturned. In 2003, a federal

judge declared him a "charlatan."

Walter refused several requests for an interview. "You have earned one's distrust that merits severing any contact with you in the future," he wrote me, veering into strange pronoun usage. "Under no circumstances would himself cooperate in your suspicious activities."

Many of his misdeeds were a matter of record before he ever stepped foot in Coquille. And yet Walter continued to operate with impunity, charging as much as $1,000 a day as a consultant. America's fragmented criminal-justice system allowed him to commit perjury in one state and move on to the next. Journalists laundered his reputation in TV shows and books. Parents desperate for closure in the unsolved murder of a son or daughter clamored for his aid. Then there was Walter's own pathology. He so fully inhabited the role of celebrated criminal profiler he appeared to forget he was pulling a con at all.

**IN RICHARD WALTER'S** telling, he was fated for a grim life studying criminals. But schoolmates who grew up with him in the rolling orchard country of 1950s Washington State remember an outgoing, popular kid who liked the piano and led the prayer band at a Seventh Day Adventist boarding school. In September 1963, at the age of 20, he married a former classmate and briefly took a job at a funeral home. ("He didn't want to work with any old, stinky bodies," his brother recalled in an interview.) After ten months, his wife filed for divorce, citing "mental cruelty." What happened over the next several years is unclear. When asked in a recent deposition where he lived and worked during that period, Walter said, "I don't remember."

Walter resurfaces in the public record in 1975, when he graduated from Michigan State University with bachelor's and master's degrees in psychology. He got an entry-level position as a lab assistant in the Los Angeles County Medical Examiner's Office. He was 33 and making roughly $3 an hour washing test tubes. He considered a doctoral program but instead took a job in 1978 as a staff psychologist at a place where he'd be able to see patients without any further qualifications: Marquette Branch Prison on Michigan's Upper Peninsula.

Walter's rapport with prisoners was poor—he often conducted interviews through a closed steel door—and he could be petty. An inmate sued Walter after he refused to pass along a dictionary sent by his mother. Two psychiatric experts and a federal judge questioned his ability to diagnose mental disorders and render basic mental-health services. Eventually,

Walter's duties largely involved conducting intake interviews with inmates. "What I call meatball stuff," says John Hand, who also worked in the state prison system as a psychologist. "Talk to them for a little while, make sure they're not totally crazy."

Away from the prison, though, Walter presented his job as giving him unique insights into the criminal mind. He became a regular at conferences hosted by the American Academy of Forensic Sciences, which was rising in stature on the strength of specialties like hair microscopy, bullet-lead analysis, and criminal profiling.

Profiling was especially hot. The FBI's Behavioral Science Unit was going from fringe to mainstream: The profilers there had consulted on fewer than 200 cases in all of the 1970s, but by the middle of the next decade, they were providing hundreds of assists per year. The unit began attracting big personalities. "Where there are stars, there are wannabe stars," says Park Dietz, a forensic psychiatrist who has worked with the BSU. "Those with big egos will often gravitate to those centers of narcissistic glory."

In 1982, Walter became a full member of the AAFS, a powerful credential. That year, for the first time, he would try on his invented persona in a courtroom.

**R**OBIE DRAKE WAS wearing military fatigues and carrying rifles and hunting knives when he left his home in the Buffalo suburbs. It was just before midnight on December 5, 1981, and the 17-year-old headed to an area of North Tonawanda filled with abandoned vehicles. He took aim at a 1969 Chevy Nova and fired 19 rounds into the passenger-side window. From inside the car, he heard groaning. The location was also a lover's lane, and his bullets had struck Stephen Rosenthal, 18, and Amy Smith, 16. Drake then stabbed Rosenthal in the back. Two police officers on a routine patrol spotted Drake stuffing Smith's body into the trunk of the Nova.

The case appeared open and shut. But the prosecutor, Peter Broderick, saw weaknesses. Drake insisted it had all been a mistake, and his reasons were just plausible enough to imagine holdouts on a jury. The scene had been dark. Drake said he'd shot the car for target practice, thinking it was empty, and panicked when he heard Rosenthal and stabbed him to make the noise stop. However unlikely that sounded, Broderick lacked a clear motive, and intent would be the sole issue separating a murder conviction from a lesser charge of manslaughter. "All I needed was some reasonable explanation for why this

thing happened," Broderick later said.

Broderick suspected Drake's motive was sexual, and he hired Lowell Levine, a forensic odontologist, to testify that faint marks on Smith's body were signs of post-mortem biting, which was possible evidence of a sex crime. Levine suggested that to firm up that angle, the prosecutor should bring in another expert—someone he'd recently met at an AAFS conference. Two weeks later, Broderick drove to the airport and picked up Richard Walter.

On the stand at Drake's trial, Walter related an impressive—and fictional—résumé. He falsely claimed that at the L.A. County Medical Examiner's Office, he had reviewed more than 5,000 murder cases. Walter also said he was an adjunct lecturer at Northern Michigan University (he had spoken there informally, possibly just once), wrote criminology papers (he had never published), and had served as an expert witness at hundreds of trials (he'd testified in two known cases—about a simple chain-of-evidence question and in a civil suit against a car company).

Walter told the jury that Drake had committed a particular type of "lust murder" because he was driven by "piquerism," an obscure sadistic impulse to derive sexual pleasure from penetrating people with bullets, knives, and teeth. Drake's attorney told the court that he could not find any expert who had ever heard of piquerism, but the judge denied his request for more time to find a rebuttal psychologist. Drake was convicted of second-degree murder. Back in Michigan, Walter sent Broderick an invoice. For securing two consecutive terms of 20 years to life, his fee was $300.

The trial was the end of Robie Drake's

freedom and the beginning of Walter's new career. He continued testifying in occasional murder trials and inflating his qualifications. By 1987, when he took the stand in *State of Ohio* v. *Richard Haynes*, he held himself out as a superstar in his field, telling the prosecutor that he was one of just ten or so criminal profilers trusted by the FBI.

Walter lectured widely, giving speeches like "Lust, Arson and Rape: A Factorial Approach" and "Anger Biting: The Hidden Impulse." Audiences loved his entertaining, wry style. "His story, as many of Richard's, has to be heard from his own mouth," wrote an amused attendee after Walter's presentation at a 1989 conference hosted by the Association of Police Surgeons of Great Britain. "It would lose all by repetition by another."

Walter was about to get a new venue for his theatrics. According to one version of events, it was around this time, at an AAFS convention, that Walter met Frank Bender, an eclectic Philadelphia artist who had begun a sideline in forensic sculpture, reconstructing busts from decomposed bodies. Bender was plugged into the local law-enforcement scene, and he introduced Walter to Bill Fleisher, a Customs agent. At a diner, the three talked about cases until the sun set. Standing on the sidewalk in the cold, they had the idea to organize a bigger confab—a group of law-enforcement professionals who would meet regularly and talk murder over lunch.

"What," Bender asked, "are we going to call our club?"

**THE NAMESAKE OF** the Vidocq Society—which Walter, Bender, and Fleisher established in Philadelphia in 1990—is



## TRUE-CRIME TV LOVED HIM

**Walter on a 2009 episode of A&E's 'Forensic Factor: The Unexpected Perpetrator' discussing a double homicide in Wisconsin.**

PHOTOGRAPH: A&E/FORENSIC FACTOR, "THE UNEXPECTED PERPETRATOR," 2009

Eugène-François Vidocq, a 19th-century French criminal turned detective who is considered the father of modern criminology. Some of the club's early members had impressive jobs as Customs agents, IRS investigators, and U.S. marshals, but there were also advocates of dubious fields like polygraphy and statement analysis. Few had extensive experience with homicide. That didn't matter much at first, as the group spent its initial meetings—usually held at Philadelphia restaurants or social clubs—discussing historical cases like the Cleveland "Torso Murders" of the 1930s. But soon the members began taking on more recent unsolved murders in which they might have a shot at catching a killer.

Criminal profiling was becoming a pop-culture sensation, thanks in large part to the 1991 blockbuster *The Silence of the Lambs,*

CBS's *48 Hours* came to a Philadelphia dining hall to watch the Vidocq Society consider the case of Zoia Assur, a 27-year-old who was found dead in the woods of Ocean County, New Jersey. Her fiancé, an ophthalmologist named Ken Andronico, suspected her death was not a suicide but murder, and a friend of Andronico's had approached the organization for help. Fleisher presented the facts and concluded, in a thick Philly accent, "Now, our case begins."

CBS correspondent Richard Schlesinger raced around the room to solicit theories. "Murder or suicide?" he asked club members as they tucked into plates of chicken Marsala. "Murder!" they blurted through full mouths. "We haven't even gotten to dessert yet!" Schlesinger cried with delight. Walter told the camera that Andronico might have been the killer. "He's playing

Others were not so lucky. At the Vidocq Society's April 1992 meeting, a Philadelphia homicide detective named Bob Snyder walked to a podium, opened a thick file, and presented the cold-case murder of Deborah Wilson, an undergraduate at Drexel University who had been killed after working into the night at a computer lab. Waiters served lunch as members viewed photos of the bloody crime scene and her foamy saliva, which indicated strangulation. Afterward, Walter offered an insight: Wilson's sneakers had been removed, indicating that the killer had a foot fetish.

When police later searched the home of David Dickson, a security guard on duty the night of the murder, they found a collection of women's sneakers and foot-fetish pornography. The press called him "Dr. Scholl," and Dickson was charged with murder. In court, his attorney protested that the alleged motive was absurd. "This man is a sneaker sniffer, not a murderer!" he cried. But the prosecutor was Roger King, a powerhouse who claimed to have put more men on death row than anyone else in the history of his office. One jury deadlocked, but King won the retrial. Dickson was sentenced to life in prison.

The Vidocq Society pinned a medal on Snyder, and the club celebrated cracking a major case. But Walter was the real winner. His theory had led to the arrest and conviction. He would cite the case in media interviews for decades.

King died in 2016. Five years later, the Philadelphia *Inquirer* published a major investigation into his tactics, finding that he had routinely manipulated witnesses, withheld exculpatory evidence, and employed jailhouse snitches whose credibility he knew was suspect—including one, John Hall, who testified against Dickson. Hall's wife had helped him fabricate testimony by sending newspaper clippings to him in jail. "Nothing he said was true," she told the *Inquirer*. At least seven of King's murder convictions have been overturned.

Dickson's could be next. In the fall, his attorney filed a petition with the court arguing that King withheld or twisted information critical to Walter's foot-fetish theory, including the possibility that the victim's sneakers may not have been taken from the scene after all.

## A COLD-CASE CLUB GLORIFIED HIM



A Vidocq Society luncheon as seen on a 1992 '48 Hours' episode called "Hard Evidence—Mystery on the Menu." Walter is at right.

which made $272 million and swept the Academy Awards. "It was a very exciting time," says Jana Monroe, an FBI profiler who helped Jodie Foster prepare for her role in the film. "But the FBI didn't like all the media attention." The Vidocq Society moved into the vacuum, quickly notching write-ups in the Philadelphia *Inquirer* and the New York *Times.*

Reporters relished describing the three co-founders: Walter was the chain-smoking genius; Bender was the artist, conspicuous among the suits in T-shirt and jeans; Fleisher was the teddy-bear G-man, prone to tearing up during presentations. Hollywood began calling, as did network TV.

that high-risk game of 'Catch me if you can,'" he said with a smile.

Andronico—who had been more than a thousand miles away in Florida at the time of Assur's death—watched the *48 Hours* episode from his apartment with his mouth agape. Patients began canceling their appointments, and his medical practice was upended for years. He was never charged with a crime. (Retired Ocean County detective James Churchill dismisses the theory and the Vidocq Society's involvement. "They never looked at the file, they never had any statements, they never had any medical records," Churchill says. "I thought it was just preposterous.")

T HE RICHARD WALTER story is not the case of an impostor who goes undetected, one misstep away from being discovered and exposed. Lots of people saw signs; few had incentive to do anything about it. Throughout the 1990s, he continued to

work in the Michigan correction system as a psychologist, and word eventually got around about his profiling sideline. Some found the arrangement comical. "If he's got an international reputation, why is he working in a prison for $10,000 a year?" Hand, his contemporary, says with a laugh.

Many others saw through Walter's act. Retired FBI agent Gregg McCrary recalls that the Behavioral Science Unit once invited Walter to Quantico to ask him questions about inmate behavior. "The narcissism, I think, was obvious. He really thought he knew a lot," McCrary says. The agents learned little, and he was not invited back. "Richard Walter is largely a poseur," McCrary says. "What I say about Richard is he's an expert at being an expert, at playing one and convincing people that he is."

Walter's victims struggled to get anyone to pay attention, even when they caught him in obvious lies. In 1995, Robie Drake still had decades to go on his sentence. From his maximum-security prison in upstate New York, he'd been digging into Walter's résumé on an antiquated computer terminal. He had married a nurse 24 years his senior named Marlene, and she helped, requesting documents and contacting Walter's former employers. They found the various ways in which Walter had perjured himself, but when Drake appealed, a court denied his motion without a hearing.

Marlene then sent the American Academy of Forensic Sciences a 13-page dossier of Walter's inflations and outright falsehoods. Officials at the organization acknowledged in internal memos that Walter had padded his résumé, but they decided to reveal as little as possible about their internal deliberations. "We do have to worry about public appearances," Don Harper Mills, a pathologist who was chairman of the ethics committee, wrote to his colleagues. In a February 1996 letter to Marlene, Mills delivered his verdict in a single paragraph. "Most of the issues do not involve the Academy's Code of Ethics," he wrote. "The Committee has concluded unanimously that there was no misrepresentation and therefore no Code violation."

One reason Walter kept skating by is that defendants like Drake existed in an ethical twilight. He was a guilty man robbed of due process. An expert witness had lied, and he had perhaps spent more of his life in prison than was warranted because of it, but he had killed two teenagers. What was Walter's perjury next to that?

Walter was also galvanized by support from an unimpeachable group: victims' families. He spoke before the Parents of Murdered Children, a nonprofit that offers grief counseling and helps families lobby parole panels against early releases, and later joined the board. At the group's annual conference, he granted private audiences to devastated parents. After years or decades of frustration with police and prosecutors, they appreciated Walter's shared sense of anger, like when he said that some murder suspects should be handled with "seven cents' worth of lead."

Walter knew how to give delicious, cinematic quotes, and he cultivated his eccentricities for journalists and producers. He boasted of subsisting on cigarettes and cheeseburgers. He said that when the time was right, he would "lie down to quite pleasant dreams" using sodium pentothal. He once yelled at a suspect, "I'll chew your dick down so far you won't have enough left to fuck roadkill."

The effect was irresistible. In *A Question of Guilt*, a Nancy Drew and Hardy Boys crossover novel published in 1996, the iconic teen detectives run into one another at a meeting of the Vidocq Society. Filmmakers courted Walter and his co-founders for years, taking them to dine at Le Bec-Fin. Walter told the Binghamton *Press & Sun-Bulletin* that a producer wanted Kevin Spacey to play him in a movie. In 1997, Danny DeVito's Jersey Films purchased the Vidocq creators' story rights in a deal worth as much as $1.3 million. (No film was ever made, Fleisher says, and the founders received a fraction of that amount.)

Money doesn't seem to be what drove Walter. While his lifestyle had some flourishes—he slept in an antique Chinese bed and played Tchaikovsky on a 1926 Chickering grand piano—he mostly lived frugally. He drank bottom-shelf wine and drove a succession of Crown Victorias into the ground.

The relish with which he played the role of a genius profiler points to another, stronger motivation: ego. "He totally cannot be in a social setting where he is not the center of attention," says a longtime Vidocq Society member. At meetings, Walter tended to speak last, rendering his judgment to a roomful of nodding heads. "He's been hyped so much by the leadership in the organization," says the member. "Nobody challenges him." (A spokesperson for the organization disputes this.)

It's difficult to look at Walter's body of work—real or claimed—and not notice some preoccupations. Of the more than 100 papers and presentations listed on his résumé, roughly a quarter pertain to homosexuality or sex crimes. A representative example, "Homosexual Panic and Murder," is a case study based on interviews he conducted with an inmate who had murdered a man and then cut off one of his testicles.

"The homosexual: not really a man," Walter testified once in a murder case. "He is a discount person; therefore, if I need to be great, if I need to satisfy my ego, if I need to satisfy my needs for power, if I need to surmount, if I need to have a demonstration of my power, well, what better way to do it?"

In September 2002, two police officers from Hockley County, Texas, flew to Philadelphia for the society's help in solving a cold case. According to a 2003 account in *Harper's*, during a private meeting after the luncheon, Walter in lurid detail pronounced the Texas murder a case of "homosexual panic"—one man suddenly killing another after a tryst. He and Frank Bender invited the detectives out to dinner, where Walter became increasingly intoxicated, according to the magazine. "They're making a movie about us," Walter said, toasting with his Chardonnay. "Frank's the pervert and I'm the guy with the big dick!"

Walter continued to press his theory. "It seemed like it didn't matter what the case was, he just thought it was some kind of sexual deviancy or homosexuality, which I disagreed with," says one of the Texas officers, Rick Wooton. No arrest has been made in the case. Walter, he says, was no help.

**IN SEPTEMBER 2000,** Walter retired from the Michigan Department of Corrections at 57 and moved to Montrose, a town in

PHOTOGRAPH: CBS NEWS ARCHIVES/48 HOURS, "HARD EVIDENCE—MYSTERY ON THE MENU," 1992

Pennsylvania with a population of 1,300. "Everyone was falling all over him because of his reputation," says Betty Smith, the former curator of the local historical society. Walter tells neighbors that he came to testify in a murder trial, fell in love with the town, and decided to stay. But two attorneys involved in the case say they don't recall ever meeting him.

Walter took on more freelance work. When he arrived in small towns around America, his presence was front-page news. In at least seven separate cold cases, Walter spoke to local reporters and delivered his catchphrase—a warning to the killer that his arrest was imminent: "Don't buy any green bananas." Walter's work did not lead to arrests in five of those cases. In a sixth, his favored suspect, a Catholic priest, committed suicide, and Walter gleefully claimed credit for his death.

Meanwhile, from his prison cell upstate, Robie Drake persisted in appealing his conviction. In January 2003, he finally got a win. Referring to Walter and his piquerism theory, a federal judge wrote that "the witness was a charlatan" and that "his testimony was, medically speaking, nonsense." In a deposition that July, Walter was evasive as Drake's attorney pressed him on the tasks he performed at the L.A. County Medical Examiner's Office.

"What were you doing?" the attorney asked.

"Good question," Walter replied.

"It's the only question."

By 2009, the Second Circuit decided it had seen enough: Walter had perjured himself with the prosecution's knowledge. The judges ordered a new trial. Prosecutors used a technique for analyzing bullet trajectory to argue that Drake had been closer to the Chevy Nova than initially thought, suggesting he must have known people were inside. In 2010, a jury convicted Drake and, though he had exposed Walter as a fraud, but for his troubles the judge extended his original 40-year sentence by an extra decade.

Throughout his career, Walter had benefited from the fractured nature of the American legal system. Especially in the years before digitized records, a public defender in one place suspicious of Walter would have trouble tracking him across jurisdictions. The Second Circuit's ruling was harder to run from. Luckily for Walter, a reputation reset was on the way.

Several years earlier, the author Michael Capuzzo, who had written a best seller on shark attacks, had scored a blockbuster $800,000 advance for a book about the Vidocq Society. *Publisher's Weekly* described it as "a true tale about a mysterious group of skilled detectives who use their skills to solve only the most despicable of crimes, led by a figure who seems to be a contemporary Sherlock Holmes."

Later, another author, Ted Botha, sold a proposal for a book about Frank Bender and his forensic sculptures. He worried about Capuzzo's three-year head start. And yet, as he reported, he never came across anyone who had spoken to Capuzzo. "I was quite amazed," Botha says. "This guy's gotten a wack-load of money, and there doesn't seem to be anything happening." Botha interviewed Walter but got a sense that something was amiss. He confined Walter to a handful of pages when he published his book, *The Girl With the Crooked Nose*, in 2008.

Capuzzo's volume, *The Murder Room*, was published two years later. It was an instant hit and would go on to sell roughly 100,000 copies, despite purple prose that described Walter as "the angel of vengeance" and "the ferryman poling parents of murdered children through blood tides of woe."

The book repeated and expanded on dozens of falsehoods in Walter's résumé. In the Michigan prison system, he wrote, Walter could shut off hot water and put inmates on a diet of "prison loaf," with three meals a day blended and baked into a tasteless brick. "You will learn to control yourself or I will control you," he allegedly told them. But a

prison spokesman disputes that a psychologist could leverage showers and meals in that way. "Maybe in *Shawshank* or something," he says. "But not in real life."

Walter also claims in the book that Michigan State hired him as an adjunct professor and that he collaborated with the university police to investigate gay twin brothers who fondled football fans without their consent outside Spartan Stadium. But a Michigan State spokesman denies that Walter has ever been employed by the school.

The book repeats Walter's claim to have solved the notorious 1986 murder of Anita Cobby, a former beauty queen who was gang-raped and nearly beheaded in Australia. Detective Ian Kennedy, who led the investigation, tells me he has never heard of Walter. Other supposed feats are stranger still. Capuzzo details the murder of Paul Bernard Allain, whose boss, Antoine LeHavre, brings the case to the Vidocq Society. In a twist, Walter accuses LeHavre of killing Allain himself, the result of a homosexual affair gone awry. But Allain and LeHavre do not seem to appear in any legal or public-record databases. Capuzzo may have changed the names; he or Walter may have made up the whole story.

Bender and Fleisher grumbled to the *Inquirer* that Capuzzo had taken too much creative license. "There are parts of that book I know are not true," Bender said. (He died in July 2011. Fleisher didn't respond to requests for an interview.) But Walter joined Capuzzo on a nationwide book tour. "It's fun to play detective," said NPR host Dave Davies as he described the Vidocq Society on *Fresh Air*. "But they aren't playing."

Walter was in his glory. "There's a price to pay," he told listeners of his macabre life's work. "I'm willing to pay it."

Capuzzo did not respond to requests for comment. He has not written another book, and today he publishes a Substack promoting vaccine conspiracy theories. During a recent podcast appearance, he said that several years ago, he heard a voice in his head say, "I am here. Tell my story."

**BY THE TIME** *The Murder Room* reinvigorated the myth of Richard Walter, a decade had passed since Leah Freeman's murder. In Coquille, the candlelight vigils had grown smaller. Pink JUSTICE FOR LEAH hoodies spent longer intervals in the closet. Leah's father died; her mother, Cory Courtright, regularly posted about the case on the message board Websleuths and interacted with amateur gumshoes, desperate for a break in the case. Nick McGuffin, now 28, had tried to move on.

**Walter told the jury that the defendant was driven by "piquerism"—an obscure impulse to derive sexual pleasure from penetrating people with bullets, knives, and teeth.**

## HIS VICTIMS WOULD EXPOSE HIM



Nick McGuffin during the final moments of his trial in 2011.



Robie Drake is escorted into court in 2010.

PHOTOGRAPHS: BENJAMIN BRAYFIELD/THE WORLD (LEFT), NIAGARA GAZETTE (RIGHT).

He'd had a daughter, graduated from culinary school, and become the head banquet chef at a casino in Coos Bay.

Coos County had a new district attorney named Paul Frasier, and he helped Coquille hire its next police chief, Mark Dannels, who committed to reopening the case. Dannels took down the old evidence boxes and assembled a cold-case team. Soon, they were flying to Philadelphia and huddling with Walter. Separately, an ABC producer had an idea: Wouldn't it be gripping television to follow the Vidocq Society in the field? A team from *20/20* shadowed Walter in Coquille as he assisted the investigation of Leah Freeman's murder, and the network built an episode around him and *The Murder Room*.

The killer, Walter told the camera, was "that muscle-flexing, Teutonic kind of braggart who thinks he's John Wayne, who wants to be a bigger man than what he is." He encouraged the police to focus on McGuffin. There was no new physical evidence, but Walter rearranged puzzle pieces that didn't quite fit and crafted his own theory: McGuffin was a jealous boyfriend who hit Leah in the face and dumped her body in the woods.

Cops played tough for *20/20* producers as they tailed McGuffin around town, hoping to provoke him. "In my opinion, he needs to be poked at a little bit," one officer said. Correspondent Jim Avila, who had reported from Beirut and the Gaza Strip, chased McGuffin's car, asking him why he wouldn't talk.

On August 24, 2010, police arrested McGuffin near his home. "Why do they think you did it?" an ABC producer asked

as he was handcuffed in his chef's jacket. "Because they have nothing else to go on and I'm the boyfriend," McGuffin said.

Just what contribution Walter made to the case is now the subject of intense legal scrutiny. Paul Frasier, the district attorney, has insisted in a series of memos that he was suspicious of Walter, learned about the Robie Drake case, and resolved not to rely on him. Yet Walter's fingerprints were all over Frasier's eventual case at trial. In his closing argument, Frasier parroted Walter's entire theory. And Mark Stanoch, who produced the *20/20* segment, worried that the coverage tainted the jury pool. "When you show up in a town of a couple thousand people with cameras, that dynamic can overwhelm the evidence," he says.

In July 2011, a jury found McGuffin not guilty of murder but—by a vote of 10–2—guilty of first-degree manslaughter. He was sent to Snake River Correctional Institution, in eastern Oregon, a notorious facility for violent inmates. He cooked in a prison kitchen and worked on a firefighting crew, cutting fire breaks in 16-hour shifts for $6 a day.

In 2014, Janis Puracal, an Oregon attorney who was starting a branch of the Innocence Project, learned about McGuffin and agreed to represent him. She looked at the time window in which he was said to have murdered Leah and disposed of her body. "It just didn't make sense," she says. Walter's role, she surmised, had been to invent for police and prosecutors a compelling narrative to make up for a lack of evidence. "They don't have a story for Nick," she says. "Walter comes in with 'the story.'"

Puracal hired a DNA expert to reexamine the state crime lab's report. The expert discovered that analysts had found male DNA on Leah's sneaker that did not belong to McGuffin. The information had never been shared with the defense. "I was over the moon," Puracal said. "And then I was pissed." She found more exculpatory evidence: an eyewitness withdrawing cash from a bank who bolstered McGuffin's alibi but whose account (along with a time-stamped ATM receipt) the state had failed to disclose. In November 2019, a circuit-court judge vacated his conviction and ordered a new trial. Frasier moved to dismiss the charges instead. A few hours later, McGuffin walked into the prison kitchen and told his supervisor that he wouldn't make his next shift.

ABC aired a follow-up *20/20* episode celebrating McGuffin's release and examining all the missteps in the case—except its own. When I called Avila, who is now retired, he defended the origi- *(Continued on page 84)*



**The Case of the Fake Sherlock**

CONTINUED FROM PAGE 39

nal report's accuracy but said he deplored the true-crime genre as "one of the lowest forms of journalism."

"My friend, 35 years in network television has destroyed my idealism," he added. "We should all be working for ProPublica. But we're not. Does that make us bad people? I couldn't get a job at *Frontline*. I tried! I couldn't get a job at *60 Minutes*." Avila said the background sheet his producers prepared had no red flags about Walter. Perhaps no one thought to look him up on Wikipedia as they prepared to air the episode that fall. If they had, they would have seen several paragraphs under the heading "The Drake Case."

McGuffin is now suing Walter, the Vidocq Society, and Oregon law enforcement, alleging that the state fabricated evidence, coerced witnesses, and withheld exculpatory information. This past June, Walter connected to a Zoom deposition from a Comfort Inn in Scranton, looking tired. He was recovering from cancer and surgery. One of McGuffin's attorneys, Andrew Lauersdorf, grilled the profiler about his claim that he worked on cases with Scotland Yard. Walter could not recall the name of any inspectors he'd worked with there and appeared not to know that Scotland Yard and the Metropolitan Police are, in fact, the same organization. When asked where Scotland Yard was located, the man who claimed to have visited the agency's offices up to 30 times said he didn't know and then offered "downtown London."

For much of the deposition, Walter spat venom at his oldest friends and allies. He resigned from the Vidocq Society in 2015, saying he no longer trusted certain members. He had quit the board of Parents of Murdered Children because, he said, someone there was embezzling money. (Bev Warnock, the current executive director, says, "I can tell you that is a false allegation.") Michael Capuzzo was "not the most brilliant chronicler I've ever met." Colleagues at the AAFS were "shallow, quite frankly." Eight hours of testimony revealed an increasingly isolated man.

A few months after the deposition, I met McGuffin in Puracal's conference room in Portland. He was still powerfully built from a decade at the weight pile, but his short hair was flecked with gray. COVID brought another lockdown soon after his release; then his mother was diagnosed with cancer and his father died. McGuffin had gotten a job as a chef at a golf course, earning less than before his arrest. He'd received death threats against himself and his daughter. "My life," he said, "is like a puzzle with the wrong pieces."

For two hours, McGuffin was composed. Then I asked if I could read from Walter's deposition, in which the profiler struggled to recall McGuffin. He'd finally given up and said, "Whatever his name is."

McGuffin's cheeks flushed. "Wow," he said. "It's like I'm a nobody." His face contorted hideously. His body began to tremble, and he excused himself from the room.

McGuffin had imagined all the ways Walter plotted to ruin his life. He'd thought about it while hacking through the Oregon forest with 80 pounds of gear, while slicing onions in a prison kitchen, and while driving through the night after his shift at the golf course to see his teenage daughter. He'd entertained every permutation but the most devastating: that Walter didn't think about him at all.

T HERE WAS ANOTHER man whom Walter could not recall during his deposition. "The—I forgot his name," Walter said. "But anyway, the bad guy."

Today, the bad guy, Robie Drake, 58, lives in a trailer park in Dutchess County with Marlene. A court tossed out Drake's second conviction because of "irrelevant and prejudicial" bite-mark evidence. In 2014, facing a third trial, Drake pleaded to reduced charges and was released. After my emails and calls went unanswered, I staked out Drake's home in the fall, and he finally appeared in an old pickup. "It's been hard," he said, when I asked about life after prison. His eyes were wide and wary. He promised to consider a formal interview, but never spoke to me again.

The Vidocq Society still meets regularly, its promise so alluring that even old marks are back for more. In October, prosecutors from Ocean County, New Jersey, traveled to Philadelphia to present a cold case. This is the same office that had deemed the Vidocq Society's investigation into Zoia Assur's death "preposterous."

Walter is still active. In October, he spoke at the North Carolina Homicide Investigators conference. As recently as 2019, he was available for work as a profiler. That year, Joey Laughlin, the sheriff of Fayette County, Indiana, was reinvestigating the 1986 disappearance of Denise Pflum and hired Walter for $3,000. "If I were the perp," Walter told a newspaper after arriving in the state, "I wouldn't buy any green bananas."

Laughlin had two main suspects, and he played interrogation tapes for Walter. Shortly after the second one began, Laughlin's chief deputy nudged him: Walter was dozing off. When he woke up, he was sure the suspect from the first tape was the murderer.

Pflum's parents were thrilled with Walter's involvement and didn't mind the napping episode. "Old people tend to nod off," David Pflum says. He wasn't aware that Walter had recently called Laughlin with a new theory about Denise's killer.

"I've been thinking," Walter said. "I think it's the dad." He mentioned that to do any more profiling work, he'd need another fee.

"I think we're good," Laughlin said.

Denise Pflum's disappearance remains the great mystery of the town. "Maybe I'm more cynical now," Laughlin told me. "There's not this great person who's waiting in the wings to come save the day."

In December, I drove to Walter's large, well-kept six-bedroom house in Montrose, Pennsylvania. An aging Mercury Grand Marquis sat in the garage, and on his front porch, an American flag was draped across a deck chair. There was no answer when I knocked. I dialed his landline. "I don't trust you, I don't like you, and I will never cooperate with you," he said from inside the house. "You're wasting your time."

I had wondered why Walter hadn't pursued the anonymity of a city, but Montrose has many appeals. Walter is beloved here. He's known for his homemade gingersnap cookies, and the bartender at the County Seat, a dive across from the courthouse, relishes hearing about his true-crime escapades. On a barstool in Montrose, he can fully inhabit the character he created without fear of fact check.

The next morning, as a blizzard descended, I made another attempt at his house, ringing the bell and banging on the door. At that very moment, a few hundred miles away in Philadelphia, Walter's attorneys were filing a new motion in the McGuffin suit. They wanted to quash Janis Puracal's request for internal documents from the American Academy of Forensic Sciences. As a support, they cited memos written by Paul Frasier, the prosecutor in the Leah Freeman case, saying he had not relied on Walter's theories after learning about the Drake case and realizing he couldn't be trusted.

It was a stunning turn. Richard Walter's best legal defense required finally acknowledging the obvious: that anyone with an internet connection should know he is a fraud. ∎

Exhibit 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


| NICHOLAS JAMES MCGUFFIN, as | ) |
| an individual and as guardian | ) |
| ad litem, on behalf of S.M., a | ) |
| minor, | ) |

                                   )
            Plaintiffs,             )
                                   )
   v.                              ) No. 6:20-cv-01163-MK
                                   )
MARK DANNELS, PAT DOWNING,          )
SUSAN HORMANN, MARY KRINGS,         )
KRIS KARCHER, SHELLY MCINNES,       )
RAYMOND MCNEELY, KIP OSWALD,        )
MICHAEL REAVES, JOHN RIDDLE,        )
SEAN SANBORN, ERIC                  )
SCHWENNINGER, RICHARD WALTER,       )
CHRIS WEBLEY, ANTHONY WETMORE,      )
KATHY WILCOX, CRAIG ZANNI,          )
DAVID ZAVALA, JOEL D. SHAPIRO       )
AS ADMINISTRATOR OF THE ESTATE      )
OF DAVID E. HALL, VIDOCQ            )
SOCIETY, CITY OF COQUILLE,          )
CITY OF COOS BAY, and COOS          )
COUNTY,                             )
                                   )
            Defendants              )
                                   )


REMOTE DEPOSITION OF RICHARD WALTER

Taken on behalf of the Plaintiffs

June 30, 2022

1          BE IT REMEMBERED THAT, pursuant to the

2    Oregon Rules of Civil Procedure, the deposition of

3    RICHARD WALTER was taken by Aaron M. Thomas,

4    Certified Shorthand Reporter and Registered

5    Professional Reporter for Oregon, on June 30, 2022,

6    commencing at the hour of 8:03 a.m., via Zoom.

7

8                    APPEARANCES:

9

10   MALONEY LAUERSDORF REINER PC
     Counsel for Plaintiffs
11   1111 East Burnside Street, Suite 300
     Portland, OR 97214
12   acl@mlrlegalteam.com
     jpuracal@forensicjusticeproject.org
13       By MR. ANDREW C. LAUERSDORF
            MS. JANIS C. PURACAL
14

15   LAW OFFICE OF ROBERT E. FRANZ, JR.
     Counsel for Defendants: City of Coquille, City of
16   Coos Bay, Coos County, Craig Zanni, Chris Webley,
     Eric Schwenninger, Sean Sanborn, Ray McNeely,
17   Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald,
     Michael Reaves, David Zavala, Anthony Wetmore,
18   Shelly McInnes
     PO Box 62
19   Springfield, Oregon 97477
     rfranz@franzlaw.comcastbiz.net
20   BY: MR. ROBERT E. FRANZ, JR.

21   OREGON DEPARTMENT OF JUSTICE
     Counsel for Defendants: Oregon State Police, John
22   Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
     100 SW Market Street
23   Portland, OR 97201
     jesse.b.davis@doj.state.or.us
24   BY: MR. JESSE B. DAVIS

25   /////

1                         --oOo--

2    WOOD SMITH HENNING & BERMAN LLP
     Counsel for Defendants: Vidocq Society and Richard
3    Walter
     12755 Southwest 69th Avenue
4    Suite 100
     Portland, Oregon 97223
5    kschaffer@wshblaw.com
     BY: KARIN L. SCHAFFER
6

7    ALSO PRESENT:  Mr. Nicholas J. McGuffin

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    EXAMINATION INDEX

2                                                      Page

3          EXAMINATION BY MR. LAUERSDORF               6

4                        * * *

5                      EXHIBIT INDEX

6       No.        Item                              Page

7        1         "About the Vidocq Society"        173

8                  website printout

9        2         Article titled "Cold Case        238

10                 Squad:  Modern-Day 'Sherlock

11                 Holmes' Team Takes on Oregon

12                 Slaying," dated August 11,

13                 2010

14       3         Article titled "Murder on the    244

15                 Menu" dated November 19, 2012

16       4         PowerPoint presentation:         250

17                 ███████████████████████████

18                 ████████████████████

19       5         Statement Analysis, Leah         260

20                 Freeman, An Analysis by Mark

21                 McClish, dated September 23,

22                 2011

23       6         Synopsis of Vidocq Society       270

24                 Cases, 207.  The Murder of

25                 Leah Freeman, 2000

1                        --oOo--

2                        *  *  *

3              REQUEST BY COUNSEL

4                                        Page

5   REQUEST FOR PRODUCTION              153

6   REQUEST FOR PRODUCTION              169

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    RICHARD WALTER

2    having first been sworn by the Certified Shorthand Reporter,

3    testified under oath as follows:

4

5    EXAMINATION BY MR. LAUERSDORF:

6         Q.    Okay.  So I'll introduce myself first.  My

7    name is Andy Lauersdorf appearing on behalf of the

8    plaintiff, Mr. McGuffin, and the initials that I

9    can't recall off the top of my head right now, but

10   appearing on behalf of plaintiff.

11              Ms. Schaffer, if you want to introduce

12   yourself.

13              MS. SCHAFFER:  Yes, Karin Schaffer,

14   counsel for Defendant Vidocq Society and Richard

15   Walter.

16              MR. LAUERSDORF:  Mr. Franz?

17              MR. FRANZ:  Yeah, I'll just be listening

18   in.  Robert Franz, attorney for the municipal

19   defendants and police officers.

20              MR. LAUERSDORF:  Mr. Davis?

21              MR. DAVIS:  Attorney for the state

22   defendants.

23              MR. LAUERSDORF:  And then Ms. Rockett?

24              MS. ROCKETT:  Yes, I'm with Vidocq Society

25   and Richard Walter as well and just listening in.

1          MR. LAUERSDORF:  Ms. Puracal is another

2  attorney representing plaintiffs in this matter as

3  well.

4          Okay.  Mr. Walter, my name is Andy

5  Lauersdorf.  You and I have never let before,

6  correct?

7      A.   Correct.

8      Q.   You understand that I'm an attorney

9  representing the plaintiffs in this matter, which is

10  a lawsuit filed against Mr. McGuffin against a

11  number of defendants including yourself.

12          Is that correct?

13      A.   Correct.

14      Q.   Can you please state your full name as

15  given at birth.

16      A.   Richard Duane Walter.

17      Q.   D-U-A-N-E?

18      A.   Correct.

19      Q.   And no S on Walter, correct?

20      A.   Correct.

21      Q.   And what was your place and date of birth?

22      A.   Toledo, Ohio, October 28, 1942.

23      Q.   What were your parents' names?

24      A.   Irvin and Viola.

25      Q.   Irvin, I-R-V-I-N?

1      A.    Correct.

2      Q.    Irvin and Viola Walter?

3      A.    Right.

4      Q.    Have you ever used any other names or

5 aliases?

6      A.    No.

7      Q.    How about any nicknames?

8      A.    No.

9      Q.    What's your current address?

10     A.    425 Lake Avenue, Montrose, Pennsylvania

11 18801.

12     Q.    Have you over the course of your lifetime

13 lived in any states other than Pennsylvania and

14 Ohio?

15     A.    Michigan.

16     Q.    Okay.  Any others?

17     A.    Washington State.

18     Q.    How long did you live in Michigan, from

19 what year to what year?

20     A.    I don't remember exactly.  About -- in the

21 '60s sometime until 1972.

22     Q.    Okay.  How about Washington, when did you

23 live there?

24     A.    When I was from a newborn -- basically a

25 newborn child until I was in my 20s.

1      Q.   Okay.  And when you left Michigan in the

2  1970s or 1970 or so, I can't read my notes there,

3  but where did you go from there?

4      A.   I went to Pennsylvania.

5          You said Michigan, right?

6      Q.   Yeah.

7      A.   Right.

8      Q.   Okay.  Have you lived in any states other

9  than Michigan, Washington, Pennsylvania and Ohio?

10     A.   A short time in California.

11     Q.   Okay.  From when to when?

12     A.   From about 1978 -- no, it was before that.

13  I think from '72 to '76, something like that.  I

14  don't have the exact dates in front of me.

15     Q.   Okay.  During the '70s, though?

16     A.   Right.

17     Q.   And for a period of approximately four

18  years, you think?

19     A.   Probably.

20     Q.   Okay.  Have you lived in any states other

21  than Michigan, Washington, Pennsylvania, Ohio, or

22  California?

23     A.   No.

24     Q.   Okay.  You're here today to be deposed.

25          Do you understand that?

1    A.   Yes.

2    Q.   And this is the time and place previously

3 agreed upon.  It's Thursday, June 30th, 2022, and

4 it's approximately 8:10 a.m.

5         Do you agree with that?

6    A.   Eastern standard time, yes.

7    Q.   Actually it's about 8:10 a.m. Pacific

8 daylight time.

9    A.   Exactly.  Okay.

10   Q.   Where you're at, it's about 11:10 a.m.

11 eastern time, correct?

12   A.   Correct.

13   Q.   This deposition is being conducted and

14 recorded used the cloud-based, peer-to-peer based

15 platform Zoom over a URL provided by Aaron Thomas

16 Court Reporting.

17        Do you understand that?

18   A.   I understand it.

19   Q.   Are you okay with that?

20   A.   Yes.

21   Q.   Will you please state your current

22 location for the record.

23   A.   It's Scranton, Pennsylvania.

24   Q.   What's the address you're at?

25   A.   Where are we at?

1          MS. SCHAFFER:  We're at the Comfort Inn in

2     Scranton, Pennsylvania.

3          Q.   Okay.  Are there any people in the room

4     with you other than Ms. Schaffer?

5          A.   No.

6          Q.   And I understand that you're represented

7     by Ms. Schaffer as your attorney and she's present

8     with you in the room.

9               Is that correct?

10         A.   Correct.

11         Q.   Have you ever attended any other

12    depositions in this case?

13         A.   No.

14         Q.   Have you reviewed the transcripts, any

15    transcripts of any of the other depositions?

16         A.   No.

17         Q.   Okay.  I'd like you to understand that

18    you're free to take a break to consult with

19    Ms. Schaffer at any time.

20              Do you know that?

21         A.   Yes.

22         Q.   And you're also free to take a break for

23    any other reason.

24         A.   Right.

25         Q.   Stretch your legs, use the bathroom, a

1    cigarette break, get fresh air, whatever, just let

2    me know, okay?

3         A.    Right.  Will do.

4         Q.    The only thing that I ask is if there's a

5    question pending, that you answer the question

6    before you take a break, okay?

7         A.    Of course, yes.

8         Q.    The court reporter is recording your

9    answers under oath that was administered to you a

10   few moments ago.

11               Do you understand that?

12        A.    Yes.

13        Q.    And do you understand what it means to be

14   under oath?

15        A.    Yes.

16        Q.    Do you understand that that means you're

17   expected to give the same careful and considered

18   answers that you would give in a court of law?

19        A.    Yes.

20        Q.    And you understand that that means that

21   the same completeness is required in your answers

22   that would be required in a court of law?

23        A.    Yes.

24        Q.    Have you ever testified in a deposition

25   before?

1    A.    Yes.

2    Q.    How many times?

3    A.    I'm unsure.

4    Q.    More than ten?

5    A.    No.

6    Q.    More than five?

7    A.    I would be surprised.  I think no.

8    Q.    Okay.  When is the last time you testified

9    in a deposition?

10    A.    If I recall correctly, it was in

11    California in the 2000 -- the early 2000 period.

12    Q.    Do you recall where in California?

13    A.    Los Angeles or -- yeah, I believe it was

14    in Los Angeles.

15    Q.    Do you recall the name of the case you

16    were deposed in?

17    A.    No.  It's been a long time.  Laura Kail

18    was the attorney.

19    Q.    Kale, K-A-L-E?

20    A.    No, K-A-I-L.

21    Q.    K-A-I-L.

22          And was she the attorney deposing you or

23    the attorney defending you?

24    A.    Defending.

25    Q.    What was your role in that case?

1          A.    As an expert on a -- against a plastic

2    surgeon who claimed that he -- the patient claimed

3    that he had misdirected and injured her.

4          Q.    Okay.  So you were testifying on behalf of

5    the patient who was claiming injury?

6          A.    Right.

7          Q.    What specifically were you engaged as an

8    expert to testify about?

9          A.    I can't recall the details at this point.

10         Q.    Did that case go to trial?

11         A.    No.

12         Q.    Okay.  When would be the next most recent

13   time you appeared in a deposition prior to that

14   case?

15         A.    I don't remember.

16         Q.    Do you recall any other states in which

17   you've sat for a deposition?

18         A.    Not at the moment.

19         Q.    Do you recall any other cases in general

20   in which you sat for a deposition?

21         A.    I probably could if I thought about it,

22   but I wasn't expecting that question, so I can't

23   respond.

24         Q.    Okay.  Would you have any records of any

25   of those depositions?

```
 1      A.    No.

 2      Q.    Okay.  So it sounds like maybe it's been a

 3   while.

 4      A.    Correct.

 5      Q.    Maybe we should go over a few ground

 6   rules.

 7            The court reporter is creating a

 8   transcript of everything that's being said during

 9   your deposition.

10            Do you understand that?

11      A.    Yes.

12      Q.    And you are also going to be responsible

13   for the accuracy of that transcript and the accuracy

14   of the information contained within it.

15            Do you understand that?

16      A.    Yes.

17      Q.    That means it's important that we try to

18   work together and create a clear transcript so that

19   there's no confusion about what's said, what your

20   testimony is, or how it's reflected in the

21   transcript, so I want you to keep in mind that

22   you're required to answer all of the questions out

23   loud, okay?

24      A.    Yes.

25      Q.    So things like nodding or shaking your
```

1   head, grunts, uh-huhs, huh-uhs, things like that,

2   they don't show up clearly on the transcript, so I

3   need you to enunciate your answers, okay?

4       A.   Yes.

5       Q.   By that same token, you're responsible for

6   expressing any kind of confusion or

7   misunderstanding.

8            Do you understand what I mean by that?

9       A.   No.

10      Q.   Okay.  So if I ask you a question, and I

11  might ask you a bad question and it's confusing, I

12  need you to say so so that it shows up in the record

13  that you were confused by the question before you

14  answer.  That gives me a chance to restate the

15  question and it gives us both the opportunity to

16  clear up any confusion so that you don't provide an

17  answer that's anything other than a truthful answer.

18           Make sense?

19      A.   Yes, makes sense.

20      Q.   If you're confused, say so.  If you think

21  I'm confused, say so.  If you don't understand a

22  question I'm asking, say so out loud so that it

23  makes its way into the record, okay?

24      A.   Yes.

25      Q.   One important thing, we have to be careful

1  not to speak over each other.  What frequently

2  happens is you might have an idea of where I'm going

3  with the question or where you think I'm going with

4  the question and you may be inclined to jump in with

5  an answer before I actually finish the question, and

6  we have to be careful to avoid doing that, okay?

7      A.   Right.

8      Q.   There might be other times where I think I

9  know where you're going with an answer, so I'm

10  inclined to jump in on the next question before

11  you're done with your answer, and I have to be

12  careful of that, okay?

13      A.   Yes.

14      Q.   So a good rule of thumb, if I hear you

15  talk, I'm going to stop talking.  If you hear me

16  start to talk, you might want to stop talking, make

17  sense?

18      A.   Yes, makes sense.

19      Q.   One of the things we have to be careful

20  about there, although you may think I'm going with a

21  question, there's a good chance you may be wrong, so

22  if you start to answer before I ask the question,

23  you may be answering a question that I'm not asking

24  or you may give an answer that's not truthful to the

25  question I'm asking, make sense?

1      A.    Makes sense.

2      Q.    Okay.  So we want to be careful there.

3            Your answers and the information that you

4      provide during this deposition will likely be used

5      at trial.

6            Do you understand that?

7      A.    Yes.

8      Q.    And if there's discrepancies or

9      inconsistencies between your testimony today and

10     your testimony at trial, those inconsistency may be

11     pointed out and used against you at trial.

12           Do you understand that?

13     A.    Yes.

14     Q.    Are you currently suffering from any

15     mental or physical illness?

16     A.    No.

17     Q.    Are you currently taking any prescription

18     medications that a medical professional has told you

19     might affect your memory or comprehension?

20     A.    The answer is yes, however I got

21     physician's clearance for this deposition.

22     Q.    Okay.  What is the medication?

23     A.    A number of them.  I just had cancer

24     surgery.

25     Q.    Okay.  Have you personally noted any

1   affects of the medication, any confusion, delirium,

2   anything like that --

3        A.   No.

4        Q.   -- that we should be looking out for?

5        A.   No.  I feel quite healthy.

6        Q.   Okay.  Are you aware of any reason why you

7   might not be able to understand or answer the

8   questions that I ask of you today?

9        A.   No.

10       Q.   Did you review any documents to prepare

11  for your deposition?

12       A.   No.

13       Q.   Did you make any notes about this case

14  while preparing for your deposition?

15       A.   No.

16       Q.   Did you speak to anyone other than your

17  attorneys to prepare for your deposition?

18       A.   No.

19       Q.   Have you ever spoken to a person named

20  Jesse Davis about this lawsuit or your role in the

21  McGuffin investigation?

22       A.   I don't know who that is, no.

23       Q.   Okay.  Have you ever spoken to anyone from

24  the Oregon Department of Justice about this lawsuit

25  or your role in the Freeman investigation?

1    A.   No.

2    Q.   How about Robert Franz, do you know who

3    that is?

4    A.   No.

5    Q.   Do you know who Sarah Henderson is?

6    A.   No.

7    Q.   When's the last time that you spoke to

8    anyone other than your attorneys about the Freeman

9    investigation?

10   A.   I don't recall exactly.  I may have talked

11   to Fred Bornhofen.  I don't recall have a recall of

12   that, but I think there's reasonable cause to

13   believe that I may have.  It was a long time ago.

14   Q.   Okay.  And who is Fred Bornhofen?

15   A.   He was the coordinator for Vidocq Society

16   for case studies.

17   Q.   Do you know if you spoke to him any time

18   in the past five years?

19   A.   No, he's been dead.

20   Q.   Oh, when did he pass?

21   A.   I think three or four, maybe close to five

22   years ago.

23   Q.   Okay.  Somewhere between 2016 and 2019?

24   A.   I believe so.

25   Q.   Do you recall what you spoke to him about?

1      A.    Pardon?

2      Q.    Do you recall what you would have spoken

3   to him about?

4      A.    Just the fact that the case was over.

5      Q.    Okay.  Have you spoken to anyone other

6   than your attorneys about this lawsuit?

7      A.    No.

8      Q.    Do you know who Paul Frasier is?

9      A.    Yes.

10     Q.    When was the last time you spoke to

11  Mr. Frasier?

12     A.    When I was out in Oregon.

13     Q.    And when was -- what year was that?

14     A.    That was when I went out for the

15  consultation with them on the case.

16     Q.    Okay.

17     A.    That was -- I don't remember exactly the

18  dates when I was out there.

19     Q.    Okay.  Do you recall what year?

20     A.    No.

21     Q.    Do you recall what time of year, what

22  season?

23     A.    I think it was cold.  I remember that.

24     Q.    Okay.

25     A.    And I think it may have been around 2010;

1    something in there.

2         Q.   Okay.  So you haven't spoken with

3    Mr. Frasier any time in the past five years.

4              Is that fair?

5         A.   No.  Fair.

6         Q.   Yes, that is fair, and no, you have not.

7              Is that correct?

8         A.   Correct.

9         Q.   Do you know who Mark Dannels is?

10        A.   Yes.

11        Q.   When was the last time that you spoke to

12   Mr. Dannels?

13        A.   When I left Oregon after that, after my

14   meeting there.

15        Q.   So the same -- the same visit?

16        A.   Correct.

17        Q.   You haven't spoken to Mr. Dannels at any

18   time in the past five years either?

19        A.   No.

20        Q.   Have you ever met or spoken to defendant

21   Pat Downing?

22        A.   No.  I don't know who that is.

23        Q.   Okay.  Do you know who Susan Hormann is?

24        A.   No.

25        Q.   Do you know who Mary Krings is?

1     A.   No.

2     Q.   Do you know who Kris Karcher is?

3     A.   No.

4     Q.   Do you know who Raymond McNeely is?

5     A.   No.

6     Q.   Do you know who John Riddle is?

7     A.   No.

8     Q.   Do you know who Eric Schwenninger is?

9     A.   No.

10    Q.   Do you know who Chris Webley is?

11    A.   No.

12    Q.   Do you know who Kathy Wilcox is?

13    A.   No.

14    Q.   How about Craig Zanni, do you know who

15    Craig Zanni is?

16    A.   No.

17    Q.   There's just one more name here.

18         How about Lisa McOwen, do you know who

19    that is?

20    A.   No.

21    Q.   Have you ever met with or spoken to any

22    member of the Freeman family?

23    A.   No.

24    Q.   Have you ever met with or spoken with the

25    McGuffin family?

```
 1        A.    No.

 2        Q.    Have you ever spoken to anyone who's not

 3   an attorney about your deposition in this lawsuit?

 4        A.    No.

 5        Q.    Have you ever spoken to any member of the

 6   press about this lawsuit?

 7        A.    No.

 8        Q.    Have you ever spoken to any member of the

 9   press about the Leah Freeman investigation or the

10   prosecution of Mr. McGuffin?

11        A.    Would you ask the question again, please.

12        Q.    Yeah, let me break it down into two parts.

13              Have you ever spoken to any member of the

14   press about the Leah Freeman investigation?

15        A.    Only when they were out there at the time

16   that I was there and they filmed.

17        Q.    All right.

18        A.    Then about three months before I received

19   paperwork from -- in this lawsuit, they called me at

20   my home and asked me if I would be willing to

21   participate in the program they wanted to do, and I

22   said "What about?" and they said "About Leah

23   Freeman," and I said "And what's the issue?" and

24   they said "Well, he's been let go and overturned,"

25   and I said "Why?" and they said "Because a judge
```

1  found that the DNA found on the shoe that was some

2  distance away or whatever else didn't have the DNA

3  on it, and therefore he was released," and I don't

4  particularly like 20/20 to begin with and I wanted

5  to get some more facts behind what was going on,

6  which I didn't do, and then I received the paperwork

7  on this case, so I realized that -- and I never

8  heard back from 20/20, but that was the first I

9  learned of the shoe and the release.

10      Q.   Okay.  So I think you kind of answered my

11  next question in there, but let me ask it anyway,

12  when you say they contacted you or you spoke with

13  them, who are they?

14      A.   A person from 20/20.

15      Q.   Okay.  ABC's 20/20 news program?

16      A.   Right.  Right.

17      Q.   Okay.  And so then I'm assuming you

18  ultimately declined to participate any further?

19      A.   They never called me back and I

20  probably -- not probably, I would not have

21  participated anyway.

22      Q.   Okay.  Is that just because you don't care

23  for 20/20 or were there other reasons why you would

24  have declined?

25      A.   Well, I don't think I would bring anything

1   to the table that wasn't already known.  I thought

2   it was a waste of my time and a waste of everyone

3   else's time for me to opine or to not -- as we get

4   further on down the road, hopefully you'll see that

5   my role was limited.

6       Q.   If there was the DNA of an unidentified

7   male found on Ms. Freeman's shoes, wouldn't that

8   be -- wouldn't that be a reason for a new profile or

9   to resume the profiling of a potential unknown

10  suspect?

11          MS. SCHAFFER:  This is Karin Schaffer.

12  I'm going to object as vague; incomplete

13  hypothetical; lacks foundation.

14          MR. DAVIS:  I'll join that objection.

15          MS. SCHAFFER:  You can answer if you

16  understand the question.

17      A.   Would you repeat it one more time.

18      Q.   Let me take it a different way, because

19  you know this better than I do, but my understanding

20  of profiling in general, the concept of

21  psychological profiling is to -- or one of the

22  purposes at least is to use the evidence from the

23  scene and different queues to try to put together a

24  psychological profile for an unknown suspect in

25  cases where you don't know who the suspect is and

1  you're trying to put together who this might be and

2  what their psychological makeup might look at.

3         Am I close?

4     A.   Well, you're partially right, and mostly

5  wrong.

6     Q.   Okay.

7     A.   Profiling is an old first level of trying

8  to analyze human behavior in terms of crime, et

9  cetera, and yes, the crime scene can and should play

10  a significant role, however with profiling, the

11  basis of that is psychological in nature, it's not

12  criminological.  We're looking for the type of

13  person that does this and then they're projecting

14  and guessing predicated on what they think they know

15  and then trying to find that individual, okay?

16         It's highly speculative.  It sometimes is

17  not -- and I agree, should not be accepted by the

18  courts, because it's too unreliable.

19         That said, then, as opposed to crime

20  assessment, which uses not psychology, but uses

21  crime as the basis for that, therefore, then, one

22  looks at what's in the crime scene, what's absent

23  from the crime scene, what are some key figures that

24  are relevant at that time, and therefore, then,

25  you're working off of a real base rather than an

1   unreliable base of profiling.

2           Therefore, then, the investigator, if he

3   understands his crime scene again of what's there as

4   well as what's not there, your detective, then, is

5   going to have a much clearer picture of the type of

6   person that they're interested in.  In terms of

7   their searching out persons of interest, they may

8   find four or five different people that may fit the

9   basic criteria.

10          But again, going back to the crime scene,

11  and there are subtypes of archetypes, as you please,

12  of offenders, how they behave, what they do and what

13  they don't do, and there's some unique

14  characteristics.  That said, it then -- and jumping

15  ahead, but it then leads, then, to let's say they

16  find five persons of there and you go through those

17  and you look in terms of pre-crime behavior, what

18  was the linkage between that suspect and the victim,

19  and you go through all of those.  Then if you don't

20  have the right person there, then you know that you

21  need to keep searching.

22          If you find somebody with 10, 15, 20

23  interchanges and they have a history and they meet

24  the criteria from the crime scene, then that becomes

25  important and it gives you reasonable cause to move

1    forward from the investigation.

2            Following that, contrary to popular

3    opinion, the murder is not over when the victim

4    dies, it's over when the perp stops deriving

5    satisfaction from the killing.  Therefore, then, you

6    have to look at post-crime behavior and what happens

7    afterwards, how do -- how do the five suspects line

8    up.

9            With that, then --

10   Q.    Let me stop you there and back you up for

11   a second.

12   A.    Sure.

13   Q.    So would it be fair to say that you -- it

14   sounds like you draw a distinction between profiling

15   and crime assessment and that you're not a fan of

16   the concept of profiling and that you would consider

17   yourself more of a person in the field of crime

18   assessment.

19           Is that fair, or do you consider yourself

20   a profiler?

21   A.    I consider myself in crime assessment.  I

22   think that there is a time and a place for

23   profiling, but maybe not in terms of trying to solve

24   the crime, but maybe understanding the offender.

25   Q.    Okay.

1    A.    And so it's possible that you can do a

2 crime assessment and at the same time you might find

3 it worthy then to have a profile of that individual

4 and his thinking about what happened, okay?

5    Q.    Okay.  So is one of the goals of either

6 profiling or crime assessment, is one of the goals

7 to develop a pool of suspects in the situations

8 where you don't have them?

9    A.    Exactly, and this will help shape -- help

10 the investigator shape for that, okay?

11    Q.    Okay.  So in a situation where you have

12 DNA -- I'll give you a hypothetical here -- in a

13 situation where you have a DNA sample on a piece of

14 clothing of a murder victim or a homicide victim and

15 that sample was taken and sent to the lab and it

16 came back as couldn't be matched, right?

17    A.    Right.

18    Q.    It's an unknown perpetrator.  That would

19 be the kind of situation where you might use crime

20 assessment to develop a pool of suspects to go out

21 and look for a match to that DNA.

22        Is that fair?

23    A.    That's true, or depending on -- let's say

24 you have a primary suspect, okay?  And they meet all

25 the other criteria.  If, then, that DNA sample on

1    the item doesn't match, okay?  Then I would advise,

2    and I think it's smart and a lot of people do it, is

3    then you would start looking for staging events,

4    okay?  Where then the bloody item may be falsely

5    placed to dissuade any identification.

6         I see a lot -- in my professional world, I

7    see a lot of staging taking place, and so I think it

8    would be reasonable, then, under those circumstances

9    that the investigators then would pursue that and

10   examine, then, the issues related to the blood on

11   the clothing.

12        I've seen -- that's very important to do.

13   I not only want to help find the right person, but I

14   want it to be the right person, I don't want it to

15   be the wrong person, and contrary to popular

16   opinion, I've saved a lot of people from being

17   arrested, because they weren't the right person.

18   They may have been a bad person, but they didn't do

19   the murder, okay?

20        Now --

21   Q.   Hold on.  Let me slow you down there.

22        Getting back to the original question, in

23   any event, you decided that you didn't want to

24   participate anymore with ABC 20/20 or give any

25   interviews.

1      A.    Right.

2      Q.    Is that correct?

3      A.    Right.

4      Q.    Okay.  So other than ABC 20/20, during the

5   original interview that you did with them and then

6   the three months before you were served with the

7   lawsuit, have you spoken to any other member of the

8   press about the Leah Freeman investigation?

9      A.    No.

10     Q.    Have you spoken to any member of the press

11   about the McGuffin prosecution?

12     A.    No.  My understanding -- my understanding

13   is that not I, but Mike Capuzzo who wrote the book

14   called The Murder Room which is about the Vidocq

15   Society, we gave a lecture in San Francisco with

16   Bill Fleisher and myself and Mike and we were asked

17   to talk, so Mike -- I was -- I was unaware or had

18   forgotten that apparently Mike mentioned something

19   in that large room about the Leah Freeman case.

20          I don't remember what he said.  There is a

21   tape out there, I know, but -- I participated in it

22   and my life is busy and I moved on.

23     Q.    Do you know the name of that lecture or

24   what that event was?  Was it RSA or RNA?

25     A.    Yes, RS -- it was the huge organization.

1    There were like 1,200 people there.

2         Q.    Okay.  And that was in San Francisco?

3         A.    Yep.

4         Q.    Do you recall what year that was?

5         A.    A few years back.

6         Q.    Was that during the Capuzzo book tour when

7    he was kind of out making the rounds and promoting

8    his book?

9         A.    Right.  It was about the book, so then we

10   talked about Vidocq, what Vidocq did, how we were

11   organized, that sort of thing, so in terms of

12   discussion, the only discussion that I know of was

13   by not myself, but by Mike Capuzzo there, and I

14   don't know how extensive it was.

15        Q.    Okay.

16        A.    And he's certainly not an expert.

17        Q.    Okay.  Other than particular presentation,

18   have you ever given a presentation or a training in

19   which the Leah Freeman investigation was discussed?

20        A.    No.

21        Q.    Have you ever attended a presentation or a

22   training in which the Leah Freeman investigation was

23   discussed --

24        A.    No.

25        Q.    -- other than what you just mentioned?

1     A.   No.

2     Q.   Okay.  Let's -- how are you doing?  Do you

3  need a break for water or anything yet?

4     A.   I'm good.

5     Q.   Okay.  I want to explore your background a

6  little bit and it's pretty extensive.  You've been

7  on the planet for a while.

8     A.   Yeah.

9     Q.   Okay.  Did you graduate from high school?

10    A.   Yes.

11    Q.   Where at?

12    A.   Upper Columbia Academy in Spangle,

13  Washington.

14    Q.   And what year did you graduate?

15    A.   '61.

16    Q.   Did you go on to college?

17    A.   I did.  I went to Michigan State

18  University.

19    Q.   And when did you enroll at Michigan State?

20    A.   There was a long period in between.  It

21  was in the late '60s, I think.

22    Q.   Okay.  When you say there was a long

23  period in between, what did you do during the period

24  in between?

25    A.   I worked for the Michigan State University

1    in their laboratory system in pharmacology and

2    anatomy.

3         Q.    Okay.  So after graduating from high

4    school, you moved from Washington to Michigan?

5         A.    Right.

6         Q.    And began working rather than attending

7    school?

8         A.    Right.

9         Q.    You worked out of East Lansing?

10        A.    Yes.

11        Q.    And you worked for Michigan State

12   University?

13        A.    Yes.

14        Q.    What department?

15        A.    In pharmacology and anatomy.

16        Q.    So is that -- would that have been in the

17   medical college?  Would that have been in the

18   letters and science program?  What would that have

19   been in?

20        A.    Pharmacology was in the -- that was before

21   the medical school was there, so they had a

22   veterinary school, so it was attached to the

23   veterinary school.  The anatomy also was there.

24        Q.    Was that also attached to the veterinary

25   school?

1      A.     I believe so, yep.

2      Q.     And what did you do for the school of

3    pharmacy or the pharmacy program?

4      A.     It was a lab program.  I helped them

5    prepare for the students and for the professor,

6    helped prepare samples and whatever else, do the

7    grunt work, and a fair amount of regular laboratory

8    work.

9      Q.     When you say regular laboratory work, what

10   do you mean by that?

11     A.     Pipe eds and samples taken and prepare

12   them to be examined by the -- by the graduate

13   students.

14     Q.     Who was your direct supervisor?

15     A.     Dr. Perry Gehring.

16     Q.     Can you spell that for me?

17     A.     G-E-H-R-I-N-G.  He's probably dead by now.

18   He was older than I am.

19     Q.     Anybody else that you worked with there in

20   your time there, any colleagues or anything?

21     A.     I'm trying to think of his name.  I'll

22   think of it in a minute.  In fact, I left there and

23   I went back to school.

24     Q.     So how long did you work in the lab there?

25     A.     Oh, probably -- I'm guessing maybe eight

1   years.

2        Q.   And then you quit and went back to school

3   at Michigan State?

4        A.   Right.

5        Q.   And was that -- so was that job, that

6   wouldn't have been a student position, was that a

7   civil service position?

8        A.   Well, it was -- yeah, civil -- I mean, we

9   were just hired by the university to work in the

10  labs.

11       Q.   Okay.  Michigan State --

12       A.   At Michigan State, right.

13       Q.   Is Michigan State a land grant school?

14       A.   Yes.

15       Q.   Run by the government?

16       A.   I don't know whether it's run by the

17  government, but yeah, by the state, yes.

18       Q.   Border regions and funded by the state?

19       A.   Of course, yes.

20       Q.   Okay.  So you would have been on the --

21  you would have been essentially on the state

22  payroll.

23       A.   (Witness nods head.)

24       Q.   Did you have like a state retirement

25  program that you --

1     A.   Yes.  Yes.

2     Q.   Okay.  Was that immediately after

3 graduating high school?

4     A.   No.

5     Q.   How long after you graduated high school

6 before you started working in the pharmacology lab

7 at Michigan State?

8     A.   I'm trying to remember.  I don't -- I

9 would think it's maybe three to five years in

10 between.

11     Q.   Okay.  And what did you do for those three

12 to five years?

13     A.   I can't remember.

14     Q.   You said you were trying to think of

15 another -- when I asked you about college and

16 supervisors, you mention Dr. Gehring, and then you

17 said you had another person on the tip of your

18 tongue.

19          Do you remember who that is?

20     A.   I haven't yet.  I will before we finish.

21     Q.   Okay.  That three to five years between

22 graduation and going to work at Michigan State,

23 could there have been any military service in there?

24     A.   No.

25     Q.   Have you ever served in the military?

1     A.   No.

2     Q.   Okay.  And you started -- you enrolled in

3  Michigan State in about 1969, you said?

4     A.   I think so.

5     Q.   So that would have been made you, what, 27

6  at the time?

7     A.   Probably.

8     Q.   1942, so that would have been made you 27

9  at the time.

10      So when you enrolled in Michigan State,

11  what was your course of study?

12     A.   Educational psychology.

13     Q.   Was that part of the school of letters and

14  sciences or was that part of the school of

15  education?

16     A.   Education.  It's an MA, not an MS.

17     Q.   Okay.  And an MA would be a master's?

18     A.   Right.

19     Q.   But when you enrolled -- when you

20  initially rolled in Michigan State, you enrolled as

21  an undergraduate, I assume, right?

22     A.   Right.  Right.

23     Q.   Okay.  And so did you enroll in the school

24  of education?

25     A.   Yes.

1    Q.    Okay.  And did you obtain a degree?

2    A.    Yes.

3    Q.    What was your degree?

4    A.    A BA.

5    Q.    And was that a BA in educational

6    psychology?

7    A.    Right, and followed by an MA in the same.

8    Q.    Okay.  And so educational psychology,

9    would that be considered the major?

10    A.    Yes.

11    Q.    Okay.  Did you take a minor or any other

12    majors?

13    A.    No.

14    Q.    And when did you obtain your bachelor's

15    degree?

16    A.    I'm not sure.  I think it was right around

17    '72.  I went through quick.

18    Q.    Okay.  Did you graduate with any honors?

19    A.    I graduated through the honors college,

20    yes.

21    Q.    What was the name of the honors college

22    program?

23    A.    It was just called the honors college.

24    Q.    And so when you say you graduated through

25    the honors college program, was there any kind of

1  designation, magna, summa, anything like that?

2  A. What were the last words?

3  Q. Was there any kind of designation given

4  like magna cum laude or summa cum laude, anything

5  like that?

6  A. No.  I was one of the eccentric students

7  in that I doubled the normal course load and then

8  there were professors who complained to the honors

9  college that I shouldn't be able to take so many

10  courses and the honors college then said as long as

11  I kept my grades and as long as I performed, I could

12  do as I wished, and I would consider that an honor

13  from the honors college, not in the traditional

14  summa cum laude.

15  Q. Okay.  So there wouldn't be an honors

16  designation on your transcript?

17  A. I don't -- I don't -- no, I don't know.

18  Q. You're just --

19  A. I haven't looked at it.

20  Q. You're just taking what the honors college

21  said about your course load --

22  A. Right.

23  Q. -- as a form of honor --

24  A. Right.  Yeah.

25  Q. Were you employed by the school while you

1  attended school there?

2       A.    No, I -- I was not.

3       Q.    Were you a member of any clubs?

4       A.    I was a member of some educational honor

5  society.  I can't remember what it was.  I didn't

6  pay much attention to it.

7       Q.    Okay.  Do you recall the name of it?  Was

8  it a Greek organization?

9       A.    Yeah.  Phi Delta Chi or something like

10  that.

11      Q.    Are you still a member?

12      A.    Oh, I haven't even thought of it until you

13  asked.

14      Q.    Did you participate in any collegiate

15  sports?

16      A.    No.  I don't like fresh air or exercise.

17      Q.    How about -- would the Phi Delta Chi be a

18  society or a club?

19      A.    It was a society.  It was a recognized

20  organization by the university.

21      Q.    Okay.  And then so you said you went on to

22  obtain a postgraduate degree?

23      A.    An MA at Michigan State also.

24      Q.    And was that also in the school of

25  education?

1     A.   Yep.

2     Q.   And what was the master's degree in?

3     A.   Educational psychology.

4     Q.   What's the -- what is the educational

5   psychology discipline as opposed to just regular

6   psychology or some other form of psychology?

7     A.   Well, it's aimed toward educating and

8   teaching and servicing.  However, it also can be

9   used through the right courses and everything else,

10   then, for working for the state or in prisons or in

11   certified hospitals where you had supervision, et

12   cetera.

13        I was running out of money and I needed

14   work, so finishing my master's, then I went out to

15   Los Angeles, and having worked in labs before, I got

16   a job while going to the community -- not -- to one

17   of the Los Angeles schools, I'm trying to think of

18   the name of it -- but anyway, what was the question?

19   I forgot.

20     Q.   The question was what is the difference

21   between disciplines in educational psychology as

22   opposed to behavioral psychology or --

23     A.   Sure.  So then I found a job with the

24   Michigan Department of Corrections and --

25     Q.   Hold on.  Let me back you up.  I think

1    we're getting a little off track.

2         A.    Okay.

3         Q.    Is there a -- I know you were saying --

4    when I asked the question, you said well,

5    educational psychology, depending on the courses you

6    take, is geared towards education and teaching or

7    perhaps working for the state or perhaps working in

8    prisons or hospitals under the supervision of a

9    doctor.

10        A.    Right.

11        Q.    And so how does that distinguish from

12   other disciplines within the psychology umbrella?

13        A.    Well, when you enter the regular

14   psychology program, they expect you to go for the

15   Ph.D., okay?  And I wanted to take it one step at a

16   time.  I wanted to get my master's and I wasn't sure

17   if I wanted to go past the master's at that point.

18   Money is important and payment is important.

19        Q.    Right.

20        A.    And so I finished with that, and I'm not

21   sorry that I did.  I've been successful with that.

22        Q.    Right, but getting back to the question,

23   is there a distinction between educational

24   psychology and other subdisciplines within the field

25   of psychology?

1     A.   Yes.  Other fields of psychology,

2  organizational psychology have all kinds of

3  variations and I wasn't interested in those things.

4     Q.   So you obtained a master's in

5  educational -- a Master's of Arts in Educational

6  Psychology from Michigan State.

7          When was the master's conferred?

8     A.   What I referred to earlier referring to

9  degrees, I think the master's was in '72.  I could

10  be wrong, but I don't have my resume in front of me,

11  and then the -- the undergraduate degree, I just

12  stayed right in course, so that would have been a

13  couple years earlier.

14     Q.   Okay.  So I had you -- based on your

15  earlier testimony, enrolling in Michigan State in

16  1969 and finishing your undergrad in 1972, which

17  would have been three years.

18     A.   Right.

19     Q.   So if the master's was in 1972, does that

20  mean you would have enrolled earlier than 1969?

21     A.   I went through quickly.  To be honest, I

22  just -- I don't have the facts in front of me.  I

23  don't know.

24     Q.   Okay.  Do you think you completed your

25  undergraduate degree in two years or less?

1      A.    Yeah.

2      Q.    Yes?

3      A.    Yes.  Part of that, now that I think about

4  it, I also had an under -- I had a community college

5  degree before that.

6      Q.    Okay.  Where was that from?

7      A.    Lansing Community College in Michigan.

8      Q.    So would that have been an associate's

9  degree?

10     A.    Right.

11     Q.    And then would credits from that degree

12 have transferred into the undergraduate program at

13 Michigan State?

14     A.    Right.

15     Q.    Okay.

16     A.    As for the dates, if necessary, I can

17 provide them for you.  I just don't have the -- I

18 don't have them in my head.

19     Q.    Okay.  What did you study at Lansing

20 Community College?

21     A.    The general undergraduate protocol for

22 the -- the arts program at that point, and then I

23 went closer to the sciences.

24     Q.    So were you working at Michigan State

25 while you were attending Lansing Community College,

1  or was that --

2       A.   Yeah.  Well, I was working in the hospital

3  there as a lab -- not as a lab, but as an orderly,

4  and then eventually I moved on to Michigan State.

5       Q.   Okay.  Which hospital did you work at?

6       A.   Sparrow Hospital.

7       Q.   Is that S-P-A-R-R-O-W?

8       A.   Yeah.

9       Q.   Do you recall the time period in which you

10  worked at Sparrow Hospital?

11       A.   Not really.

12       Q.   But it was before enrolling in Michigan

13  State?

14       A.   Right.

15       Q.   And was it before or after attending

16  Lansing Community College?

17       A.   Enrolling in Michigan State.

18       Q.   Right.

19       A.   Lansing Community college was before I

20  went to Michigan State.

21       Q.   Right, and when you worked at Sparrow

22  Hospital, was that before or after you attended

23  Lansing Community College?

24       A.   During, while I was at Lansing Community

25  College.

1    Q.    Okay.  And then when you worked in the lab

2    at Michigan State, was that before or after Sparrow

3    Hospital?

4    A.    After.

5    Q.    Okay.  So you think the master's degree

6    would have been conferred in 1972?

7    A.    I believe so, but I'm not going to stake

8    my reputation on it.

9    Q.    Okay.  Was there a subdiscipline in the

10   master's?

11   A.    No.

12   Q.    Did you have a thesis requirement?

13   A.    No.

14   Q.    So what were the requirements to complete

15   the Master's in Educational Psychology at MSU at

16   that time?

17   A.    There was a specified course discipline

18   one had to take, and if I didn't want an MS in

19   science, then I didn't have to do the dissertation.

20   Q.    Okay.  So you didn't write a master's

21   thesis or dissertation?

22   A.    Right.

23   Q.    And then did you have any postgraduate

24   education beyond the master's degree?

25   A.    Pardon?

1    Q.   Did you have any -- did you enroll in any

2    postgraduate education beyond the master's degree?

3    A.   Yeah, at the University of Southern

4    California -- oh, UCLA.

5    Q.   Okay.  And when did you enroll at UCLA?

6    A.   As soon as I graduated with the master's.

7    Q.   So 1972?

8    A.   Right in that era, or '73.

9    Q.   Okay.  In what discipline?

10   A.   Criminology.

11   Q.   Was that a standalone discipline there or

12   was that a subdiscipline of psychology?

13   A.   Standalone.  Standalone.

14   Q.   Who was your doctorate dissertation with?

15   A.   I didn't finish there, but it was Dr. --

16   retired from the FBI.  I'll think of it in a minute.

17   These are old names to me now.

18   Q.   That's okay.  Just do the best you can.

19   A.   Okay.

20   Q.   Did it come to you?

21   A.   Not yet.  It will.

22   Q.   Okay.  How about the names of any

23   colleagues that you attended with?

24   A.   No, and I'm coming close to it, the name.

25   He's probably dead by now, because he was

1  considerably older than I at the time, but he lives

2  in Oregon coincidentally.

3     Q.   In Portland?

4     A.   No, one of the towns down below near the

5  water.  I can't think of the name.  After a smoke

6  break, I'll think of it.

7     Q.   Are you ready for a smoke break?

8     A.   I think so.

9          MR. LAUERSDORF:  Okay.  Lets take a break.

10         (Pause in deposition:  9:04 - 9:12 a.m.)

11

12 BY MR. LAUERSDORF:  (Continuing)

13    Q.   Okay.  Did you think of the name of your

14 doctor adviser at UCLA?

15    A.   Yes.  It was Dr. Robert -- Dr. Robert

16 Morneau, M-O-R-N-E-A-U.

17    Q.   And you think he lives in Oregon now?

18    A.   Well, if he's still alive, he lives there.

19    Q.   Okay.  And then were you able to think of

20 the name of the supervisor other than Dr. Gehring?

21    A.   I remember his first name was Jim,

22 Dr. James -- and it starts with a G and I don't

23 remember the rest of it.

24    Q.   Do you remember the name of -- go ahead.

25    A.   Hopefully I will.

1     Q.   Okay.  Do you remember the names of any of

2   your colleagues that you worked with there at the

3   school of pharmacology?

4     A.   Not really.  Not anymore.  This was years

5   ago, of course.

6     Q.   Right.

7          Okay.  So you enrolled in the post --

8   doctorate program at UCLA in 1972 or 1973 in the

9   criminology discipline.

10         Was there any subdisciplines?

11    A.   No, but I did not finish.

12    Q.   Did you have a topic picked out for your

13  dissertation?

14    A.   Yes.  I was going to do something on

15  interviewing prisoners and also developing a

16  learning curve for sadism.

17    Q.   Did you have a chance to conduct any

18  research before you left the program?

19    A.   Not really.

20    Q.   Go ahead.

21    A.   May I correct myself from earlier?

22    Q.   Yeah.

23    A.   Before I went to the prison system, which

24  I don't think we've gotten to yet, I also then

25  worked for the Los Angeles County Medical Examiner's

1    Office for two years.

2         Q.    Okay.

3         A.    As a student professional worker.

4         Q.    Okay.  Lets stick with UCLA for now.

5         A.    Okay.

6         Q.    And then we'll go to medical examiner's

7    office.

8         A.    Right.

9         Q.    You said you didn't really have a chance

10   to conduct any research before leaving the program.

11               Did you have a chance to design any

12   research or make any pitches to your advisers or the

13   faculty?

14        A.    Yes.

15        Q.    Okay.

16        A.    And they were encouraging about it.

17        Q.    And do you recall who you pitched to?

18        A.    With Dr. Morneau.

19        Q.    Okay.  Did you have -- did you have a

20   research plan designed?

21        A.    Not really.

22        Q.    Did you prepare any drafts or an abstract,

23   anything like that of the research that you intended

24   to conduct on your thesis topic?

25        A.    No, it was verbal discussion.

1    Q.    Okay.  When did you leave the program?

2    A.    When I went to the prison system.  No, I

3  went to the L.A. County Coroner's Office for two

4  years, and then I left there after two years and

5  went to the prison -- the Michigan Department of

6  Corrections employment in the super maximum prison.

7    Q.    Okay.  So you were at UCLA beginning in

8  1972 or 1973, and when did you leave UCLA?  The

9  school, not the city of Los Angeles, when did you

10  leave the UCLA doctoral program?

11    A.    I think I was there off and on for about a

12  year and then I'm not sure why it faded for me.

13    Q.    You're not sure why what?

14    A.    It faded, I lost interest or I just didn't

15  participate as much as I had before.

16    Q.    But you left the program voluntarily?

17    A.    Yes.  And even so, Dr. Morneau still would

18  call me wherever I moved to and would try to stay in

19  contact.

20    Q.    Okay.  You mentioned earlier -- you made a

21  couple mentions of the cost of your undergraduate

22  education and your master's --

23    A.    Right.

24    Q.    Did you receive any scholarships for -- to

25  pay for your undergraduate education?

1    A.    I received a four-year scholarship, all

2  tuitions paid.

3    Q.    Was there a name of the scholarship?

4    A.    The Eisenhower Scholarship.

5    Q.    Was that an actual scholarship or a

6  federal grant at the time?

7    A.    All I know is I went at registration -- in

8  those days, we didn't register by computer, and it

9  took three days to register and there were 40,000

10  students at Michigan State at the time, so it was

11  quite a drama and I saw a desk which said

12  "Scholarships," and I walked over and I said to them

13  "I'm not sure I belong here, but I just want to ask,

14  is there anything out there that I need to be doing

15  at your desk?" and they looked it up and said "Yes,

16  you have a four-year scholarship," which was very

17  helpful.

18    Q.    Did you --

19    A.    So I could eat.

20    Q.    You still had what?

21    A.    Could eat.

22    Q.    Did you have to complete an application

23  for the Eisenhower Scholarship?

24    A.    I must have.  I don't recall it.

25    Q.    Any other scholarships besides the

1  Eisenhower Scholarship?

2      A.   Not really.

3      Q.   What about for your master's degree?

4      A.   Well, there was enough money left in

5  scholarship that I could use that also for my

6  master's.

7      Q.   Go ahead.

8      A.   And so after -- after finishing my

9  undergraduate, then I went directly into the

10  master's program and the scholarships -- since I had

11  a four-year scholarship and I hadn't been there four

12  years, I was able to finish my master's even before

13  the scholarship was used up, so theoretically I

14  still have another year and a half scholarship if I

15  want to go back close to 80 years old to finish.  I

16  think not, but --

17      Q.   What was the salary on the scholarship?

18      A.   A full tuition.

19      Q.   Do you recall what that was at the time?

20      A.   No.

21      Q.   How about for UCLA, were you offered any

22  scholarships or financial aid there?

23      A.   No.

24      Q.   You said you were off and on at UCLA for

25  about a year, so that would have put you leaving

1   about 1973 or 1974.

2           Does that sound correct?

3       A.   Right.  My resume would have all the facts

4   to it.  I -- I cannot confirm the dates that I'm

5   giving you.

6       Q.   Okay.  Do you maintain a currently updated

7   resume?

8       A.   Until about two years ago.  It's I think

9   about 18 pages long.  I figured that there was

10  enough there that anybody that wanted to know

11  anything about me would figure it out by then.  Who

12  that would be, I don't know who would benefit from

13  it.

14      Q.   Where is your resume?  How is it stored?

15      A.   On my computer.

16      Q.   Would you be willing to produce a copy of

17  that and distribute it to us?

18      A.   Yes.

19      Q.   So is your resume different than a

20  curriculum vitae or are we talking about the same

21  thing basically?

22      A.   The same thing.

23      Q.   You don't maintain two separate documents?

24      A.   No.

25      Q.   Okay.  You said 18 pages long.

1          What all information does your information

2     have on it?  What are the categories?

3          A.   A lot of murder, a lot about sex crimes, a

4     lot about violent crime.  I specialize in violent

5     crime as a profession, therefore I have not only

6     here in the United States, but also, then,

7     internationally lectured and whatever else in

8     everything from England and the Home Office,

9     Scotland Yard, to China to Istanbul to Hungary and

10    all over.

11         Q.   Let me back you up.

12              As far as the categories go, does it list

13    all of your education?

14         A.   Yes.

15         Q.   And does it list all of your employment

16    history?

17         A.   Yes.  You could get absolute accurate

18    information.

19         Q.   Does it include a list of all your

20    speaking engagements?

21         A.   Not exclusive.  There are some privileged

22    ones that I did not list.

23         Q.   Why is that?

24         A.   Because they're government protected.

25         Q.   What does that mean?

1    A.    Meaning that it was government work that

2    is privileged.

3    Q.    How so?

4    A.    By the nature of the request for my

5    services.

6    Q.    Do you have any type of government

7    security clearance?

8    A.    Nope.

9    Q.    Any type of NSA clearance, CIA, FBI, any

10   agency clearance?

11   A.    Nope.  I gave a lecture -- as an aside, I

12   gave a lecture in Orlando in the '90s, I think it

13   was, and FBI, CIA, everybody else was there, and

14   after the lecture -- this was for the American

15   Academy of Forensic Sciences, then within 15

16   minutes, the FBI had me aside and had invited me

17   then to Quantico, so from that point on, then, I

18   would periodically go and give lectures at Quantico

19   and hear other people there while I was there, and

20   so then that increased my visibility, and so then

21   the other people around would reach out to me and

22   ask me to help them on their cases or whatever was

23   going on.

24   Q.    That was an AAFS speaking engagement in

25   Orlando, Florida?

1      A.    Right.

2      Q.    What was the date of that engagement?

3      A.    Again, you can get the exact date when you

4   get my resume.

5      Q.    Okay.  What was the name of the program?

6      A.    It was in the -- this one was under the --

7   there are eight different sections of the academy,

8   but I gave this one in psychiatry.  I belonged to

9   the general section.  I didn't like the behavioral

10  science unit category, but I've forgotten exactly

11  the title of the speech that I gave.  I gave a

12  discussion of the learning curve for sadistic

13  behavior.

14     Q.    Did you present any papers or anything

15  with that discussion?

16     A.    No.  It's -- one of the problems in

17  speaking on such issues is that the bad people are

18  the very first people who will want the papers or

19  that will show up at the lectures if they can get

20  in, so I am very careful about how much education we

21  give the bad people to avoid apprehension.

22     Q.    Those are bad people that show up at the

23  American Association of Forensic Scientist lectures?

24     A.    Right, and they'd show up at other

25  lectures.  When I was in Wichita, Kansas, years ago,

1    giving a lecture on the same thing, the police asked

2    me -- this was during the time of BTK and they asked

3    me if I could come down and chat with them about

4    BTK, et cetera, et cetera, et cetera, and then --

5         Q.   What's BTK?

6         A.   Oh, that's a serial killer out of Wichita

7    that killed nine women, seven or nine women.

8              And on the way out the door, then, the

9    detective who was sitting in the back of the lecture

10   hall, he said "See that guy sitting there?"  He said

11   "He's a guy that we suspect," et cetera, et cetera,

12   et cetera.

13        Q.   What was detective's name?

14        A.   Pardon?

15        Q.   What was the detective's name?

16        A.   Oh, hell, I don't know.

17        Q.   What agency was he with?

18        A.   He was with the sheriff's department.

19        Q.   What sheriff's department?

20        A.   Wichita.

21        Q.   Wichita, Kansas?

22        A.   Kansas, yep.

23        Q.   So that's a county sheriff?

24        A.   Yep.

25        Q.   What --

1    A.    There was a whole group of people there.

2    Q.    What county is Wichita in?

3    A.    I have no idea.

4          But my point to the story is this:  When I

5    went back to give the lecture, the detective came up

6    to me just before I started to speak and he said

7    "Remember that guy who I pointed out to you?" and I

8    said "Yeah," he said "I just flushed him out of your

9    audience," and so -- and this happened more than

10   once that they will sneak in and try and get -- and

11   learn as much as they can to avoid detection, so

12   therefore I'm very careful about what I say in an

13   unprotected environment.

14   Q.    So that lecture was in Wichita, Kansas?

15   A.    Yes.

16   Q.    What was the date of that lecture?

17   A.    I have no idea.

18   Q.    And what were you lecturing on?

19   A.    Sadism.

20   Q.    Any particular aspect of sadism?

21   A.    Well, the whole learning curve.

22   Q.    When you say learning curve, what do you

23   mean by that?

24   A.    They go in different stages and they

25   always go in a direction, so if I see a crime scene

1    that, for instance, has -- for instance, in China, a

2    torso, and I look at the torso or the pictures of it

3    or whatever else, et cetera, et cetera, et cetera,

4    then I know what I'm looking at.

5         I also know by what he did, chopping up

6    the victim, et cetera, I know what stages he went

7    through before he got there, and so therefore it

8    gives a whole investigative training of leads back

9    to the perpetrator, and luckily, they then were able

10   to identify the bad guy and -- but these are the

11   kinds of help and understanding that the detectives

12   need.  It's more than just DNA, it's also the story

13   line.

14   Q.   Let me interrupt you for just a second, if

15   you don't mind.

16        What was the name of the suspect that the

17   Wichita County sheriff's deputy flushed out of the

18   lecture?

19   A.   I don't remember.  I don't think it was --

20   I don't think it was the actual killer who later was

21   caught, but --

22   Q.   Well, if he wasn't the actual killer, then

23   how was he the bad guy?

24   A.   Well, he was a suspect and they were

25   looking at him as a possible.  I couldn't -- we went

1  so far in terms of looking at the case, and I'm not

2  willing to go beyond what I know to be true or fair

3  or whatever else and I couldn't go any further than

4  what we did.  I do know --

5          Q.   What was the case that he was a suspect

6  in?

7          A.   You remember the BTK killer?  What was his

8  name?

9              MS. SCHAFFER:  I don't -- yeah, I don't

10  know.

11          A.   It was very big news.  It was huge news.

12          Q.   So he was a suspect in something called

13  the BTK killer?

14          A.   Right.

15          Q.   What year would that have been?

16          A.   Again, I don't remember when I was there.

17  You'll know exactly when you look on my resume and

18  see Wichita, Kansas.

19          Q.   Have you had any other circumstances where

20  somebody has been flushed out of one of your

21  lectures by local law enforcement?

22          A.   Yeah, a rapist.

23          Q.   And how do you identify them as a rapist?

24          A.   Because they were convicted of it.

25          Q.   And how do you know that?

1      A.    Because the cops told me.

2      Q.    Right, but I mean, I'm assuming -- well, I

3   don't have to assume, I know, for those AAFS

4   lectures, they're generally -- they require a

5   sign-up, they require a registration.

6      A.    Yeah.

7      Q.    They require a name and identification and

8   contact information, so I'm assuming they don't put

9   down on the form that they're a rapist when they

10  sign up.

11     A.    Yeah.

12     Q.    So how do you know what the criminal

13  background of the members of the audience are?

14     A.    There may have been more, but I know that

15  in this one, somebody came up, I think -- I'm sure

16  it was law enforcement came up and told me that a

17  rapist was in the audience.

18     Q.    Did they point the rapist out?

19     A.    Yep.

20     Q.    Who was the law enforcement officer?

21     A.    I have no idea.

22     Q.    What agency was he or she with?

23     A.    They were with the sheriff's department in

24  Marquette, Michigan.

25     Q.    Is that Marquette County?

1    A.    Yes.

2    Q.    And was that while you were working for

3    the Michigan legal system?

4    A.    Yes.

5    Q.    What were you lecturing on at the time?

6    A.    On rape at request from the criminal

7    justice department at the university there, the

8    University of Northern Michigan.

9    Q.    Were you in residence at the University of

10   Northern Michigan?

11   A.    I lived in Marquette, yes.

12   Q.    Were you on staff at the University of

13   Northern Michigan?  Were you an associate professor?

14   A.    Adjunct.

15   Q.    An adjunct professor?

16   A.    Yeah.

17   Q.    Capital A or small a?

18   A.    Small a.

19   Q.    So in other words, you were a guest

20   lecturer?

21   A.    Yes.

22   Q.    And who asked you to conduct this lecture?

23   A.    I think the chairman of the university's

24   criminal justice program.

25   Q.    What was that person's name?

1    A.    I don't know.  They're dead now.  I don't

2  remember.  I suppose we could go back someplace to

3  find it, but I'm not sure.

4    Q.    What was the forum for that lecture?

5    A.    A large auditorium.

6    Q.    Well, was it a single undergraduate class,

7  a graduate class?

8    A.    It was a mixture of outside people and

9  inside people.

10    Q.    So it was put on by the university, but

11  not limited to university students?

12    A.    Exactly.

13    Q.    What was the title of the lecture?

14    A.    I don't remember.

15    Q.    What aspect of rape was the lecture about?

16    A.    Pardon?

17    Q.    What particular aspect of rape was the

18  lecture dealing with?

19    A.    Well, I included the whole range.

20    Q.    That's a pretty big topic, right?  How

21  long was the lecture?

22    A.    Well over an hour.

23    Q.    And it was just on rape in general?

24    A.    Rape in general as well as pedophilia as

25  well as all kinds of deviant sex acts short of

1  murder.

2      Q.   Do you recall what year that was?

3      A.   No.

4      Q.   Do you know if that lecture was recorded

5  or not?

6      A.   No, it wasn't.  Not to my knowledge.  Not

7  to my knowledge.

8      Q.   Do you recall any of your lectures being

9  recorded?

10     A.   I don't like them to be recorded.

11     Q.   Why not?

12     A.   Because I don't trust a lot of people who

13  will edit and do clips.

14     Q.   What do you mean?

15     A.   People will exploit the lecture by taking

16  a clip out of a small portion of the lecture and

17  then playing that for mischievous means, reasons.

18     Q.   Did you ever have that happen?

19     A.   Yep.

20     Q.   When was that?

21     A.   I don't recall exactly, but I got a very,

22  very cold feeling toward any -- any recording.

23     Q.   And I guess -- I guess I could understand

24  that maybe in today's world where everything is

25  recorded digitally and it can be manipulated much

1  easier, but some of these lectures that you're

2  talking about back in Wichita and up in Marquette, I

3  guess I was assuming they were back in the days of

4  VHS and Beta and the kinds of recording devices that

5  were a little bit more difficult to --

6      A.   Right.

7      Q.   -- cut and paste from.

8           Did you ever have a situation where a

9  lecture was recorded and somebody manipulated the

10 video?  Can you think of a specific example?

11     A.   I can't think of one right now, but you

12 might -- you might assume correctly if you saw me as

13 naturally suspicious.

14     Q.   Fair enough.

15          Have you ever given any lectures where the

16 organization that was putting on the lecture

17 required it to be recorded?

18     A.   I wouldn't do it.

19     Q.   Okay.  So let's see.  Let's get back to

20 where we were.

21          Okay.  So your resume has on it your

22 education, your employment history, but not

23 necessarily a comprehensive listing of your speaking

24 engagements?

25     A.   Yes, it does have that.

1    Q.   It does have a comprehensive listing of

2  your speaking agreements?

3    A.   Yes.

4    Q.   How do you identify on there the

5  engagements that are privileged due to some kind

6  of --

7    A.   Those are not included there.  I'm not

8  going to list them.

9    Q.   So it's not a comprehensive listing, then?

10   A.   No, and I never will give one.

11   Q.   Have you ever -- this is at Quantico when

12  you said you've given presentations.

13        Does the FBI provide you with any forms,

14  guidelines, any kind of manuals for speaking at

15  Quantico?

16   A.   No.

17   Q.   Any kind of security restrictions, written

18  policies, anything that you had to sign?

19   A.   No.

20   Q.   Did you have to complete an application or

21  a background check before speaking at Quantico?

22   A.   No.  They knew of me.

23   Q.   So how did they know of you?

24   A.   Well, I'm old and I've been around since

25  Christ wore tennis shoes, so -- and they've been at

1    the American Academy of Forensic Science meetings

2    and I've been going there for over 40 years, and so

3    you get known.

4         Q.   Do these -- so by the time this person

5    pulled you aside and asked you to come speak at

6    Quantico, you had been in the AAFS for 40 years?

7         A.   Not -- well, in those days, it was

8    probably 25 or 30, 25 or 30 years.

9         Q.   Okay.  When did you first join the

10   American Association of Forensic Scientists?

11        A.   I was in the very early '70s.

12        Q.   And where were you working at the time?

13        A.   At the Los Angeles County Medical

14   Examiner's Office.

15        Q.   Why did you join the AAFS at that time?

16        A.   Because it sounded interesting and people

17   I was working with were involved with it at the

18   coroner's office, and I then found out that I could

19   go, and did.  I gave a small little lecture and they

20   were nice to me, so I thought, well, next year I'll

21   go, too, and it didn't take long and then I became a

22   member.

23             You have to -- it's a graduated kind of

24   membership which is a credential, and so you have to

25   give papers, you have to participate in the

1    organization, et cetera, which I did, and I became a

2    fellow and I've been a fellow probably for 30 years,

3    and I like it.  I have a lot of friends there and

4    some enemies, which is fine, and it suits me.

5        Q.    Are you a current fellow or a retired

6    fellow?

7        A.    I'm a retired fellow now.

8        Q.    What's the difference between a fellow and

9    a retired fellow?

10       A.    I don't have to pay for the meetings.

11       Q.    And you were in the general section, you

12   said?

13       A.    Yeah.

14       Q.    You also mentioned earlier the psychiatry

15   section.

16            Can members be in something like the

17   psychiatry section without actually being a

18   psychiatrist?

19       A.    Well, you can present there, okay?  But

20   you -- you can only belong to one of the divisions

21   and I chose to stay with general, because I thought

22   that -- and still believe, that they're a little

23   more authentic than some of the behavioral people.

24   I found them shallow, quite frankly.

25       Q.    The behavioral people you found shallow?

1    A.    Yep.

2    Q.    And would your resume also include a

3  comprehensive list of your published works?

4    A.    Some.

5    Q.    Is there anything else listed on there

6  besides education, employment history, speaking

7  engagements and published works?

8    A.    I think that's too much already.

9    Q.    Do you remember what you were speaking of

10  specifically at the Orlando engagement where the FBI

11  agent pulled you aside?

12    A.    I was speaking about the learning curve of

13  the sadist.

14    Q.    That's right.

15          Okay.  And who was the FBI agent?

16    A.    Robert Ressler, who's now dead.

17    Q.    When did he pass?

18    A.    About three years ago.  Parkinson's

19  disease.

20    Q.    Okay.  Ressler is not the gentleman that

21  you wrote -- that you wrote Profiling Killers with.

22          Is that right?

23    A.    Yep.

24    Q.    Okay.  Did you ever coauthor anything with

25  Ressler?

1     A.    No.

2     Q.    Okay.  So let's back up back to leaving

3  UCLA.

4           So you're leaving UCLA in 1973 or 1974,

5  and you go where?

6     A.    Then I went to Marquette, Michigan, where

7  I worked for the Michigan Department of Corrections.

8     Q.    Let me back you up a second, because you

9  mentioned earlier the Los Angeles County Medical

10  Examiner's Office.

11     A.    Right.

12     Q.    When were you there?

13     A.    Again, the resume will have the exact

14  dates.

15     Q.    Okay.  Can you do your best to recall?

16     A.    I know some of my dates or crooky, but I

17  just don't know any better at the moment.  I think

18  it was the early '70s.

19     Q.    So you would have been a county employee?

20     A.    Yes.

21     Q.    Were you in school at the time?

22     A.    Yes.

23     Q.    Okay.  So it was while you were enrolled

24  in the doctorate program at UCLA?

25     A.    Not UCLA, the University of California

1    Los Angeles.

2         Q.    Isn't that UCLA?

3         A.    No.

4         Q.    The University of California Los Angeles?

5         A.    Well, this one was UC campus -- oh, the

6    resume will have the correct address on it.  Yes,

7    it --

8         Q.    Are you thinking that you did not attend

9    UCLA?

10        A.    No.  The traditional UCLA, no, I didn't.

11   I don't want to mislead on that.

12        Q.    Okay.

13        A.    It was UC -- they have UC Irvine, they

14   have UC -- all these other schools, and this one was

15   in L.A., but it wasn't UCLA.

16        Q.    Okay.  But it was a University of

17   California system school?

18        A.    Exactly.  Right.

19        Q.    Is there a Cal State campus in

20   Los Angeles?

21        A.    I don't know.  I'm confused at the moment.

22        Q.    Okay.  Would you like to take a break or

23   are you okay?

24        A.    No, I'm just confused about it.  I just

25   haven't thought about all of this.  I didn't know we

1  were going to go this direction, so I -- you know,

2  it's long ago memories.

3      Q.   Okay.  But were you employed -- you were

4  enrolled at whatever school you were enrolled at --

5      A.   Right.

6      Q.   The doctoral program while you were at the

7  Los Angeles County ME's office?

8      A.   Right.

9      Q.   And then when you left the doctoral

10  program, did you stay on with the Los Angeles County

11  ME's office?

12      A.   I stayed for two years.

13      Q.   Two years after leaving the doctoral

14  program?

15      A.   I'm not sure exactly of the timing on

16  that.  It would be misleading if I said, because I

17  don't know.

18      Q.   When you started at the Los Angeles County

19  ME's office, what were your job duties?

20      A.   I was a student professional worker and I

21  worked in the lab.  I taught and did some of the

22  paperwork and all these other sorts of things.  I

23  would also translate within the lab down to the

24  autopsy area and I would then have contact with the

25  pathologist, and then periodically, they would ask

1   me, because I had some psychology under my belt,

2   they would ask me, then, for what does this mean and

3   have me come down and look at the victim of the

4   crime, so it was a great learning experience for me.

5       Q.    You said a moment ago when you started

6   talking about that that you would translate between

7   the lab and the autopsy.

8             Did you mean transport?

9       A.    Transport.

10      Q.    Transport back and forth?

11      A.    Right.  I didn't realize I said translate.

12      Q.    Okay.  So essentially you were a lab

13  runner?

14      A.    Yeah.  Yeah.  I worked seven days a week

15  at a low wage, but the experience was worth very

16  much to me.

17      Q.    Let's see, you said -- I guess you didn't

18  say.

19            Who was your supervisor at the lab?

20      A.    Dr. -- well, Dr. Noguchi was the coroner.

21      Q.    Can you spell that for me?

22      A.    N-O-G-U-C-H-I.

23      Q.    Do you know Dr. Noguchi's first name?

24      A.    I forgot.

25      Q.    And he or she was the L.A. County Coroner

1    at that time?

2        A.    Yes.

3        Q.    Or medical examiner?

4        A.    Yes, also known as coroner to the stars.

5        Q.    Was Dr. Noguchi your direct supervisor?

6        A.    No, not direct.  He was the overall

7    arching corner.  I'll think of the -- Dr. Ernie

8    Griesmer was my immediate supervisor.

9        Q.    Can you spell that for me.

10       A.    G-R-I-E-S-M-E-R.

11       Q.    Did you have any other supervisors while

12   you were working in the ME's office?

13       A.    Pardon?

14       Q.    Did you have any other supervisors while

15   you were working during your time at the county ME's

16   office?

17       A.    No, he was my primary.

18       Q.    So Griesmer and Noguchi were the two

19   supervisors?

20       A.    Correct.

21       Q.    Who was whose boss?

22       A.    Dr. Noguchi.

23       Q.    Okay.  What are the names of some of your

24   colleagues at the ME's office while you were there?

25       A.    Oh, sir, I don't remember any of those

1    anymore.

2         Q.   You mentioned that you were asked because

3    of your background in psychology, that you were

4    asked by pathologists from time to time to offer an

5    opinion on something that they were looking at

6    during an autopsy.

7              What's the name of a pathologist that

8    asked you for an opinion?

9         A.   I used to know, but again, it's been a

10   long time.

11        Q.   Do you recall the names of any of the

12   pathologists at the L.A. County ME's office while

13   you were employed there?

14        A.   I'm thinking of one.  Dr. Bucklin.

15        Q.   Spell that for me.

16        A.   B-U-C-K-L-I-N.

17        Q.   What was Dr. Bucklin's first name?

18        A.   I have no idea.  I didn't call him

19   anything other than Dr. Bucklin.

20        Q.   What would you say his age was at the time

21   that you worked there, approximately?

22        A.   His age or my age?

23        Q.   His age.

24        A.   He was probably in his 50s.

25        Q.   And how about Dr. Noguchi?

1    A.    He -- at that time, he was probably in his

2  60s or 70s.  He's still alive as far as I

3  understand.

4    Q.    What about Dr. Griesmer?

5    A.    He's retired, and still alive as far as I

6  know.

7    Q.    How old would he have been approximately

8  at the time that you worked there?

9    A.    He would have been certainly in his 60s.

10    Q.    Okay.  Other than Dr. Bucklin, do you

11  recall the names of any other pathologists who

12  worked in the ME's office during your time there?

13    A.    I never thought I'd forget, but I have.

14    Q.    Okay.  Did you do any actual case

15  reporting while you were in the Los Angeles ME's

16  office?

17    A.    No.  That was their job, not mine.

18    Q.    Are there any records or would there be

19  records at the ME's office that you consulted on the

20  cases that came through the ME's office?

21    A.    Not to my knowledge.

22    Q.    Do you remember the names of any of the

23  cases that you would have consulted on, the name of

24  the deceased, the name of the --

25    A.    Not really.  Not really.

1    Q.    Okay.  What year did you leave the ME's

2    office?

3    A.    The two years after I started.

4    Q.    And you started while you were in school,

5    so how long had you been in the doctorate program

6    before you started at the ME's office?

7    A.    I wasn't in the doctorate program.  I was

8    in the criminology program.

9    Q.    Oh, like undergrad?

10    A.    No, it would have been like a second

11    master's.

12    Q.    Okay.

13    A.    Right.

14    Q.    Okay.  So did you -- did you at any time

15    pursue or complete course work towards a doctoral

16    degree?

17    A.    I thought about it and the answer was I

18    chose not to.  From my point of view, I was

19    successful with a master's and I chose not to go

20    further.

21    Q.    Okay.  So the degree that you were

22    pursuing or the course work that you were pursuing

23    in criminology was a second master's?

24    A.    Yeah.

25    Q.    And before you really got going in that

1  program, you decided that you were just okay with

2  the --

3       A.   Right.  Right.

4       Q.   Okay.  And did your -- all right.

5            Do you recall the name of the school that

6  you were pursuing the master's in criminology at

7  yet?

8       A.   No.

9       Q.   As part of your participation in the

10 master's program at Michigan State, were you

11 required to teach?

12      A.   No.

13      Q.   How about at the California program, were

14 you required to teach there?

15      A.   No.

16      Q.   So how long were you in the master's

17 program in California in criminology before you took

18 your job at the medical examiner's office?

19      A.   I don't know.  I don't remember.  I just

20 don't remember.

21      Q.   Okay.

22      A.   Okay.

23      Q.   Okay.  So -- okay.  Maybe I misunderstood

24 your answer.

25            So did you leave the ME's office two years

1    after you started at the ME's office?

2        A.    Yes.

3        Q.    Okay.  So you were there a total of two

4    years?

5        A.    Right.

6        Q.    And your job title when you started was

7    student professional worker, right?

8        A.    Right.

9        Q.    So then when you left the criminology

10   program, the master's program at whatever school you

11   were at in California, did you lose the student

12   professional worker designation?

13       A.    No, because that was at the coroner's

14   office.

15       Q.    Was that something different than at the

16   ME's office?

17       A.    No, it was the same office.

18       Q.    Okay.  I mean, that's what I'm getting at.

19   If were you employed as a student professional

20   worker in the ME's office or coroner's office,

21   whichever, and then were you no longer a student

22   because you dropped out of the criminology program,

23   did you lose the designation of student professional

24   worker?

25       A.    No.

1       Q.   Okay.  So when you left the ME's office,

2    was your title still student professional worker at

3    that time?

4       A.   Yes.

5       Q.   And were those -- when I was a student

6    back in the day, we had what was called an LTE,

7    LTE I, LTE II, different divisions at the state

8    school.

9            Was the student professional worker title,

10   were there grade occasions?  Was there student

11   professional worker one, student professional worker

12   two, things like that in?

13      A.   No.

14           MS. SCHAFFER:  I'm going to object that

15   that calls for speculation.

16           You can answer if you know.

17      Q.   So it was just student professional

18   worker, period?

19      A.   Right.

20      Q.   Okay.  So during the two years that you

21   were there, did you receive any promotions or a pay

22   raise, anything like that?

23      A.   No.

24      Q.   And you started out in the -- you were at

25   the ME's office as a lab transport, kind of lab

1    maintenance person, right?

2        A.    And a go-fer.

3        Q.    And a go-fer, all right.

4              And at the time that you left the ME's

5    office -- well, let me back up.

6              When you were in the -- when you were in

7    lab transport, was that in a particular division or

8    department of the ME's office?

9        A.    It was separated, but not artificially

10   created differences.  I mean, there wasn't this lab

11   over here and something totally unrelated, it was

12   all very interactive.

13       Q.    Okay.  So there weren't multiple divisions

14   within the office or multiple departments?

15       A.    Not really.  Not really.

16       Q.    Okay.  You just worked for the entire

17   office in general?

18       A.    Right.

19       Q.    Okay.  And when you left the ME's office,

20   then, were your duties the same, lab transport and

21   go-fer?

22       A.    When I left the -- yes.

23       Q.    Okay.  And then when you left the ME's

24   office, where did you go?

25       A.    The Michigan Department of Corrections.

1      Q.    Okay.  Why did you decide to leave the

2    ME's office?

3      A.    I didn't see any future for it.

4      Q.    Why not?

5      A.    Well, I wasn't going to be a pathologist

6    and I didn't want to stay where I was at and I

7    wanted a future and it wasn't there, so I then found

8    a position as a psychologist for the Michigan

9    Department of Corrections in Marquette, Michigan,

10   and that had potential.  Even though it was in the

11   sticks and whatever else, I chose to go there,

12   because I thought it was in my best interest.

13     Q.    Okay.  Was there any room for advancement

14   at the Los Angeles County ME's office?

15     A.    Not for me.

16     Q.    And why not?

17     A.    You were categorized and you stayed there

18   and there was no -- there was not a lot of

19   transition by anybody.

20     Q.    Okay.  Was there -- were any of the

21   pathologists that you were working with or anybody

22   else kind of working to promote you through the

23   ranks?

24     A.    No.  That wasn't the spirit there.

25     Q.    Okay.  So you moved to Marquette, Michigan

1    and began working for the Michigan Department of

2    Corrections?

3         A.    Right.

4         Q.    Do you know what year you started with the

5    department of corrections?

6         A.    I believe it was 1978.

7         Q.    Did you take a break at all between the

8    ME's office and the department of corrections?

9         A.    No.

10        Q.    And what was your job title when you

11   started with the Michigan Department of Corrections?

12        A.    Psychologist.

13        Q.    Was that a position that had gradations,

14   like psychologist one, psychologist two, anything

15   like that?

16        A.    There were Ph.D. psychologists, and

17   myself, I was a master's psychologist, okay?

18        Q.    Okay.  And what were the -- other than the

19   degree, what was the difference between a Ph.D.

20   psychologist and a master's psychologist as far as

21   what you could do?

22        A.    The same.

23        Q.    You could do the same thing?

24        A.    (Witness nods head.)

25        Q.    You nodded your head yes?

1    A.   Yes.

2    Q.   Okay.  So what was the reason for breaking

3    in the a classification?

4         MS. SCHAFFER:  Objection; calls for

5    speculation.

6         You can answer if you know.

7    A.   I'm not sure I understood the question.

8    Q.   Yeah, you said there was a distinction

9    between Ph.D. psychologist and master's psychologist

10   within the department of corrections.

11        If they both do the same things, what was

12   the reason for the changing the classification, the

13   distinction?

14   A.   I think you misheard me or a misspoke.

15   Q.   Okay.

16   A.   When I went there, there was a Ph.D.

17   psychologist.  When I came there, I had a master's,

18   so there were two -- particularly up there, up in

19   Michigan, there were two psychologists.  Again, the

20   same job, in essence, and shortly thereafter, the

21   Ph.D. left, so I then became the psychologist for

22   that prison.

23   Q.   Okay.  What was the name of the prison?

24   A.   Marquette Branch Prison.

25   Q.   And what kind of prison was that?

1    A.    It was a maximum security prison.

2    Q.    Did that change at some point?

3    A.    No.  What happened was that they built,

4  before I got there, they had done a supermax

5  compound outside the major prison walls that is

6  called the Michigan Intensive Program Center and

7  that's where I was hired originally, and that's

8  where -- those places, you could not be handled in

9  any other situation.

10        The director then would -- or the

11  assistant director rather would then have to

12  personally put them in that prison or send them

13  there because of the tight security and the high

14  level of risk that they presented, and so my time

15  for the most part was spent in the Michigan

16  intensive program center, which is where my office

17  was, but periodically the warden then of all the

18  prisons up there would call me and say "Richard, we

19  need you over at So-and-So to do an evaluation" or

20  this or that or whatever else, so I went to both

21  units, but primarily it was the high-risk Michigan

22  Intensive Program Center.

23    Q.    Okay.  What was the other unit?

24    A.    The Branch Prison, which is the maximum

25  security, and then you had the Michigan Intensive

1    Program Center, well named, for the supermax.

2         Q.   And you would move back and forth between

3    the two prisons?

4         A.   Right.

5         Q.   How long were you stationed, I guess, in

6    the Michigan Intensive Program Center?

7         A.   Until it closed.  The government

8    eventually closed it, because they thought it was

9    too restrictive.

10        Q.   When was that?

11        A.   Pardon?

12        Q.   When was that?

13        A.   I think that was in the earlier part of

14   the '80s.

15        Q.   Early 1980s?

16        A.   Yeah.  '80s.

17        Q.   So you would have been there less than

18   five years?

19        A.   No, I'd been there longer than that.

20        Q.   In the intensive program?

21        A.   Right.

22        Q.   How long do you think you were there?  If

23   you started in --

24        A.   Oh, probably eight or ten years.

25        Q.   Okay.  So do you think it was in the late

1  '80s?

2       A.   Could be.

3       Q.   Then where did you go from there?

4       A.   I then transferred downstate to the -- the

5  major prison at Jackson Prison in Jackson, Michigan.

6  It is the -- one of the world's largest walled

7  prisons and I then worked in maximum security there

8  also.

9       Q.   Was that a maximum security prison or a

10 maximum security unit?

11      A.   It was -- it was a multilevel prison, and

12 then I worked at the intake and also, then, the

13 administrative segregation for the high risk

14 prisoners within that system.

15      Q.   Do you know what the average annual

16 population was at the Michigan Intensive Program

17 Center during the time you were there?

18      A.   There were I think 98 beds in five

19 different wings.

20      Q.   So a total of 500 beds?

21      A.   No, a total of 98.

22      Q.   Oh, okay.

23      A.   Spread over.

24      Q.   And were all the beds generally filled?

25      A.   Yes.

1   Q. And how about the Branch program?

2   A. I know less about their capacity, so it

3 would be unfair for me to comment about it.  It was

4 a busy prison, I'll put it that way, but I just

5 don't know how many people were there.

6   Q. Was the Branch program, the Branch Prison

7 larger than the intensive program?

8   A. About eight times larger.

9   Q. Okay.

10   A. Or more.

11   Q. Okay.  So we started at the Michigan

12 Department of Corrections up in Marquette and the

13 Michigan Intensive Program Center, what were your

14 job duties?

15   A. Obviously interviewing prisoners, figuring

16 out their risk, where they could be housed, under

17 what conditions, and my job also then included -- I

18 had a group of officers who then worked in those

19 units and I would supervise those officers, and they

20 had to do reports and they had to do -- they had to

21 do ticketing for prison violations and all that kind

22 of stuff.

23   At a low level, I would then hear, or hold

24 a hearing on the misdeed and impose or let them go

25 or whatever else.  If it was a major ticket, then

1  the deputy warden and I would then sit and we would

2  then do the major tickets and impose greater and

3  larger restrictions if necessary.

4      Q.   What was the name of the officers that

5  were under your direct supervisions?

6      A.   Well, it was still the MIPC or the

7  Michigan Intensive Program Center.

8      Q.   Oh, so you were a direct supervisor over

9  all the officers at the Michigan Intensive Program

10  Center?

11      A.   Over the -- over the -- those assigned to

12  cells.

13      Q.   Okay.  As opposed to perimeter?

14      A.   Pardon?

15      Q.   As opposed to assigned to the perimeter?

16      A.   Yeah, or -- well, we had lots of walls and

17  barbed wire and only once somebody tried to escape.

18      Q.   So how many officers were under your

19  direct supervision?

20      A.   About ten or fifteen.

21      Q.   315?

22      A.   No, I said ten or fifteen.

23      Q.   And what was the highest rank of any of

24  the officers that you supervised?

25      A.   Well, at the low level prison, there was a

1    sergeant, a lieutenant, and then there was a deputy

2    warden, so I had a first line in terms of the

3    everyday living and the tickets and things like

4    that.

5         Q.   Okay.  And so were the sergeant and the

6    lieutenant, were they under your direct supervision?

7         A.   No, they were under the deputy warden.

8         Q.   And who was your direct supervisor?

9         A.   Joe Gregorich, who was the deputy warden.

10        Q.   J-O-E?

11        A.   No.  G-E-O-R-G-I-C-H.

12        Q.   G-E-O-R-G-I-C-H.

13             Georgich?  Georgich?

14        A.   No, Gregorich.

15        Q.   Okay.

16        A.   Maybe I misspelled it.

17        Q.   G-I-E-G-O-R-I-C-H, Giegorich?

18        A.   Let me write it down.

19        Q.   Okay.

20        A.   G-R-E-G-O-R-I-C-H.

21        Q.   Okay.  So his first name was Joe?

22        A.   Yep.  He's still alive.  He's 88.

23        Q.   And who was the lieutenant when you

24    started working there?

25        A.   I don't remember.

1      Q.   How about the sergeant?

2      A.   I liked them, but I don't remember their

3 names.

4      Q.   Who was the Ph.D. psychologist who was

5 working there when you started?

6      A.   Larry -- I can't think of his last name.

7 He kind of went off the rails and wasn't there very

8 long.

9      Q.   Like in a breakdown kind of way?

10     A.   Yeah.

11     Q.   And you don't recall his last name?

12     A.   Not at the moment.

13     Q.   Did another Ph.D. psychologist ever come

14 back --

15     A.   No.

16     Q.   -- into that prison?

17     A.   No.

18     Q.   How about when you were down at the prison

19 in Jackson, was there a Ph.D. psychologist down

20 there?

21     A.   Yeah.

22     Q.   And what was his name or her name?

23     A.   His name is similar to my last name,

24 but -- I'll have to think about it for a minute.

25     Q.   So when you worked down in the prison in

1    Jackson with the Ph.D. psychologist, what was the

2    hierarchy there?

3         A.   You had the chief psychologist, then you

4    had assistant chief psychologist, and then you had

5    an intermediate level which I can't remember exactly

6    what they call it, and then you had the regular

7    psychologist, and they required Ph.Ds for all of

8    those.

9         Q.   Okay.  So where did you fit into that?

10        A.   I did not have a Ph.D., so I was in first

11   wrung.

12        Q.   Would that make you a regular psychologist

13   in that?

14        A.   Yep.

15        Q.   Who was the independent immediate level

16   psychologist?

17        A.   I don't remember.

18        Q.   Who was the assistant chief?

19        A.   I used to know.  I don't anymore.

20        Q.   And who was the chief psychologist at that

21   time?

22        A.   I'll think of it.

23        Q.   Okay.  Do you recall the names of any of

24   the chief psychologists while you were at Jackson?

25        A.   No.

1    Q.   How long were you at Jackson?

2    A.   Until '99, at the end of '99.

3    Q.   Why did you leave in '99?  Where did you

4  go?

5    A.   Retired.

6    Q.   Oh, okay.

7         Okay.  So you said when you started your

8  job duties, it included interviewing prisoners,

9  toward what end?

10   A.   Well, are we talking about Marquette or

11  are we talking about Jackson?

12   Q.   Let's talk about Marquette first.

13   A.   We had 98 people.  It was my rule that I

14  would walk the walk every day, and so if they had

15  questions or whatever else to ask, that was the time

16  to do it, and then if I needed to, I would have them

17  brought up and interviewed or whatever else, so it

18  was an active prison contact, at least with myself,

19  and it worked, so --

20   Q.   What was the purpose of the interviewing,

21  though?  Was that just you would interview them on a

22  disciplinary issue?  Are we talking about intake

23  interviews?  What was the purpose?

24   A.   All of the above.  They may have questions

25  about this or that or whatever else, legitimate or a

1    scheme of some kind, and so I, rather than left them

2    twisting in the wind, believed that you go and you

3    hear what they have to say, and if it makes sense,

4    you see what you can do.  If it doesn't make sense,

5    you tell them so and to rethink their position.

6        Q.   It almost sounds like a warden position or

7    a deputy warden position.

8             What's the difference between a deputy

9    warden and a psychologist there?

10       A.   Over in the marquette Bridge, believe me,

11   it would be very rare that the warden or any of the

12   others would have that kind of contact, but this was

13   a smaller unit, much more dangerous, may I add, but

14   a smaller unit and I chose to be fair and call it

15   the way it is and I think it paid off in the long

16   run.

17       Q.   Okay.  Okay.  As part of your job duties,

18   were you required to perform an intake interview

19   with each new inmate that came through the intensive

20   program?

21       A.   Yes.

22       Q.   Was there a particular form that you had

23   to use for that?

24       A.   No.

25       Q.   So how long would the typical intake

1   interview be?

2      A.   It depends on how violent it was or how

3   embroiled it was.  You may have a serial killer with

4   five or six killings under his belt or you may have

5   somebody who's just simply a bad robber and wants to

6   be a hero and can't -- chooses not to adjust to the

7   prison system, so therefore, he ends up in high

8   security, so you have a whole range of people that

9   you have to deal with.

10      Q.   So if you're looking at a serial killer

11   who has five killings under his belt, what length of

12   time are you looking at for an intake interview

13   there?

14      A.   It depends on -- I don't have to know

15   every detail and I don't have to expose all of his

16   heart, I have to figure out where his buttons are

17   and is he going to adjust and is he going to comply

18   with the rules and the regulations and what security

19   he presents.

20      Q.   So would these interviews typically be on

21   the all-day side, a couple hours, a couple minutes?

22      A.   Oh, no.  Maybe an hour.

23      Q.   Okay.  And how many intake interviews

24   would you generally do in a day?

25      A.   We didn't have that much movement, so

1    there wouldn't be every day, but then I would still

2    go down and still walk the walks and see what the

3    issues are or whatever else is going on or whether

4    somebody is pretending to be mentally ill or they

5    actually are mentally ill, and then I would have

6    them transported to the hospital.

7         Q.   Okay.  How long would that interview take

8    when you're out walking the walk and you run across

9    somebody and there's an issue, do you sit down with

10   them or just talk to them right there?

11        A.   I would talk to them right there, and then

12   if I saw it as a critical issue or important issue,

13   I then would have the officers bring them to my

14   interview area and then I would call the physician

15   over at the Branch Prison and advise him what I was

16   sending over to him and we'd generally talk about

17   it.

18        Q.   And how many times would that happen

19   typically, two or three times a day, once a day,

20   once a week?

21        A.   Oh, no.  I'd say once a week.

22        Q.   Okay.  So the rest of the time when you

23   were walking the walk, you were just interacting

24   with the inmates?

25        A.   (Witness nods head.)

1    Q.    Kind of casually?

2    A.    Yeah, also demanding a certain amount of

3    respect for the system.

4    Q.    Okay.

5    A.    And so therefore, if, for instance, they

6    were screaming, yelling and hollering, I would walk

7    right past them and wouldn't talk to them.

8    Q.    Okay.

9    A.    You have to present and you have to be

10   decent and I don't care what your background is or

11   anything else, I care what you are right now, and

12   your behavior is going to be judged.  When you get

13   control of yourself, then I won't have to control

14   you.

15   Q.    And then you said there was also -- part

16   of your job duty was risk assessment.

17          Was that part of the intake interview

18   process?

19   A.    Sure.

20   Q.    Okay.  So intake interviews, risk

21   assessment, supervising a team of 10 to 15 officers,

22   what other job duties did you have while you were at

23   the intensive program?

24   A.    I would write for the parole board and

25   review the kinds of behaviors and everything else

1    and identify risk and identify their -- where

2    they're at, and if it can be -- if there's

3    reasonable cause to trust them, and then the parole

4    board would make up their mind.

5        Q.   So what did that involve when you wrote

6    for the parole board?  Did that involve bringing an

7    inmate in and having a sitdown and that kind of

8    thing?

9        A.   Yes.  Yes.

10       Q.   And how long would one of those meetings

11   typically last?

12       A.   Generally I would get into more detail,

13   maybe an hour, an hour and a half, and then I would

14   end by telling them what I thought and what I would

15   tell the parole board, so I told them straight to

16   their face that they were a questionable entity,

17   that it did not look good and I could not support a

18   recommendation for parole.

19       Q.   How many hours a day would you typically

20   spend supervising the officers in your unit?

21       A.   At least -- well, after the other

22   psychologist left, I was on 24/7 all the time,

23   because that's what happens, so I would work an

24   eight-hour shift, and then sometimes if necessary,

25   then I would come in at night, because I wanted to

1   see what happened on the night shift and all this

2   kind of stuff, because I wanted it to run smooth.

3          Q.   Did you actually live at the prison?

4          A.   No.

5          Q.   Okay.

6          A.   I lived in the town.

7          Q.   So how many hours per day would you say

8   you typically spent on the role of supervising

9   officers?

10         A.   Eight.

11         Q.   And that was on top of conducting intake

12  interviews and parole interviews?

13         A.   Right.  Correct.

14         Q.   So how many -- what would a typical day

15  look like to you in terms of number of hours,

16  ten-hour days, twelve-hour days?

17         A.   I tried to save myself, also, so I tried

18  to stay eight hours a day, but if necessary, I'd

19  stay longer.

20         Q.   Did you have any responsibilities for

21  things like budgets, staffing, scheduling, things

22  like that?

23         A.   No.

24              In a minute, I'm going to ask you for a

25  smoke break, or whenever you want.

1     Q.   Okay.  I just want to make sure that I've

2   covered all your job duties at the intensive

3   program.

4     A.   Right.

5     Q.   So we have intake interviews, risk

6   assessment, supervising officers, and then you said

7   something about tickets, so I'm assuming that means

8   some kind of disciplinary action?

9     A.   Yes.  There's a minor and a major ticket

10   category, and I would hear all the minor --

11   individually, I would hear all the minor tickets if

12   they wanted to protest.  They could agree to the

13   ticket or they could protest and come to me.

14          If it was a major, then the deputy warden

15   and I would then sit together and hear those

16   tickets, which were generally more serious tickets.

17     Q.   So is that similar to like an arbitration,

18   you pull both sides in one at a time and hear each

19   person's side of what happened?

20     A.   Or -- yeah, I'd hear the officer who would

21   write the ticket.

22     Q.   Okay.

23     A.   What the facts were, and then I'd then

24   hear the inmate and what his explanation was.

25     Q.   Okay.  Those circumstances, you'd be

1   talking about a specific event that happened in the

2   prison?

3       A.   Right.

4       Q.   That's not an interview on life history

5   and all that?

6       A.   No.   That's correct.

7       Q.   Okay.   So other than those things, the

8   intake interviews, the risk assessment, the

9   supervising of officers, the writing to the parole

10  board and the adjudicating of minor and major

11  tickets, was there anything else that comprised your

12  duties?

13      A.   No.

14      Q.   How about at Jackson, was anything

15  different when you were at Jackson?

16      A.   No, just a larger population.

17      Q.   Okay.   Did you have any responsibility for

18  treating inmates, treating patients?

19      A.   Yes, periodically.   They would do group

20  psychotherapy for sex offenders or violent --

21  violent actions and -- but for the most part, I

22  did -- I wrote a lot of intake, I did the intake

23  on -- I was more experienced with the more violent,

24  unpredictable types, and so I would generally do

25  between four and six full interviews a day, and then

1  if you want to figure out the number, I was there

2  probably for 15, 20 years, and so you can multiply

3  that times four to six a day.

4      Q.   Are those intake interviews or therapy

5  interviews?

6      A.   Intake.  Intake.

7      Q.   Intake?

8      A.   Yeah.

9      Q.   Okay.

10     A.   And from that, then, a round number, I

11 would take that number, and then divide it and --

12 because I would periodically take leave and go off

13 to Europe or whatever it was, London, whatever the

14 case, or to Russia, so to err on the side of safety,

15 I would then just cut that number in half.  I think

16 it's more than that, but I didn't want to embellish

17 something that shouldn't be.

18     Q.   And you said a typical intake interview

19 was how long?

20     A.   It depends on the -- it very well may

21 take -- sometimes they're uncooperative or whatever

22 else, so it only takes 20 minutes.  Other times, it

23 may take an hour.  A complicated case, if there's

24 mental illness that's alleged, then it's going to

25 take longer to sort that out, and then I'd refer

1   them over to medical or not, that kind of stuff, so

2   it was more time consuming, but generally I would do

3   six cases probably in five or six hours.

4        Q.   So six cases in five hours and another

5   eight hours managing supervising officers?

6        A.   Well, I didn't supervise officers at

7   Jackson.

8        Q.   Oh, okay.  This is at Jackson that you're

9   talking about?

10       A.   Yeah.  Yeah.

11       Q.   Okay.  And then you said a couple times

12  when there was a mental health issue or mental

13  illness issue, you'd refer to medical.

14            Was a psychiatrist or a Ph.D. on staff at

15  Jackson?

16       A.   Down at Jackson, we had a whole hospital.

17       Q.   What about up at Marquette?

18       A.   Marquette had a smaller hospital and a

19  physician there.

20       Q.   Okay.  But as far as mental illness,

21  inmates in crisis, that kind of thing, you didn't

22  deal with that, you moved those folks off to the

23  hospital?

24       A.   Sometimes we would do it, but most of the

25  time, they would stay where they're at and the doc

1   would send medication over to them, but if it became

2   serious enough, a high suicide risk or whatever,

3   then I would insist that they go over there.

4           MR. LAUERSDORF:  All right.  Are you ready

5   for a smoke break?

6           THE WITNESS:  Sounds great.

7           MR. LAUERSDORF:  Okay.

8           (Pause in deposition:  10:41 - 10:52 a.m.)

9           THE WITNESS:  I need to correct the

10  record.

11          MR. LAUERSDORF:  Okay.

12          THE WITNESS:  We looked it up, I was wrong

13  with UCLA.  It was Cal State L.A.

14

15  BY MR. LAUERSDORF:  (Continuing)

16      Q.   Cal State L.A.

17           Okay.  And when were you looking that up,

18  were you able to clarify the time period that you

19  were there?

20      A.   No.  We just looked up the location and

21  then I realized that you were right.

22      Q.   Okay.  So I think we're probably going to

23  talk a little bit more about your time at the

24  Michigan Department of Corrections, but I want to go

25  back and talk about licensing a little bit.

1          So do you currently hold any professional

2     licenses?

3          A.   I just let it expire.

4          Q.   And what was that?

5          A.   My psychology license with the Michigan

6     department -- with the -- with Michigan.

7          Q.   Okay.  Other than your psychology license

8     with Michigan, do you hold any other professional

9     licenses?

10         A.   No.

11         Q.   Have you in the past?

12         A.   No.

13         Q.   I have a record of a license No. 9391 for

14    psychology in the State of Pennsylvania.

15              Does that ring any bells?

16         A.   I don't ever have any -- I don't have any

17    recognition of that.

18         Q.   Okay.  Have you ever been licensed as a

19    psychologist in the state of Pennsylvania?

20         A.   No.

21         Q.   And then I have a record of a license

22    No. 6301002812 for a psychologist in the State of

23    Michigan.

24              Is that your Michigan license?

25         A.   It could be.  I don't know my number at

1   the moment.

2       Q.   Okay.  And when I was looking at that, in

3   one location, it just says psychologist, and a

4   couple other locations, it says something called

5   master's limited psychologist.

6            What's that?

7       A.   Same thing.

8       Q.   What does that mean, master's limited

9   psychologist?

10      A.   Meaning that because it's a master's and

11  not a Ph.D., you have to be supervised.

12      Q.   Okay.  And is that true everywhere in the

13  state or like in private practice or just in the

14  DOJ --

15      A.   In the prison system, the state prison

16  system.

17      Q.   You said you let that license expire.

18           When did that expire?

19      A.   Probably last year.

20      Q.   Why did you let it expire?

21      A.   I'm more interested in criminology at the

22  moment than I am in psychology and I have no

23  interest in going back teaching or working in the

24  business system or any of that kind of thing, so I

25  just don't find it useful for me.

1    Q.    Okay.  Have you ever been licensed as a

2  psychologist anywhere other than Michigan?

3    A.    No.

4    Q.    Have you ever been licensed as a private

5  investigator anywhere?

6    A.    Yes.

7    Q.    Whereabouts?

8    A.    In Pennsylvania and I also turned that in

9  and rejected that.

10   Q.    What do you mean?

11   A.    I signed up to have it, got the license,

12  and then realized that it was not my cup of tea, so

13  I then wanted out of it, so I took it back to the

14  courthouse and turned in all my evidence and said

15  "Thank you very much.  I'm on my own."

16   Q.    Okay.  Why did you decide that wasn't your

17  cup of tea?

18   A.    Um, that's -- I'd rather consult on cases

19  than I would to go out and play detective.

20   Q.    Did you actually work for a private

21  investigation firm or anything like that?

22   A.    No.

23   Q.    Did you have any assignments as a private

24  investigator before you terminated your license?

25   A.    No, not really.  I did -- I have lectured

1    two or three times to the statewide private

2    investigators association, but I don't do that

3    anymore.  I like what I'm doing.

4        Q.   The statewide private investigators

5    association for what state?

6        A.   Pennsylvania.

7        Q.   When did you turn in your PI license?

8        A.   Oh, probably three or four years.

9        Q.   How long did you have it before you turned

10   it back in?

11        A.   Probably nine months.

12        Q.   Have you ever been licensed as a private

13   investigator in Michigan?

14        A.   No.

15        Q.   How about in the State of Oregon?

16        A.   No.

17        Q.   Have you ever been licensed as a private

18   investigator anywhere other than the state of

19   Pennsylvania?

20        A.   Right.

21        Q.   Right, no, you haven't?

22        A.   I have not.

23        Q.   Do you own any law enforcement

24   certification or credentials in any state?

25        A.   No.

1      Q.    How about any county or municipality?

2      A.    No.

3      Q.    Have you ever been convicted of a crime?

4      A.    No.

5      Q.    Have you ever been sued by anyone other

6   than Mr. McGuffin?

7      A.    I was sued by -- in the Drake case.

8      Q.    That's Drake v. Portuondo, is that the

9   name of the case?

10     A.    Right.  Out of Niagara Falls, New York.

11     Q.    Who were you sued by?

12     A.    The -- I forgot his name, but anyway, the

13  bad guy.

14     Q.    Drake?

15     A.    Yeah.  He got convicted and then appealed

16  and then he was -- he was given a larger sentence in

17  the second trial without me and then -- he

18  eventually then convinced somebody to sue again and

19  claimed that I lied and whatever else and then he

20  approached the Niagara Falls Prosecutor's Office who

21  had -- that's where the trial took place originally,

22  and from that, then, they heard all of the

23  complaints.

24          They chose, then, to believe Robie Drake

25  that I'd somehow done wrong and they didn't bother

1    to tell me about it, so therefore it then went to

2    court, and they were convinced, based on what they

3    had heard, and they didn't hear from me, heard

4    everything that was said, and so an opinion was

5    written basically victimizing as well as trying to

6    cut my neck and discredit me.

7              I then --

8       Q.   Let me stop you for a second there.

9              Were you actually sued by Mr. Drake, you

10   personally?

11      A.   I'll rephrase and say I thought I was, but

12   maybe I wasn't, I don't know, but I know that I was

13   named basically as a way of getting out of prison,

14   and again, Niagara Falls failed to let me know,

15   therefore I had no right to defend myself after the

16   fact, because I wasn't -- for some legal reasons,

17   I'm not exactly sure why.

18              You guys are the legal authorities, but

19   the -- I was not allowed to sue or to ask to be

20   heard or have it overturned or anything else like

21   that, and from that, then, I went to several lawyers

22   in New York that were licensed and they told me that

23   I didn't have any opportunity to sue, so therefore I

24   was injured and damaged and damned, if you please,

25   without any remedy.

1          And so then with all that, the Vidocq

2     Society and the American Academy got involved and

3     they both were vigorous in their investigation,

4     which I am pleased for, and from that, then, the --

5     three different people wrote to the American Academy

6     of Forensic Sciences, the ethics committee, and had

7     me taken out of the academy, however their

8     investigation of it was that I was truthful and that

9     I had not committed any violation.

10          In part, the violation at large was that I

11    used no psychological and no legitimate

12    terminologies, for instance, with the idea of what

13    piquerism was, where the multiple stabbing, et

14    cetera, and from that, then, everybody believed in

15    this paid gun, in my opinion, but psychologists that

16    testified there wasn't such a thing.

17          Well, when in fact, the first legal entry

18    where piquerism was used was in 1923 and there's a

19    whole register now of other cases where piquerism is

20    used, and whether the person who advised the court

21    was crooked or just stupid, the -- nobody ever

22    challenged the opinions of the court, so the court

23    ruled, then, that I had misquoted, et cetera, and

24    used nonprofessional language, when in fact, it's

25    part of the lexicon, it's just that he was too damn

1    dumb to figure it out, not that I'd be critical.

2        Q.   Who were the three different people that

3    complained to AAFS?

4        A.   AAFS generally and specifically does not

5    reveal that.

6        Q.   So you don't know the identity of --

7        A.   I suspect two, but do I have proof of it?

8    No.  Does AAFS have it?  Yes, but then Karin here

9    has a copy, then, of a letter from AAFS that

10   exonerates me three times for what they claim and

11   deducted for claims for what they considered to be a

12   wrongful accusation.

13       Q.   Who are the two people you suspect?

14       A.   A guy by the name of Weller and -- who's a

15   psychologist in New York.

16       Q.   W-E-L-L-E-R?

17       A.   Yes, and I suspect, then, another -- I

18   can't think of his name.  I will in a minute.

19       Q.   Do you know Mr. Weller's first name?

20       A.   No.  It may be Michael, but I'm not sure.

21   I've never met him that I know of.

22       Q.   As far as I can tell, at least in Drake v.

23   Portuondo, you weren't personally sued?

24       A.   Okay.  Fair enough.

25       Q.   So getting back to the original question,

1    other than being sued by Mr. McGuffin, have you ever

2    been sued by anyone?

3         A.    No.

4         Q.    Okay.  Have you ever sued anyone?

5         A.    No.

6         Q.    Are you currently married?

7         A.    No.

8         Q.    Have you ever been married?

9         A.    Yes.

10        Q.    To who?

11        A.    I don't remember her name.

12        Q.    Do you remember her maiden name?

13        A.    She remembered her -- I really don't want

14   to go here.  I don't like the question actually.

15        Q.    Well, I need to ask it, so I need to know

16   the name of the person that you were married to.

17             MS. SCHAFFER:  Yes, you can answer the

18   question.

19        A.    Neda Pruitt.

20        Q.    Can you spell that for me.

21        A.    N-E-D-A, P-R-U-I-T-T.

22        Q.    How long were you married?

23        A.    Not long.

24        Q.    Less than a year?

25        A.    Yep.

1    Q.    Where were you married?

2    A.    In Washington state.

3    Q.    And how did the marriage end?  I don't

4  want details, just by divorce, by death?

5    A.    By divorce.

6    Q.    Okay.  And where was the divorce filed?

7    A.    I think in the Tri-Cities, Pasco or

8  something like that.  I'm not sure.

9    Q.    Do you have any children?

10   A.    No.  I don't like children.

11   Q.    Are you currently employed?

12   A.    No.

13   Q.    Who was your last full-time employer?

14   A.    Ohio State University.  Sorry, Oklahoma

15  State University in Tulsa, Oklahoma.

16   Q.    Okay.  And how were you employed by

17  Oklahoma State University?

18   A.    I was employed to teach in the graduate

19  program.

20   Q.    Full-time?

21   A.    Yes, for a year.  I didn't like it and

22  left.

23   Q.    Teaching the graduate program in what

24  school?

25   A.    Forensic sciences.

1    Q.    Do they actually have a --

2    A.    Yes.

3    Q.    -- school of forensic sciences?

4    A.    Yep.

5    Q.    That's not a division of another --

6    A.    Well, it's a division of the medical

7    school.

8    Q.    Okay.  Do they refer to that as health

9    sciences?

10   A.    Could.

11   Q.    So is the forensic science discipline with

12   the school of health sciences?

13   A.    Right.

14   Q.    Okay.

15   A.    Makes sense.

16   Q.    And when did you teach that?

17   A.    In -- I went in '15 and left in '16.

18   Q.    And who hired you for that position?

19   A.    Rob Allen.

20   Q.    A-L-L-E-N?

21   A.    Yes.

22   Q.    What was Rob Allen's title?

23   A.    He was the director of that unit.

24   Q.    Was he a -- was he a professor, too?

25   A.    Yes, I believe so.

1       Q.    A tenured professor?

2       A.    Yep.

3       Q.    What did you teach there?

4       A.    I was supposed to be teaching crime

5    assessment amongst other things and I found out that

6    the students could memorize, they couldn't think,

7    and I felt I was wasting my time, so I left.

8       Q.    Was that a fellowship or an associate

9    professorship or adjunct professor, what was your

10   title?

11      A.    It changed across time.

12      Q.    Okay.  What was it when you started?

13      A.    When I started, it was I think -- I could

14   be wrong, but I think it was adjunct professor, and

15   then some of the professors objected, because I only

16   had a master's, so therefore they changed it to some

17   other title that I don't recall off the top of my

18   head.

19      Q.    Do you recall the names of any of the

20   professors that objected?

21      A.    No.

22      Q.    Were they in that specific program or --

23      A.    Yes.

24      Q.    The Department of Health Sciences?

25      A.    Right.  Of course they're not going to

1    tell me.

2         Q.   But they weren't just some randoms from

3    the college of literature or something like that?

4         A.   Right.

5         Q.   They were actually --

6         A.   Right.

7         Q.   Okay.  Do you recall what the title was

8    changed to after adjunct professor?

9         A.   Not off the top of my head.

10        Q.   How long after the change did you end up

11   leaving the school?

12        A.   I left I think it was in August of '16.

13        Q.   And how many classes did you actually

14   teach while you were there?

15        A.   About two.

16        Q.   Two semesters, two classes?

17        A.   No, two classes in that year.

18        Q.   Okay.  Were they on quarters, semesters,

19   or trimesters there?

20        A.   They were on semesters.

21        Q.   Okay.  So did you teach two courses the

22   same semester or one each semester?

23        A.   One each semester.

24        Q.   What was the name of the first course?

25        A.   Crime Assessment.

1    Q.    And what was the name of the second

2    course?

3    A.    Crime Assessment.

4    Q.    Oh, was it the same course?

5    A.    Yep.

6    Q.    You just taught it twice?

7    A.    Correct.

8    Q.    Who was your supervisor for that role?

9    A.    Rob Allen.

10    Q.    Okay.  And that was full-time?

11    A.    Yes.

12    Q.    Was that a salaried position?

13    A.    Yes.

14    Q.    Okay.  And who was your last full-time

15    employer before Oklahoma State?

16    A.    Michigan Department of Corrections.

17    Q.    How about part-time employer, have you had

18    any part-time jobs since leaving Michigan?

19    A.    Well, I was a consultant and lecturer with

20    a buddy of mine with the Sherry Black Foundation out

21    of Utah and we would go and give training lessons to

22    law enforcement on fighting crime.

23    Q.    Are you still doing that?

24    A.    Well, we were going to start up again, but

25    the pandemic shut that down.

1    Q.   I'll ask you questions about the Sherry

2    Black Foundation a little later.

3    A.   Okay.

4    Q.   Were there any other part-time paid

5    positions between Michigan DOC and Oklahoma State

6    University?

7    A.   Not really.

8    Q.   When was the last time that you provided a

9    service to any person or organization for a fee,

10   wage, salary, stipend, retainer or other

11   compensation?

12   A.   I don't know.  I know that I've been

13   giving a lot of stuff away pro bono.

14   Q.   Do you get paid for your speaking

15   engagements usually?

16   A.   Yeah.

17   Q.   How much do you charge?  Do you have a

18   rate schedule?

19   A.   Yes.  In fact, I'm going to be teaching in

20   October in North Carolina at the homicide school.

21   It's $1,000 a day.

22   Q.   Is that listed on your resume as well or

23   is that separate?

24   A.   Separate.  Separate.

25   Q.   Is that just a standard flat rate?

1      A.   Yes, but I will also -- I'll negotiate.

2      Q.   Is that $1,000 all in, or do you have a

3   per diem, travel expenses, that kind of thing?

4      A.   Oh, yeah.  That has to be taken care of.

5      Q.   And how many speaking engagements would

6   you say you do in a typical calendar year?

7      A.   Well, it's been unusual, so now I'm trying

8   to get back on the schedule and all that kind of

9   stuff.  I have some interest, but at the moment, the

10  only one scheduled is North Carolina.

11     Q.   Okay.  And what organization is that in

12  North Carolina?

13     A.   It's the North Carolina Homicide

14  Investigator's Association.

15     Q.   When was the last time you presented for

16  AAFS?

17     A.   It's been quite a while.

18     Q.   Do you recall the year the last time you

19  presented there?

20     A.   No.  It's time for the young people to

21  earn their stripes.

22     Q.   Let's see.  Going back to the Michigan

23  Department of Corrections for a second, you

24  mentioned Michael Capuzzo earlier.

25     A.   Right.

1     Q.   He's the guy that wrote Murder Room.

2         Is that right?

3     A.   Yes.

4     Q.   He said in there when I was reviewing

5 that, he said that you told him that while you were

6 at Michigan DOC, you could turn off the inmate

7 showers by a remote switch.

8         How did that work?

9     A.   Because they were dangerous and they

10 were -- it was a highly, highly controlled

11 environment.  Not only could we control the

12 temperature of the water, but we could control the

13 amount of water they got in the shower.

14     Q.   Did they have individual showers, then?

15     A.   No.

16     Q.   Group showers?

17     A.   Group -- well, it was a shower that only

18 one could be in at a time.

19     Q.   Oh, okay.  So a shower room with one

20 showerhead?

21     A.   Exactly.

22     Q.   Okay.  And that ran some kind of wire back

23 to your office or something?

24     A.   Well, no.  It went to the officers in the

25 bubble that was in the center of that core that

1    could watch them go to the shower, watch them in the

2    shower, and control the temperature and all that

3    kind of stuff and also cut off the shower and watch

4    them back to their cell.

5         Q.    So was there one shower for all 98 --

6         A.    No, each wing had their -- there was one

7    shower, but only -- it would rotate in terms of

8    which wing was going to be showered that day.

9         Q.    Okay.  And each wing had a bubble?

10        A.    No, one bubble or all five.

11        Q.    Okay.

12        A.    It's like a --

13        Q.    A wagon wheel?

14        A.    A wagon wheel.

15        Q.    So one bubble in the middle and five

16   spokes going off of the bubble?

17        A.    Yeah.  Yeah.

18        Q.    And the bubble is basically a command

19   center for the guards that are inside the prison?

20        A.    Exactly.  Exactly.

21        Q.    Okay.  And so from that bubble, they could

22   control all five of the showers?

23        A.    Uh-huh.

24        Q.    And monitor them?

25        A.    Uh-huh.

1    Q.    Okay.  And so how much time would you

2    spend in that bubble on a daily basis?

3    A.    I rarely, if ever, went in.  I walked down

4    there on my daily reviews, but there was no need for

5    me to go down there.

6    Q.    Okay.  So how often were you turning the

7    inmate's showers on and off by remote switch?

8    A.    Well, it depends on what was happening in

9    the shower and whether there was a disturbance or

10   whatever else, what was going on, or manipulation of

11   some kind.  It was not going to be every day, but we

12   certainly had the capacity to turn it off if

13   necessary.

14   Q.    How many times did you do that yourself

15   personally?

16   A.    I didn't -- I don't -- that's not my job.

17   It was the officer's job to do that.

18   Q.    How many times did you instruct an officer

19   to do that?

20   A.    Many times they would do it because of the

21   emergency of the situation and then I would learn

22   about it.

23   Q.    Okay.  One of the other things he

24   mentioned is that you would put inmates on a diet of

25   prison loaf which he referred to as all three meals

1    for the day blended and baked into a brick.

2         A.    Yes.

3         Q.    So tell me how that works.  You lived the

4    life, but my familiarity with prison food is that

5    the food service is pretty bureaucratic, but it

6    sounds like you had some control over the food

7    service.

8         A.    Well, yeah.  If inmates are going to throw

9    urine on you or whatever else, okay?  That's not

10   cool to serve them food or if they violate all kinds

11   of eating issues, and they will, then they get the

12   same nutrients that are in the regular meals that

13   are being served, but for those that are

14   misbehaving, then, they would take all that food,

15   mix it together, and make a loaf and put that on

16   their cell door and then they would close the cell

17   door, they would eat, so they didn't have any tools,

18   they didn't have any plates, all that kind of stuff.

19   It was just -- it was just no weapons or anything

20   else that could be made.

21        Q.    So there was no common mess in that

22   program, the intensive program?

23        A.    No.

24        Q.    So each inmate ate in their own cell?

25        A.    Oh, yeah.  Oh, yeah.  Quite so.

1      Q.    Was that essentially like an ad seg unit

2   or an isolation unit?

3      A.    Yeah.  Yes.

4      Q.    So because each meal was being served

5   individually, you personally could control how that

6   meal was prepared for each inmate?

7      A.    Yep.  This person is no longer on regular

8   diet, he's on food loaf.

9      Q.    And how is it that that responsibility

10  fell to you as opposed to the sergeant or the

11  lieutenant or an officer or the warden?

12     A.    It just did.  I wasn't opposed to it.

13     Q.    Was that part of a written policy or a

14  written protocol?

15     A.    Not that I know of, but it was a judgment

16  call as to getting back into control.  If he didn't

17  like food loaf, and there were some who did, some

18  preferred it over the regular meal, but if you

19  didn't like food loaf and you want to improve the

20  quality of your life, then shape up.

21     Q.    So how did that work?  Each day, like at

22  the beginning of the day, you'd send an order down

23  to the kitchen that says "Hey, this guy gets the

24  loaf, this guy doesn't," did you do it for each

25  meal?  How did you control that?  That seems like a

1    lot of administrative work.

2         A.    No, not really.

3         Q.    Would it be like a standing order for the

4    week?

5         A.    It could be.  It could be.  Until -- until

6    he resumes reasonable behavior that is expected.

7         Q.    Okay.  Would there be records kept of

8    that?

9         A.    Of course.  Probably.

10        Q.    Do you recall keeping records of it?

11        A.    I didn't.

12        Q.    Was there a book or did you write down "On

13   this day, I ordered the loaf for discipline for" --

14        A.    No.  No.

15        Q.    But you interacted with the inmates on a

16   daily basis, right?

17        A.    Yeah.

18        Q.    How much time did they each get out of --

19   did they get any group time out of a cell or was

20   each individual allowed yard time independently or

21   shower time --

22        A.    Yard time independent, and they had cages,

23   in essence, so you would let three or four people

24   out, but in separate cages.  They couldn't be

25   together.

1        Q.    Okay.

2        A.    Because they'd beat each other up or

3    whatever.

4        Q.    And did you have your own office inside

5    the prison?

6        A.    Yes.

7        Q.    Where was that located?

8        A.    In the front -- at the front of the

9    building behind the gates.

10       Q.    Okay.  So it would be like an

11   administrative area and you'd have to enter behind

12   the gates to get to the bubble?

13       A.    Yeah.

14       Q.    Were your interactions when you would do

15   the interactions with inmates, was that a

16   one-on-one, was there an officer in the room, how

17   did that work?

18       A.    It depends on the circumstances.  It

19   depends what I needed to or wanted to discuss.  It

20   also depended on the patient -- or the prisoner.

21   Sometimes they would have to have leg irons, belly

22   chains and an officer in the room, because they were

23   too violent.

24       Q.    You --

25       A.    Other times, not so.

1    Q.    Were you a salaried employee?

2    A.    Yes.

3    Q.    How were your hours tracked?

4    A.    Everybody knew when I was there.

5    Q.    You didn't have a timecard or a sign-in

6  sheet or anything like that?

7    A.    No.  No.

8    Q.    But you would have to sign in and out of

9  the prison, right?

10    A.    No.  They recognized me and I'd walk in.

11    Q.    Oh, so they didn't keep time records of

12  people coming and going?

13    A.    Oh, they did for everybody else, but good

14  lord, I was right across from the bubble and they

15  saw me every day.  They knew who I was.

16    Q.    How about records of your intake

17  interviews and other contact with inmates, would the

18  DOC have kept records of that?  Were you required to

19  make records?

20    A.    It was more my choice and I did make

21  records and I kept files.

22    Q.    Did you take any of those files with you

23  when you left DOC?

24    A.    No.

25    Q.    Okay.  So DOC would have records of all of

1    the contact that you --

2         A.    No.

3         Q.    No?

4         A.    Because they closed that whole unit and

5    converted it over to a lower level of inmate, so I

6    don't -- then they disbursed all those high risk

7    back into general population, which was unwise in my

8    opinion, but anyway.

9         Q.    The DOC would still have records, right?

10        A.    Theoretically.

11        Q.    Do you recall the name of any of the

12   corrections officers that you worked with while you

13   were at the --

14        A.    Not anymore.

15        Q.    -- program?

16        A.    No.

17        Q.    How about at Jackson?

18        A.    No.

19        Q.    Do you have any friends left over from

20   those days that you worked with, colleagues who you

21   worked with and became friends with?

22        A.    Yeah.

23        Q.    Who would that be?

24        A.    Don Larzarki.

25        Q.    Can you spell the last name for me.

1        A.    L-A-R-Z-A-R-K-I out of Detroit.

2        Q.    Anybody else who you recall?

3        A.    Not really.

4        Q.    Is there any other employment that we

5  haven't talked about it?  We've got --

6        A.    I --

7        Q.    Go ahead.

8        A.    No, go ahead.

9        Q.    We've got the pharmacology lab at Michigan

10  State, right?  Then we've got Sparrow Hospital, and

11  then we've got the L.A. County Medical Examiner's

12  Office, and then we've got Michigan Department of

13  Corrections and we've got Oklahoma State University.

14        Is there anything that -- any other

15  employment that we've left out?

16        A.    I'm curious about your first mention.

17        What was the first one that you mentioned?

18        Q.    The lab at the school of pharmacology at

19  Michigan State.

20        A.    Okay.  Fair enough.

21        Q.    Did I get that wrong?

22        A.    No, I thought I heard you say something

23  else.

24        Q.    Okay.  I also said Sparrow Hospital, but I

25  might have got those two reversed.

1      A.    No, you didn't.

2      Q.    Okay.  So any other employment other

3    than -- and I've gone through your entire employment

4    history, have we gone through that?

5      A.    I think so.  I find it exhausting.

6      Q.    Okay.  Well, we're going to take a break

7    in just a minute.  Ms. Schaffer asked if we could

8    take a break and get some food in I think about 20

9    minutes.

10            Am I right about that?

11            MS. SCHAFFER:  Yeah.  What do you think,

12   Richard, 20, 30 minutes?

13     A.    Yeah, 20 minutes, I don't care.

14     Q.    Did you do any side work or outside jobs

15   while you were employed by the Michigan DOC?

16     A.    Yeah, I would take -- I would take leave

17   or vacation and go off to England or whatever and

18   lecture and work cases and come back.

19     Q.    When you say work cases, what do you mean?

20     A.    Well, if they have a complicated case that

21   they're trying to understand, then they would call

22   and sort of say "Can you come over and can you help

23   us out?"

24     Q.    Okay.  So who is they?

25     A.    Scotland Yard amongst others, the

1   Metropolitan Police, and the Home Office.

2       Q.   Who did you work with at Metropolitan

3   Police?

4       A.   Some of the detectives involved in murder

5   and they may have other issues that they thought I

6   could help.

7       Q.   Okay.  What were the names of the

8   detectives who were involved in the --

9       A.   I don't recall and -- I just don't recall.

10      Q.   You don't recall any of the names of the

11  detectives that you worked with at Metropolitan

12  Police?

13      A.   Nope.

14      Q.   When you worked with Metropolitan Police,

15  where did you work?

16      A.   What do you mean?

17      Q.   What was the physical location.

18      A.   The Metropolitan Police building.

19      Q.   Which is -- what's the address there?

20      A.   I have no idea.

21      Q.   Do you have a town or suburb or --

22      A.   It's London.

23      Q.   Okay.  What area of London?

24      A.   I don't know, sir.

25      Q.   East side, west side, north side, south

1   side?  Do you know?

2        A.   Nope.

3        Q.   How many cases did you work on with

4   Metropolitan Police?

5        A.   I don't recall.

6        Q.   Do you recall the names of any of the

7   cases that you worked on for the Metropolitan

8   Police?

9        A.   No.

10        Q.   When was the last time you worked on a

11   case with the Metropolitan Police?

12        A.   I think it was a cannibal case and I think

13   that was about -- no, there were things since.  I

14   would be unfair to you if I gave you a time, because

15   I'm not sure and I don't want to misdirect.

16        Q.   Okay.  Do you recall the decade?

17        A.   In the last ten years.

18        Q.   Oh, okay.

19        A.   Yeah.

20        Q.   And who was your contact on that case?

21        A.   I forgot his name, but eventually the case

22   was resolved, badly.

23        Q.   Okay.  So your contact was a him?

24        A.   Yep.

25        Q.   Approximately what was his age?

1    A.    Everybody is younger than I am.  He's

2  probably -- now, he's probably 50.  I'm not being

3  evasive, I just don't remember his name.

4    Q.    Do you recall his rank?

5    A.    I want to say sergeant, but I can't

6  confirm that.

7    Q.    Do you recall anyone else that worked on

8  that case?

9    A.    No.

10    Q.    When you referred to it as the cannibal

11  case, what was going on in that case?

12    A.    The guy -- or the perp killed a guy and

13  took his brain and fried it in butter and ate it.

14    Q.    Where did that happen?

15    A.    In London.

16    Q.    Which part of London?

17    A.    I don't know.

18    Q.    A single murder?

19    A.    Yes.

20    Q.    What was your role in the investigation?

21    A.    To explain cannibalism to him, and no, I

22  don't want to explain it.

23    Q.    So let's see, how did this person get

24  ahold of you?

25    A.    They -- I'm not sure.  Through contacts of

1    other people who recommended that they call me.

2         Q.    And how did you correspond with the

3    person?

4         A.    Telephone, and then in the meantime,

5    before it was all over, I was over and gave a

6    lecture which he attended and then I was supposed to

7    go back to explain to the court about all this and

8    the court then decided that it was too messy to hear

9    in court, so they then convicted him to a mental

10   institution and avoided the trial.

11        Q.    What was the date of the lecture that you

12   gave?

13        A.    I don't know.

14        Q.    What was the title of the lecture?

15        A.    It was all day long.  It was a training

16   session.

17        Q.    Where was it held?

18        A.    In Leicester.

19        Q.    And what was the name of the organization

20   that put it on?

21        A.    I don't know.  The Brits organized it.

22        Q.    And were you presenting?

23        A.    Yes.

24        Q.    What did you present?

25        A.    A cross lecture across a wide spectrum of

1   crime assessment and murder investigation.

2        Q.   Was it you for the whole day or did you

3   just have one --

4        A.   Yes, I was the whole day.

5        Q.   Okay.  Do you have any promotional

6   materials from that --

7        A.   No.

8        Q.   -- appearance?

9        A.   No.

10       Q.   Were you paid for that appearance?

11       A.   I don't think so.

12       Q.   Do you have any records from that

13  appearance?

14       A.   No.

15       Q.   Do you have any records from your work on

16  the cannibal case?

17       A.   No.

18       Q.   Were you paid for your work on the

19  cannibal case?

20       A.   No.  I should have charged them.

21       Q.   How did you pay for your expenses,

22  traveling, accommodations and everything to England?

23       A.   I can't remember.  I'm sure somebody paid

24  for it, because I didn't.

25       Q.   Do you have a particular airline that you

1    like to fly?

2         A.    No.

3         Q.    Other than the case that you referred to

4    as the cannibal case, what other cases did you work

5    on with the Metropolitan Police?

6         A.    The others are privileged and I choose not

7    to discuss them.

8         Q.    Who would be able to verify your work on

9    those cases without disclosing privilege?

10        A.    No one.

11        Q.    Who did you report to for your work on

12   these cases?

13        A.    You're exhausting me with an unanswerable

14   question.

15        Q.    Well, who was your contact for those

16   cases?

17        A.    I'm not going to discuss it.  I'm not

18   going to, no.

19        Q.    Okay.  I just want to be clear, you're

20   refusing to answer?

21        A.    Yes.

22        Q.    Where did any of those cases take place?

23   I understand you may be refusing to answer, but I

24   just need to have you say that for the record.

25        A.    I refuse to answer.

1         MS. SCHAFFER:  I'm also going to object.

2  I believe that's been asked and answered.

3         MR. LAUERSDORF:  I asked him about where

4  the cannibalism case took place and he didn't know

5  the answer to that.  Now I'm asking where were any

6  of the other cases that he worked on for the

7  Metropolitan Police took place.

8    Q.   My understanding is that you're refusing

9  to answer.

10        Is that correct, Mr. Walter?

11    A.   That's correct.

12    Q.   So is my understanding correct that other

13  than the cannibal case that we've already talked

14  about, you're refusing to answer any questions about

15  casework or consulting work that you did with the

16  Metropolitan Police?

17    A.   Correct.

18    Q.   And the metropolitan police was in some

19  part of London, England?

20    A.   Right.  Yes.

21    Q.   Okay.  And then you said you did work for

22  Home Office?

23    A.   Yes.

24    Q.   How many cases have you worked on for Home

25  Office?

1    A.    Same answer.  I'm not going to respond.

2    Q.    And just so my understanding is correct,

3  my understanding is that you're refusing to answer

4  any questions with regard to casework or consulting

5  work that you did with Home Office in -- somewhere

6  in England?

7    A.    Yes.

8    Q.    And then Scotland Yard, how many cases

9  have you worked on for Scotland Yard?

10    A.    I refuse to respond.

11    Q.    Even with regard to just the number of

12  cases?

13    A.    Yep.

14         MS. SCHAFFER:  Let me just state an

15  objection to all the line of questioning with regard

16  to Metro Police, Home Office and Scotland Yard.  The

17  question is not relevant to the subject matter of

18  this litigation.  I'll just state my objection for

19  the record.

20    Q.    Just so my understanding is correct,

21  Mr. Walter, you're refusing to answer any questions

22  with regard to casework or consulting work that you

23  performed with or for Scotland Yard in England.

24         Is that right?

25    A.    That's right.  Right.

1    Q.   Okay.  Other than Home Office,

2  Metropolitan Police and Scotland Yard, did you do

3  any other side work or consulting work while you

4  were employed by Michigan DOC?

5    A.   I'm refusing to answer any further

6  questions about employment.

7    Q.   About your employment?

8    A.   Yep.  Yep.

9    Q.   Okay.  How about during your time with the

10  Los Angeles County Medical Examiner's Office, did

11  you do any consulting or side work while you were

12  employed by the Los Angeles County Medical

13  Examiner's Office?

14    A.   Again, I'm refusing all discussion on

15  outside work.

16    Q.   Okay.  So let me make sure that I

17  understand what you're saying just so I can avoid a

18  bunch of unnecessary questions.

19        If my understanding is correct, you're

20  refusing to answer any questions regarding work or

21  employment outside of the history of employment that

22  we have already discussed.

23        Is that correct?

24    A.   That's correct.

25        MS. SCHAFFER:  Andy, is this a good time

1  to break for lunch if we're going to move on to a

2  different topic?

3          MR. LAUERSDORF:  Yeah, let me ask one more

4  question, and I understand he's going to refuse to

5  answer, but I have to ask anyway.

6      Q.   How were you employed in 2010?

7          MS. SCHAFFER:  I'm sorry, can you repeat

8  the question.

9      Q.   Yeah, how were you employed in 2010, the

10  year 2010?

11          MS. SCHAFFER:  Lacks foundation; assumes

12  facts not in evidence.

13          You can answer if you can.

14      A.   I'm not going to respond.

15      Q.   Well, were you employed by anyone in 2010?

16  Were you on anyone's payroll?

17      A.   To be quite frank, I don't remember, but

18  I'm going to assume not.

19          MR. LAUERSDORF:  Okay.  Sounds like a good

20  place to take a break.

21          THE WITNESS:  Okay.  Great.

22          MS. SCHAFFER:  So how about a half an

23  hour, does that work for everyone?

24          MR. LAUERSDORF:  Sounds good for me.

25          (Lunch recess taken:  11:52 - 12:30 p.m.)

1

2    BY MR. LAUERSDORF:   (Continuing)

3        Q.   Okay.  Let's see, we were talking about

4    the metropolitan police, and other than the case

5    that you referred to as the cannibal case, what are

6    the other cases that you worked on or consulted on

7    for the Metropolitan Police?

8        A.   I can't remember the name of the case per

9    se.  In a park in Central London, a female victim

10   was murdered and stabbed 60 some times, et cetera.

11   There was a great deal of controversy over the whole

12   issue.  Her -- she was brutally murdered and all

13   kinds of theories had popped up.

14            Then I was asked to review it.  One did

15   and one had great discussions about it.  Again, I

16   wish I could remember the name, but I can't.  From

17   that, then, they realized that the primary suspect

18   at the time finally realized that he didn't do it

19   and it took them another year or so and they then on

20   their own discovered, thanks to DNA, the person who

21   actually did it who's now in jail serving time, so

22   that was a huge case in London.  This was probably

23   ten years ago now.

24       Q.   Who asked you to review it?

25       A.   The Yard did, and I don't remember the

1    name of the detective.

2         Q.   Scotland Yard did?

3         A.   Yes.

4         Q.   They asked you to review a case for

5    Metropolitan Police?

6         A.   Yeah, and so I did, and Bob Wessler from

7    FBI also reviewed it and several other people.  It

8    looked like a different person, however, then, there

9    was some deviltry in the police service that then

10   tried to manipulate and whatever else the primary

11   suspect at the time and we basically told him that

12   he was wrong.

13        Q.   Who was that, who did you tell that he was

14   wrong?

15        A.   The investigators who were working on the

16   case.  I believe it was a particular individual who

17   was very suspicious.

18        Q.   What was the investigator's name?

19        A.   I don't know.  I just mentioned that.

20             With that, then, eventually a year later,

21   they found out through DNA that the primary suspect

22   that they had had didn't match and then they found

23   out that somebody already in prison for another

24   murder had committed the crime, so it was a big deal

25   and people were punished over it who were craving a

1    boondoggle, so that's that case.

2           However, that said, you also asked me

3    about cases, other cases through the various

4    agencies, and I've been to London at least 20, 30

5    times.

6        Q.   Okay.  Lets break that down a little bit.

7           So on this last case that you're talking

8    about with the woman with the 60 stab wounds, you

9    don't know who the investigator was at Scotland Yard

10   that asked to you review it?

11       A.   Right.

12       Q.   But where did your work take place on the

13   case?

14       A.   At the Metropolitan Police.

15       Q.   At what location?

16       A.   Right Downtown London.

17       Q.   And who did you work with there?

18       A.   I just told you, I don't remember.

19       Q.   Well, I asked you before who asked you to

20   review it and you didn't remember.

21       A.   Right.

22       Q.   And I asked you who you worked with on the

23   case rather than who asked you to review it.

24       A.   Right.

25       Q.   You don't remember?

1    A.   It's been a long time and I just don't

2    remember.

3    Q.   What are the names of the folks you've

4    worked with at Scotland Yard in the past who have

5    asked you to review cases?

6    A.   I'm trying to think.  John -- I always

7    block on his name.  He was the head of the

8    investigative unit there on homicides.  We had long

9    conversations about it and the skullduggery that

10   went on about it.

11   Q.   About what, the homicide unit or a

12   particular case?

13   A.   The skullduggery on this particular case

14   that took place.  They got a psychologist who then

15   set up a honey trap to entice him to -- for an

16   admission and the whole thing was framed and he was

17   convinced that that was the guy, so he thought it

18   was in his best interest to lie and misrepresent

19   before he got caught.

20   Q.   What was the name of the psychologist?

21   What was the name -- oh, sorry.

22   A.   I hear you.

23   Q.   Okay.

24   A.   I'm blocking on it.  He didn't like me and

25   I didn't like him.  He was afraid to meet me, so I

1    never got to meet him face to face, but he -- I know

2    he charged the Yard I think over 400,000 pounds for

3    his immoral and illegal work and -- Ron somebody.

4    At one time, he was relatively famous in England for

5    his work.

6          Q.   Lon, L-O-N?

7          A.   Ron, R-O-N.

8          Q.   Oh, R-O-N.

9          Okay.  And then you said John was the head

10   of homicide investigation?

11         A.   Yeah, John.  Yeah.

12         Q.   And you don't recall his last name?

13         A.   No.

14         Q.   This was ten years ago, so around 2011?

15         A.   At least, or maybe before, but I think

16   then.

17         Q.   Other than John, who else have you worked

18   with at Scotland Yard?

19         A.   A number of them.  I work cases and I

20   don't -- at the time, I knew their names, but at the

21   time, I didn't care.  Well, I cared, but it's gone

22   the way of -- into a pit.  I just can't recall.

23         Q.   So you don't recall the names of anyone

24   that you worked with at Scotland Yard other than

25   John?

1    A.    Right.  Right.

2    Q.    Okay.  How about Metropolitan Police, what

3    are the names of the folks that you worked with at

4    Metropolitan Police over the years?

5    A.    Well, a number of various agencies there.

6    They hold these plaques and all that kind of crap,

7    but I really can't remember their names.  I'm not

8    being obstructive, I just don't remember their

9    names.  It's been a couple of years since I've seen

10   any of them.

11   Q.    How about Home Office, how about anybody

12   that you worked with at Home Office?

13   A.    I would if I heard their name, but at the

14   time the Home Office called me and asked me if --

15   they were the ones that asked me if I would look at

16   cannibal case and I said yes, so then I worked on

17   that, but I can't remember the guy who called me.

18   It's been a long time.

19   Q.    Okay.  Other than the -- other than the

20   cannibal case and the 60-stab-wound case what's

21   another case that you worked on for somebody at

22   Scotland Yard or Metropolitan Police or --

23   A.    Outside of those agencies also are the

24   various counties, whatever you call them, a serial

25   rapist that we helped take down.

1    Q.   Where was that?

2    A.   Up in mid England.  I don't remember

3  exactly.  It's been a long time.  I had no idea I'd

4  be asked these questions, so otherwise I would have

5  had the names or reviewed.

6    Q.   Are they all on your resume?

7    A.   No.

8    Q.   But you're able to retrieve the names if

9  you had the opportunity?

10   A.   I think I could maybe.  I'm not sure.  I

11 won't promise.  I will promise that I will try.

12   Q.   Okay.  Do you have any records that you

13 worked on any cases for Scotland Yard?

14   A.   No.

15   Q.   Do you have records of any of your work on

16 cases with Metropolitan Police?

17   A.   No.

18   Q.   Do you have any records of any of your

19 work on cases with Home Office?

20   A.   No.  I don't keep records.

21   Q.   Does that mean you had records at some

22 point and you destroyed them or you just don't keep

23 any records?

24   A.   I don't keep any records.

25   Q.   On any of your cases?

1     A.     Rarely.  Once in a while, I will.

2     Q.     Did you make any records on the Freeman

3   investigation?

4     A.     No.

5     Q.     Okay.  Other than what we talked about

6   with the Metropolitan Police, Scotland Yard and the

7   Home Office, did you do any other work for other

8   employers, side work, freelancing, while you were

9   employed with the Michigan Department of

10  Corrections?

11    A.     Yes, often.

12    Q.     With who?

13    A.     Again, in Istanbul, Turkey, which was

14  problematic, but aside from that.

15    Q.     Who did you work with in Turkey?

16    A.     The Turkish-- the Istanbul Police.  I gave

17  a lecture that was translated into Russian as well

18  as Turkish and I gave it in English.

19    Q.     Who was your contact at the Istanbul

20  Police?

21    A.     Oh, God.  I'll never remember their names.

22  They're difficult to pronounce.  I developed a bad

23  habit of not remembering names when I was working,

24  because I always knew -- I was interested in what

25  they were saying rather than their names per se and

1    I always had officers around me that could tell me

2    who they were after the fact if I forgot, but -- so

3    I'm not good at name recall.  It's a bad habit

4    and -- that's it.

5        Q.    When was the last time that you renewed

6    your passport?

7        A.    Maybe a couple years ago.

8        Q.    Do you have any of your old passports?

9        A.    Yep.

10       Q.    Those would show your travel to Istanbul

11   or England to work on these cases, right, so we'd be

12   able to put dates on things from there?

13       A.    I can go back and look.

14       Q.    Okay.  I'd ask that you do that, and if

15   you have the passports, we'd ask for copies of that

16   and we'll send a request for production on that.

17            Other than Istanbul, Turkey, and the

18   case -- well, what kind of case did you consult on

19   in Istanbul?

20            (REQUEST FOR PRODUCTION)

21       A.    Well, I lectured, and then I was

22   approached and told that on one side of the Bosporus

23   which runs through Istanbul, that a group of men and

24   women had been slaughtered and that parts, then,

25   were taken from the men and put on the women and

1   vice-versa and all this kind of stuff, and then they

2   discovered on the opposite side of the Bosporus the

3   same pattern, so there were about 12 to 15 deaths

4   there.

5         When I then asked about that, they went

6   into full denial and said that never happened and

7   they didn't have any bodies, they didn't have any

8   serial killers and whatever and so they were totally

9   uncooperative, so I then said "Well, it's good that

10  you heard the lecture, because you're young

11  detectives, and before your time is up in the police

12  service, certainly you'll run across one or two" and

13  you walk away from something like that.

14      Q.   Okay.  So wait a minute.

15         You give a lecture, somebody approached

16  you after the lecture, said that there had been

17  these murders, 12 to 15 murders?

18      A.   Correct.

19      Q.   And when you asked about those murders,

20  they told you that never happened?

21      A.   Yep.

22      Q.   And you don't recall who that person is?

23      A.   It was one of the lieutenants in the

24  Turkish -- in the Istanbul Police.

25      Q.   Do you recall approximately what age he

1    was?

2         A.    I would say he was about 35.

3         Q.    Do you recall what office he worked out

4    of?

5         A.    No.

6         Q.    Where in Istanbul was your presentation?

7         A.    At the -- it's not the university, but

8    they have an old section in Istanbul, old government

9    offices, very quaint, and I was there also on an

10   independent national forensic conference, so the

11   conference was held in that area.  I never met him

12   at his office.  I met him at the -- at the

13   conference site.

14        Q.    Okay.  What was the organization that put

15   on the conference?

16        A.    The International Association of Forensic

17   Scientists.

18        Q.    And who was your contact for setting up

19   that speaking engagement?

20        A.    I'm not sure.  I know that the Turks

21   bought my ticket and put me up in a hotel, which was

22   not where I wanted to be, but aside from that, they

23   were paying for it and it was a big deal for them,

24   so they were primarily in charge of my time when I

25   was there, which I did not find that comfortable.

1    Q.   Who did you go with?

2    A.   I went alone.  A lot of Americans were

3 there at the meeting.

4    Q.   Which of your colleagues do you recall

5 being there for this meeting?

6    A.   I'll think of it in a minute.  She's the

7 head of the forensic nursing program at -- or he

8 started it.

9    Q.   She's the head of the forensic nursing

10 program where?

11    A.   Well, at -- through the academy.  She

12 started the forensic nursing program.

13    Q.   At AAFS?

14    A.   Yep.

15    Q.   You don't recall her name now?

16    A.   I will.

17    Q.   Do you recall any of your other colleagues

18 that you ran into there?

19    A.   A lot of Americans were there.  In fact --

20 I'm just blocking on it.  I'll think of it.  I'll

21 think of some.

22    Q.   Okay.

23    A.   I'll give them to you.

24    Q.   You didn't happen to recall the other

25 fellow besides Dr. Gehring who was supervising you

1    at the pharmacology lab, did you?

2          A.    It could be Jim Gibson.

3          Q.    G-I-B-S-O-N?

4          A.    Yeah, or something very similar to that.

5          Q.    How about the names of the chief

6    psychiatrist or the assistant chief psychiatrist at

7    Jackson?

8          A.    At what?

9          Q.    At Jackson, the prison at Jackson.

10         A.    There were two or three different

11   psychiatrists there.

12         Q.    Do you recall the names of any of them?

13         A.    No.  I didn't approve of most of them.

14         Q.    Okay.  Other than Istanbul and England,

15   the cases we've talked about so far, did you do any

16   other side work while you were at Michigan DOJ?

17         A.    China.

18         Q.    Whereabouts in China?

19         A.    Hong Kong.

20         Q.    What did you do in Hong Kong?

21         A.    I -- they wanted an opinion on a torso

22   that they found floating up in the water and --

23         Q.    Whereabouts?

24         A.    And I looked at it.

25         Q.    Whereabouts did they find it?

1    A.    Right on the dock in town.

2    Q.    In the ocean?

3    A.    Yes.

4    Q.    That's a big town, which dock in town?

5  Whereabouts?

6    A.    I have no idea.

7    Q.    Who was your contact there?

8    A.    Hong Kong Police.

9    Q.    Do you recall the name of the person you

10  went through?

11    A.    Oh, no.

12    Q.    When was that?

13    A.    In the 2000s sometime.  I'm not sure when.

14    Q.    What about your trip to Istanbul, when was

15  that?

16    A.    I don't know.  It would be on my resume.

17    Q.    Okay.  Have you been back to Istanbul more

18  than once?

19    A.    No.

20    Q.    How about Hong Kong, have you been to

21  Hong Kong more than once for work?

22    A.    I've been to Hong Kong eight times, but I

23  have no intention of ever going again.

24    Q.    Were all eight times for work?

25    A.    Yep.  In route to Australia.

1     Q.   Also for work?

2     A.   Oh, yeah.

3     Q.   How many times have you actually done

4 casework or consulting work in Hong Kong?

5     A.   In Hong Kong?

6     Q.   Yeah.

7     A.   Off the top of my head, I can think of two

8 or maybe three, but I found it to be a waste of my

9 time.

10    Q.   Okay.  What was the first case that you

11 worked on in Hong Kong?

12    A.   I just mentioned that one.

13    Q.   That was the one where they found a torso

14 in the water?

15    A.   Right.

16    Q.   And you don't know the names of anybody

17 that you worked with on that case?

18    A.   No.

19    Q.   And that was in the early 2000s?

20    A.   I think so.

21    Q.   Do you recall the agency that you worked

22 with?

23    A.   Hong Kong Police.

24    Q.   Do you remember which unit or which

25 location?

1    A.    No.

2    Q.    Do you remember the rank of anybody that

3    you worked with there?

4    A.    There's a reasonably large structure of

5    lower and upper at any one time.

6    Q.    Okay.  So what does that mean?

7    A.    It means that the bosses were there and

8    the foot soldiers were there.

9    Q.    How did you communicate with them?

10   A.    In English.

11   Q.    Oh, okay, so they spoke English?

12   A.    Some.

13   Q.    But you don't recall any of their names?

14   A.    No.

15   Q.    Do you have any records from that?

16   A.    Nope.

17   Q.    Okay.  What was the next case that you

18   worked on in Hong Kong?

19   A.    I'm trying to remember what -- I'm sure

20   there was one, but I can't remember what it was.

21   Q.    Do you recall when it was?

22   A.    Nope.

23   Q.    Do you recall who you worked with or who

24   asked you to get involved?

25   A.    No.  No.

1     Q.   Okay.  So you did two or three cases in

2  Hong Kong.

3         How many cases in Australia?

4     A.   A lot.  A major case in Wollongong.

5     Q.   Can you spell that for me?

6     A.   W-O-L-L-O-N-G-O-N-G.

7     Q.   What kind of case was that?

8     A.   A murder of a female, head cut off and

9  thrown down a bank.

10    Q.   The head cut off and thrown down the bank

11  or the head cut off and the body thrown down the

12  bank?

13    A.   Both.

14    Q.   Who was your contact on that work?

15    A.   Pat Ryan and her husband was also a

16  pathologist who's now dead, Ray Ryan.

17    Q.   R-Y-A-N?

18    A.   Yes.

19    Q.   And Pat is short for what?

20    A.   Patricia.

21    Q.   And do you have contact information for

22  Patricia?

23    A.   I probably do at home.

24    Q.   What agency was Patricia with?

25    A.   She was out of -- outside of -- outside

1  of -- between Sydney and Wollongong in some little

2  town.

3        Q.    A local police agency or something?

4        A.    Well, yeah, but they were both

5  international forensic pathologists, so they were

6  called in on the case who then contacted me.

7        Q.    Who were they called in by?

8        A.    Pardon?

9        Q.    Who were they called in by?

10       A.    I have no idea.

11       Q.    What agency?

12       A.    I have no idea.

13       Q.    Where did your work on the case take

14  place?

15       A.    Here.

16       Q.    In the U.S.?

17       A.    Yeah, they brought all the information

18  over and they came over to the American Academy and

19  I reviewed it and that was that.

20       Q.    How many cases have you worked on or

21  consulted on actually in Australia?

22       A.    I really don't know a number.  I don't

23  remember any of the people that I worked with, but

24  they -- well, I did work with Sydney P.D. on a child

25  molestation ring that was going on that included the

1  takedown of a judge, and a Supreme Court judge, may

2  I add, and several other people that were running a

3  ring of homosexual deviance, so they asked me to

4  come and talk to the Royal Commission and explain

5  some of the evidence and asked questions and

6  eventually then the parties were deposed.

7      Q.   What is the Royal Commission?

8      A.   It's kind of like a grand jury for us.

9      Q.   And when did you appear there?

10     A.   It was probably prior to 2000.  Right

11  around the 2000 period.

12     Q.   Do you recall the name of the judge who

13  was deposed?

14     A.   Nope.

15     Q.   And you don't recall the names of any of

16  the officers or people that you worked with on that

17  case?

18     A.   No.

19     Q.   But the agency was Sydney P.D.?

20     A.   Yep.

21     Q.   And where did your work take place?

22     A.   Well, I stayed in Sydney in a hotel and I

23  was invited to the Royal Commission and I went.

24     Q.   What part of Sydney did you stay in?

25     A.   I don't remember.  I normally stayed at

1    the Sheraton.

2        Q.    When you say you were invited to the Royal

3    Commission, was there some kind of formal process

4    for that, a subpoena or something?

5        A.    No, you come.  They showed up the next

6    morning at my door making sure I made it there on

7    time.

8        Q.    Okay.  Any other cases that you've worked

9    on in Australia?

10        A.    There are, but I really don't remember

11    them at this point.

12        Q.    Okay.  Would all of these cases be listed

13    on your resume?

14        A.    No.

15        Q.    Why not?

16        A.    It takes up too much space.

17        Q.    So how do you decide which cases to list

18    on your resume and which to leave off?

19        A.    My decision at the time when I get to the

20    resume and self recording, I decide whether I'm

21    going to include it or not.

22        Q.    How often do you revise your resume?

23        A.    Not very often.  In fact, I've stopped

24    writing in it for the last two years, three.

25        Q.    Okay.  So other than Istanbul, England,

1    Hong Kong and Australia, were there any other places

2    internationally where you've worked casework or

3    consulting jobs?

4         A.    At the moment, I can't think of any,

5    but -- there may have been, but I can't think of any

6    at the moment.

7         Q.    Can you think of a name of any person who

8    you've worked with on a foreign criminal

9    investigation?

10        A.    I'm thinking.

11        Q.    Other than John and Pat Ryan and Ray Ryan.

12        A.    Oh, Dick Sherpard, who's a forensic

13   pathologist who is in Liverpool, England.

14        Q.    How do you spell his last name?

15        A.    S-H-E-R-P-A-R-D.

16        Q.    In Liverpool?

17        A.    Yep.

18        Q.    What agency is he with?

19        A.    He was with several hospitals in London,

20   and then he moved to Liverpool.

21        Q.    So he wasn't part of a criminal

22   investigation service?

23        A.    Yeah, he was a pathologist for all the

24   murder cases.

25        Q.    Oh, okay.  I thought you said he was

1    employed by the hospitals.

2         A.    No.  No.  No.

3         Q.    Okay.  So which agency was he with, then?

4         A.    He was with some of the major hospitals

5    there that they also have forensic pathologists and

6    he was also a police worker, I believe.

7         Q.    How many times have you worked with

8    Mr. Sherpard?

9         A.    Numerous times.  Sometimes we'd just talk

10   about it and sometimes he'd bring pictures and

11   sometimes I would be there and he would show me the

12   victim and we would talk about it and it was just

13   opinion and a certain amount of -- of what could or

14   could not be relevant to the investigation.

15        Q.    Did you get paid for any of your work with

16   the Metropolitan Police?

17        A.    No.

18        Q.    How about with Home Office?

19        A.    Oh, home -- no.

20        Q.    Have you been paid or did you get paid for

21   any of your work with Scotland Yard?

22        A.    No.

23        Q.    Did you get paid for any of your work with

24   the Hong Kong Police?

25        A.    No.

1    Q.   Did you get paid for any of your work with

2   Istanbul Police?

3    A.   No.

4    Q.   Did you get paid for any of your work in

5   Australia?

6    A.   No.

7    Q.   Some have you been paid for any work

8   that -- any casework or consulting work that you've

9   done internationally?

10   A.   Not that I can think of, no.

11   Q.   How about reimbursement of expenses, have

12  you been reimbursed your expenses for any of your

13  work?

14   A.   The only one -- well, that was an advance,

15  but the only one was from Turkey when they took me

16  from home to Turkey for that conference.

17   Q.   Was that the International Association of

18  Forensic Scientists?

19   A.   Right.

20   Q.   That wasn't actually paid for by the

21  Turkish government or police, that was paid for by

22  the organization, right?

23   A.   Whatever.

24   Q.   Well, is that right or not right?

25   A.   Say it again.

1              What did you say?

2         Q.   That wasn't paid for by the Turkish police

3    or government, it was paid for by the organization,

4    the International Association of Forensic --

5         A.   No, that wasn't paid for by the Turkish

6    government.  I could be wrong, though.  I could be

7    wrong.

8         Q.   Okay.  Other than that expense by the

9    Turkish government, you don't think any of your

10   other expenses have been reimbursed in any of your

11   international work?

12        A.   Right.  What they do is give you a good

13   education.

14        Q.   Have you published papers or treatises on

15   any of your international work?

16        A.   Rarely.

17        Q.   Okay.  Tell me about the papers you've

18   published on your international work.

19        A.   I published in what's call the Police

20   Surgeon's Manual about four or five studies or

21   comments or cases or whatever.

22        Q.   Okay.  Where is the Police Surgeon's

23   Manual published?

24        A.   It's not anymore and it's a defunct

25   organization now.  They combined with another group,

1    so they're no longer available.

2        Q.    So do you have copies of the articles that

3    you published there?

4        A.    Yep.

5        Q.    Yes?

6        A.    Yes.

7        Q.    I'll ask that you produce those, so that's

8    a request for production for that.

9              Any other publications related to any

10   other published accounts of your international work?

11                 (REQUEST FOR PRODUCTION)

12       A.    No.

13       Q.    Are those articles that you published in

14   the Police Surgeon's Manual, are those about your

15   international work?

16       A.    Not necessarily.  They also included

17   American cases.

18       Q.    Okay.

19       A.    I'm not leaving the room.  I'm just going

20   to stand up for a bit.  My butt is sore.

21       Q.    That's okay.

22             Do you want to take a break?

23       A.    No, I'm good.

24       Q.    Okay.  Lets talk about the Vidocq Society

25   a little bit.

1          Are you still a member of the Vidocq

2    Society?

3          A.    No.

4          Q.    When did you leave?

5          A.    In -- on December 31st at 11:45.

6          Q.    December 31st of what year?

7          A.    '15.

8          Q.    2015?

9          A.    Yes.





1     Q.   How was the Vidocq Society funded while

2  you were there?

3         MS. SCHAFFER:  I'm going to object that it

4  calls for speculation.

5         Answer only if you know.

6         I also want to just object to the question

7  that it's outside of the purview of Mr. Walter as a

8  witness and more appropriate for a corporate

9  designee of Vidocq Society to answer.

10     Q.   Go ahead and answer if you can.

11     A.   Pardon?

12        MS. SCHAFFER:  You can answer the question

13  if you can if you understand it and if you know.

14     A.   Primarily it was through dues.

15  Periodically people would donate money, but the

16  majority, my understanding is, came from the dues of

17  the members.

18        (Exhibit No. 1 marked.)

19     Q.   And I'm going to show you what's been

20  marked -- or what -- yeah what's been marked as

21  Exhb. 1.  Can you see what's on the screen in front

22  of you?

23     A.   The Vidocq Society.

24     Q.   I'll represent that this is a screenshot

25  from the Vidocq Society web page of

1  www.vidocq/about.  This screenshot was captured

2  yesterday, June 29th, 2022.

3          Was there a commissioner position at the

4  Vidocq Society in 2010?

5      A.   Yes, Bill Fleisher.

6      Q.   Has there ever been more than one

7  commissioner?

8      A.   They have a different commissioner now,

9  which is Ben Redmond.

10     Q.   And what was the commissioner's role at

11 Vidocq Society in 2010?

12     A.   The same as the CEO of a company.  They

13 try to maximize the efficiency of the intended

14 purpose for the organization in the first place.

15     Q.   So Mr. Fleisher would be responsible for

16 the day-to-day operations of the Vidocq Society in

17 2010?

18     A.   Yes.

19     Q.   When was the last time that you spoke with

20 Mr. Fleisher?

21     A.   About two months ago.

22     Q.   Have you ever spoken to him about this

23 case?

24     A.   No, I don't think so.

25     Q.   Where is he living now?

1    A.   He lives in New Jersey, Cherry Hill,

2  New Jersey.

3    Q.   Do you have a phone number for him?

4    A.   I don't on me, no.

5    Q.   Do you have access to a phone number for

6  him?

7    A.   You could call the Vidocq Society and they

8  could give you a telephone number for him.

9    Q.   I actually can't call the Vidocq Society.

10   A.   Oh.

11   Q.   Okay.  So who was the commissioner when

12  you left?

13   A.   Will, Will Fleisher.

14   Q.   Was he the person that accepted your

15  resignation?

16   A.   I'm not sure he accepted it, but he dealt

17  with it.

18   Q.   Okay.  Was there a deputy commissioner and

19  a chairman of the board in 2010?

20   A.   Yes.  I don't remember who it was I don't

21  remember off the top of my head.

22   Q.   But it wasn't Howard Lebofsky?

23   A.   No.  No.  I think it was -- Ben Redmond

24  was deputy.

25   Q.   And he is now commissioner?

1    A.    Yeah, because Bill -- Bill had some health

2    issues and whatever else and felt it was time that

3    he step aside, so he then accepted sort of an

4    emeritus status and Howard -- not Howard, but Ben

5    then took over.

6    Q.    Okay.  What does the deputy commissioner

7    and chairman of the board do?  What's his role?

8    A.    Follow up.  Bill was a strong leader, so

9    generally the deputy commissioner was in league with

10   the commissioner.

11   Q.    Then in 2007, was there a deputy

12   commissioner and case manager?

13   A.    Yes.

14   Q.    Who would that have been?

15   A.    That was Fred Bornhofen, who's now dead.

16   Q.    He was somebody that you mentioned

17   earlier.

18         Is that right?

19   A.    Right.

20   Q.    And what was the role of the case manager

21   at Vidocq in 2010?

22   A.    Departments would contact him to see if

23   they could present at Vidocq and he would then

24   review and then contact them if they were approved

25   and then he'd arrange for them to be at a meeting.

1   Vidocq then would pay for their flight of two

2   detectives to Philadelphia, they would water, house

3   and feed them, and then they would present a

4   presentation to the Vidocq Society, and then, as we

5   discussed before, sometimes I would take them -- not

6   always, but take them with others including Lebofsky

7   would go along at night, take them out to dinner and

8   have a discussion of the case that they had

9   presented and then they would go home.

10      Q.   What were the -- in 2010, what were the

11  annual dues for the Vidocq Society?

12      A.   I don't recall off the top of my head at

13  the moment.

14      Q.   But the annual dues were enough to bring

15  people in, pay for their flights?

16      A.   Well, earlier financial issues, we once

17  had a treasurer who was very efficient at keeping

18  the coffers full and would get donations and raise

19  money to keep the coffers adequate.  Since that

20  time, that policy has dissipated, so I don't know

21  their current financial status.

22          I know that they still pay a lot of money

23  to the -- what's that organization -- anyway, for

24  their meeting spots and all that kind of stuff.

25  I've wondered also about this, but I'm not the best

1   person to answer that question.

2        Q.   So as far as the case manager goes, would

3   all of the cases that came into Vidocq for review be

4   routed through that person?

5        A.   Right.

6        Q.   So Fred Bornhofen would have had to sign

7   off on the Freeman investigation?

8        A.   Right.

9        Q.   And he would have been an essential point

10  of contact for the Coquille Police Department or

11  whoever was presenting?

12       A.   Yes.

13       Q.   And how long ago did you say he passed?

14       A.   Three or four years ago, maybe five, but I

15  think probably three.

16       Q.   Are you familiar with Mr. Bornhofen's

17  process for how he brought cases in and evaluated

18  them before signing off on them?

19       A.   In brief, it was that they had to be cold

20  for at least two years, the case had to be, and

21  generally they did not take drug cases and they

22  required to get some kind of a prediscussion of what

23  the case was about and see if it met standards that

24  somehow had been established, and from that, we

25  would then decide yes or no.

1      Q.   And if you decided yes, then he would fly

2      the folks out for a presentation?

3      A.   Exactly.

4      Q.   What do you know about the prediscussion

5      that would take place, what was involved in that?

6      A.   What did he say?

7           What did you say?

8      Q.   What do you know about the prediscussion

9      that would take place, what was involved in that?

10     A.   Well, you would want to know what the case

11     was about and what the problems were and something

12     along those lines and whether it would meet some of

13     the talents that were in the room, okay?

14     Q.   Did you have to do any investigation or

15     initial investigation of the case before a --

16          MS. SCHAFFER:  Calls for speculation.

17     A.   Not to my knowledge.

18     Q.   And how about this secretary and case

19     manager, did that position exist in 2010?

20     A.   I don't know.  I don't believe -- I don't

21     recall this person.

22     Q.   Okay.  But do you recall the position,

23     secretary and case manager?

24     A.   No, no.

25     Q.   Do you recall who was on the board of

1    directors in 2010?

2          A.    Generally, yes.

3          Q.    And who would that be?

4          A.    Well, you have up there Adamson, who I

5    don't know well.  I certainly know Barbara Cohan.

6          Q.    This was a snapshot taken yesterday.

7          A.    Right.

8          Q.    Were they on the board of directors back

9    in 2010?

10         A.    Barbara certainly was.

11         Q.    Okay.  Do you know if Edgar Adamson was?

12         A.    I think he was back then.  I don't know if

13   he is now or not.

14         Q.    Okay.  How about Edward Gaughan?

15         A.    He's still on the board.

16         Q.    Was he on the board in 2010?

17         A.    Yes.

18         Q.    How about Thomas McAndrew?

19         A.    He wasn't then, no.

20         Q.    How about Christopher McMullen?

21         A.    I don't know him.

22         Q.    Do you know who had those other two board

23   seats in 2010?

24         A.    I can't speculate on it.  I'll answer no.

25         Q.    Do you know how many board seats there

1    were at Vidocq Society in 2010?

2        A.   I don't remember actually, so I'll have to

3    say no.

4        Q.   How about the position of chief science

5    office or officer, was that a position at the Vidocq

6    Society in 2010?

7        A.   Not in '10, I don't think.  Fred Rieders

8    was a member, but not on the board at that time to

9    my knowledge.

10       Q.   Was the position of chief science officer

11    a position on the board when you left in 2016?

12       A.   Donaldson has left, and Stephenson, by

13    this, is still on the board.

14       Q.   With regard to Exhb. 1, I'm asking about

15    this position here, the chief science officer.

16       A.   Oh, right.

17       Q.   Was that a position at Vidocq Society --

18       A.   I don't believe so.

19       Q.   -- when you left in 2016?

20       A.   I don't believe so.

21       Q.   Okay.  How about this position, Public

22    Affairs Officers, was that a position -- was that an

23    officer position at Vidocq Society in 2010?

24       A.   I don't recognize Walter Hunter.  I do

25    recognize Tenuto.

1    Q.    Do you recall that as a position in 2016,

2    Public Affairs Officers?

3    A.    Yes.

4    Q.    And was that an officer position in 2010?

5    A.    I believe so.

6    Q.    What was your understanding of public

7    affairs officers, what that position did for Vidocq

8    Society?

9    A.    Well, when people had questions or

10   whatever else, or on TV, people may call and want to

11   tell or other people would want to come and attend

12   and write books or whatever else, so they would

13   steer them to or away from access.

14   Q.    Okay.  So for example, if ABC's 20/20

15   wanted to meet with a member of Vidocq Society about

16   an open case investigation, would the Public Affairs

17   Officers get involved in that?

18   A.    Yes.  They would contact them and then

19   they would then contact the board.

20   Q.    Okay.  So were any of these gentlemen

21   involved in the decision for you to participate with

22   ABC 20/20 in the Freeman investigation?

23         MS. SCHAFFER:  I'm going to object that it

24   lacks foundation and calls for speculation.

25   A.    Yeah, I'm not sure.  I think he was, but I

1  can't say.

2        Q.   You think Mr. Tenuto was?

3        A.   Right, but I can't say.

4        Q.   How about this committee, Case Analysis

5  and Investigation Committee, do you recognize that

6  as a committee that existed in Vidocq Society in

7  2010?

8        A.   It was covert and it was hidden from me

9  and I disapprove of the person and I disapprove of

10 the committee.

11       Q.   Okay.  But was that a committee that

12 existed at Vidocq Society in 2010?

13       A.   It was secret, I believe.  I didn't know

14 about it at the time.

15       Q.   You did not know about it at the time?

16       A.   No.  It was kept from me.

17       Q.   Do you know why it was kept from you?

18       A.   Yeah, because --

19            MS. SCHAFFER:  Calls for speculation.

20       A.   Because it was wrong.

21       Q.   Because it was wrong?

22       A.   Uh-huh.

23       Q.   Why was it wrong?

24       A.   Well, again, I won't divide it -- I

25 disagreed with the whole idea of it and I felt that

1    it was dragging Vidocq down.

2         Q.   The Case Analysis and Investigation

3    Committee?

4         A.   Right.

5         Q.   What were they doing that you thought was

6    dragging Vidocq down?

7         A.   I think they were loose with information.

8         Q.   Does that mean dishonest?

9         A.   Yes.

10        Q.   Was Dr. Schroeder a member of Vidocq

11   Society in 2010?

12        A.   Yes.

13        Q.   Why did you come to the opinion that the

14   Case Analysis and Investigation Committee was

15   dishonest?

16        A.   I'm not prepared to go there.

17        Q.   Okay.  Well --

18        A.   That's one of the things that's a sticking

19   point.

20        Q.   Okay.  So are you refusing to answer the

21   question?

22        A.   I'm willing to say that my opinion is

23   speculative and it should not be assumed to be true.

24        Q.   Okay.

25        A.   However -- however, I believe -- I

1    personally believe that it is true.

2        Q.    Okay.  So what is your opinion?

3        A.    My opinion is that Vidocq has chosen to

4    keep Schroeder.

5        Q.    To keep what?

6        A.    To keep Schroeder.

7        Q.    I can't understand what you're saying,

8    Vidocq --

9        A.    Has chosen to keep Schroeder in that

10   position.

11       Q.    Oh, and you feel that Schroeder should be

12   removed from that position?

13       A.    Yes.

14       Q.    Why do you believe Schroeder should be

15   removed from that position?

16       A.    I don't trust him.

17       Q.    And why don't you trust him?

18       A.    I really don't want to get into the weeds

19   with this.  It gets -- it gets too messy.

20       Q.    Well, I have to ask you the question and I

21   appreciate --

22       A.    I think if you sneak around about things,

23   it's suspicious, and I found him many times sneaking

24   around stuff I found out later and I don't approve

25   of that.  Even if he was right, I still don't

1    approve of the technique.

2         Q.   Okay.  So give me an example of when you

3    found out that he was sneaking around about

4    something.

5         A.   He would try and sit next to me and find

6    out about cases and this and that and everything

7    else, he knew better than to contact the police

8    after the fact and gain more information, but he was

9    doing that, and he hid it from me and the other

10   people that would have challenged him, and so I --

11   and he wanted to be important, which is fine, I

12   guess, but not at the risk of the credibility of

13   Vidocq.

14        Q.   So was it a matter of him interfering in

15   your cases?

16        A.   No, interfering with Vidocq's cases.

17        Q.   Okay.  As a member of Vidocq, how was he

18   interfering in Vidocq's cases?

19        A.   Because he was acting outside the protocol

20   for being a member.

21        Q.   Is that a written protocol?

22        A.   I'm going to refer to as she said earlier

23   to people who are currently involved in the whole

24   scheme -- Bill Fleisher or whoever else, what the

25   scheme of what the rules were back then and what

1    they are today, okay?  I think they find acceptable

2    today what I found unacceptable back then.

3        Q.   So as of 2010, were you aware of a

4    protocol for being -- a written protocol for being a

5    member of Vidocq Society?

6        A.   I believe there was.  I'm not prepared to

7    discuss it.  Others who know more about it are the

8    best evidence.

9        Q.   But you believe there was written protocol

10   for membership in Vidocq Society?

11       A.   I believe there was.

12       Q.   Where would that be kept?

13       A.   I don't know at this point.

14       Q.   Do you recall if -- let's see, I'm just

15   going to go down a list of names.

16            Was Benjamin Redmond a member of the

17   Vidocq Society in 2010?

18       A.   Yes.

19       Q.   Was he present when the Freeman case was

20   presented to Vidocq Society?

21       A.   He was there, yes.

22       Q.   Do you recall whether he was there or not?

23       A.   I don't know.

24       Q.   Were you there when the Freeman case was

25   presented to Vidocq Society?

1    A.    Yes.

2    Q.    But you don't recall if Mr. Redmond was?

3    A.    Correct.  There was a room full of people.

4    Q.    How about Mr. Fleisher, was he a member in

5    2010?

6    A.    Yes.

7    Q.    And was he present when the Freeman case

8    was presented?

9    A.    I don't know.

10    Q.    How about Mr. Lebofsky, was he a member in

11    2010?

12    A.    Yes.

13    Q.    Do you recall if he was present when the

14    Freeman case was presented?

15    A.    I don't know.

16    Q.    How about Mr. Gill, was he a member in

17    2010?

18    A.    Yes.

19    Q.    Do you recall if he was present when the

20    Freeman case was presented?

21    A.    I do not remember.

22    Q.    All right.  How about Heather Hines, was

23    she a member in 2010?

24    A.    I don't know her.

25    Q.    How about Carey E.G. Galvin, was he or she

1    a member in 2010?

2         A.    I don't know them.

3         Q.    How about Edgar Adamson, was he a member

4    of Vidocq Society in 2010?

5         A.    I believe so.  I'm not sure, but I believe

6    so.

7         Q.    And do you recall if he was present when

8    the Freeman case was presented to Vidocq Society?

9         A.    No.

10        Q.    What about -- you don't recall or he

11   wasn't present?

12        A.    I don't recall.

13        Q.    How about Barbara J. Cohan-Saavedra, was

14   she a member of Vidocq Society in 2010?

15        A.    Yes.

16        Q.    Do you recall if she was present when the

17   Freeman case was presented?

18        A.    I don't know.

19        Q.    How about Edward Gaughan, was he a member

20   of Vidocq Society in 2010?

21        A.    Yes.

22        Q.    Do you recall if he was present when the

23   Freeman case was presented to the Vidocq Society?

24        A.    No.

25        Q.    No, you don't recall, or no, he wasn't

1    there?

2         A.   I don't recall.

3         Q.   How about Thomas McAndrew, was he a member

4    of the Vidocq Society in 2010?

5         A.   No.

6         Q.   How about Christopher McMullen, was he a

7    member of Vidocq Society in 2010?

8         A.   I don't remember him.

9         Q.   How about Frank A. Mayer, was he a member

10   of Vidocq Society in 2010?

11        A.   Yes.

12        Q.   Do you recall if he was present when the

13   Freeman case was presented to Vidocq Society?

14        A.   I don't recall.

15        Q.   How about M. Fredric Rieders, was he a

16   member of the Vidocq Society in 2010?

17        A.   Yes.

18        Q.   Do you recall if he was present when the

19   Freeman case was presented to Vidocq Society?

20        A.   I don't remember.

21        Q.   How about Walter B. Donaldson II, was he a

22   member of the Vidocq Society in 2010?

23        A.   I'm not sure.  He resigned right around

24   that time, I recall.

25        Q.   Do you know why he resigned?

1       A.    I'm not sure.

2       Q.    Did you have any conversations with him

3   about that?

4       A.    No.

5       Q.    How about Peter R. Stephenson, was he a

6   member of Vidocq Society in 2010?

7       A.    I'm not sure.

8       Q.    How about Walter E. Hunter III, was he a

9   member of Vidocq Society in 2010?

10      A.    I don't know him.

11      Q.    How about Edward A. Tenuto, I think you

12  already mentioned that he was a member in 2010.

13            Is that right?

14      A.    Right.

15      Q.    Do you recall if he was present when the

16  Freeman case was presented to Vidocq Society?

17      A.    I don't know.

18      Q.    Was Dr. Schroeder present -- or was

19  Dr. Schroeder a member of the Vidocq Society in

20  2010?

21      A.    Could have been.  I'm not sure.

22      Q.    Okay.  Edward Gaughan, I think we

23  mentioned.

24            So this name up here is spelled

25  G-A-U-G-H-A-N, and this name down here is spelled

1   G-A-U-G-A-N.

2          Are these two different people or the same

3   person?

4      A.   It sounds like the same person.  The first

5   one is the correct spelling.

6      Q.   Okay.  These people we've talked about,

7   okay.

8          Okay.  What is the Sherry Black

9   Foundation?

10     A.   The Sherry Black Foundation was created by

11  Sherry Black's daughter who is Heidi Miller of the

12  Miller Foundation out of Salt Lake City.  She was

13  viciously murdered and they reached out to Vidocq

14  and asked for help and we tried and tried and went

15  out and this and that, and eventually my old

16  friend/expert and I had been going out and educating

17  the original police department on the case and they

18  were absolutely incompetent, and so then we went and

19  lectured again and told them that the killer would

20  probably be around the age of 19 and that he would

21  be within two or three city blocks from the

22  residence and whatever else.  There was much more to

23  the case, but aside from that, that's the

24  significant bit.

25          More time went by, and eventually, then,

1  thanks to -- what's the DNA, you know, where they --

2  oh, Ancestry.com, they then found a relative,

3  eventually they found the guy.

4      Heidi Miller called me and said --

5  actually about last year, called me and said

6  "Richard, guess what?" and I said "What?" and she

7  said "They caught him!" and I said "Really?"  I said

8  "Great."  I said, "I just have to ask, how old was

9  he at the time?"

10     "He was 19," said she, and I said "Where

11  did he live?" and she said "Two blocks away," and

12  so -- but in the meantime, they then decided -- and

13  they're an extremely wealthy family, they decided to

14  underwrite programs for law enforcement where they

15  would come and have a three-day presentation by

16  Patrick Zirpoli and myself, and then an extra day to

17  bring their cases and we would help them with their

18  cases, and it was very successful until the

19  pandemic, and then everything went flat, so now

20  they're just starting to get going again, but in the

21  meantime, we probably educated not only in Utah, but

22  in Tennessee and other places, we've educated

23  probably 2,000 cops or more, and the Miller

24  Foundation have funded that to make it easier.

25     I think it costs something like $50 to

1  $100 for three days of lecture that other people

2  were charging, you know, outrageous amounts.  It has

3  resulted in at least, maybe more, but I know of at

4  least four murderers being caught that would not

5  have been.

6       So they're providing a real community

7  service and I think very well of them and they pay

8  us and they pay us well at $1,000 a day, and from

9  that, we're now in contact again and we're getting

10  ready to start up and do more teaching almost

11  pro bono for the agencies.

12     Q.   Let me slow you down for a second.

13          It wasn't clear from your answer who was

14  actually murdered, was it Sherry Black?

15     A.   Yes.

16     Q.   And Heidi Miller is Sherry Black's

17  daughter?

18     A.   Yes.

19     Q.   And Heidi Miller set up the Sherry Black

20  Foundation?

21     A.   Yes.

22     Q.   And that is funded by a foundation called

23  the Miller Foundation?

24     A.   Yes, and she's a Miller, she and her

25  husband.

1    Q.   And who runs the Sherry Black Foundation?

2  Who's responsible for the day-to-day operation?

3    A.   They have a manager, but I think that's

4  going to be changing very soon.  The last one did

5  well, but we want more action from that and Heidi

6  and her daughter and whoever else are paying close

7  attention to it and they're keen on getting back and

8  giving back to the community, the kind of law

9  enforcement teaching and investigation that they

10 need and not just rely on DNA.

11   Q.   When was that foundation set up?

12        MS. SCHAFFER:  Calls for speculation.

13        You can answer if you know.

14   A.   I don't know the exact date, the exact

15 year.  I think it was about '17.

16   Q.   When did you join?

17   A.   Right at the beginning.

18   Q.   And where is it located, in Utah?

19   A.   Yeah, Salt Lake City.

20   Q.   And what's your role with the foundation?

21   A.   My buddy Patrick Zirpoli and I teach crime

22 assessment, lots of illustrations, lots of

23 questions, all that kind of stuff, and it's proven

24 to be successful.

25   Q.   And does it take on cases the same way

1  Vidocq does?

2      A.   Vidocq is much freer.  Vidocq is pro bono.

3      Q.   Okay.  Like how does the Sherry Black

4  Foundation -- so does the Sherry Black Foundation

5  take on cold cases?

6      A.   Oh, yeah.

7      Q.   And how does it screen those cases?

8           MS. SCHAFFER:  Objection; calls for

9  speculation.

10          You can answer if you know.

11     A.   They screen through us and ask us in terms

12 of are the cases for their -- we really want to

13 educate the whole crowd, but for the cold cases that

14 want attention, then we screen them for efficiency

15 and productivity and success and all that kind of

16 stuff and then we get back and let them know and

17 then they bring their cases -- those people bring

18 their cases for us to help on the fourth day.

19     Q.   So the same process that Vidocq used?

20     A.   Exactly.

21     Q.   Okay.  And who is Patrick Zirpoli?

22     A.   He was the head of the Pennsylvania State

23 Police Crime Unit.

24     Q.   How long have you known him?

25     A.   Years.

1          Q.    Ten years, twenty years?

2          A.    Probably 15.

3          Q.    Why did you decide to partner with him?

4          A.    Because he's smart and he's good.

5          Q.    Was he a member of Vidocq Society?

6          A.    He was until he resigned almost exactly

7     the same minute that I did.

███    ███    ████████████████████████

███    ████████████

███    ███    ██████████████████████

11         Q.    And how many cases have you worked on as a

12    representative of the Sherry Black Foundation?

13         A.    Oh, I don't know.  A lot.  A lot.  A lot.

14         Q.    More than 50?

15         A.    Probably.

16         Q.    More than 100?

17         A.    I think probably less than 100, but more

18    than 50.

19         Q.    How many cases are you currently working

20    on as a representative of the Sherry Black

21    Foundation?

22         A.    Well, since we've been shut down because

23    of the pandemic, it's gone basically to zero, but we

24    still have cases in the wings that we want to revive

25    and get back to.

1    Q.   How many cases -- I think you mentioned

2  four that you could think of off the top of your

3  head.

4         How many cases have you solved while

5  working with the Sherry Black Foundation?

6    A.   We don't know.  They don't always get back

7  to us with their success rate.

8    Q.   But you did say you knew of four off the

9  top of your head?

10   A.   Yep.

11   Q.   What are those four?

12   A.   Sherry Black is one, and then three of

13 them out of -- out of Idaho, three bad guys.

14   Q.   What are the names of those cases?

15   A.   I have no idea.

16   Q.   Do you know the facts or circumstances or

17 who the contact is on those cases?

18   A.   My buddy Patrick would, but -- I don't

19 have them.

20   Q.   When you say you solved the Sherry Black

21 case, I got the impression from what you were saying

22 earlier that Heidi Miller kind of called you out of

23 the blue and said "Hey, guess what?  They caught

24 him."

25        Explain to me how you solved it.

1      A.   Well, I didn't mean to say -- if I did say

2    it, I didn't mean to say that we solved it, okay?

3      Q.   Okay.

4      A.   What I said was that we gave them some

5    primary evidence as to where to look, et cetera, and

6    they apparently didn't do it, okay?  They missed,

7    then, the critical points along the way.

8           What actually solved it was the DNA search

9    and then when they caught the guy, he confessed, et

10   cetera, et cetera, et cetera.  What I said was, I

11   was trying to validate or explain the fact that they

12   could have solved it probably ten years earlier had

13   they paid attention and gone out and did the work

14   when we told them where to be looking.

15     Q.   Well, this is one of the situations where

16   they came to you and presented a case to you asking

17   for your help and then you gave them this

18   information and they just ignored it?

19     A.   Yes.

20     Q.   Does that happen frequently?

21     A.   Out there, it does.

22     Q.   Out in Utah?

23     A.   Eventually the case was taken away from

24   that police department and turned over to the

25   sheriff's department and that's where it was solved.

1      Q.   Who was the original police department?

2      A.   I -- oh, what do they call it.  South

3  Salt Lake Police Department.  It a separate police

4  department on the south side of Salt Lake.

5      Q.   And do you know who you worked with on

6  that agency on that case?

7      A.   Well, the chief finally changed.  All I

8  know is that they didn't pay any attention.  They

9  were looking for a black guy and they thought all

10  people with a black gene were going to appear black.

11  Wrong, they can appear white also and they can

12  appear mulatto, so therefore, they -- based on their

13  prejudice, they then did a bad job.

14      Q.   What was your specific role in solving any

15  of the three Idaho cases that you mentioned?

16      A.   They came to us at the meetings and

17  explained the case and Zirpoli and I both looked at

18  it and said have you looked at this and this and

19  this case, have you done this and done that?  And

20  they said no, so they went back, they tried, and

21  some of their own intellect also came into it, and

22  from that, they got on the right -- they got on the

23  right trail and followed it down and got them.

24      Q.   What specific advice did you give them?

25      A.   I don't remember at the moment.

1     Q.   Okay.  What is the Templar Group?

2     A.   That was a short-lived group started by a

3  mutual friend of Zirpoli's and mine, a private

4  investigative agency, and so talked us into doing

5  it, but then realized it was not my cup of tea or

6  Zirpoli's, so it fell apart quickly.

7     Q.   Is that around the time that you changed

8  your private investigator's license?

9     A.   Yes.  I was very disappointed and

10  disgusted by the whole venture.

11     Q.   Were you still a member of the Vidocq

12  Society at the time?

13     A.   Yes.

14     Q.   Who started up the Templar Group?

15     A.   A guy by the name of Steve Stoud.

16     Q.   Steve Stoud, S-T-O-U-D?

17     A.   Yes, who was a former Pennsylvania State

18  Police who preceded Zirpoli as the head of the crime

19  unit.

20     Q.   I have the same Robert Stoud associated

21  with --

22     A.   Same.

23     Q.   Is that the same guy?

24     A.   Yeah.  Yeah.

25     Q.   Okay.  And the purpose was it was supposed

1    to be a private investigator agency?

2        A.    Right.

3        Q.    Who is Anthony Manetta?

4        A.    He is -- I don't know if he's still there,

5    but he was -- last I learned, I think he was a

6    lieutenant with the Pennsylvania State Police.

7        Q.    What's his approximate age?

8        A.    He should be around 40 right now.

9        Q.    When's the last time that you had any

10   contact with Mr. Manetta?

11       A.    It's been a long time.

12       Q.    How about James C. Ford, who's that?

13       A.    It's one of Steve's friends that I don't

14   know that I've met.  Maybe I have, but I wouldn't

15   know him if I saw him.

16       Q.    Okay.  What is Steve Stoud's approximate

17   age?

18       A.    Probably pushing 50.

19       Q.    And when's the last time that you talked

20   to him?

21       A.    Well, he stopped by my house and I was

22   busy with something else and I just told him that I

23   couldn't see him at that time, and so he left, and I

24   heard he was trying to get ahold of me and I don't

25   care if I do.

1       Q.      Okay.  Why is that?

2       A.      I think he's a user of people.

3       Q.      Okay.  Do you feel that he used you?

4       A.      Yes.

5       Q.      How so?

6       A.      He asked me what I thought and he'd go

7    back and pretend it was his.

8       Q.      How was the Templar Group funded?

9       A.      By -- we each put in -- I can't remember

10   how much we each put in.  We each put in a lot of

11   money and it was worth it to get out.

12      Q.      So did you have to forfeit your

13   contribution?

14      A.      Yep.

15      Q.      Were you compensated at all?  Did you make

16   any money off the Templar Group?

17      A.      Not a dime.

18      Q.      What was your role, just a private

19   investigator?

20      A.      Yeah.  I'm not a gumshoe running out up

21   and down streets.  I'm an old man.

22      Q.      What is located at 1879 Chenango Street in

23   Montrose, Pennsylvania?

24      A.      I own a house there.

25      Q.      And what is located at 148 Spruce Swamp

1  Road in Milanville, Pennsylvania?

2      A.    That's where Patrick Zirpoli lives.

3      Q.    Do you know why the business was set up

4  with all of the members' addresses listed as your

5  address?

6      A.    Pardon?

7      Q.    Do you know why the business was set up

8  with all of the partners' addresses listed as your

9  address?

10     A.    No, I was not aware of that.

11     Q.    How many cases did you work on as a

12  partner in the Templar Group?

13     A.    None.

14     Q.    What is the Omega Crime Assessment Group?

15     A.    It's a group that I started years and

16  years and years ago as an independent, and then it

17  went by the wayside.

18     Q.    Who set that up, you?

19     A.    Yes.

20     Q.    Why was it set up?  What was it for?

21     A.    I thought it might be a way to make

22  contact with others and I found out that it was more

23  of a nuisance than a blessing.

24     Q.    How so?

25     A.    Well, if you haven't figured it out by

1    now, in my world, it can be extremely competitive

2    and a lot of people will cut your throat at the

3    easiest point that they can, and so I was getting a

4    lot of unnecessary garbage that I didn't want to put

5    up with, so I stopped all that.

6         Q.   Who is Barbara Dunn?

7         A.   Barbara Dunn is the stepmother of Scott

8    Dunn and wife of Jim Dunn, and Scott Dunn was

9    murdered in Texas, I'm trying to think of the name

10   of the town.  It's cloudy.

11            Eventually, then, and you may or may not

12   have seen the case of Scott Dunn, the murder of

13   Scott Dunn on television, they often show it on

14   48 Hours or Forensic Files.  It's where eventually

15   his girlfriend was jealous over another girlfriend

16   and murdered him and they couldn't find the body,

17   couldn't find the body, and it was one of the first

18   cases around that a conviction was done with no

19   body, no weapon, but a conviction was gathered.

20            She now is out of prison.  She put a hit

21   on the father of the victim.  She put a hit on the

22   judge.  Well, on the prosecutor, who then became a

23   judge, and he died in a motorcycle accident by a

24   drunk, and she put a hit on everybody else other

25   than myself, which I found interesting, but --

1    Q.   Is that the case where they sprayed

2  Luminol all over the apartment and found blood?

3    A.   Yep.  Yep.

4    Q.   And I think I read somewhere that your

5  role in that case was to convince the prosecutor

6  that they had enough evidence to convict?

7    A.   Yes.  Yes.

8    Q.   Just based on the quantity of blood?

9    A.   Well, I argued that the blood was tissue,

10  therefore part of the body.

11    Q.   And did the prosecutor adopt that

12  argument?

13    A.   Yes.

14    Q.   And did they present that argument at

15  trial?

16    A.   Yes, and it prevailed.

17    Q.   It prevailed.

18         How was Omega Crime Assessment Group

19  funded?

20    A.   Me.  It was -- it never turned out to be a

21  money making operation.

22    Q.   Okay.  What was Barbara Dunn's role?

23    A.   I don't -- I don't see the connection

24  between -- I don't know of any connection between

25  Omega and Barbara Dunn.

1     Q.    She's listed on the corporate records for

2   Omega Crime Assessment Group.

3     A.    Really.

4     Q.    With the Pennsylvania Secretary of

5   States's office.

6     A.    News to me.

7     Q.    Did you earn any money with Omega Crime

8   Assessment Group?

9     A.    Nope.

10    Q.    And what's located at 32 Sutphin Pines in

11  Yardley, Pennsylvania?

12    A.    That's where the Dunns lived before they

13  moved to Georgia or North Carolina, wherever it is.

14    Q.    How many cases did you work out on as a

15  representative of Omega Crime Assessment Group?

16    A.    I don't know that I did any actually.

17    Q.    Are you currently a member of any other

18  private, professional organizations other than the

19  Sherry Black Foundation?

20    A.    No.

21    Q.    Were you previously a member of any other

22  private, professional organizations other than

23  Vidocq Society, Sherry Black Foundation or the

24  others that we've talked about?

25    A.    Not that I can think of.

1    Q.    What about Parents of Murdered Children?

2    A.    Oh, yes.  Okay.  I no longer belong, but I

3 was on the national board of that organization.

4    Q.    Did you resign from that board?

5    A.    Eventually I did.  It was worthwhile, but

6 it had very bad management and eventually the

7 manager was fired because she was spending a lot of

8 the monies for the organization at the gambling

9 booths, but that's another issue.

10    Q.    Okay.  And is that why you resigned?

11    A.    Yes.

12    Q.    Have you published anything as a member of

13 the Sherry Black Foundation?

14    A.    No, not really.

15    Q.    Did you publish any articles or anything

16 under the Vidocq Society rubric?

17    A.    No.

18    Q.    Are you currently a member of any public

19 professional organization?

20    A.    Such as?

21    Q.    Pennsylvania Society for Psychologists?

22    A.    No.

23    Q.    Anything like that?

24    A.    No.

25    Q.    Crime organizations, anything like that?

1      A.   No.

2      Q.   Have you been a member of any professional

3  organizations that we have not discussed?

4      A.   None that I can think of.

5      Q.   And you're not currently teaching.

6           Is that correct?

7      A.   Pardon?

8      Q.   You're not currently teaching.

9           Is that correct?

10     A.   Yes.  Correct.

11     Q.   Do you have any previous teaching

12  positions other than the Oklahoma State position

13  that we discussed?

14     A.   Other than teaching in the -- at the

15  various places around the world as well as the

16  Sherry Black Foundation and that kind of stuff, I

17  enjoy teaching.

18     Q.   But not for any colleges or universities?

19     A.   No.  The purpose is different.  I expect

20  those that attend the police issues want to be

21  better cops and want to be able to be more efficient

22  than what they are, where that same thirst is not

23  necessarily predominant with students in a classroom

24  at a university.

25     Q.   Okay.  But you're not -- you don't have

1  any previous teaching positions at colleges or

2  universities that we haven't talked about?

3      A.   Right.  Right.

4      Q.   Okay.  So you said as part of your resume,

5  you maintain a list of at least some of the

6  publications you've authored.

7           Is that correct?

8      A.   Right.  Right.

9      Q.   So in my search in your background in

10  trying to figure out, trying to find as much of your

11  published materials as I could, I came across the

12  following articles.  One is -- one the author is

13  listed as Richard A. Walter, but the title of the

14  paper is an Examination of the Psychological Aspects

15  of Bite Marks.

16      A.   Yes.

17      Q.   From the American Journal of Medicine and

18  Pathology in March 1984, so I'm assuming that's you.

19      A.   That's true.

20      Q.   And it's just got your middle initial

21  wrong?

22      A.   Right.

23      Q.   And in that, you're listed as a prison

24  psychologist with the Michigan Intensive Program

25  Center, Michigan Department of Corrections,

1    Marquette, Michigan.

2              So when you authored that, you were at

3    Michigan DOC.

4              Is that right?

5       A.   Right.  Right.

6       Q.   As part of your responsibilities with

7    Michigan DOC, were you required to publish?

8       A.   No.

9       Q.   Were you required to complete any

10   research?

11      A.   No.

12      Q.   Okay.  So that was just kind of a side

13   thing you did?

14      A.   Right.  Right.

15      Q.   So that was one.  The other one -- another

16   one I found was Richard D. Walter, Anger Biting, The

17   Hidden Impulse, The American Journal of Forensic

18   Medicine and Pathology in September 1985, and that

19   was apparently a paper presented at the American

20   Association of Forensic Scientists, Odontology

21   Section in 1983.

22             Does that sound right?

23      A.   Yes.

24      Q.   And that says the same thing, that you

25   were at the Michigan DOC at the time that you wrote

1    and presented that article.

2           Did you -- this might sound like an odd

3    question, but it will make sense if you bear with

4    me.

5           How much vacation time did you get every

6    year while you were at Michigan DOC?

7    A.    I don't recall, but I used to save a lot

8    of it and I stored it up to use a week or two to go

9    to wherever.

10   Q.    Okay.  So did you have to use vacation?

11   A.    Yes.

12   Q.    They didn't give you leaves of absence to

13   go --

14   A.    Sometimes within the state, then the state

15   police, for instance, they'd call and ask if they

16   could borrow me from the department of corrections,

17   who resented it.

18   Q.    Okay.  How many times did the state police

19   borrow you?

20   A.    I would think at least ten, fifteen times.

21   Q.    And what did they borrow you for?

22   A.    Generally on their cases and arsons and

23   things like that?

24   Q.    Do you recall who you worked with at state

25   police that would have borrowed you from DOC?

1      A.    I have his name at home.  It's still on

2   my -- I still have a folder for him on my computer.

3   I can't think of his name at the moment, but a good

4   guy.  I don't know if he's still alive or not, but

5   some of the other detectives there in the Marquette

6   area, they used me more than most.

7      Q.    Do you recall any of their names?

8      A.    Well, I know the detective, Don something,

9   died.  I don't know about this other guy.  I hope

10  he's still alive, but, yeah, they would go to the

11  warden and ask him, and the warden was good about

12  it, but I think that the feds down in Lansing yelled

13  about it a little bit, because why should we help

14  them, and I didn't take that attitude.

15     Q.    What agency was the detective, Don, with

16  that passed away?

17     A.    Michigan State Police.

18     Q.    Can you recall the names of any cases that

19  you wrote reports on for agencies in Michigan

20  outside of DOC?

21     A.    I don't know.  I can't think of any at the

22  moment.  I very well may have.

23     Q.    If you were doing work for Michigan State

24  Police as a Michigan state employee, you would have

25  been required to write a report of your

1    investigation and your findings, right?

2         A.   Right.   Right.

3         Q.   Okay.   So do you recall authoring reports

4    on any particular cases?

5         A.   I just did one not long ago for them.   I'm

6    still convinced that it's a murder.   They then chose

7    to believe that it was a suicide.   I think they got

8    it wrong, but I wrote what I thought to them was

9    correct.

10        Q.   What was the name of that case?

11        A.   I'd have to go back and look.   It's within

12   the last two years.   It's the now retired assistant

13   sheriff, he called me on it and wanted me to help,

14   and I felt hoodwinked by the mother, because the

15   more I learned after the fact, I'm still -- I'm very

16   suspicious of her and what she had to say and how

17   she reported it and all this kind of stuff.

18        Q.   And what was the assistant sheriff's name?

19        A.   Mike Quale.

20        Q.   Can you spell that for me?

21        A.   Q-U-A-L-E.   He's a good guy to talk to if

22   you want to.

23        Q.   What agency was he with?

24        A.   He was with the sheriff's department.   He

25   was the deputy sheriff, you know --

1     Q.    What county?

2     A.    For Marquette County.

3     Q.    And you said that was within the last two

4  years?

5     A.    Yep.

6     Q.    How about have you ever testified at trial

7  in a state court case in Michigan?

8     A.    When I worked for DOC, I testified against

9  a guy who claimed that we -- I forget exactly what

10 the complaint was, but he then hired a lawyer that

11 felt he could get him $15,000, because the

12 department would pay $15,000 not to have to go to

13 court, to federal court, it was just too much bother

14 for them, and I then urged them to go to court and

15 we did and I then testified and the lawyers were

16 very upset, because the jury came back in about 30

17 minutes and found him in error.

18         I saw him the next day at prison and he

19 said "Mr. Walter, I'll never do that again," and I

20 said "Smart boy," but -- yeah.

21    Q.    What was the name of that case?

22    A.    The prisoner was at DOC and --

23    Q.    What kind of case was it?

24    A.    Well, it was -- the claim, it was

25 something outrageous, I don't remember what it was,

1    that he'd been injured somehow.  Again, it was just

2    to get money.

3         Q.   Were you testifying as a fact witness or

4    an expert witness?

5         A.   As -- I testified for the department.

6         Q.   Right, as to facts that you observed?

7         A.   Right.  Right.  Yeah.

8         Q.   So not as an expert witness?

9         A.   Right.  Right.

10        Q.   Have you testified in any other cases in

11   the state of Michigan other than that one?

12        A.   I don't think so.  I don't think so.

13   Thanks to the Drake decision, I then decided that I

14   wasn't going to go that direction.  I would aid and

15   assist and sometimes I would then educate or the

16   other psychologists or whatever else would call me

17   and ask me for advice to send them to do whatever

18   the testimony was, but I decided it was not good

19   until I could get my name cleared and it took a long

20   time.

21             With that said, with the American Academy

22   of Forensic Sciences and the others, I feel, and I

23   didn't do wrong, I feel now if I went to court, I

24   would let the chips fall where they may, tell the

25   truth and there you are.

1    Q.    Have you ever testified at trial in

2    Pennsylvania?

3    A.    Not that I know of.

4    Q.    Other than the Drake case, have you ever

5    testified at trial in New York?

6    A.    No.  I don't think so, no.

7    Q.    Have you ever testified at trial in any

8    other state other than Michigan?

9    A.    They told me that I erred, because I was

10   asked about trials and I thought I had two in

11   California.  They claim that I only did one, so

12   therefore, I was a liar.  In fact, I was just

13   starting to think about that the other day.  I was

14   told -- I could have been wrong, but I don't think I

15   was.

16   Q.    I think the issue here was -- the concern

17   was whether or not you'd ever testified as an expert

18   witness in the field of psychology in California.

19   A.    Okay.

20   Q.    And the problem was that the one time you

21   had testified was on a chain of custody issue as

22   part of your work in the lab at the ME's office, and

23   the other time, I'm not even sure if you even

24   testified, but it had something to do with a Mazda

25   car accident.

1          Does that ring a bell?

2     A.   Mazda comes to mind, but I'd have to think

3 about it for a long time before it comes full

4 version.

5     Q.   Have you ever testified as an expert

6 witness in the field of psychology in any court in

7 the US?

8     A.   In what?

9     Q.   Have you ever testified as an expert

10 witness in the field of psychology in any court in

11 the U.S. other than the Drake case?

12     A.   No, I don't believe so.

13     Q.   Okay.  Getting back to -- we were talking

14 about your list of publications, and I had found the

15 two, The Examination of Psychological Aspects of

16 Bite Marks and Anger Biting, and then I found a

17 third which was Richard Walter, Homosexual Panic and

18 Murder in the American Journal of Forensic Medicine

19 and Pathology, volume 6, No. 1, in March of 1985.

20     A.   Right.

21     Q.   And then the last one I found was Keppel,

22 Robert D., and Richard Walter, Profiling Killers: A

23 Revised Classification Model for Understanding

24 Sexual Murder, The International Journal of Offender

25 Therapy and Comparative Criminology, 43, 4, 1999 by

1    Sage Publication.

2        A.    Right.

3        Q.    And I wasn't able to find any other

4    published articles by you and I'm wondering if you

5    can point me in the right direction, if there are

6    others out there, or is that it, those four?

7        A.    I think there are a couple more I've

8    written.  I can't remember the titles, but I have

9    them listed at home and I have copies of them, I

10   think, so I'll send a copy to you and you can send

11   them on to him, all right?

12       Q.    Sounds good.

13             Okay.  Let's see.  There was also

14   something about -- and this is something I think I

15   got from some of the things I read about you online

16   and from that presentation that you talked about

17   earlier that Capuzzo was at, this concept of a

18   matrix in the form of -- essentially I think what

19   you said that it was in the form of a double helix,

20   similar to DNA, and it was some kind of helix or

21   matrix schematic to identify killers developed as a

22   tool of investigation using pre-crime crime and

23   post-crime behavior to help develop suspects.

24             Did I get that right?

25       A.    Yeah, for the most part.  I don't like

1    being interpreted by others meaning Capuzzo.  That

2    said, he may have accidentally gotten it right.

3    Yeah, it's called the helix, the learning curve of

4    sadism, and I referred to it earlier as a

5    developmental -- highly projected, but developmental

6    schematic learning -- they go through various

7    stages, always in the same order, going through, so

8    when I look at a crime scene that is sadistic, I can

9    see where they're at, I know where they have been,

10   their steps through, so then that opens up a whole

11   new range of investigation of questions, et cetera,

12   that should be there.  It does not apply to all

13   murder, it applies to sadism.

14            Now, having said that, then, more

15   importantly is the crime assessment.  I wish I had a

16   board here, but I don't.  You can take and write

17   down the center of the paper or the board, write

18   down the crime, and that becomes the standard.  You

19   look at that for your standard.

20            Over here, then, you look at pre-crime

21   behavior, and over here, you look at post-crime

22   behavior, and as a consequence, then, your crime, if

23   you know how to assess it, for instance, as in this

24   case, I would opine that it was a -- what we call a

25   power assertive murder, okay?

1      Well, what's that mean?  We can get into

2   that in a second, but -- so that's going to help the

3   investigator once he understands what that is and if

4   he understands something about the eccentricities of

5   power as a class of killer or a type of killer, what

6   they do and what they don't do and all these other

7   such things.  It helps you, then, understand who and

8   what you're looking for.

9      Therefore, let's say you have three or

10  four suspects, and number one, you say what was the

11  relationship to the victim and all this kind of

12  stuff and what has happened that would cause these

13  events to take place.

14      From that, then, you come to No. 2.

15  No. 1, they have one, he knows her, that's it.

16  No. 2, then, they have dated.  He knows her, he

17  dated her, they've been to parties together,

18  whatever, and No. 3, then, is somebody who knows her

19  well, a boyfriend, a girlfriend, whatever else, and

20  then the argument, the fights, the issues, and all

21  the stuff teenagers go through and sometimes they

22  get carried away, and low and behold, you end up

23  with 15 or 20 different key power-related issues.

24      Fine.  Then you take a line and you go

25  off, then, to that action which is related by

1    presence or absence in your crime scene and you can

2    maybe get 12, 15 linkages to that.

3            Does that prove it to me?  No.

4            What it does do, then, if you come over to

5    post-crime behavior, what happens after the murder,

6    and then you watch their behavior, watch what they

7    do, watch how they respond, watch all these other

8    kinds of things, and people are going to come

9    forward and say this, that and everything else, and

10   from that, then, you can come back over and link

11   that back to the center, and so now you have a

12   straight line that flows through and crosses over by

13   the No. 3 by his behavior and by his actions.

14       Q.    Okay.  So have you ever published an

15   example of this matrix?

16       A.    I've not published it.  I have lectured

17   and taught forensic people.  I am very hesitant.

18   Hell, I created this over 30 years ago and I'm just

19   starting to let loose of it.

20       Q.    You created it in the 1980s?

21       A.    Before that actually.  I started in the

22   '70s.  I hung on to it for a long time and then I

23   started -- and I double-checked it here, there,

24   wherever and -- but what happens is that -- when

25   you're reading it, then you do a basis, then, for

1    saying, gee, let's look at the person of interest,

2    and it gives you, then, a foundation which to work

3    from to start looking for physical evidence, et

4    cetera, et cetera, et cetera, which can be

5    manipulated, whatever.

6         Q.   Has anyone ever been able to validate this

7    matrix?

8         A.   We have not formally done it, but I know

9    it's been used over and over again successfully.

10        Q.   Because in doing my research, I found a

11   lot of articles and a lot of researchers, a lot of

12   criticism on it, and a few that purport to attempt

13   to devalidate it and they concluded that it can't be

14   validated, and I didn't find anything where you

15   addressed that criticism and I'm kind of wondering

16   why not.

17        A.   Nobody has ever approached me with

18   criticism.

19        Q.   Have you ever reviewed any of the papers

20   that have been written by like Craig Binnell, Brett

21   Snook, Sampson Higgs and all these folks?

22        A.   Where are they from?

23        Q.   Well, let's see, Carlton University,

24   Criminal Justice and Behavior -- Journal of Criminal

25   Justice and Behavior, Journal of Aggression and

1    Violent Behavior.  Another one is the Criminal

2    Justice and Behavior.

3            Ever since you published that article in

4    1999, there have been -- well, I've got six or seven

5    papers just here in my office that I've reviewed

6    trying to validate that model in your matrix and the

7    model that you laid out in profiling killers, and

8    they've all come to the conclusion, as far as I can

9    tell, that it can't be validated.  I haven't yet

10   been able to find anywhere where it's been peer

11   reviewed and validated.

12           I'm just wondering if you of somebody

13   somewhere where it's been peer reviewed and someone

14   has been able to validate it?

15        A.   If I recall correctly, I think before he

16   died, Keppel did.

17        Q.   Okay.  And wrote a paper on it?

18        A.   I believe he did, or an article, and -- he

19   is now dead, but I can reach out and see if I can

20   find out.

21        Q.   I think I looked at everything he wrote,

22   but if you can reach out and find it and produce it,

23   that would be great.

24        A.   Yeah.

25        Q.   Was your matrix used, the helix -- do you

1    call it the helix?

2         A.   Yeah, but I didn't -- the irony of all

3    this is, sir, in that paper you're talking about

4    with Keppel, the's helix was not introduced.

5         Q.   Yeah, I know, that's why I was wondering

6    if you published it anywhere, because the closest

7    I've come to it is an article called Classifying

8    Serial Sexual Murder/Murderers, An Attempt to

9    Validate Keppel and Walter's 1999 Model, which is

10   offered by Craig Bennell, Sarah Bloomfield, Karla

11   Emeno, and Evanya Musolino of Carlton University and

12   published in the Journal of Criminal Justice and

13   Behavior, volume 40, No. 1, in January of 2013.

14        They come up -- they display what I

15   believe is the matrix or helix or their version of

16   it, at least, trying to use your -- what you put

17   together in your article with Keppel.

18        A.   Huh.

19        Q.   So I can see here kind of the double

20   helix, the matrix thing happening, that's why I'm

21   wondering where you published that where I can see

22   what you might have --

23        A.   Yeah.  If I recall correctly, now that

24   you've brought that up, Peter Stephenson also read

25   all those papers, because he and I talked about it,

1   and he's a big computer guy and all this kind of

2   stuff and he is a bite guy and he then found all

3   their mistakes in those papers that they wrote.

4        Q.   What's his name?

5        A.   Peter Stephenson.  We talked about him

6   earlier.  He lives in Detroit.

7        Q.   Part of Vidocq?

8        A.   Yeah, he's with Vidocq.

9        Q.   Okay.  Has he published anything?

10       A.   Not that I -- I don't know if he has or

11  not, I should ask him, or you can ask him, but I

12  know that he can certainly inform you on it, better

13  than, much better than I.

14            MS. SCHAFFER:  Can we take a quick break?

15  I think Mr. Walter wants to get up and stretch his

16  legs for a minute.

17            MR. LAUERSDORF:  Sure.

18            MS. SCHAFFER:  We'll just take five.

19            (Pause in deposition:  2:46 - 2:57 p.m.)

20

21  BY MR. LAUERSDORF:  (Continuing)

22       Q.   Was the matrix or the helix that you

23  developed used in the Freeman investigation?

24       A.   I'm -- let me ask a question before I

25  respond.  If you're referring to the matrix as the

1    helix, the helix was not used in this case, okay?

2         Q.   Are the matrix and the helix two different

3    things?

4         A.   Yes.

5         Q.   Oh, okay.  All right.

6         A.   Yeah.

7              So what was used is a block process and a

8    thought suggestion, ideas exchanged of what they had

9    to tell me, okay?  And what they told me, then, was

10   significant, because I did not interview one person

11   in the case and I relied on Chief Dannels, for the

12   most part.

13        Q.   Okay.

14        A.   As to what was said, who said what, all

15   these other sorts of things, and so my idea was to

16   exchange ideas and to look, then, for a pattern

17   development that would explain the case in chief or

18   let them understand where they needed to improve or

19   change or whatever else, and so it was a matter of

20   listening and my only source really was the

21   information that the chief had or that the chief had

22   acquired himself, and I for one, having some

23   experience in these issues, I never accept what the

24   police say as a -- who a suspect is.

25        Q.   What did you do to verify or corroborate

1  the information that Chief Dannels provided to you?

2      A.   I accepted his word for what was said.

3      Q.   Okay.

4      A.   Or what he said, okay?

5      Q.   So essentially what you did was took the

6  facts that he provided you, or the information that

7  he provided you, whether they were facts or not --

8      A.   Right.

9      Q.   -- and crafted that into a narrative that

10 the prosecution could use to prosecute Mr. McGuffin?

11          MS. SCHAFFER:  Objection; lacks

12 foundation; it's argumentative.

13     Q.   I'm just trying to understand what he just

14 said.

15          Can you answer the question?

16     A.   What I did was I listened to what they had

17 to say and asked questions, but I didn't challenge,

18 because I didn't have anything to challenge with,

19 because I didn't interview the original people,

20 okay?  And so --

21     Q.   You knew at the time that they were coming

22 to you specifically and the Vidocq Society for

23 guidance on how to wrap this case up, right?

24     A.   And/or what it meant, okay?  And so that

25 was my job.  I was not here as a professional.  I am

1   doing my professional work as I normally would in

2   terms of consultation and all that kind of stuff.  I

3   was there to listen and to help them understand what

4   they claim to be true, okay?

5       Q.   Okay.  I'm trying to think of analogy, and

6   correct me if I'm wrong, but it sounds like the

7   analogy would be you're taking the puzzle pieces

8   that they give you and you're assembling them into

9   the puzzle that reveals the picture to them?

10          MS. SCHAFFER:  I'm going to object;

11  incomplete hypothetical; it's vague and ambiguous.

12      Q.   Does that sound like a correct analogy?

13      A.   Well, I think -- I think if you expose the

14  ideas and various arrangements that could have taken

15  place, which is likely, which is not likely, did

16  they coincide, and did they eventually, then, form a

17  construct of understanding in terms of what they

18  claimed happened, okay?

19      Q.   And is that based on your understanding of

20  the matrix that you to developed?

21      A.   Yep, and they -- I was never suggesting

22  that I was absolutely right.  I was presenting ideas

23  so that they could see their own case.

24      Q.   Right, because you understood that they

25  were coming to you because they were out of ideas,

1  right?

2      A.   Yeah, and from that, then, I, for

3  instance, knew nothing about the second shoe

4  until -- I may have been told, okay?  I'm not

5  arguing that I didn't hear it.  I knew nothing about

6  the second shoe and the DNA until 20/20 called me.

7  I was gobsmacked by it.

8      Q.   I guess my question is:  You knew that

9  they were coming to you for guidance and that they

10  were going to rely on what you told them, and so why

11  didn't you take some steps to verify or corroborate

12  the information that they were providing you?

13          MS. SCHAFFER:  Objection; asked and

14  answered; calls for speculation; argumentative;

15  lacks foundation.

16      A.   Because I wasn't there to help them solve

17  the crime per se, whether they thought so or not,

18  okay?  I was there to provide them with ideas and

19  suggestions and whatever else in terms of meaning

20  what they had said and how it linked up or didn't

21  link up, to what would be expected, okay?

22      Q.   So when Vidocq Society back when you were

23  there, back in 2010 when you taking these cases, did

24  Vidocq provide a disclaimer to the agencies that

25  were coming in, any kind of manual or guidelines,

1  did you explain to them "Hey, this is what we do and

2  don't do, this is what you can expect and not

3  expect"?

4          MS. SCHAFFER:  Objection; calls for

5  speculation.

6          You can answer.

7      A.   And Frederick -- I don't know when he

8  didn't, Frederick always gave that disclaimer.

9      Q.   Verbally or was there some kind of a

10  written --

11      A.   In written, okay?

12      Q.   Okay.

13      A.   And so one of the great mistakes of a lot

14  of opinion people is that they jump to conclusions.

15  I choose not to do that.  I want the facts as

16  perceived, and in my case, they were perceived,

17  because I didn't know them first person.  I wanted

18  them, then, to come to their own conclusion based on

19  the facts that they asserted were true and valuable.

20          From that, then, as I could promote

21  through ideas or whatever else some alternative

22  interpretation peripherals, I would have jumped at

23  it immediately and did probably.

24          I don't remember necessarily, but when

25  the -- when the bulk of the materials were in and I

1    understood what they were saying, I then indicated

2    that it was consistent with what we would call a

3    power-assertive murder.

4         Q.    Okay.  So you talked to Chief Dannels and

5    DA Frasier about the matrix, about your

6    classification system at some point?

7         A.    Yeah, in the pre-crime crime, post crime,

8    okay?

9         Q.    So you did describe the matrix to them?

10        A.    Yeah.

11        Q.    Okay.

12        A.    And from that, then, I didn't write on the

13   board, nothing else, and they created a board of the

14   matrix, if you please.

15        Q.    When was that?  When did they create that?

16        A.    When I was there.

17        Q.    In Coquille?

18        A.    Yeah, in Coquille.

19        Q.    Okay.

20        A.    So then I started listing out, then, the

21   history as they perceived and learned from the

22   witnesses of the relationship between the victim and

23   the suspect.

24        Q.    So they created a board of the matrix

25   while you were there?

1      A.   Yes.

2      Q.   Do you recall if that was shown on 20/20

3   at all?

4      A.   No, I don't think so.  I haven't seen that

5   show since right after it came out.

6      Q.   Okay.

7      A.   And I would say, I didn't like it, okay?

8           That said, then, when you then get through

9   and you show the linkages then between what could be

10  perceived as motive, opportunity, all this kind of

11  stuff, then -- and you measure that against the

12  pre-crime behavior and the arguments of they

13  allegedly or reported as so to me had, then you link

14  that, then, to the crime scene itself, is it

15  consistent with PA?  Yes.

16          Now, when you look at post-crime behavior,

17  okay, and the cleanup, allegedly, and the car and

18  the other issues and allegedly some of the alleged

19  friends that testified about his behavior, now you

20  see that that also was consistent with PA, and that

21  basically, by his own behavior, then, he's --

22  circumstantially he's raising his hand as it all

23  fits together and he's saying "I'm your guy."

24          Now, investigations should not stop there.

25  They should also go into the forensics which gives

1    the investigator, then, the ability to look --

2    hopefully look in the right places and challenge and

3    see if you can develop more scientific evidence,

4    okay?  But again, I did not opine that absolutely he

5    did it and whatever else.  What I did was I showed

6    them, predicated on what they told me, this is how

7    it fits together, okay?

8         Q.   So let me stop you there for a second and

9    see if I understand, because I think what you're

10   saying, and correct me if I'm wrong, but I think

11   what you're saying -- or the way I'm -- the way I'm

12   understanding what you're saying and based on what

13   I've read in your papers and the papers we've

14   reviewed in your papers --

15        A.   Right.

16        Q.   -- it sounds like what you're saying is

17   based on what they provided me, I determined from

18   the crime scene evidence that this homicide was

19   committed by a power assertive perpetrator?

20        A.   Right.

21        Q.   A perpetrator who demonstrated

22   power-assertive tendencies?

23        A.   Right.

24        Q.   And then they put this board together with

25   the pre-crime behavior and the post-crime behavior

1  of McGuffin, and based on the information that they

2  provided to me about pre-crime and post-crime, I

3  concluded that Mr. McGuffin met the power-assertive

4  profile?

5      A.   Exactly.

6      Q.   Okay.  And you discussed that with them,

7  with the investigators, Dannels and Frasier?

8      A.   Yeah.  I didn't say he did it.

9      Q.   Okay.  So you didn't say he did it, but

10  from there, now you've discussed this where you said

11  yes, in your opinion, you have a homicide scene that

12  is consistent with a power-assertive perpetrator and

13  you have a suspect who has a power-assertive

14  profile.

15      A.   Right.

16      Q.   So where are they supposed to go with

17  that?  Because it sounds like you matched them up

18  pretty tightly.

19          MS. SCHAFFER:  I'm going to object; lacks

20  foundation; misstates the witness's testimony;

21  argumentative.

22      Q.   Okay.  Mr. Walter, have I misstated what

23  you're saying?

24      A.   I lost my thought.

25          Oh, actually, if all the facts that they

1   told me are and were true, okay?

2       Q.   Okay.

3       A.   The suspect did himself more damage than

4   anybody in terms of creating the suspicion which was

5   put on his shoulders by them, okay?

6            I am -- well, first of all, I was acting

7   as a simulant for their thinking process and their

8   understanding.  I wasn't there as a professional in

9   my normal professional work, okay?  It's different.

10  Different process.

11      Q.   How do you distinguish between the two and

12  how do you make sure that they are clear that you

13  are acting in one capacity and not the other?

14      A.   All you have to be is around me for five

15  minutes and you can figure that one out.

16      Q.   Okay.  You know, that may be true with

17  some folks, maybe not true of others.

18      A.   It's true of me, okay?

19      Q.   Okay.

20      A.   From that, then, I would have loved to

21  have said "Gee, do you have any other PAs, power

22  assertives, that we can look into or you should look

23  into" or whatever else, okay?  But that never came

24  about.

25      Q.   Why not?

1     A.    I don't know that there was anybody else.

2     Q.    Did you ask?

3     A.    I am not convinced, by the way, that we

4     should be talking about just McGuffin.  I would

5     think you should be talking about they.

6     Q.    Explain.

7     A.    Often with PAs, they like to have

8     witnesses and they also like to have people who can

9     delegate the fact that they were successful.  In

10    fact, with PAs, certainly you can get the

11    individual, but often you'll get as many as three to

12    five people involved, and I'm not convinced beyond a

13    shadow of a doubt, and though this was never brought

14    up by them, I'm still not convinced that it wasn't

15    more than one.

16    Q.    Okay.  Did you tell them that?

17    A.    I don't remember specifically telling them

18    that, but it was certainly within my lexicon to do

19    that, to make that kind of a statement.

20          And what I still don't understand about

21    the case --

22          MS. SCHAFFER:  There's no question

23    pending.

24    Q.    Were you finishing a thought?

25    A.    No, go ahead.

1    Q.   Okay.  So let's get into the investigation

2  a little bit.

3         When did you first become aware of

4  Ms. Freeman outside of the investigation?

5    A.   When they presented it at Vidocq.

6    Q.   Had you spoken to anybody about it before

7  Chief Dannels came out to Vidocq Society to present

8  it?

9         (Exhibit No. 2 marked.)

10   A.   No.  I'm going to show you what's been

11 marked as Exhb. 2, this is you an article called

12 "Cold Case Squad:  Modern-Day 'Sherlock Holmes' Team

13 Takes on Oregon Slaying."  The author is Rob Wallace

14 I think of ABC News with a publication date of

15 August 11, 2010, which is an article about you and

16 Vidocq Society and your participation in the Freeman

17 investigation.

18         I'll take you to, let's see here, it must

19 be page -- whatever this page is, page 3 of 7 of the

20 PDF.

21         We've got this quote here from

22 Mr. Capuzzo, "People think of them" -- and he's

23 talking about you and Vidocq Society -- "People

24 think of them as wizards to sort of peep and mutter

25 and go into a back room and come out and say 'He did

1    it,'" said Philadelphia crime writer Michael

2    Capuzzo, who profiles the group in his book, "The

3    Murder Room."

4         And then the author of the article points

5    out that Dannels said he reviewed some information

6    about you and did not hesitate to call for outside

7    help.

8         Are you aware as Mr. Capuzzo states that

9    people have this impression of you and Vidocq, that

10   they can give you some information and you'll be

11   able to tell them who did it?

12   A.   Many do.

13   Q.   What's that?

14   A.   Many do.

15   Q.   Many do.

16        So what do you do to let them know, "Hey,

17   that's not what's going on here," or is that what's

18   going on?  I don't know.

19   A.   No, it's not what's going on.  If you want

20   to be in the guessing game, it can be true, but

21   erroneous.  That said, the truth, it takes good,

22   hard work to sort through and find cause and

23   justification and linkage then between the two

24   people and then motive, method and opportunity are

25   critical to that and there's much more involved, and

1    despite Michael's gift with the English language,

2    he's not the most brilliant chronicler I've ever

3    met, and so I'm not charmed by his comments.

4          That said, people have a lot of

5    misconceptions, and at one time we were much more

6    secretive than we are today.

7          Q.   Do you think that's one of the problems

8    with the way Vidocq is headed?  Is that one of your

9    concerns?

10         A.   Yes.

11         Q.   Down here on the next page, page 4 of 7 of

12   the article, Capuzzo wrote "Walter's nickname at

13   Scotland Yard is living Sherlock Holmes, 'cause he

14   sort of looks, talks, and acts like Sherlock Holmes,

15   said Capuzzo, but he's the real deal, as a

16   criminologist, too.  And he's devoted his life to

17   it."

18         Who at the Scotland Yard gave you the

19   nickname of Sherlock Holmes?

20         A.   I'm not really sure.

21         Q.   Is that something that you told

22   Mr. Capuzzo, that peep at Scotland Yard call you

23   that?

24         A.   I might have, and I quite dislike the term

25   or the comparison.

1      Q.    Did Mr. Capuzzo ever tell you whether or

2  not he had gotten in touch with anybody at Scotland

3  Yard to vet his book?

4      A.    I don't think so.  I'm sure not.

5      Q.    Then if we go on -- go ahead.

6      A.    I wouldn't be a bit surprised if he got

7  that from chatter while at the Vidocq Society.

8      Q.    If we go on to page 6 of 7, we talked a

9  little bit about some of the cases that show up on

10  the Internet for you and one of them is that Dunn

11  case, Alicia Hamilton, and it says here "Back in

12  Oregon, Police Chief Dannels was impressed with the

13  Vidocq Society's track record of solving the

14  unsolvable.  The society, in turn, thought they

15  could help find out what happened to Leah Freeman.

16  They took the case, with Richard Walter as point

17  man.  Dannels flew to Philadelphia to meet the

18  team."

19          So that's part of what I'm curious about,

20  are you sure you didn't have any communication or

21  conversation with Dannels before they came out there

22  to present in Philadelphia?

23      A.    I'm quite sure that I didn't, and in your

24  highlighted paragraph there, basically he was

25  impressed because of the Dunn case rather than

1   having a pre-conference with me.

2       Q.   Okay.  Is that something that he talked to

3   you at some point, how impressed he was with Vidocq

4   and you in particular?

5       A.   If he did, I didn't choose to hear him.

6       Q.   Okay.  Do you recall having any

7   conversations with him about your prior work?

8       A.   No, not really.

9       Q.   Okay.  Then it shows "They took the case

10  with Richard Walter as the point man."

11          Would having you as the point man be

12  something that happened after they presented, or

13  could you have been preassigned by -- what's us

14  name?

15          MS. SCHAFFER:  I'm going to object that

16  this lacks foundation.  This is a periodical

17  article.  This doesn't actually reflect anything

18  that's designated.  I don't think it's relevant and

19  it lacks foundation.

20      Q.   Go ahead and answer the question, if you

21  can.

22          MS. SCHAFFER:  Yeah, you can go ahead and

23  answer the question, if you can.

24      A.   What was the question?

25      Q.   This idea of you as the point man, and let

1   me ask you, were you considered the point man on

2   Vidocq's participation in the Freeman investigation?

3        A.   After the presentation at Vidocq.

4        Q.   Okay.  So that would have been something

5   that occurred after the presentation?

6        A.   Right.

7        Q.   Okay.  So they came to present, and do you

8   recall when they came to present?

9        A.   No.

10       Q.   Who was present when they came to present?

11       A.   All the regular people.

12       Q.   Do you know how many?

13       A.   I have no idea.

14       Q.   Do you recall who came out from Oregon?

15       A.   Dannels and the prosecutor and a police

16   officer.  There may have been one -- it seems to me

17   like there were five people that came.

18       Q.   Okay.  And do you recall the name of the

19   prosecutor?

20       A.   Yeah.

21       Q.   Is that Mr. Frasier?

22       A.   Yeah.

23       Q.   Okay.  And do you recall the name of the

24   police officer?

25       A.   No.

1      Q.   Okay.  When they came out, did they

2  already have a theory developed about what had

3  happened with Ms. Freeman and who was responsible?

4      A.   They may have.  It wasn't explicit, but

5  they may have.

6      Q.   Okay.  And when they came out, what

7  specifically did they tell you about the case up to

8  that point?

9      A.   They just ran through some of the

10 evidence, not all of it, but some of the evidence

11 that they had, and it sounded like they had a good

12 idea of who they thought was the bad guy, but that

13 would not have influenced me.

14          (Exhibit No. 3 marked.)

15     Q.   Okay.  So let me show you another exhibit

16 here.  I'll show you what's been marked as Exhb. 3.

17 This is an article called Murder on the Menu from

18 November 19, 2012.  It's by something called

19 The Crime Report, and what this guy is talking

20 about, and you can read the whole article if you

21 want to, but I'll just summarize it for you and you

22 can let me know if you need to hear more.

23     A.   Right.

24     Q.   This guy is an author who was apparently

25 allowed to come along to a Vidocq meeting with a

1  couple of detectives, Bryan Hargett and Sergeant

2  Mickey Williams, who were investigating the murder

3  of a woman named Jodine Serrin in Carlsbad,

4  California, and he's recording on just generally

5  what happened at this meeting, so I wanted to go

6  through it just a little bit and see if this is

7  consistent with your understanding of what generally

8  happened at one of these presentations.

9       He says "He talks about Fred Bornhofen

10  there, who you've mentioned, and he said that he

11  acts as Vidocq's case management director, and I

12  think that's correct, right, we've already talked

13  about?

14       A.   Right.

15       Q.   And then on the next page, he says "Often

16  the Vidocq Society covers the investigators' airfare

17  and hotel expenses."

18       Do you know if Vidocq covered the expenses

19  for Chief Dannels and Mr. Frasier and their

20  entourage?

21       A.   That's a great mystery of this case,

22  because they asked me, I then have no record of it,

23  I then called Vidocq, talk to the treasurer, and he

24  has no record of it.  I haven't talked to Dannels

25  and I don't know if they have a record of it or not.

1  I know that I didn't pay for it, and so the question

2  who paid the expenses, I also called the travel

3  agency that Vidocq used and they don't have evidence

4  for it, and so I'm at a loss to explain it.

5       Q.   Okay.  But you're certain that they came

6  out there?

7       A.   Yeah.

8       Q.   Okay.  And then it says here in this

9  particular case, the -- let me get the name right,

10 the Serrin case.  In this case, Bornhofen handed out

11 copies of a brief about the case and said as a rule,

12 he makes sure to collect all copies when lunch is

13 over.

14           Do you recall that Bornhofen handed out

15 copies of the brief on the Freeman investigation

16 prior to the investigation?

17      A.   I don't know that he did on that one.

18      Q.   Okay.  Was that his routine practice or

19 his habit?

20      A.   Often was the case.

21      Q.   Okay.  And then he says "'I burn them in

22 my incinerator, so they don't get out to the

23 public,' Bornhofen explained."

24      A.   Right.

25      Q.   Is that your understanding of what

1    Bornhofen's practice was?

2         A.    Yes.

3         Q.    Okay.  And was that something that was a

4    Vidocq policy?

5         A.    It was a protective policy that I think

6    went by the wayside.

7         Q.    Since you left, since the time you left?

8         A.    Yes.

9         Q.    Okay.  And then it says down here, he

10   talks about how the meeting goes on, and he says

11   "The detectives poured through details of the case,

12   pointing out clues, missed opportunities, and

13   possible leads.  On the projector screen, they wove

14   a tale of a case that they had clearly put their

15   heart into."

16              So that suggests to me that they were

17   presenting some sort of a PowerPoint or a video or

18   something that they produced?

19        A.    A PowerPoint.

20        Q.    Is that pretty typical of the people that

21   come to present?

22        A.    A PowerPoint, yes.

23        Q.    Okay.  Do you recall if Chief Dannels had

24   a PowerPoint presentation for you when they came

25   out?

1      A.    I don't recall.

2      Q.    Okay.  And then he says here "The audience

3   studied the photos of the crime scene."

4            Would that be part of the PowerPoint or do

5   people typically bring out glossies and

6   eight-by-tens and actual photos to pass around?

7      A.    Very rarely did that happen.

8      Q.    Okay.  And then he basically says that

9   after that, that the questions came out rapid fire,

10  and then they tried to answer the questions.

11           Down here on page 3 of 4, they say

12  "Sometimes the club's real hard-nosed sleuthing

13  comes after the formal presentation of the case,

14  when Vidocq members who think they can offer help or

15  advice line up to discuss their thoughts with

16  detectives."

17           Is that the same thing that you were

18  talking about earlier when you said you sometimes

19  take folks out to dinner and talk about the case?

20     A.    Let me read that line again.

21           Yes.

22     Q.    Okay.  So is this -- what he's talking

23  about here, is this something that happened inside

24  the presentation, and then at some point the

25  presentation ended and then you take them out to

1   dinner?

2        A.   The presentation ends, they don't know

3   they're going to be invited out or not.

4        Q.   Oh, okay.

5        A.   Okay.  And then if they do a good job and

6   look like they're interested or whatever else, then

7   I, as well as -- we'd ask them to stay over an extra

8   night and then we would take them out to different

9   restaurants or whatever else for -- to be congenial

10  as well as give them an opportunity to loosen up and

11  ask questions.

12       Q.   Okay.

13       A.   Because the room where they generally

14  present and the hall that they present can be

15  relatively intimidating.

16       Q.   Okay.  And then he mentions down here that

17  there were a couple people that came up and asked

18  some questions, but when Richard Walter, the famed

19  forensic psychologist, began to explain his thoughts

20  on the murder, a small crowd gathered.  It says

21  Bornhofen describes you as the backbone of the

22  organization, so I'm wondering, I don't want to

23  trigger any modesty or anything, but it sounds like

24  you're really the draw here, that this is you as

25  opposed to the bigger organization.

1          Is that fair or no?

2     A.    I think many people believe that.

3     Q.    Okay.

4     A.    Not necessarily myself.

5     Q.    Okay.  So when you tendered your

6  resignation, was there any -- did anybody say "Hey,

7  please don't go.  That's not okay"?

8     A.    Yes.

9     Q.    And who said that?

10    A.    A number of people that -- I wouldn't say

11 a number, but a few that couldn't believe it and

12 they saw my absence as a loss.  Whether true or not,

13 that was their expression.

14         (Exhibit No. 4 marked.)

15    Q.    Okay.  So then I'll stop sharing this, and

16 then I want to show something else here.  I'll show

17 you what's been marked as Exhb. 4.

18         Do you see that PowerPoint presentation on

19 your screen?

20    A.    Yes.

21    ████  ████████████████████████████████████████

22 ████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ███████████████████████████████████████████████

25 █████████████████████████████████



1 ▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬

2 ▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬

3 ▬▬▬

4 ▬ ▬▬ ▬▬ ▬▬

5 ▬ ▬▬▬▬▬▬▬▬▬▬

6 ▬▬▬▬▬▬▬▬▬▬

7 ▬▬▬▬▬▬▬▬▬▬

8 ▬▬▬▬▬▬

9          Do you know which shoe Deputy Oswald found

10 on Hudson Ridge, whether it was the left or the

11 right?

12     A.   No.  I was only aware of one shoe and that

13 was right by the gas station there and the cemetery

14 was right across the road and it was relatively

15 quickly found, I believe.

16     Q.   Okay.  And did anybody tell you who found

17 that shoe?

18     A.   No.

19     Q.   So quickly found, so your understanding is

20 that shoe was found on the night that Ms. Freeman

21 disappeared?

22     A.   This shoe.

23     Q.   This shoe that we're --

24     A.   One shoe was found right off that corner,

25 I believe.

1     Q.    Okay.

2     A.    And then -- and then I know nothing about

3  the second shoe very much at all.

4     Q.    Okay.  So let me back you up here.

5           This is 11:40 p.m. on the night of the

6  disappearance, a man named Tony Messerle finds a

7  shoe in the middle of the North Elm Street, holds on

8  to that shoe and eventually turns it over to

9  investigators on July 4th, and DNA evidence

10 identifies it as Leah's shoe, but you don't know

11 whether that's the right or the left?

12    A.    No.

13    ■■■        ■■■■■■■■■■■■■■■■■■■■■■■■

14 ■■■■■■■■■■■■■■■■

15    ■■■      ■■■■

16    Q.    Okay.  And did you -- was it your

17 understanding, did anyone tell you that the first

18 shoe that was found had blood on it somewhere?

19    A.    I've been curious about that.

20    Q.    Do you recall anyone telling you that?

21    A.    I had not remembered blood was found on

22 that shoe, but apparently, I was misinformed.

23    Q.    Do you recall who misinformed you?

24    A.    Probably myself not hearing correctly.

25    ■■■        ■■■■■■■■■■■■■■■■■■■■■■■■



1 ████████████████████████████████████████

2 ███     ██████████████████

3 ███   ████   ██████████████████

4 ████████████████████████████████████████

5 ██████████████████████████

6 ██████████████████████ what's your

7 recollection of what happened with -- after the

8 presentation was given, what happened next on the

9 Freeman case?

10     A.   I think there was speculation that they

11 didn't have enough to move forward in the room.

12     Q.   Were there small group discussions of any

13 kind?

14     A.   No.  I think there were probably -- you

15 asked me earlier, I did respond.  I think there were

16 probably -- generally you'll find about 50 people

17 there at the case presentation.

18     Q.   Okay.  After the presentation, did half of

19 them get up and leave?  Did all of them get up and

20 leave or stick around and --

21     A.   Yeah, they stuck around and chatted for a

22 while.  They all had their opinions about this, that

23 and whatever else.  I think that even Dannels and

24 the police officer and everybody but the prosecutor

25 thought that they needed more development and that

1    they couldn't move forward with the prosecution.

2           However, then, we went to dinner, and it

3    was at dinner, I believe -- it could have happened

4    at the meeting, but I think it was at dinner, then,

5    that the prosecutor then said that he thought it had

6    legs and that he always wanted to try a

7    circumstantial case and this -- he wanted to move

8    forward on this, and I think Dannels and the other

9    police officer weren't gobsmacked pleased, but

10   gobsmacked by it all, okay?

11       Q.   Did you get the impression that the

12   prosecutor was not convinced before coming to

13   Vidocq?

14       A.   I don't know.

15       Q.   Okay.  I'm just kind of wondering why you

16   got the sense that Dannels and the other police

17   officer were gobsmacked.  It seems to me that if the

18   prosecutor was already convinced that he could go

19   forward, there wouldn't be much reason to come up to

20   present at Vidocq Society.

21       A.   Well, how about this reaction, I'll

22   imitate it, "Really?"

23       Q.   Okay.  So do you recall -- you went out to

24   dinner, who all went to dinner with you?

25       A.   Just them and myself.

1    Q.   Anyone else from Vidocq decide to go with

2    you?

3    A.   No.

4    Q.   What was discussed at the dinner?

5    A.   The case.

6    Q.   What specifically was discussed about the

7    case?

8    A.   Well, I think that they were still quite

9    loose, very, very loose in their understanding of

10   the collection of material that they had.  I then --

11   I think I offered the suggestion that from my

12   understanding that it was a PA case, that I would

13   have some more evidence and to affirm that and I'd

14   like to see more crime scene photos and all that,

15   kind of stuff, okay?

16   Q.   So at that point, was there a decision

17   made that you would come back to Coquille with them

18   at some point?

19   A.   They asked me if I would, and I think I

20   said it would depend on whether Vidocq agrees with

21   it.

22   Q.   And apparently Vidocq agreed with you.

23   A.   Yes.

24   Q.   Because you went back.

25        Do you recall during the presentation, did

1    you take any notes?

2          A.    No.

3          Q.    Did you see anyone else at Vidocq taking

4    any notes while they were reviewing the case?

5          A.    I would disapprove.

6          Q.    How about at the dinner, any notes taken

7    at the dinner by anyone that you recall?

8          A.    I can't affirm positively.  I think the

9    investigator did.

10         Q.    Okay.  And then after you had the dinner

11   and talked a little bit, what happened next?  How

12   did the dinner end?

13         A.    I went home.  I went back to my hotel

14   room.  I can't remember -- it had to be Vidocq

15   called me, or Fred, and said that they had contacted

16   and wanted me to come out and I said "What does the

17   Vidocq Society think about that?" and he said "It's

18   your decision," and apparently it was okay and now

19   the whole issue of payment and stuff is a mystery,

20   but anyway, I got there.

21         Q.    And did Mr. Bornhofen say who had

22   contacted him?

23         A.    No.

24         Q.    So we don't know if it was Dannels or

25   Frasier or who?

1    A.    Right.

2    Q.    Okay.  And when you say the question of

3  payment is a mystery, what do you mean?

4    A.    We never could figure out who paid for the

5  airfare and all that kind of stuff.

6    Q.    Okay.  Was it another one of those things

7  where you tried to look at Vidocq's records, talked

8  to the travel agents and that sort of thing?

9    A.    Yeah.  Yeah.

10    Q.    And there's no record of Vidocq paying for

11  it?

12    A.    Well, they didn't -- they changed Frasier

13  and all this kind of stuff, but I talked to the most

14  recent treasurer and he looked and they only have

15  six years back, they don't have ten years back.

16    Q.    So the decision was made that you would

17  travel to Coquille and that Vidocq would

18  participate.

19         What was the plan for Vidocq Society's

20  involvement in the pre-investigation?

21    A.    Me going out and getting ideas and giving

22  them suggestions and giving them a sense of

23  perspective and letting them make up their own mind.

24  That's how they wanted to proceed.  I did not say

25  "Go get him," okay?  It's their choice.  I was there

1    only as an interested pro bono person.  It's their

2    case, not mine.  I wasn't the investigator.  I

3    didn't do the cross checking of their facts, that

4    sort of thing.  It was just a -- it was a thought

5    stimulated -- hopefully a thought stimulating

6    exercise for them so they could understand their

7    case.

8            What they do with that case is their

9    problem or their benefit, not mine.

10       Q.   Was the involvement with any other Vidocq

11   Society members contemplated?

12       A.   Not that I know of.

13       Q.   Who is Mark McClish?

14       A.   I don't know.

15       Q.   Do you know what his involvement was?

16       A.   I don't know who he is.

17            (Exhibit No. 5 marked.)

18       Q.   Okay.  Let me show you what's been marked

19   as Exhb. 5.

20            I'll represent to you that this is a blog

21   post from a blog that's maintained or a website

22   maintained by somebody named Mark McClish, and this

23   was from September 23, 2011, and it's about Leah

24   Freeman, the investigation, and he says down here,

25   "In November of 2009, the Vidocq Society asked me to

1   analyze the statement McGuffin gave to the police

2   shortly after Freeman disappeared."

3           I'm wondering if you -- first of all, did

4   you ask Mr. McClish to analyze any evidence or any

5   statements made by Mr. McGuffin?

6       A.   Absolutely not, and I talked to Bill

7   Fleisher and nobody from Vidocq asked.

8       Q.   Okay.  Because this date here, November of

9   2009, if I understand correctly, that would have

10  been, what, a month or more before Dannels came out

11  and presented to Vidocq?

12      A.   I can't remember when he came out.

13      Q.   Okay.  So that's another one of the

14  reasons I'm asking if you had any involvement in the

15  case prior to them coming out to present it.

16      A.   No.  We didn't know anything about it.

17      Q.   Okay.  Have you ever seen this blog post?

18      A.   I've heard about it.  I haven't seen it.

19      Q.   Okay.  What have you heard about it?

20      A.   That the fact it was on, but I was never

21  involved.

22      Q.   Okay.  Did you at any point watch the

23  ABC 20/20 series on -- the original series on the

24  Freeman disappearance and investigation?

25      A.   Way back when the first time, yes.

1    Q.   Do you recall Mr. McClish appearing on

2  that show?

3    A.   No.

4    Q.   Okay.  Do you recall him being a member of

5  the Vidocq Society?

6    A.   Absolutely not.

7    Q.   Okay.  And then -- okay.  So assuming that

8  the Vidocq Society did not ask Mr. McClish to get

9  involved, do you know if they asked anyone other

10  than Mr. McClish to get involved?

11    A.   I do not know.

12    Q.   What's that?

13    A.   I do not know.

14    Q.   Okay.  And what was the plan for your

15  involvement in the investigation?

16         MS. SCHAFFER:  I'll object; that's asked

17  and answered, I believe.

18    Q.   Okay.  That was when you said earlier that

19  you were just going out there to be a pro bono

20  resource?

21    A.   Yep.

22    Q.   Where did you get your training in

23  investigating crime?

24    A.   A wide range of services, mostly applied

25  training, though I did attend a couple classes while

1    there for other reasons, classes at FBI, but more

2    than that, correct working around a lot of

3    investigators, you learn, if you want to learn, you

4    learn and you develop and you make some mistakes,

5    but you also learn from your mistakes.  Across time,

6    you learn to improve.

7         Q.    So most of that learning takes place in

8    Michigan, then?

9         A.    All over.

10        Q.    Who would you consider the person you

11   spent the most time with in terms of learning how to

12   investigate a crime scene?

13        A.    Keppel.

14        Q.    Okay.  Anything one else?

15        A.    I didn't think of anybody at the moment.

16        Q.    Did you receive any training on crime

17   scene preservation or documentation?

18        A.    It's not my forte, so therefore, I leave

19   that to the experts.

20        Q.    Okay.  How about things like bloodstain

21   pattern interpretation or fingerprint analysis,

22   anything like that?

23        A.    I let everybody do the job that they're

24   able to do.

25        Q.    How did the law enforcement investigation

1   play into the crime assessment?

2        A.    Run that by me one more time.

3        Q.    Well, my original question was how does

4   the law enforcement investigation play into

5   profiling in your role as a profiler, but I

6   understand from earlier that you'd probably prefer

7   not to be called a profiler here, so my question now

8   is how does the law enforcement investigation play

9   into your crime assessment?

10       A.    Okay.  It's wonderful, what they then do,

11  if they learn crime assessment, then they learn to

12  assess the scene, they learn what they're looking

13  at, hidden as well as open, and from that, then,

14  it's going to give them a jump lead, then, on

15  looking for, in this case, a power-assertive type

16  person, et cetera, amongst her friends, enemies, or

17  whatever else, so you're going to keep a lookout.

18            You're going to look at other people, too,

19  but the crime scene is already giving the

20  investigator a heads up, and he can also then

21  explain to the court why he did what he did

22  rather -- because of this, because of his training

23  and whatever else, as opposed to profiling which is

24  speculative and has to have a belief system that is

25  not always solid.

1        Q.    Okay.  And so what aspects of the

2    investigation do you rely on in trying to do your

3    analysis in trying to reach conclusions about the

4    type of --

5        A.    The crime scene -- the crime scene is

6    always the center point.  At your crime scene,

7    everything moves from there.  If you run to the

8    suspect first without understanding your crime

9    scene, unless you're unnaturally lucky, you're

10   probably going to make an error.

11       Q.    Okay.  So what do you do to review the

12   crime scene, like in a case like this, if you have a

13   case -- well, not like this, but a case that's two

14   years old, it's a cold case, the crime scene has

15   probably been sifted over, and in some cases it's

16   been cleaned up and folks have moved on, so where do

17   you draw information from to complete your crime

18   assessment?

19       A.    Well, one of the things you want to do is

20   check the crime scene without interference or

21   staging, which is very, very common.  When you see

22   staging, then, you realize it's not what it appears,

23   it's trying to avoid, then, and confuse the police.

24   Well, if you can unconfuse the police, then, and

25   they can see it for what it is rather than what it

1    appears to be, then you can start making significant

2    headway.

3         Q.   Right, and I imagine it's easier to look

4    for those things if you're on the crime scene

5    initially or you're a first responder or you're

6    there when the investigation is fresh, but for you,

7    you're coming into most of these cases quite a while

8    after the crime scene has already been dealt with,

9    so for you personally, what is it you look at to

10   figure out the crime scene, the police reports, the

11   lab reports, the interviews, what is it that you

12   draw on to reach your conclusions?

13        A.   Pictures.  Pictures.

14        Q.   Photos?

15        A.   I want to see the photos, because what

16   most other people see and they describe it to me is

17   quite different than what I see when I look at it.

18        Q.   Okay.  So do you look at anything other

19   than the photos?

20        A.   Oh, yeah.  I look at the photos, I look at

21   the autopsy, I look at certainly the vicinity and

22   who discovered the body and all these other kind of

23   traditional issues.

24        Q.   Okay.  And then -- so you developed an

25   opinion of the classification for the crime in the

1    Freeman investigation.

2            Is that right?

3            MS. SCHAFFER:  Objection; misstates the

4    witness' testimony.  I don't believe he ever

5    testified that he formed an opinion.

6        Q.   I thought you testified that you thought

7    this was a power assertive.

8        A.   I didn't testify.  Oh, I testified -- I

9    think it is, was a power-assertive case, but -- I

10   forgot what started the argument.

11       Q.   I'm sorry, I didn't mean it to be an

12   argument.  I was just asking if -- I was just asking

13   if it was correct that you had developed a theory or

14   an opinion of the typology of the perpetrator and

15   the crime scene in this case.

16       A.   I developed my own opinion, but I didn't

17   necessarily share that.  I shared with them what

18   their evidence showed.  They can draw the

19   conclusion, then, whether it fits or doesn't fit and

20   whether he's the guy.  He did -- I mean, they did

21   make that judgment and they thought it was then

22   the -- McGuffin, whatever his name is.

23       Q.   Okay.  And that was based on their

24   understanding of your theory about power assertive

25   versus power reassurance versus anger retaliation

1    versus anger --

2        A.   Exactly, that you have major differences.

3        Q.   Okay.  So let me show you here what's been

4    marked as Exhb. 6.

5             MS. SCHAFFER:  Do you want to take a short

6    break?

7             MR. LAUERSDORF:  Yeah, do you want to take

8    a break real quick?  This next exhibit is probably

9    15 to 20 minutes, so if you want to take a break,

10   now is a good time.

11            MS. SCHAFFER:  Andy, how much more time do

12   you have?  I know we've taken some breaks, but we're

13   on hour eight, so I'm willing to go another 30

14   minutes, because I think we've probably taken an

15   hour in breaks, but this is a long day for the

16   witness.

17            MR. LAUERSDORF:  Yeah, and I think we're

18   going to have to call him back anyway, and I know

19   you'll object to that and we'll have to get some

20   guidance from the court on that, but I probably have

21   another hour.

22            MS. SCHAFFER:  Yeah --

23            MR. LAUERSDORF:  If you want to suspend it

24   and we can go talk to the court about resuming it or

25   if you just want to resume it, because he's

1    mentioned a number of documents that I think frankly

2    are probably responsive to our request for

3    production that haven't been produced.

4            He's mentioned a number of other documents

5    today that he's willing to produce, so I'm guessing

6    that we're going to get some documents that we're

7    going to want to ask him about at some point in the

8    future anyway, and then there's the whole time that

9    was taken up with the refusal to answer stuff, so I

10   think there's a good chance the court is going to

11   let us come back anyway.

12           If we can reach an agreement on that, I

13   can agree to limit the time and be pretty

14   circumspect, but if you want to cut it off, trust

15   me, it's been a long day for me, too.

16           MS. SCHAFFER:  No, I understand.

17           Let me talk to him and see how he's doing.

18   You saw what happened before lunch.

19           MR. LAUERSDORF:  Yeah.

20           MS. SCHAFFER:  He tried to hang in there.

21   Health wise, again, it's not great, so I'm trying to

22   be really sensitive to that.  I know he's not going

23   to want to come back.

24           MR. LAUERSDORF:  Let me -- if I can just

25   get through this last exhibit, and I think we can

1    get through it actually pretty quick.  It looks like

2    a lot more information on my outline than it really

3    is.  I think we can finish up by 4:30.

4              MS. SCHAFFER:  Okay.  And again, it's 7:30

5    here.

6              MR. LAUERSDORF:  I know.

7              (Pause in deposition:  4:05 - 4:09 p.m.)

8              (Exhibit No. 6 marked.)

9

10   BY MR. LAUERSDORF:  (Continuing)

11        Q.   All right.  I'm going to show you now

12   what's been marked as Exhb. 6.

13   ███████████████████████████████████████

14   █████████████████████████████████████

15   ██████████    ███████

16        ███    ████████████████████ .

17        ███    ███████████████████████

18   ████████████████████████████████████████

19   █████████████████████████████████████

20   ████████████████████████████████████████

21   ███████████████████

22         ███████████████████████████████████████

23   ████████████████████████████

24        ███    ██████

25        ███    ████████████████████████████████

1 ▬▬▬▬▬▬▬

2 ▬▬▬▬ ▬▬▬▬▬▬

3 ▬ ▬▬▬▬

4     Q.    You were a founder of the organization,

5 correct?

6     A.    Right.

7     Q.    Did you have any role in establishing the

8 procedures or protocols for the organization?

9     A.    Primarily, that was left to others on the

10 board, because I was not on the board originally.

11 ▬ ▬▬ ▬▬▬▬▬▬

12 ▬▬▬▬▬

13 ▬▬▬▬▬

14 ▬ ▬▬▬ ▬▬▬

15 ▬ ▬▬ ▬▬▬▬▬

16 ▬▬▬▬▬▬▬

17 ▬▬▬▬▬

18 ▬▬▬▬▬

19 ▬▬▬▬▬▬

20 ▬▬▬▬▬▬▬

21 ▬▬▬▬▬▬▬

22 ▬

23 ▬ ▬▬▬

24 ▬ ▬▬ ▬▬▬▬

25 ▬▬▬▬▬▬▬

1

2

3

4

5

6

7

8          Do you know if any polygraph tests were

9   provided to Vidocq in part of the presentation?

10         A.    I don't know.  I don't know.

11         Q.    Mr. Fleisher has some kind of

12   specialization in polygraph.

13              Is that right?

14         A.    That's correct.

15         Q.    Do you recall him being involved in this

16   investigation at all?

17         A.    Not with polygraph.  He may have been, but

18   I don't know anything about it.

19

20

21

22

23

24

25









1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮ ▮▮ ▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮

5 ▮▮ ▮▮▮▮▮▮▮▮▮▮

6 ▮▮ ▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮

11 ▮▮ ▮▮▮▮▮

12 ▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮

13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14 ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮

17          When did you stop communicating with Chief

18  Dannels on the Freeman investigation?

19          A.   When I left the city.

20          Q.   Okay.  How long were you in Coquille?

21          A.   I think three days, three days.

22          Q.   You said when you went there, you thought

23  it was cold.

24          A.   Yes.

25       ▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1  ██████████████████████████████████████  does

2  that give you any better recollection of when you

3  were in Coquille?

4      A.   I just knew it was cold and they put me up

5  in the gambling house.

6      Q.   So the casino?

7      A.   Correct.

8      Q.   And then after you left, after the 20/20

9  airing and after you left, did you correspond with

10  Dannels after that at all?

11      A.   No.

12      Q.   How about DA Frasier?

13      A.   No.

14      Q.   Did Frasier ask you to appear for the

15  grand jury at all?

16      A.   No.

17      Q.   Did you ever ask about that?

18      A.   No.

19      Q.   Did you ever talk to Frasier after leaving

20  Coquille?

21      A.   No.

22      Q.   Do you know who at the Vidocq Society was

23  following up on the Freeman investigation after you

24  left Coquille?

25      A.   No.

1      Q.    Then why didn't you have any

2   correspondence with anybody on the Freeman

3   investigation after you left Coquille?

4      A.    Because I did my job of basically giving

5   them options and looking at the -- and ideas and

6   their observations, et cetera, and that was my job.

7   I wasn't there to be a detective, it was there to

8   educate them on what they claimed that they had.

9      Q.    Well, whose idea of Mr. McGuffin and

10  Ms. Freeman getting in a fight where her bloody shoe

11  was found, was that something that was discussed at

12  dinner?

13     A.    No, it was discussed when I was there.

14     Q.    In Coquille?

15     A.    Yes.

16     Q.    Oh, okay.

17            Do you recall it being discussed at all at

18  the dinner or during the presentation in

19  Philadelphia?

20     A.    No.  No.

21     Q.    Okay.  So when you did go to Coquille,

22  then -- well, I guess at any time during your

23  involvement, did you review any of the police

24  reports that had been generated on the Freeman

25  investigation?

1      A.    Not at all.

2      Q.    How about did you review any of the lab

3   reports that had been generated?

4      A.    No.

5      Q.    Did you ever discuss or hear anything

6   about reports from the Chorley laboratory in

7   England?

8      A.    About the what?

9      Q.    The Chorley Laboratory in England,

10   C-H-O-R-L-E-Y.

11      A.    I don't know anything about it.

12      Q.    Did you review the autopsy report?

13      A.    I don't know.  I can't remember.

14      Q.    What did you do to determine what position

15   the body was in when it was found?

16           MS. SCHAFFER:  Can you restate that

17   question.

18      Q.    Yeah, what did you do to determine the

19   position that the body was in when it was found?

20      A.    I'm not sure that I said anything about

21   it.

22      Q.    Do you recall talking to anybody about the

23   position that the body was found in or the condition

24   of the body when it was found?

25      A.    Well, she was thrown away like trash, but

1    aside from that, if it would have been an anger

2    retaliatory killing, that would have been much more

3    important, but it's not, it's a PA, so body position

4    has much less importance than it would if it were an

5    anger retaliatory.

6         Q.   Okay.  So when you say she was thrown away

7    like trash, what do you base that on?

8         A.   Because they took me to the scene, showed

9    me where she went over, described where she was, and

10   I may have looked at the pictures they took before

11   they removed her, but it was -- it's obvious that

12   they were just trying to get rid of the body and get

13   out of there.

14        Q.   Who took you to the scene?

15        A.   The chief and a cadre of his people.

16        Q.   Do you remember anyone else who was there

17   other than Dannels?

18        A.   No.  I know there were other people there.

19        Q.   Do you know how many other people were

20   there?

21        A.   No.

22        Q.   How long did you spend at the scene?

23        A.   Probably -- maybe 25 minutes.

24        Q.   Okay.  And did you look at photos of the

25   scene?

1      A.    Yes.

2      Q.    At the time when the body was found?

3      A.    Yes.

4      Q.    Okay.  And so from that and the

5  conversations that you had, you concluded that she

6  had been thrown or dumped there rather than placed

7  there?

8      A.    Right.

9      Q.    And what is that based on?

10      A.    Well, it was on a steep incline over --

11  just off the road, so whoever did it took her and

12  probably put her at the top and rolled her down, so

13  that's where she ended.

14      Q.    So do you base that on your -- is that a

15  common sense thing or do you have some kind of

16  experience with biomechanical analysis or physics or

17  what are you basing that on?

18      A.    I'm basing it on the fact that PAs don't

19  like anger on dead bodies, so they try to get rid of

20  them as soon as possible and they will do it

21  quickly, so there's not a great deal of care or

22  elegance of posing or any of the other kinds of

23  things you'll find with other murder types.

24      Q.    But that presumes that you are -- that

25  presumes that you are looking at a PA as opposed to

1    one of the other types?

2         A.    Exactly.

3         Q.    So are you saying that in your opinion,

4    the body could not have ended up in the position it

5    ended up in unless the perpetrator was a PA?

6         A.    No, I'm not saying that.

7         Q.    Okay.  So that's where I get a little bit

8    confused.

9         A.    Yeah, that's too exclusionary, but if

10   you're looking at probability, it makes sense that

11   it went down that way.  Other things could have

12   happened, yes, but for PAs, that would be unusual.

13        Q.    Okay.  That's the issue that I -- that I

14   guess I'm struggling with, though, is you bring in

15   the concept of probability which suggests some kind

16   of statistical basis, so what I'm wondering is -- it

17   seems like a chicken and egg thing, right?

18        A.    Right.

19        Q.    We conclude that it was a PA, and

20   therefore, the condition of the body and the

21   position of the body makes sense.  It happened --

22        A.    Right.  Right.

23        Q.    But if you take away the presumption that

24   it's a PA --

25        A.    Right.

1    Q.    -- then there's multiple other plausible

2    explanations for how a body ends up in the position

3    that it ends up in?

4    A.    Yeah.  Well, it's a matter of ideas, okay?

5    And it's a matter of probability and likelihood.

6          Is it absolute?  No.  Is it likely?  Yes.

7    Is it a major case issue?  I don't think so, but it

8    is consistent with the rest of the story told.

9    Q.    Okay.  And so when you say when you apply

10   probability, are you talking about probability from

11   essentially a common sense perspective or did you

12   actually do some math?  Was there actual statistical

13   analysis and probability theory employed?

14   A.    Oh, Keppel and I both work extensively on

15   all of those subtypes that -- and we did the stats

16   on them and we work on them, and independent of what

17   reviewers may think, I stand by the work that we

18   did, so is there -- is there probability factors in

19   play?  Yes.  Statistically, yes, so again, just

20   because probability is there, strange things can

21   happen.  I'm not saying it's absolute.  I'm saying

22   it's likely.

23   Q.    But there was no -- you didn't do any --

24   you didn't do any statistical analysis of applied

25   probability theory to each of the variables that

1    were present in this particular case, right?  You

2    just did that with the general categories that you

3    described in the Keppel report, and that's based on

4    your interviews at the Michigan DOC, right?

5         A.    Yeah, I hear you.  I think it's a bit

6    glib, okay?  And I look at the major overview of the

7    case and then I look at individual bits of the case

8    and I then came to the conclusion that it made sense

9    that it was a PA and that these factors were all

10   elements of PA.

11        Q.    Okay.  And you discussed that with Chief

12   Dannels and --

13        A.    Right.

14        Q.    Okay.  Did you review any of the

15   polygraphy reports?

16        A.    Any of the who?

17        Q.    Polygraphy reports.

18        A.    No.

19        Q.    You said photographs, did you review any

20   of the witness interviews?

21        A.    I didn't review them.  I was told about

22   them.

23        Q.    Okay.  By who?

24        A.    Dannels.

25        Q.    Did you review any video recordings of the

1    retrieval of the body?

2        A.    No.

3        Q.    How about any video recordings of any of

4    the witness interviews or grand jury testimony?

5        A.    Any review of the what?

6        Q.    Any video recordings of witness reviews or

7    grand jury testimony?

8        A.    No.

9        Q.    How about any physical evidence like the

10   shoes or evidence collected from the body retrieval,

11   anything like that?

12       A.    I have no memory of that.

13       Q.    And how about media reports, did you

14   review any of the newspaper articles about the

15   disappearance or the homicide --

16       A.    No.

17       Q.    -- or anything like a blog or anything --

18       A.    No.

19       Q.    Okay.  I think I asked you this before,

20   but I have to circle back.  I'm trying to figure

21   out, my understanding from some of the other

22   depositions is Dannels and his crew came out, they

23   presented at Vidocq, and somewhere in there the idea

24   was generated to bring publicity back to the case,

25   so they came back and had this press conference

1    right away, and so I'm just wondering if you recall

2    whose idea it was to bring publicity to the case.

3         A.    I have no idea.

4         Q.    Okay.  It wasn't yours?

5         A.    Nope.

6         Q.    Okay.

7         A.    No.  Heaven's sake, no.

8              MR. LAUERSDORF:  Okay.  I think that's a

9    decent stopping point for now.  I'm going to suspend

10   the deposition at this point and reserve the right

11   to resume it at a later date.  I understand that

12   we'll probably need to seek some guidance from the

13   court on that.

14             But it's been a long day.  I understand

15   that you've been ill in the recent past, and frankly

16   I don't want to push you much farther, and I think

17   we've got some additional discovery that you're

18   going to be gracious enough to produce that we

19   talked about earlier today and I may want to ask you

20   some question about that as well.

21             So I'm just letting everybody know, I

22   don't want to get in an argument, but I want to give

23   everybody a heads up that I plan to try to call you

24   back and ask you a few more questions, probably

25   another hour of questions at some point in the

1    future.  Just a heads up.  Your attorney and I will

2    argue about that with the court, but for now, I'm

3    suspending the deposition.

4            THE WITNESS:  Thank you.

5            MS. SCHAFFER:  Yeah, I just want to go on

6    the record and make my objection to that that we've

7    been going now for eight and a half hours and I --

8    you know, based on FRCP 30, the time limit for these

9    depositions was seven hours, so I don't think

10   there's any basis to continue.  You've had a full

11   day for any and all questioning, so I would object

12   to any request or motion to continue the deposition.

13           MR. LAUERSDORF:  Okay.  We can go off the

14   record.

15           Oh, wait a second.  Let's go back on the

16   record for second.

17           While your mind is fresh, I think earlier

18   you said at some point, you said "What I still don't

19   understand about this case," and then I said "Were

20   you finishing a thought there or what was going on?"

21   and you said "No, I'll wait for a question."

22           So now my question is:  What is it that

23   you still didn't understand about the case at that

24   point?

25       A.   I don't remember.

1      MR. LAUERSDORF:  All right.  Fair enough.

2      Okay.  Then just ditto the same thing I

3  said about suspending and reserving the right to

4  resume.  I understand that Ms. Schaffer has an

5  objection and you don't need to make it again, it's

6  noted for the record and we can go off the record.

7      (Deposition adjourned at 4:37 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF OREGON        )

2    County of Multnomah )

3

4              I, Aaron M. Thomas, Certified Shorthand

5    Reporter, Registered Professional Reporter, and

6    Notary Public for the State of Oregon, do hereby

7    certify that ROBERT WALTER personally appeared

8    before me at the time and place mentioned in the

9    caption herein; that the witness was by me first

10   duly sworn on oath and examined upon oral

11   interrogatories propounded by counsel; that said

12   examination, together with the testimony of said

13   witness, was taken down by me in stenotype and

14   transcribed through computer-aided transcription;

15   and that the foregoing transcript constitutes a

16   full, true and accurate record of said examination

17   of and testimony given by said witness, and of all

18   other oral proceedings had during the taking of said

19   deposition, and of the whole thereof.

20             Witness my hand and Notarial Seal at

21   Portland, Oregon, this 9th day of July, 2022.

22

23

24   _____

                                    Aaron M. Thomas
25                                  Oregon CSR 04-0388