## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD WALTER** | : | |
| Plaintiff, | : | **NO: 3:23-cv-02166-MEM** |
| v. | : | |
| | : | **JURY TRIAL OF SIX** |
| **DAVID GAUVEY HERBERT and** | : | **DEMANDED** |
| **NEW YORK MAGAZINE** | : | |
| | : | **PLAINTIFF'S AMENDED** |
| Defendants. | : | **COMPLAINT** |
| | : | |

### EXHIBITS TO PLAINTIFF'S AMENDED COMPLAINT

| Exhibit | Description |
|---|---|
| A | Underlying Article with Commentary - David Gauvey Herbert, *The Case of the Fake Sherlock,* New York Magazine (April 11, 2023) |
| B | AAFS Report |
| C | Robert D. Keppel, Richard Walter, *Profiling Killers: A Revised Classification Model for Understanding Sexual Murder,* International Journal of Offender Therapy and Comparative Criminology |
| D | Society of Professional Journalists – Code of Ethics |

**THE BEASLEY FIRM, LLC**

BY:   /s/ James E. Beasley Jr.
JAMES E. BEASLEY, JR.
THE BEASLEY BUILDING
1125 Walnut Street
Philadelphia, PA 19107
215.592.1000
215.592.8360 (telefax)
Attorneys for Plaintiff

Dated:  15 March 2024

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA  19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

# EXHIBIT "A"

INTELLIGENCER | THE CUT | VULTURE | THE STRATEGIST | *New York* | CURBED | GRUB STREET | MAGAZINE ⌄    Subscribe | Sign In



# Intelligencer



**CRIME** | APR. 11, 2023

## The Case of the Fake Sherlock Richard Walter was hailed as a genius criminal profiler. How did he get away with his fraud for so long?

*By David Gauvey Herbert*

Illustration: Adam Maida

*This article was featured in One Great Story, New York's reading recommendation newsletter. Sign up here to get it nightly.*

**C**oquille, on the Oregon coast, is a two-stoplight town where mist rolls off the Pacific and many of the 4,000 residents work in lumber and fishing. On the night of June 28, 2000, a 15-year-old named Leah Freeman left a friend's house and set off on her own. She was seen walking past McKay's Market, the credit union, and the high school, but she never made it home. At a gas station, a county worker found one of Leah's sneakers.

The local paper published Leah's school photo: big smile, mouthful of braces. Police and a donor put together a $10,000 reward for information leading to her safe return. K-9 units swept the school grounds, and police set up roadblocks and interviewed motorists. On its sign, the Myrtle Lane Motel posted a description of Leah. A month later, the message was replaced with Job 1:22: "The Lord gives. The Lord takes." A search party had found Leah's body at the bottom of an embankment, severely decomposed. "We prayed for her to return," the motel manager told a reporter. "And now we can pray for whoever did this to be caught."

But the killer was not caught. The police had initially treated Leah as a runaway before mounting a search, and when the FBI and state police finally arrived, investigators were too far behind. They never recovered. As months turned into years, Coquille police dwelled on one suspect whose story never quite made sense to them: Nick McGuffin, Leah's 18-year-old boyfriend. Friends had seen them argue. Police said he switched cars the night she vanished and flunked a polygraph. The hunch was there, but the physical evidence wasn't.

In January 2010, a new team of detectives and a prosecutor flew to Philadelphia to pursue a last-ditch option: to present the case to a league of elite investigators called the Vidocq Society, which met once a month to listen to the facts of cold cases and sometimes venture instant insights. The group's co-founder, Richard Walter, was billed as one of America's preeminent criminal profilers, an investigative wizard who could examine a few clues and conjure a portrait of a murderer.

Walter was tall and gaunt with a hard-to-place, vaguely English accent. He

favored Kools and Chardonnay, and he was never photographed in anything but a dark suit, a tiny smile often curling at the corner of his mouth. His public profile was about to explode. A publisher was finalizing a book about the Vidocq Society, *The Murder Room*, which detailed Walter's casework on four continents and claimed that at Scotland Yard he was known as "the living Sherlock Holmes."


POWERED BY CONCERT

## MOST VIEWED STORIES

**1.** Good Riddance, Kyrsten Sinema, Plutocratic Shill

**2.** Marjorie Taylor Greene Blamed Wildfires on Secret Jewish Space Laser

**3.** The Return of the Clintons

**4.** Why Is the CDC Now Treating COVID Like It's the Flu?

**5.** Who Will Be Trump's VP Pick? The Latest 2024 Veepstake Odds

In Philadelphia, members of the Coquille team presented Leah Freeman's murder to the Vidocq Society. Later, at a private dinner, Walter dangled before them a tantalizing profile that suggested the killer was indeed McGuffin, the boyfriend they had suspected all along. Soon, Walter traveled to Coquille and examined crime scenes with the police chief, trailed by a camera crew from ABC's *20/20*.

Building on the momentum of Walter's visit, the authorities arrested McGuffin and charged him with killing Leah. As he awaited trial, he watched the *20/20* episode about his case from the Coos County jail. There on TV was Walter, a man he had never met, all but accusing him of murder. "It's sweet revenge," Walter said with a grin. "And I take great personal satisfaction in hearing handcuffs click." McGuffin was convicted and sentenced to a decade in prison. In the years to come, he would often sit in his cell and wonder: Who *was* that thin man smoking on the screen?

Richard Walter is many things and little that he claims. Since at least 1982, he has touted phony credentials and a bogus work history. He claims to have helped solve murder cases that, in reality, he had limited or no involvement with — and even one murder that may not have occurred at all. These lies did not prevent him from serving as an expert witness in trials across the country. His specialty was providing criminal profiles that neatly implicated defendants, imputing motives to them that could support harsher charges and win over juries. Convictions in at least three murder cases in which he testified have since been overturned. In 2003, a federal judge declared him a "charlatan."

Walter refused several requests for an interview. "You have earned one's distrust that merits severing any contact with you in the future," he wrote me, veering into strange pronoun usage. "Under no circumstances would himself cooperate in your suspicious activities."

Many of his misdeeds were a matter of record before he ever stepped foot in Coquille. And yet Walter continued to operate with impunity, charging as much as $1,000 a day as a consultant. America's fragmented criminal-justice system allowed him to commit perjury in one state and move on to the next. Journalists laundered his reputation in TV shows and books. Parents desperate for closure in the unsolved murder of a son or daughter clamored for his aid. Then there was Walter's own pathology. He so fully inhabited the role of celebrated criminal profiler he appeared to forget he was pulling a con at all.





Richard Walter in 1992. Photo: Zuma Press



**EDITOR'S PICKS**


**OSCARS 2024**
'I'm Not Going to Sell a $60 Candle'


**NOISE**
I Tried to Fix My Block's Honking Problem


**FIRST PERSON**
The 82-Year-Old Cure for My Midlife Crisis

**I**n Richard Walter's telling, he was fated for a grim life studying criminals. But schoolmates who grew up with him in the rolling orchard country of 1950s Washington State remember an outgoing, popular kid who liked the piano and led the prayer band at a Seventh Day Adventist boarding school. In September 1963, at the age of 20, he married a former classmate and briefly took a job at a funeral home. ("He didn't want to work with any old, stinky bodies," his brother recalled in an interview.) After ten months, his wife filed for divorce, citing "mental cruelty." What happened over the next several years is unclear. When asked in a recent deposition where he lived and worked during that period, Walter said, "I don't remember."

Walter resurfaces in the public record in 1975, when he graduated from Michigan State University with bachelor's and master's degrees in psychology. He got an entry-level position as a lab assistant in the Los Angeles County Medical Examiner's Office. He was 33 and making roughly $3 an hour washing test tubes. He considered a doctoral program but instead took a job in 1978 as a staff psychologist at a place where he'd be able to see patients without any further qualifications: Marquette Branch Prison on Michigan's Upper Peninsula.

Walter's rapport with prisoners was poor — he often conducted interviews through a closed steel door — and he could be petty. An inmate sued Walter after he refused to pass along a dictionary sent by his mother. Two psychiatric experts and a federal judge questioned his ability to diagnose mental disorders and render basic mental-health services. Eventually, Walter's duties largely involved conducting intake interviews with inmates. "What I call meatball stuff," says John Hand, who also worked in the state prison system as a psychologist. "Talk to them for a little while, make sure they're not totally crazy."

Away from the prison, though, Walter presented his job as giving him unique insights into the criminal mind. He became a regular at conferences hosted by the American Academy of Forensic Sciences, which was rising in stature on the strength of specialties like hair microscopy, bullet-lead analysis, and criminal profiling.

Profiling was especially hot. The FBI's Behavioral Science Unit was going from fringe to mainstream: The profilers there had consulted on fewer than 200 cases in all of the 1970s, but by the middle of the next decade, they were providing hundreds of assists per year. The unit began attracting big personalities. "Where there are stars, there are wannabe stars," says Park Dietz, a forensic psychiatrist who has worked with the BSU. "Those with big egos will often gravitate to those centers of narcissistic glory."

In 1982, Walter became a full member of the AAFS, a powerful credential. That year, for the first time, he would try on his invented persona in a courtroom.



Walter on a 2009 episode of A&E's *Forensic Factor: The Unexpected Perpetrator* discussing a double homicide in Wisconsin. Photo: A&E

**R**obie Drake was wearing military fatigues and carrying rifles and hunting knives when he left his home in the Buffalo suburbs. It was just before midnight on December 5, 1981, and the 17-year-old headed to an area of North Tonawanda filled with abandoned vehicles. He took aim at a 1969 Chevy Nova and fired 19 rounds into the passenger-side window. From inside the car, he heard groaning. The location was also a lover's lane, and his bullets had struck Stephen Rosenthal, 18, and Amy Smith, 16. Drake then stabbed Rosenthal in the back. Two police officers on a routine patrol spotted Drake stuffing Smith's body into the trunk of the Nova.

The case appeared open and shut. But the prosecutor, Peter Broderick, saw weaknesses. Drake insisted it had all been a mistake, and his reasons were just plausible enough to imagine holdouts on a jury. The scene had been dark. Drake said he'd shot the car for target practice, thinking it was empty, and panicked when he heard Rosenthal and stabbed him to make the noise stop. However unlikely that sounded, Broderick lacked a clear motive, and intent would be the sole issue separating a murder conviction from a lesser charge of manslaughter. "All I needed was some reasonable explanation for why this thing happened," Broderick later said.

Broderick suspected Drake's motive was sexual, and he hired Lowell Levine, a forensic odontologist, to testify that faint marks on Smith's body were signs of postmortem biting, which was possible evidence of a sex crime. Levine suggested that to firm up that angle, the prosecutor should bring in another expert — someone he'd recently met at an AAFS conference. Two weeks later, Broderick drove to the airport and picked up Richard Walter.

On the stand at Drake's trial, Walter related an impressive — and fictional — résumé. He falsely claimed that at the L.A. County Medical Examiner's Office, he had reviewed more than 5,000 murder cases. Walter also said he was an adjunct lecturer at Northern Michigan University (he had spoken there informally, possibly just once), wrote criminology papers (he had never published), and had served as an expert witness at hundreds of trials (he'd testified in two known cases — about a simple chain-of-evidence question and in a civil suit against a car company).

Walter told the jury that Drake had committed a particular type of "lust murder" because he was driven by "piquerism," an obscure sadistic impulse to derive sexual pleasure from penetrating people with bullets, knives, and teeth. Drake's attorney told the court that he could not find any expert who had ever heard of piquerism, but the judge denied his request for more time to find a rebuttal psychologist. Drake was convicted of second-degree murder. Back in Michigan, Walter sent Broderick an invoice. For securing two consecutive terms of 20 years to life, his fee was $300.

The trial was the end of Robie Drake's freedom and the beginning of Walter's new career. He continued testifying in occasional murder trials and inflating his qualifications. By 1987, when he took the stand in *State of Ohio v. Richard Haynes*, he held himself out as a superstar in his field, telling the prosecutor that he was one of just ten or so criminal profilers trusted by the FBI.

Walter lectured widely, giving speeches like "Lust, Arson and Rape: A Factorial Approach" and "Anger Biting: The Hidden Impulse." Audiences loved his entertaining, wry style. "His story, as many of Richard's, has to be heard from his own mouth," wrote an amused attendee after Walter's presentation at a 1989 conference hosted by the Association of Police Surgeons of Great Britain. "It would lose all by repetition by another."

Walter was about to get a new venue for his theatrics. According to one version of events, it was around this time, at an AAFS convention, that Walter met Frank Bender, an eclectic Philadelphia artist who had begun a sideline in forensic sculpture, reconstructing busts from decomposed bodies. Bender was plugged into the local law-enforcement scene, and he introduced Walter to Bill Fleisher, a Customs agent. At a diner, the three talked about cases until the sun set. Standing on the sidewalk in the cold, they had the idea to organize a bigger confab — a group of law-enforcement professionals who would meet regularly and talk murder over lunch.

"What," Bender asked, "are we going to call our club?"

MOST VIEWED STORIES

1. Good Riddance, Kyrsten Sinema, Plutocratic Shill

2. Marjorie Taylor Greene Blamed Wildfires on Secret Jewish Space Laser

3. The Return of the Clintons 🔊

4. Why Is the CDC Now Treating COVID Like It's the Flu?

5. Who Will Be Trump's VP Pick? The Latest 2024 Veepstake Odds





A Vidocq Society luncheon as seen on a 1992 *48 Hours* episode called "Hard Evidence — Mystery on the Menu." Walter is at right. Photo: CBS NEWS ARCHIVES/48 HOURS, "HARD EVIDENCE—MYSTERY ON THE MENU" 1992



**OSCARS 2024**
'I'm Not Going to Sell a $60 Candle'

**NOISE**
I Tried to Fix My Block's Honking Problem

**FIRST PERSON**
The 82-Year-Old Cure for My Midlife Crisis

**T**he namesake of the Vidocq Society — which Walter, Bender, and Fleisher established in Philadelphia in 1990 — is Eugène-François Vidocq, a 19th-century French criminal turned detective who is considered the father of modern criminology. Some of the club's early members had impressive jobs as Customs agents, IRS investigators, and U.S. marshals, but there were also advocates of dubious fields like polygraphy and statement analysis. Few had extensive experience with homicide. That didn't matter much at first, as the group spent its initial meetings — usually held at Philadelphia restaurants or social clubs — discussing historical cases like the Cleveland "Torso Murders" of the 1930s. But soon the members began taking on more recent unsolved murders in which they might have a shot at catching a killer.

Criminal profiling was becoming a pop-culture sensation, thanks in large part to the 1991 blockbuster *The Silence of the Lambs*, which made $272 million and swept the Academy Awards. "It was a very exciting time," says Jana Monroe, an FBI profiler who helped Jodie Foster prepare for her role in the film. "But the FBI didn't like all the media attention." The Vidocq Society moved into the vacuum, quickly notching write-ups in the Philadelphia *Inquirer* and the New York *Times*.

Reporters relished describing the three co-founders: Walter was the chain-smoking genius; Bender was the artist, conspicuous among the suits in T-shirt and jeans; Fleisher was the teddy-bear G-man, prone to tearing up during presentations. Hollywood began calling, as did network TV.

CBS's *48 Hours* came to a Philadelphia dining hall to watch the Vidocq Society consider the case of Zoia Assur, a 27-year-old who was found dead in the woods of Ocean County, New Jersey. Her fiancé, an ophthalmologist named Ken Andronico, suspected her death was not a suicide but murder, and a friend of Andronico's had approached the organization for help. Fleisher presented the facts and concluded, in a thick Philly accent, "Now, our case begins."

CBS correspondent Richard Schlesinger raced around the room to solicit theories. "Murder or suicide?" he asked club members as they tucked into plates of chicken Marsala. "Murder!" they blurted through full mouths. "We haven't even gotten to dessert yet!" Schlesinger cried with delight. Walter told the camera that Andronico might have been the killer. "He's playing that high-risk game of 'Catch me if you can,'" he said with a smile.

Andronico — who had been more than a thousand miles away in Florida at the time of Assur's death — watched the *48 Hours* episode from his apartment with his mouth agape. Patients began canceling their appointments, and his medical practice was upended for years. He was never charged with a crime. (Retired Ocean County detective James Churchill dismisses the theory and the Vidocq Society's involvement. "They never looked at the file, they never had any statements, they never had any medical records," Churchill says. "I thought it was just preposterous.")

Others were not so lucky. At the Vidocq Society's April 1992 meeting, a Philadelphia homicide detective named Bob Snyder walked to a podium, opened a thick file, and presented the cold-case murder of Deborah Wilson, an undergraduate at Drexel University who had been killed after working into the night at a computer lab. Waiters served lunch as members viewed



strangulation. Afterward, Walter offered an insight: Wilson's sneakers had been removed, indicating that the killer had a foot fetish.

When police later searched the home of David Dickson, a security guard on duty the night of the murder, they found a collection of women's sneakers and foot-fetish pornography. The press called him "Dr. Scholl," and Dickson was charged with murder. In court, his attorney protested that the alleged motive was absurd. "This man is a sneaker sniffer, not a murderer!" he cried. But the prosecutor was Roger King, a powerhouse who claimed to have put more men on death row than anyone else in the history of his office. One jury deadlocked, but King won the retrial. Dickson was sentenced to life in prison.

The Vidocq Society pinned a medal on Snyder, and the club celebrated cracking a major case. But Walter was the real winner. His theory had led to the arrest and conviction. He would cite the case in media interviews for decades.

King died in 2016. Five years later, the Philadelphia *Inquirer* published a major investigation into his tactics, finding that he had routinely manipulated witnesses, withheld exculpatory evidence, and employed jailhouse snitches whose credibility he knew was suspect — including one, John Hall, who testified against Dickson. Hall's wife had helped him fabricate testimony by sending newspaper clippings to him in jail. "Nothing he said was true," she told the *Inquirer*. At least seven of King's murder convictions have been overturned.

Dickson's could be next. In the fall, his attorney filed a petition with the court arguing that King withheld or twisted information critical to Walter's foot-fetish theory, including the possibility that the victim's sneakers may not have been taken from the scene after all.

---

**T**he Richard Walter story is not the case of an impostor who goes undetected, one misstep away from being discovered and exposed. Lots of people saw signs; few had incentive to do anything about it. Throughout the 1990s, he continued to work in the Michigan correction system as a psychologist, and word eventually got around about his profiling sideline. Some found the arrangement comical. "If he's got an international reputation, why is he working in a prison for $10,000 a year?" Hand, his contemporary, says with a laugh.

Many others saw through Walter's act. Retired FBI agent Gregg McCrary recalls that the Behavioral Science Unit once invited Walter to Quantico to ask him questions about inmate behavior. "The narcissism, I think, was obvious. He really thought he knew a lot," McCrary says. The agents learned little, and he was not invited back. "Richard Walter is largely a poseur," McCrary says. "What I say about Richard is he's an expert at being an expert, at playing one and convincing people that he is."

Walter's victims struggled to get anyone to pay attention, even when they caught him in obvious lies. In 1995, Robie Drake still had decades to go on his sentence. From his maximum-security prison in upstate New York, he'd been digging into Walter's résumé on an antiquated computer terminal. He had married a nurse 24 years his senior named Marlene, and she helped, requesting documents and contacting Walter's former employers. They found the various ways in which Walter had perjured himself, but when Drake appealed, a court denied his motion without a hearing.

Marlene then sent the American Academy of Forensic Sciences a 13-page dossier of Walter's inflations and outright falsehoods. Officials at the organization acknowledged in internal memos that Walter had padded his résumé, but they decided to reveal as little as possible about their internal deliberations. "We do have to worry about public appearances," Don Harper Mills, a pathologist who was chairman of the ethics committee, wrote to his colleagues. In a February 1996 letter to Marlene, Mills delivered his verdict in a single paragraph. "Most of the issues do not involve the Academy's Code of Ethics," he wrote. "The Committee has concluded unanimously that there was no misrepresentation and therefore no Code violation."

One reason Walter kept skating by is that defendants like Drake existed in an ethical twilight. He was a guilty man robbed of due process. An expert witness had lied, and he had perhaps spent more of his life in prison than was warranted because of it, but he had killed two teenagers. What was Walter's perjury next to that?

**MOST VIEWED STORIES**

**1.**  Good Riddance, Kyrsten Sinema, Plutocratic Shill

**2.**  Marjorie Taylor Greene Blamed Wildfires on Secret Jewish Space Laser

**3.**  The Return of the Clintons

**4.**  Why Is the CDC Now Treating COVID Like It's the Flu?

**5.**  Who Will Be Trump's VP Pick? The Latest 2024 Veepstake Odds



**The TV correspondent raced around the dining room, soliciting theories. "Murder!" the sleuths blurted through full mouths of chicken Marsala.**

Walter was also galvanized by support from an unimpeachable group: victims' families. He spoke before the Parents of Murdered Children, a nonprofit that offers grief counseling and helps families lobby parole panels against early releases, and later joined the board. At the group's annual conference, he granted private audiences to devastated parents. After years or decades of frustration with police and prosecutors, they appreciated Walter's shared sense of anger, like when he said that some murder suspects should be handled with "seven cents' worth of lead."

Walter knew how to give delicious, cinematic quotes, and he cultivated his eccentricities for journalists and producers. He boasted of subsisting on cigarettes and cheeseburgers. He said that when the time was right, he would "lie down to quite pleasant dreams" using sodium pentothal. He once yelled at a suspect, "I'll chew your dick down so far you won't have enough left to fuck roadkill."

The effect was irresistible. In *A Question of Guilt*, a Nancy Drew and Hardy Boys crossover published in 1996, the iconic teen detectives run into one another at a meeting of the Vidocq Society. Filmmakers courted Walter and his co-founders for years, taking them to dine at Le Bec-Fin. Walter told the Binghamton *Press & Sun-Bulletin* that a producer wanted Kevin Spacey to play him in a movie. In 1997, Danny DeVito's Jersey Films purchased the Vidocq creators' story rights in a deal worth as much as $1.3 million. (No film was ever made, Fleisher says, and the founders received a fraction of that amount.)

Money doesn't seem to be what drove Walter. While his lifestyle had some flourishes — he slept in an antique Chinese bed and played Tchaikovsky on a 1926 Chickering grand piano — he mostly lived frugally. He drank bottom-shelf wine and drove a succession of Crown Victorias into the ground.

The relish with which he played the role of a genius profiler points to another, stronger motivation: ego. "He totally cannot be in a social setting where he is not the center of attention," says a longtime Vidocq Society member. At meetings, Walter tended to speak last, rendering his judgment to a roomful of nodding heads. "He's been hyped so much by the leadership in the organization," says the member. "Nobody challenges him." (A spokesperson for the organization disputes this.)

It's difficult to look at Walter's body of work — real or claimed — and not notice some preoccupations. Of the more than 100 papers and presentations listed on his résumé, roughly a quarter pertain to homosexuality or sex crimes. A representative example, "Homosexual Panic and Murder," is a case study based on interviews he conducted with an inmate who had murdered a man and then cut off one of his testicles.

"The homosexual: not really a man," Walter testified once in a murder case. "He is a discount person; therefore, if I need to be great, if I need to satisfy my ego, if I need to satisfy my needs for power, if I need to surmount, if I need to have a demonstration of my power, well, what better way to do it?"

In September 2002, two police officers from Hockley County, Texas, flew to Philadelphia for the society's help in solving a cold case. According to a 2003 account in *Harper's*, during a private meeting after the luncheon, Walter in lurid detail pronounced the Texas murder a case of "homosexual panic" — one man suddenly killing another after a tryst. He and Frank Bender invited the detectives out to dinner, where Walter became increasingly intoxicated, according to the magazine. "They're making a movie about us," Walter said, toasting with his Chardonnay. "Frank's the pervert and I'm the guy with the big dick!"

Walter continued to press his theory. "It seemed like it didn't matter what the case was, he just thought it was some kind of sexual deviancy or homosexuality, which I disagreed with," says one of the Texas officers, Rick Wooton. No arrest has been made in the case. Walter, he says, was no help.



**EDITOR'S PICKS**


**OSCARS 2024**
'I'm Not Going to Sell a $60 Candle'


**NOISE**
I Tried to Fix My Block's Honking Problem


**FIRST PERSON**
The 82-Year-Old Cure for My Midlife Crisis







Robie Drake is escorted into court in 2010. Photo: Niagara Gazette

**I**n September 2000, Walter retired from the Michigan Department of Corrections at 57 and moved to Montrose, a town in Pennsylvania with a population of 1,300. "Everyone was falling all over him because of his reputation," says Betty Smith, the former curator of the local historical society. Walter tells neighbors that he came to testify in a murder trial, fell in love with the town, and decided to stay. But two attorneys involved in the case say they don't recall ever meeting him.

Walter took on more freelance work. When he arrived in small towns around America, his presence was front-page news. In at least seven separate cold cases, Walter spoke to local reporters and delivered his catchphrase — a warning to the killer that his arrest was imminent: "Don't buy any green bananas." Walter's work did not lead to arrests in five of those cases. In a sixth, his favored suspect, a Catholic priest, committed suicide, and Walter gleefully claimed credit for his death.

Meanwhile, from his prison cell upstate, Robie Drake persisted in appealing his conviction. In January 2003, he finally got a win. Referring to Walter and his piquerism theory, a federal judge wrote that "the witness was a charlatan" and that "his testimony was, medically speaking, nonsense." In a deposition that July, Walter was evasive as Drake's attorney pressed him on the tasks he performed at the L.A. County Medical Examiner's Office.

"What were you doing?" the attorney asked.

"Good question," Walter replied.

"It's the only question."

By 2009, the Second Circuit decided it had seen enough: Walter had perjured himself with the prosecution's knowledge. The judges ordered a new trial. Prosecutors used a technique for analyzing bullet trajectory to argue that Drake had been closer to the Chevy Nova than initially thought, suggesting he must have known people were inside. In 2010, a jury convicted Drake again. He had exposed Walter as a fraud, but for his troubles the judge extended his original 40-year sentence by an extra decade.

**Walter told the jury that the defendant was driven by "piquerism" — an obscure impulse to derive sexual pleasure from penetrating people with bullets, knives, and teeth.**

Throughout his career, Walter had benefited from the fractured nature of the American legal system. Especially in the years before digitized records, a public defender in one place suspicious of Walter would have trouble tracking him across jurisdictions. The Second Circuit's ruling was harder to run from. Luckily for Walter, a reputation reset was on the way.

Several years earlier, the author Michael Capuzzo, who had written a best seller on shark attacks, had scored a blockbuster $800,000 advance for a book about the Vidocq Society. *Publisher's Weekly* described it as "a true tale about a mysterious group of skilled detectives who use their skills to solve only the most despicable of crimes, led by a figure who seems to be a contemporary Sherlock Holmes."

Later, another author, Ted Botha, sold a proposal for a book about Frank Bender and his forensic sculptures. He worried about Capuzzo's three-year head start. And yet, as he reported, he never came across anyone who had spoken to Capuzzo. "I was quite amazed," Botha says. "This guy's gotten a wack-load of money, and there doesn't seem to be anything happening." Botha interviewed Walter but got a sense that something was amiss. He

MOST VIEWED STORIES

1. Good Riddance, Kyrsten Sinema, Plutocratic Shill

2. Marjorie Taylor Greene Blamed Wildfires on Secret Jewish Space Laser

3. The Return of the Clintons

4. Why Is the CDC Now Treating COVID Like It's the Flu?

5. Who Will Be Trump's VP Pick? The Latest 2024 Veepstake Odds



confined Walter to a handful of pages when he published his book, *The Girl With the Crooked Nose*, in 2008.

Capuzzo's volume, *The Murder Room*, was published two years later. It was an instant hit and would go on to sell roughly 100,000 copies, despite purple prose that described Walter as "the angel of vengeance" and "the ferryman poling parents of murdered children through blood tides of woe."

The book repeated and expanded on dozens of falsehoods in Walter's résumé. In the Michigan prison system, he wrote, Walter could shut off hot water and put inmates on a diet of "prison loaf," with three meals a day blended and baked into a tasteless brick. "You will learn to control yourself or I will control you," he allegedly told them. But a prison spokesman disputes that a psychologist could leverage showers and meals in that way. "Maybe in *Shawshank* or something," he says. "But not in real life."

Walter also claims in the book that Michigan State hired him as an adjunct professor and that he collaborated with the university police to investigate gay twin brothers who fondled football fans without their consent outside Spartan Stadium. But a Michigan State spokesman denies that Walter has ever been employed by the school.

The book repeats Walter's claim to have solved the notorious 1986 murder of Anita Cobby, a former beauty queen who was gang-raped and nearly beheaded in Australia. Detective Ian Kennedy, who led the investigation, tells me he has never heard of Walter. Other supposed feats are stranger still. Capuzzo details the murder of Paul Bernard Allain, whose boss, Antoine LeHavre, brings the case to the Vidocq Society. In a twist, Walter accuses LeHavre of killing Allain himself, the result of a homosexual affair gone awry. But Allain and LeHavre do not seem to appear in any legal or public-record databases. Capuzzo may have changed the names; he or Walter may have made up the whole story.

Bender and Fleisher grumbled to the *Inquirer* that Capuzzo had taken too much creative license. "There are parts of that book I know are not true," Bender said. (He died in July 2011. Fleisher didn't respond to requests for an interview.) But Walter joined Capuzzo on a nationwide book tour. "It's fun to play detective," said NPR host Dave Davies as he described the Vidocq Society on *Fresh Air*. "But they aren't playing."

Walter was in his glory. "There's a price to pay," he told listeners of his macabre life's work. "I'm willing to pay it."

Capuzzo did not respond to requests for comment. He has not written another book, and today he publishes a Substack promoting vaccine conspiracy theories. During a recent podcast appearance, he said that several years ago, he heard a voice in his head say, "I am here. Tell my story."



Nick McGuffin during the final moments of his trial in 2011. Photo: BENJAMIN BRAYFIELD/THE WORLD

**B**y the time *The Murder Room* reinvigorated the myth of Richard Walter, a decade had passed since Leah Freeman's murder. In Coquille, the candlelight vigils had grown smaller. Pink JUSTICE FOR LEAH hoodies spent longer intervals in the closet. Leah's father died; her mother, Cory Courtright, regularly posted about the case on the message board Websleuths and interacted with amateur gumshoes, desperate for a break in the case. Nick McGuffin, now 28, had tried to move on. He'd had a daughter, graduated from culinary school, and become the head banquet



## NEW YORK
### EDITOR'S PICKS



**OSCARS 2024**
'I'm Not Going to Sell a $60 Candle'



**NOISE**
I Tried to Fix My Block's Honking Problem



**FIRST PERSON**
The 82-Year-Old Cure for My Midlife Crisis



chef at a casino in Coos Bay.

Coos County had a new district attorney named Paul Frasier, and he helped Coquille hire its next police chief, Mark Dannels, who committed to reopening the case. Dannels took down the old evidence boxes and assembled a cold-case team. Soon, they were flying to Philadelphia and huddling with Walter. Separately, an ABC producer had an idea: Wouldn't it be gripping television to follow the Vidocq Society in the field? A team from *20/20* shadowed Walter in Coquille as he assisted the investigation of Leah Freeman's murder, and the network built an episode around him and *The Murder Room*.

The killer, Walter told the camera, was "that muscle-flexing, Teutonic kind of braggart who thinks he's John Wayne, who wants to be a bigger man than what he is." He encouraged the police to focus on McGuffin. There was no new physical evidence, but Walter rearranged puzzle pieces that didn't quite fit and crafted his own theory: McGuffin was a jealous boyfriend who hit Leah in the face and dumped her body in the woods.

Cops played tough for *20/20* producers as they tailed McGuffin around town, hoping to provoke him. "In my opinion, he needs to be poked at a little bit," one officer said. Correspondent Jim Avila, who had reported from Beirut and the Gaza Strip, chased McGuffin's car, asking him why he wouldn't talk.

On August 24, 2010, police arrested McGuffin near his home. "Why do they think you did it?" an ABC producer asked as he was handcuffed in his chef's jacket. "Because they have nothing else to go on and I'm the boyfriend," McGuffin said.

Just what contribution Walter made to the case is now the subject of intense legal scrutiny. Paul Frasier, the district attorney, has insisted in a series of memos that he was suspicious of Walter, learned about the Robie Drake case, and resolved not to rely on him. Yet Walter's fingerprints were all over Frasier's eventual case at trial. In his closing argument, Frasier parroted Walter's entire theory. And Mark Stanoch, who produced the *20/20* segment, worried that the coverage tainted the jury pool. "When you show up in a town of a couple thousand people with cameras, that dynamic can overwhelm the evidence," he says.

In July 2011, a jury found McGuffin not guilty of murder but — by a vote of 10–2 — guilty of first-degree manslaughter. He was sent to Snake River Correctional Institution, in eastern Oregon, a notorious facility for violent inmates. He cooked in a prison kitchen and worked on a fire-fighting crew, cutting fire breaks in 16-hour shifts for $6 a day.

In 2014, Janis Puracal, an Oregon attorney who was starting a branch of the Innocence Project, learned about McGuffin and agreed to represent him. She looked at the time window in which he was said to have murdered Leah and disposed of her body. "It just didn't make sense," she says. Walter's role, she surmised, had been to invent for police and prosecutors a compelling narrative to make up for a lack of evidence. "They don't have a story for Nick," she says. "Walter comes in with 'the story.'"

Puracal hired a DNA expert to reexamine the state crime lab's report. The expert discovered that analysts had found male DNA on Leah's sneaker that did not belong to McGuffin. The information had never been shared with the defense. "I was over the moon," Puracal said. "And then I was pissed." She found more exculpatory evidence: an eyewitness withdrawing cash from a bank who bolstered McGuffin's alibi but whose account (along with a time-stamped ATM receipt) the state had failed to disclose. In November 2019, a circuit-court judge vacated his conviction and ordered a new trial. Frasier moved to dismiss the charges instead. A few hours later, McGuffin walked into the prison kitchen and told his supervisor that he wouldn't make his next shift.

ABC aired a follow-up *20/20* episode celebrating McGuffin's release and examining all the missteps in the case — except its own. When I called Avila, who is now retired, he defended the original report's accuracy but said he deplored the true-crime genre as "one of the lowest forms of journalism."

"My friend, 35 years in network television has destroyed my idealism," he added. "We should all be working for ProPublica. But we're not. Does that make us bad people? I couldn't get a job at *Frontline*. I tried! I couldn't get a job at *60 Minutes*." Avila said the background sheet his producers prepared had no red flags about Walter. Perhaps no one thought to look him up on

**MOST VIEWED STORIES**

1. Good Riddance, Kyrsten Sinema, Plutocratic Shill

2. Marjorie Taylor Greene Blamed Wildfires on Secret Jewish Space Laser

3. The Return of the Clintons 🔊

4. Why Is the CDC Now Treating COVID Like It's the Flu?

5. Who Will Be Trump's VP Pick? The Latest 2024 Veepstake Odds

Wikipedia as they prepared to air the episode that fall. If they had, they would have seen several paragraphs under the heading "The Drake Case."

McGuffin is now suing Walter, the Vidocq Society, and Oregon law enforcement, alleging that the state fabricated evidence, coerced witnesses, and withheld exculpatory information. This past June, Walter connected to a Zoom deposition from a Comfort Inn in Scranton, looking tired. He was recovering from cancer and surgery. One of McGuffin's attorneys, Andrew Lauersdorf, grilled the profiler about his claim that he worked on cases with Scotland Yard. Walter could not recall the name of any inspectors he'd worked with there and appeared not to know that Scotland Yard and the Metropolitan Police are, in fact, the same organization. When asked where Scotland Yard was located, the man who claimed to have visited the agency's offices up to 30 times said he didn't know and then offered "downtown London."

For much of the deposition, Walter spat venom at his oldest friends and allies. He resigned from the Vidocq Society in 2015, saying he no longer trusted certain members. He had quit the board of Parents of Murdered Children because, he said, someone there was embezzling money. (Bev Warnock, the current executive director, says, "I can tell you that is a false allegation.") Michael Capuzzo was "not the most brilliant chronicler I've ever met." Colleagues at the AAFS were "shallow, quite frankly." Eight hours of testimony revealed an increasingly isolated man.

A few months after the deposition, I met McGuffin in Puracal's conference room in Portland. He was still powerfully built from a decade at the weight pile, but his short hair was flecked with gray. COVID brought another lockdown soon after his release; then his mother was diagnosed with cancer and his father died. McGuffin had gotten a job as a chef at a golf course, earning less than before his arrest. He'd received death threats against himself and his daughter. "My life," he said, "is like a puzzle with the wrong pieces."

For two hours, McGuffin was composed. Then I asked if I could read from Walter's deposition, in which the profiler struggled to recall McGuffin. He'd finally given up and said, "Whatever his name is."

McGuffin's cheeks flushed. "Wow," he said. "It's like I'm a nobody." His face contorted hideously. His body began to tremble, and he excused himself from the room.

McGuffin had imagined all the ways Walter plotted to ruin his life. He'd thought about it while hacking through the Oregon forest with 80 pounds of gear, while slicing onions in a prison kitchen, and while driving through the night after his shift at the golf course to see his teenage daughter. He'd entertained every permutation but the most devastating: that Walter didn't think about him at all.



**T**here was another man whom Walter could not recall during his deposition. "The — I forgot his name," Walter said. "But anyway, the bad guy."

Today, the bad guy, Robie Drake, 58, lives in a trailer park in Dutchess County with Marlene. A court tossed out Drake's second conviction because of "irrelevant and prejudicial" bite-mark evidence. In 2014, facing a third trial, Drake pleaded to reduced charges and was released. After my emails and calls went unanswered, I staked out Drake's home in the fall, and he finally appeared in an old pickup. "It's been hard," he said, when I asked about life after prison. His eyes were wide and wary. He promised to consider a formal interview, but never spoke to me again.

The Vidocq Society still meets regularly, its promise so alluring that even old marks are back for more. In October, prosecutors from Ocean County, New Jersey, traveled to Philadelphia to present a cold case. This is the same office that had deemed the Vidocq Society's investigation into Zoia Assur's death "preposterous."

Walter is still active. In October, he spoke at the North Carolina Homicide Investigators conference. As recently as 2019, he was available for work as a profiler. That year, Joey Laughlin, the sheriff of Fayette County, Indiana, was reinvestigating the 1986 disappearance of Denise Pflum and hired Walter for $3,000. "If I were the perp," Walter told a newspaper after arriving in the state, "I wouldn't buy any green bananas."



*New York*
**EDITOR'S PICKS**


**OSCARS 2024**
'I'm Not Going to Sell a $60 Candle'


**NOISE**
I Tried to Fix My Block's Honking Problem


**FIRST PERSON**
The 82-Year-Old Cure for My Midlife Crisis



Laughlin had two main suspects, and he played interrogation tapes for Walter. Shortly after the second one began, Laughlin's chief deputy nudged him: Walter was dozing off. When he woke up, he was sure the suspect from the first tape was the murderer.

Pflum's parents were thrilled with Walter's involvement and didn't mind the napping episode. "Old people tend to nod off," David Pflum says. He wasn't aware that Walter had recently called Laughlin with a new theory about Denise's killer.

"I've been thinking," Walter said. "I think it's the dad." He mentioned that to do any more profiling work, he'd need another fee.

"I think we're good," Laughlin said.

Denise Pflum's disappearance remains the great mystery of the town. "Maybe I'm more cynical now," Laughlin told me. "There's not this great person who's waiting in the wings to come save the day."

In December, I drove to Walter's large, well-kept six-bedroom house in Montrose, Pennsylvania. An aging Mercury Grand Marquis sat in the garage, and on his front porch, an American flag was draped across a deck chair. There was no answer when I knocked. I dialed his landline. "I don't trust you, I don't like you, and I will never cooperate with you," he said from inside the house. "You're wasting your time."

I had wondered why Walter hadn't pursued the anonymity of a city, but Montrose has many appeals. Walter is beloved here. He's known for his homemade gingersnap cookies, and the bartender at the County Seat, a dive across from the courthouse, relishes hearing about his true-crime escapades. On a barstool in Montrose, he can fully inhabit the character he created without fear of fact check.

The next morning, as a blizzard descended, I made another attempt at his house, ringing the bell and banging on the door. At that very moment, a few hundred miles away in Philadelphia, Walter's attorneys were filing a new motion in the McGuffin suit. They wanted to quash Janis Puracal's request for internal documents from the American Academy of Forensic Sciences. As a support, they cited memos written by Paul Frasier, the prosecutor in the Leah Freeman case, saying he had not relied on Walter's theories after learning about the Drake case and realizing he couldn't be trusted.

It was a stunning turn. Richard Walter's best legal defense required finally acknowledging the obvious: that anyone with an internet connection should know he is a fraud.

*Want more stories like this one?* **Subscribe now** *to support our journalism and get unlimited access to our coverage. If you prefer to read in print, you can also find this article in the April 10, 2023, issue of* New York *Magazine.*

**ONE GREAT STORY: A NIGHTLY NEWSLETTER FOR THE BEST OF *NEW YORK***
The one story you shouldn't miss today, selected by *New York*'s editors.

| Enter your email | SIGN UP |

TAGS:   CRIME   RICHARD WALTER   CRIMINAL JUSTICE   TRUE CRIME   NEW YORK MAGAZINE
MORE

🗨 47 COMMENTS

---

💬 Comments

*Please read our* *community guidelines.*
*Have a concern or tech problem related to commenting?* *Report it.*
*All comments with links in them will require a moderator to approve.*

All Comments 47

| Newest ⌄ |

— madelynjolie1002  8 MONTHS AGO *(Edited)*
Your articles is bias— And you are actually a stalker! Also, I think it is interesting that you refer to him as a fraud— It is apparent that you have a vendetta against Mr. Walter. The fact that you don't have access to the depositions; otherwise, you'd have posted it, etc, nor anything solid factually, yet comment on it all as it its true,

Increase processing power

**MOST VIEWED STORIES**

1.  Good Riddance, Kyrsten Sinema, Plutocratic Shill

2.  Marjorie Taylor Greene Blamed Wildfires on Secret Jewish Space Laser

3.  The Return of the Clintons 🔊

4.  Why Is the CDC Now Treating COVID Like It's the Flu?

5.  Who Will Be Trump's VP Pick? The Latest 2024 Veepstake Odds

any true professional will view your commentary as literally laughable. While nobody is perfect— The fact that you fail to note anything of value Mr. Walter has contributed to completely diminishes your report. He is valued manumentally to have solved many well known high profile cases world wide, such as creating the psychological profile for John List, among many huge others! I am not surprised he kept ignoring while you literally stalked him at his home— I would have called the cops on you. I also wouldn't be surprised he sues you for defamation. Anyone with intellegince will immediately take you see through your one sided silly commetary. Also, just because Nick McGuffin's conviction was vacated because they found someone else's DNA does not mean he not guilty. Touched DNA is different from other DNA. Who else did it than? He'll never win his lawsuit against the court and Vidocq! I wouldn't be surprised if they find more evidence on him later again— Nick did it; this is simlar to the notorius case of Adnan Syed now... Where Syed is still guilty and there's much talk about it now again... Your article is beyond ridiculous

    ▲ LIKE 1    ↩ REPLY    ⌣ SHARE          ⚑ REPORT

---

**mike.ri.rodelli** 9 MONTHS AGO

Hi jstephen,

I interviewed with this reporter earlier this year and just now stumbled onto this article. While I made it clear that Richard may not be an angel, I emphasized to the reporter that he absolutely had to balance the article (advice he apparently did not heed) with the things that Walter got right. I did mention to him the fact that piquerism is an accepted profiling term today and that all you have to do is Google it. Walter was apparently too far ahead of his time for the courts in 1982, although I have always conceived of piquerism as being done with a knife, not a firearm. (But that is likely more of a reflection of my limited knowledge of profiling than anything else.) Too bad Mr. Herbert does not mention this fly in his ointment. He also does not mention me once in his article, maybe because I had things to say that were contrary to his thesis.

I have known Mr. Walter since I sought out the assistance of the Vidocq Society in 2004 with the case of the SF Bay Area Zodiac killer. Mr. Walter profiled that case and came up with the opposite profile from such people as John Douglas, who says that Zodiac was some "pathetic loser." Many others say the same thing. Mr. Walter profiled the Zodiac as a "wealthy, non-sexual, power-assertive" killer. I stand behind that profile because it captures many of the traits that have been discussed as being applicable to the killer since 1969. My own suspect also fits that profile and I devote an entire chapter to Walter's profile in my book, "In the Shadow of Mt. Diablo: The Shocking True Identity of the Zodiac Killer."

I have always found Mr. Walter to be a wealth of insightful information in my dealings with him in the Zodiac case. I have an entire folder of notes I scribbled down over the years in my discussions with him. I do, however, admit that he did apparently play footsie with his credentials in the Drake case. Why? Only he knows.

I learned many years ago (and in a very hard way) that a reporter must balance his story for fairness. It is worth noting that Mr. Herbert does not even mention Walter's remarkable profile of John List in this piece, a profile which nailed the family mass murderer down right to the type of glasses he'd be wearing over twenty years after he committed his crimes. As I recall, Walter also said that initially List would move hundreds of miles away from NJ (he went to Denver) and then after twenty or so years, move to within ~300 miles of the crime scene. List had moved to Richmond, VA. I guess giving credit where it is due is not part of Mr. Herbert's MO.

I cannot defend everything that Walter has done in his career, nor would I try to. But neither can I stand by and see only the negative aspects of his life paraded before the public. Like I said, he deserves a balanced story.

    ▲ LIKE 1    ↩ REPLY    ⌣ SHARE          ⚑ REPORT

**sarah058** 9 MONTHS AGO
  ↩ In reply to **mike.ri.rodelli**
Why does the journalist have to be fair to a man who ruined multiple lives with his made up stories?

    ▲ LIKE    ↩ REPLY    ⌣ SHARE          ⚑ REPORT

**madelynjolie1002** 9 MONTHS AGO
  ↩ In reply to **sarah058**
Sarah, Mike is correct— A good writer and critic, always gives the person he/she is writing about a fair commentary, especially if it warrants it— As I noted, the fact that the writer of this article failed to do so and makes a lot of accusations and does not have access to the actual depositions; otherwise, he'd have posted them, etc, nor anything else he claimed that is solid factually, yet comments on it all as it's ALL true, any true professional will view his commentary as literally laughable. While nobody is perfect— The fact that again he fails to note anything of value Mr. Walter has contributed to completely diminishes his report. Walter is valued manumentally within the LE and FBI to have solved many well known high profile cases world wide, such as creating the psychological profile for John List, among many huge others,w hich has led to their arrest! I am not surprised he kept ignoring the writer of this article as Walter was literally being stalked by

him at his home— I would have called the cops. His commentary is one-sided. Also, just because Nick McGuffin's conviction was vacated because they found someone else's DNA does not mean he is not guilty. Touched DNA is different from other DNA, that DNA could've been touched DNA. Who else did it than? Nick McGuffin will never win his lawsuit against the court and Vidocq Society! I wouldn't be surprised if they find more evidence on him later again— Nick did it. For courts to lose a lawsuit along with others whom helped the court is rare.

👍 LIKE    💬 REPLY    ↗ SHARE                                    🚩 REPORT

**broncosara102**  10 MONTHS AGO

I suspect that most criminal profilers are frauds. I have seen countless profilers on TV, YouTube, and podcasts speak about crimes they seem to know nothing about that libel suspects and totally innocent people with made up stories about their motive and personality with zero evidence. Often what claim to be facts is completely contradictory to the evidence in a case. Unfortunately because many are labeled Dr. And they are referred to as experts their opinions are believed as if they were facts. They are definitely tainting investigations, juries and the public destroying the lives of innocent people and our justice system.

👍 LIKE    💬 REPLY    ↗ SHARE                                    🚩 REPORT

**slbrickler**  11 MONTHS AGO

I came to the conclusion by the end that Mr. Walter, aside from his narcissistic personality disorder, may have had a fetish in the enjoyment of watching innocent people be sent to jail and their lives destroyed through the power of his imagination. He was a sociopath who enjoyed destroying lives. Hope he eventually reaps what he's sown.

👍 LIKE 6    💬 REPLY    ↗ SHARE                                    🚩 REPORT

> **juliancastor1**  11 MONTHS AGO
> 💬 In reply to **slbrickler**
> Sounds like sadistic personality disorder (enforcing subtype).
>
> 👍 LIKE 1    💬 REPLY    ↗ SHARE                                🚩 REPORT

**dannorder**  11 MONTHS AGO

Although I am not saying that Walter is anything other than an egotist with extremely overstated credentials, it's always been perplexing that people were choosing to imply that piquerism is not a real term in order to attack him.

I believe the first reference I heard to it was 30 years ago and spelled picquerism. It was in an introduction to psychology textbook, which would have been read by too many people to call obscure. After all, it had to be in pretty wide use to be considered introductory material.

These days you can just do a quick Internet search. If you don't trust Wikipedia and recent web articles, you can always do advanced searches. The first confirmed source I could find (by snippit view and in popular documents) for the piquerism spelling is in 1970 testimony to Congress about the kind of obscenity sent by U.S. Mail.

It's kind of ironic that actually being right about something was the thing the court cited to try to show he didn't know what he was talking about. It's a shame they didn't use a different approach, when there were so many other things they could have focused on.

👍 LIKE 1    💬 REPLY    ↗ SHARE                                    🚩 REPORT

**jeevanv2623**  11 MONTHS AGO

A great article that displays how easy it is for a psychologist to lie since there is no objective test or criteria like with a biologist and DNA evidence. Psychology pretends to be a science, despite it being impossible to experimentally analyze anything without too many confounding factors to count. I would recommend people read the background of famous foundational "psychology studies" such as the Stanford prison experiment or the Milgram obedience experiment which were later found to be openly misrepresented, rigged, or edited to achieve the shocking conclusion. Despite this knowledge, both these experiments and more continue to be published in psychology textbooks.

👍 LIKE 8    💬 REPLY    ↗ SHARE                                    🚩 REPORT

> **artjax**  11 MONTHS AGO
> 💬 In reply to **jeevanv2623**
> Psychology is a science. I have indeed read about both of the experiments you mention as somehow justifying your strange attempt at removing Psychology from fields of science, and your prose makes me wonder if you ever looked into the replications or indeed even know that one of the hallmarks of science is whether or not something is replicable. What is confusing is your completely bypassing the article's points of the guy being himself psychologically unstable -his obsession with sexuality and especially homosexuality, the divorce for metal cruelty after only 10 months, his pathological lying, his inability to handle his own life as it was and himself as he was and so his fabrications about himself, the extreme extent of those

fabrications, the need for attention and for being seen as the very best at
something all point to Narcissistic Personality Disorder with probable other
pathological tendencies.

👍 LIKE 4   ↩ REPLY   ⌣ SHARE                    🚩 REPORT

─ **slbrickler**  11 MONTHS AGO
↩ In reply to **artjax**

Psychology is not a science imo, it's one person's opinion about another
persons actions most times....Opinion is hardly "science" in the strict
sense....One can try to apply "science" like attitudes towards psychology in
the attempt to explain people's actions, but there is no "science" behind the
diagnosis of a personality disorder. It's taking "clues" or numbering actions
in such a way as to form an opinion about why someone is acting one way or
another. Sure, there is "science" to some degree from the context you can
change a persons actions by applying drugs that affect thought or actions,
but trying to read a persons mind is not a "science" imo....It's more of an art
form based on years of observation of human interaction. Science does like
to act like it adheres to a "if something is replicable" truth, but it does not
and cannot in the realm of human emotion/intelligence/psychiatric actions
that do NOT replicate with 100% accuracy between humans....You cannot
point to a psychiatric diagnosis and say with 100% accuracy that the
diagnosis will result in x or y actions 100% of the time....hence, Psychology
is not a "science" except in the glorified mind of itself....

👍 LIKE 2   ↩ REPLY   ⌣ SHARE                    🚩 REPORT

─ **juliancastor1**  11 MONTHS AGO
↩ In reply to **slbrickler**

Psychology is a social science, not a physical science. Phenomenologically
different, therefore.

But even in physical science, you have different schools of thought and
rivalries.

👍 LIKE 2   ↩ REPLY   ⌣ SHARE                    🚩 REPORT

─ **madelynjolie1002**  3 MONTHS AGO
↩ In reply to **slbrickler**

Psychology is both a Science + Art!

👍 LIKE   ↩ REPLY   ⌣ SHARE                    🚩 REPORT

─ **madelynjolie1002**  3 MONTHS AGO
↩ In reply to **artjax**

Exactly! And, as I noted above, the fact that the writer of this article fails to
acknowledge the vast of great work Mr. Walter has done is without merit;
instead, the writer of the article makes a lot of accusations and does not
have access to the actual depositions; otherwise, he'd have posted them, etc,
nor anything else he claimed that is solid proof that Mr. Walters is actually a
liar and fraud, however, comments on it all as it's ALL true. Any true
professional will view the writer of this article and his commentary as
literally laughable. While nobody is perfect— The fact that again he fails to
note anything of value Mr. Walter has contributed to completely diminishes
his report. Walter is valued manumentally within the LE and FBI sector to
have solved many well known high profile cases world wide, such as creating
the psychological profile for John List, among many other high profile cases

👍 LIKE   ↩ REPLY   ⌣ SHARE                    🚩 REPORT

─ **lindacgrady**  11 MONTHS AGO

Oops. Disregard my previous comment- the college student suspect is from
Albrightsville, over an hour away from Montrose. My bad. Shoulda fact-checked
first. 😄

👍 LIKE 3   ↩ REPLY   ⌣ SHARE                    🚩 REPORT

─ **lindacgrady**  11 MONTHS AGO

I think Montrose PA is the same tiny town where the suspect in the Moscow, Idaho
college student killings was arrested, at his parents home, in December, 2022.
Seems like a bizarre coincidence, if my memory is serving me correctly.

👍 LIKE   ↩ REPLY   ⌣ SHARE                    🚩 REPORT

─ **coastda**  11 MONTHS AGO

Having retired after 40 years as both a criminal defense lawyer and an elected
District Attorney in Oregon I have no affection for Paul Frasier, the bumbling
prosecutor in Coos County, Oregon.

But just because someone who appears to have made up his credentials (Walter)
managed to insinuate himself into the case, does not change the facts. The reversal
of fortune, in a judge-only hearing called Post Conviction Relief, freed Rick
McGuffin based on the failure of state police to disclose the presence of another's
DNA on the victim's body.

Defense attorneys are not looking for the truth. Their job is to free their clients,
regardless of whether they did it or not. Trying to find injey headlines in a failed

prosecution is just as much a misstep as dragging the press along to claim you have solved the crime.

What really sealed it - for those of us actually practicing law in Oregon (and go ahead and look me in Wikipedia) is that Snake River Prison is not some dreadful hellhole, other than the overwhelmingly violent men who are left after Oregon's last Governor freed thousands for reasons having nothing to do with their guilt or innocence.

A massively disappointing article.

👍 LIKE 4   ↩ REPLY   SHARE                                    ⚑ REPORT

---

**artjax**  11 MONTHS AGO
↩ In reply to **coastda**

Well, yes, it is of course quite accurate that defense attorneys are ethically obligated to free their clients by any means possible -which to be frank is the objection I have to the profession's code of ethics- but it is also the prosecuting attorney's job to convict the accused and in that pursuit prosecutors routinely seek to eliminate jurors who know too much about some field involved in the case/present appeals to emotion outside of facts/seek to suppress facts that can show the accused may not have committed the crime, and so on. It's a two way street as far as that sort of thing goes. I was quite surprised earlier in life to find out that even the oft said restriction that a lawyer cannot actually lie in court appears not to be quite that straightforward, and that judges do not have to recuse themselves from trials in which they have already decided the guilt or innocence of the accused person -they merely have to recuse themselves from ones in which they might have some financial interest.

👍 LIKE 4   ↩ REPLY   SHARE                                    ⚑ REPORT

---

**gilrosenberg**  11 MONTHS AGO  *(Edited)*

There are plenty of licensed, accredited genuine con artists like psychiatrists, psychologists and social workers that will readily testify on behalf of any or every side for $$$! Don't bother focusing on any of them. They claim to be "experts" and have lots of experience.

👍 LIKE 5   ↩ REPLY   SHARE                                    ⚑ REPORT

---

**bobby**  11 MONTHS AGO

This is a great article. However, I'm sorry to tell you that his wikipedia page supports all his lies, and has not been changed to reflect the truth. Bizarre. I actually have a wikipedia page, and it lists me as having a rather strange middle name -- and I don't even have a middle name! I tried to change it once, got nowhere, and decided, what the hell, it gives me plausable deniability, I can also tell people they got my age wrong!

👍 LIKE 12   ↩ REPLY   SHARE                                    ⚑ REPORT

---

**yahzi**  11 MONTHS AGO

So... this is a profile of Trump's next Attorney General?

👍 LIKE 10   ↩ REPLY   SHARE                                    ⚑ REPORT

---

**jorgegeorgepaez**  11 MONTHS AGO

What a horrible person.....

👍 LIKE 6   ↩ REPLY   SHARE                                    ⚑ REPORT

---

**joanie1**  11 MONTHS AGO

McGuffin? Woah! That's a famous term!

> **Alfred Hitchcock and MacGuffin**
>
> The first person to use *MacGuffin* as a word for a plot device was Alfred Hitchcock. He borrowed it from an old shaggy-dog story in which some passengers on a train interrogate a fellow passenger carrying a large, strange-looking package. The fellow says the package contains a "MacGuffin," which, he explains, is used to catch tigers in the Scottish Highlands.

Google it and you can read the whole thing. **Truth IS stranger than fiction!**

Guys like this show up and remind us how bizarre life is.

👍 LIKE 12   ↩ REPLY   SHARE                                    ⚑ REPORT

---

**joanie1**  11 MONTHS AGO
↩ In reply to **joanie1**

I thought of Ann Rule, a true crime writer who is so readable and also finds the right crimes to write about.
She's a gem. Wonder what she thinks about this "con man crime guy"?

👍 LIKE 8   ↩ REPLY   SHARE                                    ⚑ REPORT

---

**thomasjoan80**  11 MONTHS AGO
↩ In reply to **joanie1**

Um, probably not much, since she's dead ...

LIKE 11 · REPLY · SHARE                                        REPORT

**joanie1** 11 MONTHS AGO
In reply to **thomasjoan80**
So you don't believe her spirit lives on?

LIKE 5 · REPLY · SHARE                                        REPORT

**joanie1** 11 MONTHS AGO
In reply to **joanie1**
She may be looking at these comments right now.

LIKE · REPLY · SHARE                                        REPORT

**doro.wynant** 11 MONTHS AGO
In reply to **joanie1**
That's *Whoa* (as one says to a bolting horse), not *Woah*, you maroon.

LIKE 1 · REPLY · SHARE                                        REPORT

**joanie1** 11 MONTHS AGO
In reply to **doro.wynant**
It's whatever the eff I want it to be.

LIKE 1 · REPLY · SHARE                                        REPORT

**obama4ever** 11 MONTHS AGO

Reading this reminds me of J Warner Wallace who says he was a cold case
homicide detective and is now a Christian apologist who uses his cold case
methods to prove the New Testament is true including the resurrection.

But he uses circular logic, forces everything to fit his narrative, and doesn't even
know the history of the New Testament or who wrote it; like thinking the Gospels
are eyewitness testimony from independent sources. Every time I see hear him
talk all I can think about is how many innocent people he might have convicted.

LIKE 16 · REPLY · SHARE                                        REPORT

**whitecat** 11 MONTHS AGO
In reply to **obama4ever**
The Trumpworld Base eagerly consumes tidy narratives that confirm their
worldviews and keep the complex and ever-evolving modern world at a
distance (even while they expect that devilish modern society to deliver them
support and healthcare).

Compare too how the author of *The Murder Room* (praising Wilson's genius
at crafting narratives that convince small-town juries) is now peddling antivax
conspiracy theories online.

LIKE 13 · REPLY · SHARE                                        REPORT

**pstephen** 11 MONTHS AGO

First, I have known and worked with Mr. Walter for decades. I am a cyber
criminologist with a PhD in digital investigation. I have authored or contributed
to over 20 books on technology-related topics, have published hundreds of articles
in technical and trade magazines, and published 18 peer-reviewed papers. Mr.
Walter and I have presented peer-reviewed research on more than one occasion at
the American Academy of Forensic Sciences. I taught digital forensics for over 10
years at the university level. Your article is substantially wrong in many respects
and may be slanderous in some.

I reviewed all of the issues surrounding the Drake case for Mr. Walters and found
many errors. He was advised, however, that he did not have standing to do
anything about correcting the errors.

I also did a statistical analysis of Mr. Walters' methods using over 1,000 actual
cases in which he did not participate (the HITS database in Washington state).
That winnowed down to about 800 complete cases after doing some analysis to
weed out those without enough data, etc. I found that, applying Mr. Walters'
methodology to those cases - all of which had been solved - resulted in
substantially the same outcome as the physical investigation and prosecution.

One very important point that you make that is a major error: Mr. Walter is not,
nor has he claimed, to my knowledge, to be, a "criminal profiler". His technique is
referred to as crime (or, sometimes, crime scene) assessment. The two are very
different.

Because he is a controversial figure, Mr. Walter attracts attacks such as yours.
Because what he does and developed along with another experienced investigator,
Robert Keppel, is somewhat arcane, it often is not well understood by lay persons.
I fact-checked the Drake case accusations some years back and my empirical
analysis of the Keppel-Walters methodology of crime classification also was done
several years back. I am in the process of fact checking your article and I will
submit the fact check for publication when it is complete.

P. R. Stephenson, PhD, CISSP (lifetime), FAAFS, VSM
pstephen@DrPeterStephenson.org

👍 LIKE 2   ↩ REPLY   ⌁ SHARE                                    🏴 REPORT

— **alex** 11 MONTHS AGO
↩ In reply to **pstephen**

Hmm. So claiming to identify someone's motives and particular diagnoses or
fetishes is not profiling that person?

Also, if you look at the web archive for the Vidocq society, he is listed as a
profiler. He should have had that corrected if he didn't want people to think of
him that way.

https://web.archive.org/web/20080827164757/http://vidocq.org/who.html

👍 LIKE 10   ↩ REPLY   ⌁ SHARE                                   🏴 REPORT

— **pstephen** 11 MONTHS AGO
↩ In reply to **alex**

You're right… he should have corrected it but those things that get published
are less important to him than doing the work he does. I will speak with him
and suggest that. Do note, however, that I said that he doesn't refer to
himself as a profiler and in his training classes goes to great lengths to make
the distinction.

He wrote two paper on the differences: Profiling vs. Crime Assessment: A
Case for Separation and Clarification and Clarifying investigative concepts. I
am having trouble running down a link to the papers, but the citations
according to ChatGPT (GPT-4) are: Walter, R. (1999). Profiling vs. Crime
Assessment: A Case for Separation and Clarification. Journal of
Interpersonal Violence, 14(3), 223–231 and Walter, R. (1990). Clarifying
investigative concepts. Journal of Police Science and Administration.

Anyway, thanks for the good catch… appreciated.

—P

👍 LIKE 2   ↩ REPLY   ⌁ SHARE                                    🏴 REPORT

— **jannette.zarouhe** 11 MONTHS AGO
↩ In reply to **pstephen**

ChatGpt is known to "hallucinate" articles when asked for citations.

https://futurism.com/newspaper-alarmed-chatgpt-references-article-
never-published

I couldn't find either of these articles using my university's academic
journal search tools.

👍 LIKE 10   ↩ REPLY   ⌁ SHARE                                   🏴 REPORT

— **euphorbia_euphorbia** 11 MONTHS AGO
↩ In reply to **pstephen**

ChatGPT makes up citations.

👍 LIKE 5   ↩ REPLY   ⌁ SHARE                                    🏴 REPORT

— **pstephen** 11 MONTHS AGO
↩ In reply to **euphorbia_euphorbia**

Exactly…. I could not find the citations either, but I can obtain copies of
the papers. Please note that we are talking about the 90sand some of the
publications that were around then are no longer. Also, it was common
to change titles to fit available headline space in some publications. The
ones noted are not al academic and may have printed the papers in an
"article" format similar to a trade journal.

👍 LIKE   ↩ REPLY   ⌁ SHARE                                      🏴 REPORT

— **jeevanv2623** 11 MONTHS AGO
↩ In reply to **pstephen**

How did you apply Mr. Walters' methodology "statistically"? His methodology
does not have any objective steps that can be modeled mathematically. Unless
you have invented artificial intelligence, this would seem to be impossible.

👍 LIKE 8   ↩ REPLY   ⌁ SHARE                                    🏴 REPORT

— **pstephen** 11 MONTHS AGO
↩ In reply to **jeevanv2623**

Great question. Walter/Keppel delineate 4 "subtypes" of criminal behavior. I
took over 1,000 cases, eliminated those where data were incomplete or
unreliable and ended up with around 800 cases. The data source was the
HITS database in Washington state. Then I analyzed the cases using the
Richard/Keppel approach and compared my results with the actual results.
I don't have my paper at hand (long ago archived) but my recollection was
that there was about a 90+% coincidence of the two sets of results.

👍 LIKE   ↩ REPLY   ⌁ SHARE                                      🏴 REPORT

**artjax**  11 MONTHS AGO
↩ In reply to **pstephen**

This is very interesting, given your membership in the Vidocq society, degrees in diplomacy and computer research, writings in what i will shorthand as cyberhardening, and such additional details a few moments spent in checking online sources brought up such as the interesting peer-reviewed article that found the Keppel-Walters methodology -which is specifically a methodology of classification of serial murderers- which was being looked at due to the lack of empirical evidence for it- could not be validated.
Perhaps I should look further when I have more time. I am, after all, a multi-degreed professional myself with some research background.

👍 LIKE 3   ↩ REPLY   ⌘ SHARE                              🚩 REPORT

**pstephen**  11 MONTHS AGO
↩ In reply to **artjax**

Another really great comment. The paper you reference was the reason I did my research. I'm not going to take the space here but my recollection is that the other paper left out some very important analysis points so their outcome was flawed. In my research I did not exclude the data that the other paper excluded, hence my different conclusion. The reason they lacked empirical evidence was that they didn't look for it. I had the benefit of Keppel's access to HITS (which he was involved in developing) and a far larger base of cases with much more detail the the other team had. As to peer review, at the time the hypothesis they were working on was quite arcane and I doubt that they had peer reviewers experienced in the art. Since it was a double blind peer review, we never can know the reviewers.

Now the big question: Where is my paper? At Richard's request I never published it (as I recall). His feeling was that the reactions to the other paper were cooling and he did not want to open that can of snakes again. While Richard may be thought of as a bit eccentric, he has a keen psychologist's sense of when to leave well enough alone. My results satisfied him personally - I seem to recall that he had my work reviewed by someone he respected and the results were positive.

👍 LIKE   ↩ REPLY   ⌘ SHARE                              🚩 REPORT

**pstephen**  10 MONTHS AGO
↩ In reply to **artjax**

Just noticed you referenced my degrees and I want to clear up a minor point. My PhD is in digital investigation, not computer research.

👍 LIKE   ↩ REPLY   ⌘ SHARE                              🚩 REPORT

**pstephen**  11 MONTHS AGO
↩ In reply to **pstephen**

I want to add something here. This is just a single major error the author of this article made (as I said, I am in the process of fact checking). The author says:

"The book repeats Walter's claim to have solved the notorious 1986 murder of Anita Cobby, a former beauty queen who was gang-raped and nearly beheaded in Australia. Detective **Ian Kennedy**, who led the investigation, tells me he has never heard of Walter."

Richard forwarded an email sent to him 24 April 2023 from Dr. Anthony Moynham, a Medical Physician for the NSW Police Department. He was involved in the case and remembers Richard's contribution. He notes that the five individuals apprehended and convicted fit Richard's description (he uses the term "profile") exactly. He also points out that Detective Sergeant Tony Callamartis not Ian Kennedy was the lead on the case.

This is just one example of errors of fact presented by the author are grossly misleading.

--P

👍 LIKE   ↩ REPLY   ⌘ SHARE                              🚩 REPORT

**davezimny**  11 MONTHS AGO

> In July 2011, a jury found McGuffin not guilty of murder but — by a vote of 10-2 — guilty of first-degree manslaughter.

I was under the impression that guilty verdicts in criminal trials had to be unanimous. Is this not true in Oregon?

👍 LIKE 1   ↩ REPLY   ⌘ SHARE                              🚩 REPORT

**aclay**  11 MONTHS AGO
↩ In reply to **davezimny**

https://www.themarshallproject.org/2023/01/07/oregon-louisiana-non-unanimous-juries-unconstitutional only very recently has the Supreme Court

👍 LIKE 2    💬 REPLY    🔗 SHARE                                    ⚑ REPORT

**davinrerbert** 11 MONTHS AGO

💬 In reply to **davezimny**

At the time, Oregon was one of two states that allowed non-unanimous
verdicts in such trials.

👍 LIKE 15    💬 REPLY    🔗 SHARE                                    ⚑ REPORT

**coastda** 11 MONTHS AGO

💬 In reply to **davezimny**

In Oregon for over 80 years a person in a felony case could be EITHER
acquitted or convicted on a 10-2 vote (a policy England fairly adopted). Until
about 2014 BOTH defense attorneys and prosecutors thought the system
worked well because it was 1) just as easy to get OFF as it was to be convicted
(unlike other states) and 2) there is/was no empirical evidence that a non-
unanimous verdict resulted in any greater number of convictions than states
with unanimous requirements.

Finally, readers should know after convincing the state courts to retroactively
start releasing felons who were lawfully convicted, defense attorneys in
Oregon want to be the ONLY state where you can be found NOT guilty based
on just 10 votes. So much for the requirement of unanimity!

👍 LIKE    💬 REPLY    🔗 SHARE                                    ⚑ REPORT

🖥 Top of comments                    📄 Top of article

SIGN IN TO COMMENT



THE **Intelligencer** FEED

2:37 P.M.

EARLY AND OFTEN

## Nikki Haley Couldn't Have It All

*By* SARAH JONES

Conservative women can bid for status and attain
it, but they still belong to a party and a movement
that deny them equality.



**1:47 P.M.**

POLITICS

### Get Ready to See the National Guard on Your Commute

*By* NIA PRATER

Governor Kathy Hochul announced that 750 guardsmen will be placed in the MTA system as part of a five-point plan to address subway crime.



**12:36 P.M.**

TREMENDOUS CONTENT

### Where Is Melania? Not at Trump's Mar-a-Lago Victory Party.

*By* MARGARET HARTMANN

Although Donald Trump promised the First Lady would be campaigning "quite a bit," she could not make it to an event held at her home.





AD

BOTTEGA   VENETA

DISCOVER MORE

POWERED BY CONCERT

**MOST POPULAR**

1. **Good Riddance, Kyrsten Sinema, Plutocratic Shill**
   *By* JONATHAN CHAIT

2. **Marjorie Taylor Greene Blamed Wildfires on Secret Jewish Space Laser**
   *By* JONATHAN CHAIT

3. **The Return of the Clintons** 🔊
   *By* GABRIEL DEBENEDETTI

4. **Why Is the CDC Now Treating COVID Like It's the Flu?**
   *By* CHAS DANNER

5. **Who Will Be Trump's VP Pick? The Latest 2024 Veepstake Odds**
   *By* MARGARET HARTMANN

**11:29 A.M.**

EARLY AND OFTEN

### Haley Ends Campaign As She Started It: With No Clear Path Forward

*By* ED KILGORE

Her inability to come to grips with what Donald Trump has done to her party has characterized Nikki Haley's campaign from the get-go.



**6:24 A.M.**

EARLY AND OFTEN

### Trump's Very Super Tuesday Confirms It's His Party



By ED KILGORE

Haley won one more heavily Democratic state but the day belonged to the front-runner.



---

6:19 A.M.    EARLY AND OFTEN

## Schiff's Strategy Worked: He Will Face Garvey in California Senate Election

*By* ED KILGORE

The front-running Democrat love-bombed the hapless Republican with ads that boosted him over the more formidable Katie Porter.



---

6:00 A.M.    WHAT WE KNOW

## Absolutely Everything We Know About the Trump Sneakers

*By* CHAS DANNER AND MATT STIEB

There's a shady Wyoming LLC behind the effort and nobody knows who the manufacturer is, but it's already pretty clear these aren't quality kicks.



---

5:00 A.M.    GAMES

## Unlike MJ, LeBron Is Ending His Career With Dignity

*By* WILL LEITCH

He's still playing at a high level and doesn't seem too bothered about his team's mediocrity.



---

3/5/2024    THE NATIONAL INTEREST

## Good Riddance, Kyrsten Sinema, Plutocratic Shill

*By* JONATHAN CHAIT

She killed her career by blocking bipartisan ideas that threatened the rich.



---

3/5/2024    EARLY AND OFTEN

## Did Trump Really Vow to Defund Schools With Vaccine Mandates?

*By* MARGARET HARTMANN

His campaign says he's only threatening cuts to schools that require COVID shots — though that's not clear from his stump speech.



---

3/5/2024    EARLY AND OFTEN

## Kyrsten Sinema to Retire, Tells Voters: It's Not Me. It's



### You

By ED KILGORE

Centrist politicians often blame the system. But as she bowed out of the Arizona Senate race, Sinema made it clear she thinks voters are the problem.



---

3/5/2024

THE MONEY GAME

## Why Did Bitcoin Hit a New All-Time High?

By KEVIN T. DUGAN

Is Wall Street just in a "buy anything" mood?



---



POWERED BY CONCERT                                              FEEDBACK

---

3/5/2024

POLITICS

## Who Will Replace Mitch McConnell As GOP Senate Leader?

By NIA PRATER

John Cornyn and John Thune are the favorites, but they're not the only candidates.



---

3/5/2024

ISRAEL-HAMAS WAR

## AOC Rattled by Protesters Demanding She Call Gaza a Genocide

By MATT STIEB

"You're not helping these people," Ocasio-Cortez replied, in a tense encounter at the Alamo Drafthouse Cinema.



---

3/5/2024

EARLY AND OFTEN

## Are Haley Voters Actually Biden Voters?

By ED KILGORE

A good number of GOP primary voters are rejecting Trump. That could show his weakness in November — but not if they're really Democrats.



3/5/2024

SCREEN TIME

## Apple, Tesla, and the Dying Dream of Self-Driving Cars

*By* JOHN HERRMAN

Apple's decision to kill its automotive program is part of a bigger story.



---

3/5/2024

WHAT WE KNOW

## What We Know About the Man Who Self-Immolated in Front of the Israeli Embassy

*By* MATT STIEB

The 25-year-old Air Force service member shouted "Free Palestine" as he burned to death in protest of the Israel-Hamas war.



---

3/5/2024

TREMENDOUS CONTENT

## Trump Has Confused Obama for Biden 7 Times (and Counting)

*By* MARGARET HARTMANN

Is Trump really calling his 2024 rival "Obama" for "comedic reasons and for sarcasm"? Here's a list of his alleged gaffes so you can be the judge.



---

3/5/2024

CHAPTERS

## The Earthquake Trade

*By Gary Stevenson*

I was an outsider in London finance. And when disaster struck in Japan, that was my biggest advantage.



---

3/5/2024

EARLY AND OFTEN

## Why Nikki Haley Is Still Running

*By* DAVID FREEDLANDER

She keeps losing to Trump by double digits with no hope of winning the nomination. Her supporters say she's after something bigger.



---

3/4/2024

POLL POSITION

## California Senate Polls: Schiff Helps Garvey Edge Out Fellow Democrats

*By* ED KILGORE

Adam Schiff spent millions to ensure a long-shot GOP candidate will be his general-election rival. Polls of the March 5 primary show it's working.



3/4/2024

PALESTINE

## Biden Should Quit Hiding From the Protesters

*By* SARAH JONES

Morality and American democracy require the president embrace rather than dismiss pro-Palestinian voices.



3/4/2024

THE NATIONAL INTEREST

## Is Biden in Denial About the Polls?

*By* JONATHAN CHAIT

Or is the happy talk just spin?



3/4/2024

THE NATIONAL INTEREST

## Is Biden in Denial About the Polls?

*By* JONATHAN CHAIT

Or is the happy talk just spin?



3/4/2024

POLITICS

## Top Trump Org Exec Admits Perjury, But Still Won't Flip

*By* NIA PRATER

Former CFO Allen Weisselberg's plea could serve as a warning to other witnesses against lying under oath ahead of future Trump-related cases.



3/4/2024

EARLY AND OFTEN

## Nikki Haley Breaks Primary Losing Streak Ahead of Super Tuesday

*By* ED KILGORE

She won Washington, D.C., with a tiny number of GOP votes. Given what's likely to happen to her on March 5, any win over Trump is welcome.



READ MORE ON THE

**Intelligencer**

HOMEPAGE

ABOUT INTELLIGENCER     ABOUT NEW YORK MAGAZINE     NEWSLETTERS     HELP     CONTACT     PRESS     MEDIA KIT     WE'RE HIRING     PRIVACY

TERMS     AD CHOICES     DO NOT SELL OR SHARE MY PERSONAL INFORMATION     ACCESSIBILITY

INTELLIGENCER IS A VOX MEDIA NETWORK. © 2024 VOX MEDIA, LLC. ALL RIGHTS RESERVED.

# EXHIBIT "B"

TO: AAFS Board of Directors
FROM: AAFS Ethics Committee
SUBJECT: Complaint #2023-05
DATE: September 10, 2023

This will be an unusual report because, in the case of dismissals, we usually offer only a brief description. The very public nature of this complaint, based on publication in a nationwide magazine, requires a detailed explanation.

When this complaint was first received, it was accompanied only by an article from *New York* magazine, written by David Herbert. (Attachment 1) When the Ethics Committee (hereafter "the Committee") members read the article, we all thought that we would be recommending some sort of sanction. By the time we finished our investigation, we all thought that the complaint should be dismissed. The article accuses the Respondent of fraud and also makes the Academy appear ineffective for not sanctioning him as a result of two previous complaints.

Because of the very public nature of the complaint, the Respondent, Mr. Richard D. Walter, Retired Fellow, General Section, has agreed that the Ethics Committee can waive the usual requirement of confidentiality when reporting this dismissal.

Much of the misconduct alleged in the New York article occurred many years ago and was therefore outside of the Committee's jurisdiction. Mr. Walter, however, gave a deposition in 2022, wherein several of the old allegations were discussed in detail. We concluded that any material misstatements in that deposition could be considered as within our jurisdiction. After reviewing the transcript, the Committee sent the respondent a pointed letter, (Attachment 2) inviting him to respond to several apparent discrepancies. It was Mr. Walter's answer, accompanied by documentation that he provided (Attachment 3), and additional information the Committee obtained independently which ultimately persuaded the Committee that this complaint should be dismissed.

The following are issues that demonstrate that the *New York* article is highly biased and contains factual errors.

**1. Relationship with the FBI's Behavioral Science Unit**

From the article (Page 5):

> He continued testifying in occasional murder trials and inflating his qualifications. By 1987, when he took the stand in State of Ohio v. Richard Haynes, he held himself out as a superstar in his field, telling the prosecutor that he was one of just ten or so criminal profilers trusted by the FBI.

(Page 7)

Many others saw through Walter's act. Retired FBI agent Gregg McCrary recalls that the Behavioral Science Unit once invited Walter to Quantico to ask him questions about inmate behavior. "The narcissism, I think, was obvious. He really thought he knew a lot," McCrary says. The agents learned little, and he was not invited back.

From Mr. Walter's answer:

My relationship with the FBI was not based on Gregg McCrary, but on my close relationship and investigative and teaching collaborations for thirty years with pioneering FBI Special Agent Robert Ressler, a principal founder of the FBI's Behavioral Science Unit (BSU).

Ressler invited me to return to the FBI Academy and the BSU numerous times to give lectures and attend lectures and discussions with experts like the psychiatrist Robert Hare, the pioneering Canadian researcher on psychopaths.

Current FBI Special Agent Stephen Mooney says an FBI record shows my role in crime assessment history that I repeatedly discussed at the BSU. "It states in the late 1990's, ROBERT KEPPEL and RICHARD WALTER adopted the rapist typologies originally devised by Groth et al (1977) and converted them into homicide categories (Keppel & Walter, 1999)," Mooney wrote in an email (Document 11).

*The Committee's findings:*

*The statement that Mr. Walter was "inflating his qualifications" when he testified about his relationship with the FBI is not supported by the evidence. The statement that Mr. Walter was not invited back to the BSU is not supported by the evidence.*

## 2. Relationship with the Metropolitan Police

From the article (Page 10):

One of McGuffin's attorneys, Andrew Lauersdorf, grilled the profiler about his claim that he worked on cases with Scotland Yard. Walter could not recall the name of any inspectors he'd worked with there and appeared not to know that Scotland Yard and the Metropolitan Police are, in fact, the same organization. When asked where Scotland Yard was

located, the man who claimed to have visited the agency's offices up to 30 times said he didn't know and then offered "downtown London."

(Suggesting, but not stating, that this relationship was a fabulation).

Document 11(a) appended to the Respondent's answer is a statement from Dr. Richard Sheperd that describes in detail Mr. Walter's relationship with Scotland Yard over a 30+ year time frame.

The Committee was provided with a sworn statement dated July 20, 2023 by Dr. Julian Boon, a chartered forensic psychologist from the UK who states:

> To wit he has to my knowledge at least twice lectured at New Scotland Yard (8-10 Broadway, City of Westminster, London) and also had a lunch held in his honour there. However, beyond that I am aware that he has contributed to the UK police's understanding of offenders, their future risks, behaviour and optimal interview stratagem. He has done so:
>
> • for several years in extended training programmes co-presenting with ex-FBI Detective Robert Ressler
> • collaborated, published, and worked with ex-US Detective and prolific author Robert Keppel
> • worked/helped me personally (pro bono) with multiple UK cases
> • lectured/trained not only in the US but also internationally - appearing with me at professional forensic conferences in locations as varied as Las Vegas, London and Vienna
> • twice gave training programmes at the University of Leicester, England - once for my Forensic Post-Graduate students and once for senior serving UK officers seeking advice on their cases. Both groups gave excellent feedback thereafter.
>
> In short Richard Walter is to be recommended as someone who is immensely experienced and knowledgeable in the field of applied forensic psychology.

*The Committee's findings:*

*The suggestion that Mr. Walter was not being truthful about his relationship with Scotland Yard is not supported by the evidence. The inability to remember names from long-ago consultations does not mean that the consultations did not happen.*

**3. Food loaf a/k/a prison loaf**

From the article (Page 8):

> The book [Capuzzo, *The Murder Room*, Avery 2010] repeated and
> expanded on dozens of falsehoods in Walter's résumé. In the Michigan
> prison system, he wrote, Walter could shut off hot water and put inmates
> on a diet of "prison loaf," with three meals a day blended and baked into
> a tasteless brick. "You will learn to control yourself or I will control you,"
> he allegedly told them. But a [unnamed] prison spokesman disputes that a
> psychologist could leverage showers and meals in that way. "Maybe in
> *Shawshank* or something," he says. "But not in real life."

Actually:

The current Michigan Department of Corrections (MDOC) website carries a policy
directive for the use of food loaf on page 8 at this link.

https://www.michigan.gov/-
/media/Project/Websites/corrections/publications/Folder4/0405120v468891.pdf?rev
=20f716760f1c49c8b7ad6085effd76da

The Committee was provided with an affidavit dated August 9, 2023 from a co-worker
of Mr. Walter, Edward J. Bujdos, which states the following:

> Richard: Per our recent phone contact, I vividly recall the use of "Food
> Loaf" with administrative segregation prisoners within the MDOC. I
> began my employment with MDOC in February 1981, covering all the
> custody levels in the State Prison of Southern Michigan, (SPSM). The
> various custody levels included Reception and Guidance Center (R&GC),
> Trustee Division, (Custody Level 2), Northside (Level 3), Closed Custody
> (Level 4), and Administrative Segregation (Cell Block 5). Cell Block 5
> housed the prisoners who were found guilty of breaking major custody
> rules, including assault on staff, assault on other prisoners, possession of
> drugs, attempts at insurrection and rioting. A long-term standard policy
> established long before you and I found employment with the MDOC was
> the use of "Food Loaf." When a prisoner acted out while in Cell Block 5,
> his next meals were a baked loaf of the day's menu: bread, meat, fish,
> milk, dessert, etc., placed in a mixer, then baked for consumption by the
> prisoner. Three meals a day, with each meal a blended concoction. This
> added for the prisoner to eat with his fingers and not with table utensils.

*The Committee's findings:*

*Food loaf was and is a permitted punishment for prisoners in the MDOC system. The Committee has no reason to believe that Mr. Walter's statements on the subject were false.*

## 4. Work for the Los Angeles County Medical Examiner (LACME)

This is perhaps the most credible charge. Mr. Walter claims to have worked on 5,000 to 10,000 cases for this office while working as a "student professional worker" (lab technician) during an 844-day tenure.

From the article (Page 5):

> On the stand at Drake's trial, Walter related an impressive—and fictional—résumé. He falsely claimed that at the L.A. County Medical Examiner's Office, he had reviewed more than 5,000 murder cases.

This testimony occurred in 1987 and the trial transcript reflects that he testified as follows:

> A. Starting in 1975, or around there, I was with the Los Angeles County Coroner's Office, their estimate is that I either reviewed or was involved with -- -- or considered --
>
> THE COURT: No, overruled. It's not their estimate. It's your estimate; so go ahead. Give your estimate.
>
> A. My estimate would be approximately 10,000 cases. Of those 10,000, approximately 5,000 cases were murder. Since that time, since 1978, then, I have been with the prison system and doing outside consultation with other Police Agencies here in the States and abroad; and I would estimate approximately another 5,000 murder cases.

This testimony, having occurred in 1987, is beyond this Committee's jurisdiction and Mr. Walter made no such claim in his 2022 deposition. However, the Committee chose to follow up this issue since Mr. Walter made similar claims on his 1988 application for reinstatement to AAFS membership and, if false, could have caused a rejection of that application.

The Committee obtained the LACME's annual reports from the time Mr. Walter was employed. In our letter to Mr. Walter, we wrote:

Additionally, we have reviewed your application to rejoin the Academy in 1988 and have a question about your claim on the application regarding your work at the Los Angeles County Medical Examiner's Office (LACME). You stated, "I worked with the Los Angeles Medical Examiner's Office on approximately 8,000 to 10,000 cases." According to the LACME's annual reports, published on their website, the total number of homicides for the LACME during your stated period of employment was approximately 2,900. We would appreciate your explanation of this discrepancy along with any documentation supporting this statement submitted in support of your application for reinstatement.

In his answer to the Committee's letter, Mr. Walter wrote:

I made a conservative estimate that "I worked with the Los Angeles Medical Examiner's Office on approximately 8,000 to 10,000 cases." I must correct the Committee's assumption. I worked not only on homicide cases, but on everything that came into the office, including suicides, drug deaths, vehicular accidents, accidental deaths, and deaths by natural causes. We handled about 16,000 cases a year. According to LA County Chief Medical Examiner-Coroner Thomas N. Noguchi's Biennial Report covering fiscal years 1975-76 and 1976-77, the LACME investigated 31,767 deaths, an average of 15,883.5 cases a year. In his subsequent report for fiscal years 1977-78 and 1978-79 Noguchi reported the LACME investigated 32,868 deaths—an average of 16,434 deaths per year. (See Document 14 for both reports). I was working on a flood of cases for long hours seven days a week for two years and four months during this period, more focused on the fact it was a time of formative growth for me than on counting cases, but Griesemer advised me that a good estimate of my workload, "to be on the safe side," was to cut the caseload approximately in half. I chose to make an even more conservative estimate.

Mr. Walter has been previously challenged regarding his testimony about his work experience at LACME. In 1996, he was the subject of an ethics complaint regarding his testimony in New York vs. Drake. Writing in the third person, Mr. Walter's answer to the 1996 AAFS Ethics Committee regarding these numbers was:

In reference to the respondent's previous employment and work at the Los Angeles County Medical Examiner's Office, it is true that testimony given in the above-cited cases reflected duties of a Student Professional Worker. This employment and title resulted from previous employment with Michigan state University in the Department of Pharmacology as a Lab Technician, Masters Degree in Educational Psychology from Michigan State University, and Matriculation in Criminal Justice courses

at Cal State University at LA. As stated in the various court cases, the
stated duties included chain of evidence of biological samples and related
items, drug control, and a host of every day menial tasks including
cleaning of laboratory glassware. Based upon the specific assigned duties
related to chain of evidence, the respondent was often in the autopsy
rooms and had available a number of reports regarding deaths of nearly
17,000 persons per year. Having read a majority of these cases, the
testimony in The State of New York v. Robbie Drake reflected a
conservative estimate of 5,000 to 7,500 cases reviewed. In addition to the
official duties, it is also true that the respondent had numerous
consultations with Pathologists, police officers, and Forensic Specialists.
Again, although not hired for this purpose, the respondent informally
participated in crime assessment, profiling activities, in Forensic meetings,
and gave in-service lectures relevant to the body politic. For
documentation of the above statements, please see letter sent under
separate cover to the Chairman by Dr. Griesemer. (See item #3.) In
addition, if necessary, the above statements could be supported by
contacting AAFS members Eston Schwecke (Crim M) and Gary Sims
(Crim M).

Despite having the transcript referenced above, in which the Respondent testified that
he "estimated" that he had "reviewed or was involved with or had considered" 10,000
cases, 5,000 of which were murders, the Chair of the Ethics Committee on February 2,
1996 wrote:

> Though Mr. Walter's representation of status in Michigan and of
> experiences in California do fall within the purview of the Code, the
> Committee has concluded unanimously that there was no material
> misrepresentation and therefore no Code violation.

The members of the current (2023) Committee are at a loss to understand how the 1996
Ethics Committee reached this conclusion. We can only speculate that an "over-
estimation" of the number of cases worked was not considered to be a "material
misrepresentation."

*The Committee's findings:*

*Mr. Walter gave false testimony in the Drake case in 1987, but that is beyond the reach of the
current Committee's jurisdiction. It is highly unlikely that Mr. Walter consulted on 5,000
murder cases while working at LACME. There were not that many homicides during his tenure.
His testimony in 1987 was false but we have no contemporary false statements within our
jurisdiction. His use of a similar estimate on his 1988 application for reinstatement to the
Academy was not sufficiently specific as to what kind of cases he was "involved" with to provide
probable cause to pursue an investigation.*

Directors should bear in mind that the Ethics Committee's jurisdiction only extends to alleged misconduct committed within the last five years, so we could only consider Mr. Walter's testimony in the 2022 deposition. Given this limitation, the Committee concluded that the complaint should be dismissed.

Respectfully submitted,

AAFS ETHICS COMMITTEE

John J. Lentini, Chair

Attachment 1

Herbert, The Case of the Fake Sherlock, New York, April 10-23, 2023

# *New York*

*APRIL 10–23, 2023*



*Richard Walter in 1992.*

PHOTOGRAPH: DETROIT FREE PRESS/ZUMA PRESS

*FEATURES*

### How Stormy Daniels Sees It Ending

She spent the night with a tacky reality-television star. The rest is now American history.
*By Olivia Nuzzi*

**20**

### Emma Tucker's Deadline

The newly appointed *Wall Street Journal* editor steers the paper through a stakes-couldn't-be-higher diplomatic crisis.
*By Shawn McCreesh*

**26**

### The Case of the Fake Sherlock

How Richard Walter used phony credentials and a bogus work history to secure convictions.
*By David Gauvey Herbert*

**32**

**Richard Walter** was hailed as a genius criminal profiler at murder trials, at forensic conferences, and on true-crime TV. In reality, he was a fraud. How did he get away with it for so long?

# The Case of the Fake Sherlock

**By David Gauvey Herbert**

*Illustration by Adam Maida*





OQUILLE, ON the Oregon coast, is a two-stoplight town where mist rolls off the Pacific and many of the 4,000 residents work in lumber and fishing. On the night of June 28, 2000, a 15-year-old named Leah Freeman left a friend's house and set off on her own. She was seen walking past McKay's Market, the credit union, and the high school, but she never made it home. At a gas station, a county worker found one of Leah's sneakers.

The local paper published Leah's school photo: big smile, mouthful of braces. Police and a donor put together a $10,000 reward for information leading to her safe return. K-9 units swept the school grounds, and police set up roadblocks and interviewed motorists. On its sign, the Myrtle Lane Motel posted a description of Leah. A month later, the message was replaced with Job 1:22: "The Lord gives. The Lord takes." A search party had found Leah's body at the bottom of an embankment, severely decomposed. "We prayed for her to return," the motel manager told a reporter. "And now we can pray for whoever did this to be caught."

But the killer was not caught. The police had initially treated Leah as a runaway before mounting a search, and when the FBI and state police finally arrived, investigators were too far behind. They never recovered. As months turned into years, Coquille police dwelled on one suspect whose story never quite made sense to them: Nick McGuffin, Leah's 18-year-old boyfriend. Friends had seen them argue. Police said he switched cars the night she vanished and flunked a polygraph. The hunch was there, but the physical evidence wasn't.

In January 2010, a new team of detectives and a prosecutor flew to Philadelphia to pursue a last-ditch option: to present the case to a league of elite investigators called the Vidocq Society, which met once a month to listen to the facts of cold cases and sometimes venture instant insights. The group's co-founder, Richard Walter, was billed as one of America's preeminent criminal profilers, an investigative wizard who could examine a few clues and conjure a portrait of a murderer.

Walter was tall and gaunt with a hard-to-place, vaguely English accent. He favored Kools and Chardonnay, and he was never photographed in anything but a dark suit, a tiny smile often curling at the corner of his mouth. His public profile was about to explode. A publisher was finalizing a book about the Vidocq Society, *The Murder Room*, which detailed Walter's casework on four continents and claimed that at Scotland Yard he was known as "the living Sherlock Holmes."

In Philadelphia, members of the Coquille team presented Leah Freeman's murder to the Vidocq Society. Later, at a private dinner, Walter dangled before them a tantalizing profile that suggested the killer was indeed McGuffin, the boyfriend they had suspected all along. Soon, Walter traveled to Coquille and examined crime scenes with the police chief, trailed by a camera crew from ABC's *20/20*.

Building on the momentum of Walter's visit, the authorities arrested McGuffin and charged him with killing Leah. As he awaited trial, he watched the *20/20* episode about his case from the Coos County jail. There on TV was Walter, a man he had never met, all but accusing him of murder. "It's sweet revenge," Walter said with a grin. "And I take great personal satisfaction in hearing handcuffs click." McGuffin was convicted and sentenced to a decade in prison. In the years to come, he would often sit in his cell and wonder: Who *was* that thin man smoking on the screen?

Richard Walter is many things and little that he claims. Since at least 1982, he has touted phony credentials and a bogus work history. He claims to have helped solve murder cases that, in reality, he had limited or no involvement with—and even one murder that may not have occurred at all. These lies did not prevent him from serving as an expert witness in trials across the country. His specialty was providing criminal profiles that neatly implicated defendants, imputing motives to them that could support harsher charges and win over juries. Convictions in at least three murder cases in which he testified have since been overturned. In 2003, a federal judge declared him a "charlatan."

Walter refused several requests for an interview. "You have earned one's distrust that merits severing any contact with you in the future," he wrote me, veering into strange pronoun usage. "Under no circumstances would himself cooperate in your suspicious activities."

Many of his misdeeds were a matter of record before he ever stepped foot in Coquille. And yet Walter continued to operate with impunity, charging as much as $1,000 a day as a consultant. America's fragmented criminal-justice system allowed him to commit perjury in one state and move on to the next. Journalists laundered his reputation in TV shows and books. Parents desperate for closure in the unsolved murder of a son or daughter clamored for his aid. Then there was Walter's own pathology. He so fully inhabited the role of celebrated criminal profiler he appeared to forget he was pulling a con at all.

IN RICHARD WALTER'S telling, he was fated for a grim life studying criminals. But schoolmates who grew up with him in the rolling orchard country of 1950s Washington State remember an outgoing, popular kid who liked the piano and led the prayer band at a Seventh Day Adventist boarding school. In September 1963, at the age of 20, he married a former classmate and briefly took a job at a funeral home. ("He didn't want to work with any old, stinky bodies," his brother recalled in an interview.) After ten months, his wife filed for divorce, citing "mental cruelty." What happened over the next several years is unclear. When asked in a recent deposition where he lived and worked during that period, Walter said, "I don't remember."

Walter resurfaces in the public record in 1975, when he graduated from Michigan State University with bachelor's and master's degrees in psychology. He got an entry-level position as a lab assistant in the Los Angeles County Medical Examiner's Office. He was 33 and making roughly $3 an hour washing test tubes. He considered a doctoral program but instead took a job in 1978 as a staff psychologist at a place where he'd be able to see patients without any further qualifications: Marquette Branch Prison on Michigan's Upper Peninsula.

Walter's rapport with prisoners was poor—he often conducted interviews through a closed steel door—and he could be petty. An inmate sued Walter after he refused to pass along a dictionary sent by his mother. Two psychiatric experts and a federal judge questioned his ability to diagnose mental disorders and render basic mental-health services. Eventually,

Walter's duties largely involved conducting intake interviews with inmates. "What I call meatball stuff," says John Hand, who also worked in the state prison system as a psychologist. "Talk to them for a little while, make sure they're not totally crazy."

Away from the prison, though, Walter presented his job as giving him unique insights into the criminal mind. He became a regular at conferences hosted by the American Academy of Forensic Sciences, which was rising in stature on the strength of specialties like hair microscopy, bullet-lead analysis, and criminal profiling.

Profiling was especially hot. The FBI's Behavioral Science Unit was going from fringe to mainstream: The profilers there had consulted on fewer than 200 cases in all of the 1970s, but by the middle of the next decade, they were providing hundreds of assists per year. The unit began attracting big personalities. "Where there are stars, there are wannabe stars," says Park Dietz, a forensic psychiatrist who has worked with the BSU. "Those with big egos will often gravitate to those centers of narcissistic glory."

In 1982, Walter became a full member of the AAFS, a powerful credential. That year, for the first time, he would try on his invented persona in a courtroom.

ROBIE DRAKE WAS wearing military fatigues and carrying rifles and hunting knives when he left his home in the Buffalo suburbs. It was just before midnight on December 5, 1981, and the 17-year-old headed to an area of North Tonawanda filled with abandoned vehicles. He took aim at a 1969 Chevy Nova and fired 19 rounds into the passenger-side window. From inside the car, he heard groaning. The location was also a lover's lane, and his bullets had struck Stephen Rosenthal, 18, and Amy Smith, 16. Drake then stabbed Rosenthal in the back. Two police officers on a routine patrol spotted Drake stuffing Smith's body into the trunk of the Nova.

The case appeared open and shut. But the prosecutor, Peter Broderick, saw weaknesses. Drake insisted it had all been a mistake, and his reasons were just plausible enough to imagine holdouts on a jury. The scene had been dark. Drake said he'd shot the car for target practice, thinking it was empty, and panicked when he heard Rosenthal and stabbed him to make the noise stop. However unlikely that sounded, Broderick lacked a clear motive, and intent would be the sole issue separating a murder conviction from a lesser charge of manslaughter. "All I needed was some reasonable explanation for why this

thing happened," Broderick later said.

Broderick suspected Drake's motive was sexual, and he hired Lowell Levine, a forensic odontologist, to testify that faint marks on Smith's body were signs of postmortem biting, which was possible evidence of a sex crime. Levine suggested that to firm up that angle, the prosecutor should bring in another expert—someone he'd recently met at an AAFS conference. Two weeks later, Broderick drove to the airport and picked up Richard Walter.

On the stand at Drake's trial, Walter related an impressive—and fictional—résumé. He falsely claimed that at the L.A. County Medical Examiner's Office, he had reviewed more than 5,000 murder cases. Walter also said he was an adjunct lecturer at Northern Michigan University (he had spoken there informally, possibly just once), wrote criminology papers (he had never published), and had served as an expert witness at hundreds of trials (he'd testified in two known cases—about a simple chain-of-evidence question and in a civil suit against a car company).

Walter told the jury that Drake had committed a particular type of "lust murder" because he was driven by "piquerism," an obscure sadistic impulse to derive sexual pleasure from penetrating people with bullets, knives, and teeth. Drake's attorney told the court that he could not find any expert who had ever heard of piquerism, but the judge denied his request for more time to find a rebuttal psychologist. Drake was convicted of second-degree murder. Back in Michigan, Walter sent Broderick an invoice. For securing two consecutive terms of 20 years to life, his fee was $300.

The trial was the end of Robie Drake's

freedom and the beginning of Walter's new career. He continued testifying in occasional murder trials and inflating his qualifications. By 1987, when he took the stand in *State of Ohio* v. *Richard Haynes*, he held himself out as a superstar in his field, telling the prosecutor he was one of just ten or so criminal profilers trusted by the FBI.

Walter lectured widely, giving speeches like "Lust, Arson and Rape: A Factorial Approach" and "Anger Biting: The Hidden Impulse." Audiences loved his entertaining, wry style. "His story, as many of Richard's, has to be heard from his own mouth," wrote an amused attendee after Walter's presentation at a 1989 conference hosted by the Association of Police Surgeons of Great Britain. "It would lose all by repetition by another."

Walter was about to get a new venue for his theatrics. According to one version of events, it was around this time, at an AAFS convention, that Walter met Frank Bender, an eclectic Philadelphia artist who had begun a sideline in forensic sculpture, reconstructing busts from decomposed bodies. Bender was plugged into the local law-enforcement scene, and he introduced Walter to Bill Fleisher, a Customs agent. At a diner, the three talked about cases until the sun set. Standing on the sidewalk in the cold, they had the idea to organize a bigger confab—a group of law-enforcement professionals who would meet regularly and talk murder over lunch.

"What," Bender asked, "are we going to call our club?"

**THE NAMESAKE OF** the Vidocq Society—which Walter, Bender, and Fleisher established in Philadelphia in 1990—is



**TRUE-CRIME TV LOVED HIM**

Walter on a 2009 episode of A&E's 'Forensic Factor: The Unexpected Perpetrator' discussing a double homicide in Wisconsin.

PHOTOGRAPH: A&E/FORENSIC FACTOR, "THE UNEXPECTED PERPETRATOR," 2009

Eugène-François Vidocq, a 19th-century French criminal turned detective who is considered the father of modern criminology. Some of the club's early members had impressive jobs as Customs agents, IRS investigators, and U.S. marshals, but there were also advocates of dubious fields like polygraphy and statement analysis. Few had extensive experience with homicide. That didn't matter much at first, as the group spent its initial meetings—usually held at Philadelphia restaurants or social clubs—discussing historical cases like the Cleveland "Torso Murders" of the 1930s. But soon the members began taking on more recent unsolved murders in which they might have a shot at catching a killer.

Criminal profiling was becoming a pop-culture sensation, thanks in large part to the 1991 blockbuster *The Silence of the Lambs*,

CBS's *48 Hours* came to a Philadelphia dining hall to watch the Vidocq Society consider the case of Zoia Assur, a 27-year-old who was found dead in the woods of Ocean County, New Jersey. Her fiancé, an ophthalmologist named Ken Andronico, suspected her death was not a suicide but murder, and a friend of Andronico's had approached the organization for help. Fleisher presented the facts and concluded, in a thick Philly accent, "Now, our case begins."

CBS correspondent Richard Schlesinger raced around the room to solicit theories. "Murder or suicide?" he asked club members as they tucked into plates of chicken Marsala. "Murder!" they blurted through full mouths. "We haven't even gotten to dessert yet!" Schlesinger cried with delight. Walter told the camera that Andronico might have been the killer. "He's playing

Others were not so lucky. At the Vidocq Society's April 1992 meeting, a Philadelphia homicide detective named Bob Snyder walked to a podium, opened a thick file, and presented the cold-case murder of Deborah Wilson, an undergraduate at Drexel University who had been killed after working into the night at a computer lab. Waiters served lunch as members viewed photos of the bloody crime scene and her foamy saliva, which indicated strangulation. Afterward, Walter offered an insight: Wilson's sneakers had been removed, indicating that the killer had a foot fetish.

When police later searched the home of David Dickson, a security guard on duty the night of the murder, they found a collection of women's sneakers and foot-fetish pornography. The press called him "Dr. Scholl," and Dickson was charged with murder. In court, his attorney protested that the alleged motive was absurd. "This man is a sneaker sniffer, not a murderer!" he cried. But the prosecutor was Roger King, a powerhouse who claimed to have put more men on death row than anyone else in the history of his office. One jury deadlocked, but King won the retrial. Dickson was sentenced to life in prison.

The Vidocq Society pinned a medal on Snyder, and the club celebrated cracking a major case. But Walter was the real winner. His theory had led to the arrest and conviction. He would cite the case in media interviews for decades.

King died in 2016. Five years later, the Philadelphia *Inquirer* published a major investigation into his tactics, finding that he had routinely manipulated witnesses, withheld exculpatory evidence, and employed jailhouse snitches whose credibility he knew was suspect—including one, John Hall, who testified against Dickson. Hall's wife had helped him fabricate testimony by sending newspaper clippings to him in jail. "Nothing he said was true," she told the *Inquirer*. At least seven of King's murder convictions have been overturned.

Dickson's could be next. In the fall, his attorney filed a petition with the court arguing that King withheld or twisted information critical to Walter's foot-fetish theory, including the possibility that the victim's sneakers may not have been taken from the scene after all.

## A COLD-CASE CLUB GLORIFIED HIM



A Vidocq Society luncheon as seen on a 1992 '48 Hours' episode called "Hard Evidence—Mystery on the Menu." Walter is at right.

which made $272 million and swept the Academy Awards. "It was a very exciting time," says Jana Monroe, an FBI profiler who helped Jodie Foster prepare for her role in the film. "But the FBI didn't like all the media attention." The Vidocq Society moved into the vacuum, quickly notching write-ups in the Philadelphia *Inquirer* and the New York *Times*.

Reporters relished describing the three co-founders: Walter was the chain-smoking genius; Bender was the artist, conspicuous among the suits in T-shirt and jeans; Fleisher was the teddy-bear G-man, prone to tearing up during presentations. Hollywood began calling, as did network TV.

that high-risk game of 'Catch me if you can,'" he said with a smile.

Andronico—who had been more than a thousand miles away in Florida at the time of Assur's death—watched the *48 Hours* episode from his apartment with his mouth agape. Patients began canceling their appointments, and his medical practice was upended for years. He was never charged with a crime. (Retired Ocean County detective James Churchill dismisses the theory and the Vidocq Society's involvement. "They never looked at the file, they never had any statements, they never had any medical records," Churchill says. "I thought it was just preposterous.")

T HE RICHARD WALTER story is not the case of an impostor who goes undetected, one misstep away from being discovered and exposed. Lots of people saw signs; few had incentive to do anything about it. Throughout the 1990s, he continued to

work in the Michigan correction system as a psychologist, and word eventually got around about his profiling sideline. Some found the arrangement comical. "If he's got an international reputation, why is he working in a prison for $10,000 a year?" Hand, his contemporary, says with a laugh.

Many others saw through Walter's act. Retired FBI agent Gregg McCrary recalls that the Behavioral Science Unit once invited Walter to Quantico to ask him questions about inmate behavior. "The narcissism, I think, was obvious. He really thought he knew a lot," McCrary says. The agents learned little, and he was not invited back. "Richard Walter is largely a poseur," McCrary says. "What I say about Richard is he's an expert at being an expert, at playing one and convincing people that he is."

Walter's victims struggled to get anyone to pay attention, even when they caught him in obvious lies. In 1995, Robie Drake still had decades to go on his sentence. From his maximum-security prison in upstate New York, he'd been digging into Walter's résumé on an antiquated computer terminal. He had married a nurse 24 years his senior named Marlene, and she helped, requesting documents and contacting Walter's former employers. They found the various ways in which Walter had perjured himself, but when Drake appealed, a court denied his motion without a hearing.

Marlene then sent the American Academy of Forensic Sciences a 13-page dossier of Walter's inflations and outright falsehoods. Officials at the organization acknowledged in internal memos that Walter had padded his résumé, but they decided to reveal as little as possible about their internal deliberations. "We do have to worry about public appearances," Don Harper Mills, a pathologist who was chairman of the ethics committee, wrote to his colleagues. In a February 1996 letter to Marlene, Mills delivered his verdict in a single paragraph. "Most of the issues do not involve the Academy's Code of Ethics," he wrote. "The Committee has concluded unanimously that there was no misrepresentation and therefore no Code violation."

One reason Walter kept skating by is that defendants like Drake existed in an ethical twilight. He was a guilty man robbed of due process. An expert witness had lied, and he had perhaps spent more of his life in prison than was warranted because of it, but he had killed two teenagers. What was Walter's perjury next to that?

Walter was also galvanized by support from an unimpeachable group: victims' families. He spoke before the Parents of Murdered Children, a nonprofit that offers grief counseling and helps families lobby parole panels against early releases, and later joined the board. At the group's annual conference, he granted private audiences to devastated parents. After years or decades of frustration with police and prosecutors, they appreciated Walter's shared sense of anger, like when he said that some murder suspects should be handled with "seven cents' worth of lead."

Walter knew how to give delicious, cinematic quotes, and he cultivated his eccentricities for journalists and producers. He boasted of subsisting on cigarettes and cheeseburgers. He said that when the time was right, he would "lie down to quite pleasant dreams" using sodium pentothal. He once yelled at a suspect, "I'll chew your dick down so far you won't have enough left to fuck roadkill."

The effect was irresistible. In *A Question of Guilt*, a Nancy Drew and Hardy Boys crossover novel published in 1996, the iconic teen detectives run into one another at a meeting of the Vidocq Society. Filmmakers courted Walter and his co-founders for years, taking them to dine at Le Bec-Fin. Walter told the Binghamton *Press & Sun-Bulletin* that a producer wanted Kevin Spacey to play him in a movie. In 1997, Danny DeVito's Jersey Films purchased the Vidocq creators' story rights in a deal worth as much as $1.3 million. (No film was ever made, Fleisher says, and the founders received a fraction of that amount.)

Money doesn't seem to be what drove Walter. While his lifestyle had some flourishes—he slept in an antique Chinese bed and played Tchaikovsky on a 1926 Chickering grand piano—he mostly lived frugally. He drank bottom-shelf wine and drove a succession of Crown Victorias into the ground.

The relish with which he played the role of a genius profiler points to another, stronger motivation: ego. "He totally cannot be in a social setting where he is not the center of attention," says a longtime Vidocq Society member. At meetings, Walter tended to speak last, rendering his judgment to a roomful of nodding heads. "He's been hyped so much by the leadership in the organization," says the member. "Nobody challenges him." (A spokesperson for the organization disputes this.)

It's difficult to look at Walter's body of work—real or claimed—and not notice some preoccupations. Of the more than 100 papers and presentations listed on his résumé, roughly a quarter pertain to homosexuality or sex crimes. A representative example, "Homosexual Panic and Murder," is a case study based on interviews he conducted with an inmate who had murdered a man and then cut off one of his testicles.

"The homosexual: not really a man," Walter testified once in a murder case. "He is a discount person; therefore, if I need to be great, if I need to satisfy my ego, if I need to satisfy my needs for power, if I need to surmount, if I need to have a demonstration of my power, well, what better way to do it?"

In September 2002, two police officers from Hockley County, Texas, flew to Philadelphia for the society's help in solving a cold case. According to a 2003 account in *Harper's*, during a private meeting after the luncheon, Walter in lurid detail pronounced the Texas murder a case of "homosexual panic"—one man suddenly killing another after a tryst. He and Frank Bender invited the detectives out to dinner, where Walter became increasingly intoxicated, according to the magazine. "They're making a movie about us," Walter said, toasting with his Chardonnay. "Frank's the pervert and I'm the guy with the big dick!"

Walter continued to press his theory. "It seemed like it didn't matter what the case was, he just thought it was some kind of sexual deviancy or homosexuality, which I disagreed with," says one of the Texas officers, Rick Wooton. No arrest has been made in the case. Walter, he says, was no help.

**IN SEPTEMBER 2000,** Walter retired from the Michigan Department of Corrections at 57 and moved to Montrose, a town in

PHOTOGRAPH: CBS NEWS ARCHIVES/48 HOURS, "HARD EVIDENCE—MYSTERY ON THE MENU," 1993

> The **TV correspondent** raced around the dining room, soliciting theories. **"Murder!"** the sleuths blurted through full mouths of **chicken Marsala.**

Pennsylvania with a population of 1,300. "Everyone was falling all over him because of his reputation," says Betty Smith, the former curator of the local historical society. Walter tells neighbors that he came to testify in a murder trial, fell in love with the town, and decided to stay. But two attorneys involved in the case say they don't recall ever meeting him.

Walter took on more freelance work. When he arrived in small towns around America, his presence was front-page news. In at least seven separate cold cases, Walter spoke to local reporters and delivered his catchphrase—a warning to the killer that his arrest was imminent: "Don't buy any green bananas." Walter's work did not lead to arrests in five of those cases. In a sixth, his favored suspect, a Catholic priest, committed suicide, and Walter gleefully claimed credit for his death.

Meanwhile, from his prison cell upstate, Robie Drake persisted in appealing his conviction. In January 2003, he finally got a win. Referring to Walter and his piquerism theory, a federal judge wrote that "the witness was a charlatan" and that "his testimony was, medically speaking, nonsense." In a deposition that July, Walter was evasive as Drake's attorney pressed him on the tasks he performed at the L.A. County Medical Examiner's Office.

"What were you doing?" the attorney asked.

"Good question," Walter replied.

"It's the only question."

By 2009, the Second Circuit decided it had seen enough: Walter had perjured himself with the prosecution's knowledge. The judges ordered a new trial. Prosecutors used a technique for analyzing bullet trajectory to argue that Drake had been closer to the Chevy Nova than initially thought, suggesting he must have known people were inside. In 2010, a jury convicted Drake again. He had exposed Walter as a fraud, but for his troubles the judge extended his original 40-year sentence by an extra decade.

Throughout his career, Walter had benefited from the fractured nature of the American legal system. Especially in the years before digitized records, a public defender in one place suspicious of Walter would have trouble tracking him across jurisdictions. The Second Circuit's ruling was harder to run from. Luckily for Walter, a reputation reset was on the way.

Several years earlier, the author Michael Capuzzo, who had written a best seller on shark attacks, had scored a blockbuster $800,000 advance for a book about the Vidocq Society. *Publisher's Weekly* described it as "a true tale about a mysterious group of skilled detectives who use their skills to solve only the most despicable of crimes, led by a figure who seems to be a contemporary Sherlock Holmes."

Later, another author, Ted Botha, sold a proposal for a book about Frank Bender and his forensic sculptures. He worried about Capuzzo's three-year head start. And yet, as he reported, he never came across anyone who had spoken to Capuzzo. "I was quite amazed," Botha says. "This guy's gotten a wack-load of money, and there doesn't seem to be anything happening." Botha interviewed Walter but got a sense that something was amiss. He confined Walter to a handful of pages when he published his book, *The Girl With the Crooked Nose*, in 2008.

Capuzzo's volume, *The Murder Room*, was published two years later. It was an instant hit and would go on to sell roughly 100,000 copies, despite purple prose that described Walter as "the angel of vengeance" and "the ferryman piloting parents of murdered children through blood tides of woe."

The book repeated and expanded on dozens of falsehoods in Walter's résumé. In the Michigan prison system, he wrote, Walter could shut off hot water and put inmates on a diet of "prison loaf," with three meals a day blended and baked into a tasteless brick. "You will learn to control yourself or I will control you," he allegedly told them. But a

prison spokesman disputes that a psychologist could leverage showers and meals in that way. "Maybe in *Shawshank* or something," he says. "But not in real life."

Walter also claims in the book that Michigan State hired him as an adjunct professor and that he collaborated with the university police to investigate gay twin brothers who fondled football fans without their consent outside Spartan Stadium. But a Michigan State spokesman denies that Walter has ever been employed by the school.

The book repeats Walter's claim to have solved the notorious 1986 murder of Anita Cobby, a former beauty queen who was gang-raped and nearly beheaded in Australia. Detective Ian Kennedy, who led the investigation, tells me he has never heard of Walter. Other supposed feats are stranger still. Capuzzo details the murder of Paul Bernard Allain, whose boss, Antoine LeHavre, brings the case to the Vidocq Society. In a twist, Walter accuses LeHavre of killing Allain himself, the result of a homosexual affair gone awry. But Allain and LeHavre do not seem to appear in any legal or public-record databases. Capuzzo may have changed the names; he or Walter may have made up the whole story.

Bender and Fleisher grumbled to the *Inquirer* that Capuzzo had taken too much creative license. "There are parts of that book I know are not true," Bender said. (He died in July 2011. Fleisher didn't respond to requests for an interview.) But Walter joined Capuzzo on a nationwide book tour. "It's fun to play detective," said NPR host Dave Davies as he described the Vidocq Society on *Fresh Air*. "But they aren't playing."

Walter was in his glory. "There's a price to pay," he told listeners of his macabre life's work. "I'm willing to pay it."

Capuzzo did not respond to requests for comment. He has not written another book, and today he publishes a Substack promoting vaccine conspiracy theories. During a recent podcast appearance, he said that several years ago, he heard a voice in his head say, "I am here. Tell my story."

**BY THE TIME** *The Murder Room* reinvigorated the myth of Richard Walter, a decade had passed since Leah Freeman's murder. In Coquille, the candlelight vigils had grown smaller. Pink JUSTICE FOR LEAH hoodies spent longer intervals in the closet. Leah's father died; her mother, Cory Courtright, regularly posted about the case on the message board Websleuths and interacted with amateur gumshoes, desperate for a break in the case. Nick McGuffin, now 28, had tried to move on.

---

Walter **told the jury** that the defendant was driven by **"piquerism"**—an obscure impulse to derive sexual pleasure from **penetrating people** with bullets, knives, and teeth.

---

## HIS VICTIMS WOULD EXPOSE HIM



Nick McGuffin during the final moments of his trial in 2011.



Robie Drake is escorted into court in 2010.

PHOTOGRAPHS: BENJAMIN BRAYFIELD/THE WORLD (LEFT); NIAGARA GAZETTE (RIGHT).

He'd had a daughter, graduated from culinary school, and become the head banquet chef at a casino in Coos Bay.

Coos County had a new district attorney named Paul Frasier, and he helped Coquille hire its next police chief, Mark Dannels, who committed to reopening the case. Dannels took down the old evidence boxes and assembled a cold-case team. Soon, they were flying to Philadelphia and huddling with Walter. Separately, an ABC producer had an idea: Wouldn't it be gripping television to follow the Vidocq Society in the field? A team from *20/20* shadowed Walter in Coquille as he assisted the investigation of Leah Freeman's murder, and the network built an episode around him and *The Murder Room*.

The killer, Walter told the camera, was "that muscle-flexing, Teutonic kind of braggart who thinks he's John Wayne, who wants to be a bigger man than what he is." He encouraged the police to focus on McGuffin. There was no new physical evidence, but Walter rearranged puzzle pieces that didn't quite fit and crafted his own theory: McGuffin was a jealous boyfriend who hit Leah in the face and dumped her body in the woods.

Cops played tough for *20/20* producers as they tailed McGuffin around town, hoping to provoke him. "In my opinion, he needs to be poked at a little bit," one officer said. Correspondent Jim Avila, who had reported from Beirut and the Gaza Strip, chased McGuffin's car, asking him why he wouldn't talk.

On August 24, 2010, police arrested McGuffin near his home. "Why do they think you did it?" an ABC producer asked

as he was handcuffed in his chef's jacket. "Because they have nothing else to go on and I'm the boyfriend," McGuffin said.

Just what contribution Walter made to the case is now the subject of intense legal scrutiny. Paul Frasier, the district attorney, has insisted in a series of memos that he was suspicious of Walter, learned about the Robie Drake case, and resolved not to rely on him. Yet Walter's fingerprints were all over Frasier's eventual case at trial. In his closing argument, Frasier parroted Walter's entire theory. And Mark Stanoch, who produced the *20/20* segment, worried that the coverage tainted the jury pool. "When you show up in a town of a couple thousand people with cameras, that dynamic can overwhelm the evidence," he says.

In July 2011, a jury found McGuffin not guilty of murder but—by a vote of 10-2—guilty of first-degree manslaughter. He was sent to Snake River Correctional Institution, in eastern Oregon, a notorious facility for violent inmates. He cooked in a prison kitchen and worked on a firefighting crew, cutting fire breaks in 16-hour shifts for $6 a day.

In 2014, Janis Puracal, an Oregon attorney who was starting a branch of the Innocence Project, learned about McGuffin and agreed to represent him. She looked at the time window in which he was said to have murdered Leah and disposed of her body. "It just didn't make sense," she says. Walter's role, she surmised, had been to invent for police and prosecutors a compelling narrative to make up for a lack of evidence. "They don't have a story for Nick," she says. "Walter comes in with 'the story.'"

Puracal hired a DNA expert to reexamine the state crime lab's report. The expert discovered that analysts had found male DNA on Leah's sneaker that did not belong to McGuffin. The information had never been shared with the defense. "I was over the moon," Puracal said. "And then I was pissed." She found more exculpatory evidence: an eyewitness withdrawing cash from a bank who bolstered McGuffin's alibi but whose account (along with a time-stamped ATM receipt) the state had failed to disclose. In November 2019, a circuit-court judge vacated his conviction and ordered a new trial. Frasier moved to dismiss the charges instead. A few hours later, McGuffin walked into the prison kitchen and told his supervisor that he wouldn't make his next shift.

ABC aired a follow-up *20/20* episode celebrating McGuffin's release and examining all the missteps in the case—except its own. When I called Avila, who is now retired, he defended the origi- *(Continued on page 84)*



**The Case of the Fake Sherlock**

CONTINUED FROM PAGE 39

nal report's accuracy but said he deplored the true-crime genre as "one of the lowest forms of journalism."

"My friend, 35 years in network television has destroyed my idealism," he added. "We should all be working for ProPublica. But we're not. Does that make us bad people? I couldn't get a job at *Frontline*. I tried! I couldn't get a job at *60 Minutes*." Avila said the background sheet his producers prepared had no red flags about Walter. Perhaps no one thought to look him up on Wikipedia as they prepared to air the episode that fall. If they had, they would have seen several paragraphs under the heading "The Drake Case."

McGuffin is now suing Walter, the Vidocq Society, and Oregon law enforcement, alleging that the state fabricated evidence, coerced witnesses, and withheld exculpatory information. This past June, Walter connected to a Zoom deposition from a Comfort Inn in Scranton, looking tired. He was recovering from cancer and surgery. One of McGuffin's attorneys, Andrew Lauersdorf, grilled the profiler about his claim that he worked on cases with Scotland Yard. Walter could not recall the name of any inspectors he'd worked with there and appeared not to know that Scotland Yard and the Metropolitan Police are, in fact, the same organization. When asked where Scotland Yard was located, the man who claimed to have visited the agency's offices up to 30 times said he didn't know and then offered "downtown London."

For much of the deposition, Walter spat venom at his oldest friends and allies. He resigned from the Vidocq Society in 2015, saying he no longer trusted certain members. He had quit the board of Parents of Murdered Children because, he said, someone there was embezzling money. (Bev Warnock, the current executive director, says, "I can tell you that is a false allegation.") Michael Capuzzo was "not the most brilliant chronicler I've ever met." Colleagues at the AAFS were "shallow, quite frankly." Eight hours of testimony revealed an increasingly isolated man.

A few months after the deposition, I met McGuffin in Puracal's conference room

in Portland. He was still powerfully built from a decade at the weight pile, but his short hair was flecked with gray. COVID brought another lockdown soon after his release; then his mother was diagnosed with cancer and his father died. McGuffin had gotten a job as a chef at a golf course, earning less than before his arrest. He'd received death threats against himself and his daughter. "My life," he said, "is like a puzzle with the wrong pieces."

For two hours, McGuffin was composed. Then I asked if I could read from Walter's deposition, in which the profiler struggled to recall McGuffin. He'd finally given up and said, "Whatever his name is."

McGuffin's cheeks flushed. "Wow," he said. "It's like I'm a nobody." His face contorted hideously. His body began to tremble, and he excused himself from the room.

McGuffin had imagined all the ways Walter plotted to ruin his life. He'd thought about it while hacking through the Oregon forest with 80 pounds of gear, while slicing onions in a prison kitchen, and while driving through the night after his shift at the golf course to see his teenage daughter. He'd entertained every permutation but the most devastating: that Walter didn't think about him at all.

**T**HERE WAS ANOTHER man whom Walter could not recall during his deposition. "The—I forgot his name," Walter said. "But anyway, the bad guy."

Today, the bad guy, Robie Drake, 58, lives in a trailer park in Dutchess County with Marlene. A court tossed out Drake's second conviction because of "irrelevant and prejudicial" bite-mark evidence. In 2014, facing a third trial, Drake pleaded to reduced charges and was released. After my emails and calls went unanswered, I staked out Drake's home in the fall, and he finally appeared in an old pickup. "It's been hard," he said, when I asked about life after prison. His eyes were wide and wary. He promised to consider a formal interview, but never spoke to me again.

The Vidocq Society still meets regularly, its promise so alluring that even old marks are back for more. In October, prosecutors from Ocean County, New Jersey, traveled to Philadelphia to present a cold case. This is the same office that had deemed the Vidocq Society's investigation into Zoia Assur's death "preposterous."

Walter is still active. In October, he spoke at the North Carolina Homicide Investigators conference. As recently as 2019, he was available for work as a profiler. That year, Joey Laughlin, the sheriff of Fayette County, Indiana, was reinvestigating the 1986 disappearance of Denise Pflum and hired Walter for $3,000. "If

I were the perp," Walter told a newspaper after arriving in the state, "I wouldn't buy any green bananas."

Laughlin had two main suspects, and he played interrogation tapes for Walter. Shortly after the second one began, Laughlin's chief deputy nudged him: Walter was dozing off. When he woke up, he was sure the suspect from the first tape was the murderer.

Pflum's parents were thrilled with Walter's involvement and didn't mind the napping episode. "Old people tend to nod off," David Pflum says. He wasn't aware that Walter had recently called Laughlin with a new theory about Denise's killer.

"I've been thinking," Walter said. "I think it's the dad." He mentioned that to do any more profiling work, he'd need another fee.

"I think we're good," Laughlin said.

Denise Pflum's disappearance remains the great mystery of the town. "Maybe I'm more cynical now," Laughlin told me. "There's not this great person who's waiting in the wings to come save the day."

In December, I drove to Walter's large, well-kept six-bedroom house in Montrose, Pennsylvania. An aging Mercury Grand Marquis sat in the garage, and on his front porch, an American flag was draped across a deck chair. There was no answer when I knocked. I dialed his landline. "I don't trust you, I don't like you, and I will never cooperate with you," he said from inside the house. "You're wasting your time."

I had wondered why Walter hadn't pursued the anonymity of a city, but Montrose has many appeals. Walter is beloved here. He's known for his homemade gingersnap cookies, and the bartender at the County Seat, a dive across from the courthouse, relishes hearing about his true-crime escapades. On a barstool in Montrose, he can fully inhabit the character he created without fear of fact check.

The next morning, as a blizzard descended, I made another attempt at his house, ringing the bell and banging on the door. At that very moment, a few hundred miles away in Philadelphia, Walter's attorneys were filing a new motion in the McGuffin suit. They wanted to quash Janis Puracal's request for internal documents from the American Academy of Forensic Sciences. As a support, they cited memos written by Paul Frasier, the prosecutor in the Leah Freeman case, saying he had not relied on Walter's theories after learning about the Drake case and realizing he couldn't be trusted.

It was a stunning turn. Richard Walter's best legal defense required finally acknowledging the obvious: that anyone with an internet connection should know he is a fraud. ∎

**Attachment 2**

**July 2, 2023 Letter from the Ethics Committee to Mr. Walter**



American Academy of Forensic Sciences
410 N 21st St, Colorado Springs, CO 80904
(719) 636-1100
General office
in ⚬ ▢ ▭

July 2, 2023

Mr. Richard Walter
425 Lake Avenue
Montrose, PA  18801          via email: riwalter@epix.net

RE: AAFS Ethics Committee Complaint # 2023-05

Dear Mr. Walter:

The AAFS Ethics Committee has received a complaint from the Chair of the General Section containing allegations of misconduct on your part. The complainant attached a file containing a *New York* magazine "Intelligencer" article by David Herbert entitled, "The Case of the Fake Sherlock." Copies of the article and the complaint are attached.

Many of the allegations in the article pertain to misconduct that you allegedly committed many years ago, and thus exceed the five-year time limit imposed on our committee by the AAFS Policies and Procedures Manual. A copy of the relevant portion of the Manual is attached.

We were made aware, however, that you gave a deposition in ongoing litigation on June 30, 2022. Any material misstatements in that deposition would fall within our jurisdiction.

We have only recently obtained the transcript of your deposition. Upon review of your sworn testimony, we found several ethically problematic statements made by you (detailed below) for which we request responses.

Among these are the statement on page 58 about your relationship with the FBI Academy in Quantico. You described your first visit to Quantico, and then you state, "from that point on, I would periodically go and give lectures." According to the *New York* article, Retired FBI Special Agent Gregg McCrary stated that you gave one lecture there, failed to impress the audience, and were never invited back. We would appreciate your explanation of this discrepancy along with any documentation supporting your sworn statement.

At page 121 you were asked about your employment by Oklahoma State University. You stated that although you taught one course in each of two semesters, it was a full-time salaried position. According to our information and belief, such a university level employment arrangement would be very unusual. We would appreciate your explanation of this discrepancy along with any documentation supporting your sworn statement.

At page 124 of the deposition, you were asked about a passage from a book called *The Murder Room.* You repeated a story about having control over individual inmate showers and their type of food (referring to "food loafs") to control their behavior. A spokesman for the Michigan State Department of Corrections denied that you had such control. According to the *New York* article the prison spokesman disputes that a psychologist could leverage showers and meals in that way.

Mr. Richard Walter
July 2, 2023
Page 2

"Maybe in Shawshank or something," he says. "But not in real life." We would appreciate your explanation of this discrepancy along with any documentation supporting your sworn statement.

Additionally, we have reviewed your application to rejoin the Academy in 1988 and have a question about your claim on the application regarding your work at the Los Angeles County Medical Examiner's Office (LACME). You stated, "I worked with the Los Angeles Medical Examiner's Office on approximately 8,000 to 10,000 cases." According to the LACME's annual reports, published on their website, the total number of homicides for the LACME during your stated period of employment was approximately 2,900. We would appreciate your explanation of this discrepancy along with any documentation supporting this statement submitted in support of your application for reinstatement.

Also, in your application, you stated you were in a PhD program at Michigan State and that "I am a full-time student at MSU..." When you were asked about this by AAFS Membership Services, in your July 20, 1988 letter entitled "Response to reinstatement questions" you wrote,

> The word "current" in the application was intended to convey the meaning that I was still working on the degree. It was not intended to mean that the degree would be conferred in 1988. For purposes of clarification, the word "current" was intended to be read as "on-going".

Yet in your 2022 deposition at page 80, you were asked "did you at any time pursue or complete coursework toward a doctoral degree?" You answer was, "I thought about it and the answer was I chose not to." Can you explain this apparent discrepancy?

In a letter, dated May 24, 1988, AAFS Membership Services wrote asking for clarification of certain information contained in your CV submitted in support of your reinstatement application.

> Two terms contained in your vita are in need of clarification: "Interphase" and "Maintain with police, attorneys, prosecutors, and staff in dealing and solving crimes;". What is "dealing" crime?

In your July 20, 1988 letter, in response to that request for clarification, you wrote (at p.2) "the line will accurately read, "maintain contact with police, attorneys, prosecutors and forensic staff in solving crimes;".

Yet at pp. 75-76 of your deposition, you stated:

> I was a student professional worker and I worked in the lab. I taught and did some of the paperwork and all these other sorts of things. I would also translate (later corrected to "transport") within the lab down to the autopsy area and I would then have contact with the pathologist, and then periodically, they would ask me, because I had some psychology under my belt, they would ask me, then, for what does this mean and have me come down and look at the victim of the crime, so it was a great learning experience for me.

Mr. Richard Walter
July 2, 2023
Page 2

Also on page 76 of your deposition, the following exchange occurs:

> Line 13:  Q. Okay. So essentially you were a lab runner?
> Line 14:  A. Yeah. Yeah. I worked seven days a week at a low wage, but the experience was worth very much to me.

We are concerned that the apparent discrepancies between the information you supplied in support of you application for reinstatement and your sworn statements in the quoted deposition are in violation of the AAFS Code of Ethics and Conduct with which you agreed to comply by signing your application on January 25, 1988:

"1. Every member of the American Academy of Forensic Sciences shall avoid any material misrepresentation of training, experience, or area of expertise."

The Committee invites you to respond to these allegations. You have 30 business days to do so.

Sincerely,

AAFS ETHICS COMMITTEE


John J. Lentini, Chair

**Attachment 3**

**August 8, 2023 Answer from Respondent**

# RICHARD D. WALTER
### 425 Lake Avenue
### Montrose, Pennsylvania 18801
### riwalter@epix.net

August 8, 2023

John J. Lentini, Chair
AAFS Ethics Committee
American Academy of Forensic Sciences
410 N 21st St.
Colorado Springs, CO 80904
Via email: scientific.fire@yahoo.com

Dear Mr. Lentini,

Thank you for the opportunity to clear the air of the egregious falsehoods in the *New York* magazine story by David Garvey Herbert, "The Case of the Fake Sherlock," which violates long-held journalistic standards of truth-seeking including use of questionable anonymous sources and outright fabrications. As a proud member of the AAFS for more than thirty years, one is eager to answer the Ethics Committee's questions to swiftly resolve this matter. Regarding your questions:

**1. My work with Michigan prisoners.**  Please note that the *New York* magazine story did not "deny" ("to declare (something) to be untrue," *Merriam-Webster*) the truth of my statement about control over inmate showers and food, per the complaint. The magazine "disputed" my statement ("to call into question or cast doubt upon"), using an anonymous source and innuendo ("hint, insinuation…"), including a fact-free allusion to the Hollywood movie *The Shawshank Redemption,* to claim that food loaf in Michigan was "not in real life." The facts are otherwise. (See below, documents 5, 6, 7, 8, and 9, an affidavit and Michigan Department of Corrections (MDOC) Policy Directives on Offender Meals and Food Quality Assurance documenting the permitted use of "food loaf" for unmanageable inmates from 1977 to the present day).

I was the head psychologist at the Michigan Intensive Program Center (MIPC), responsible for the treatment, rehabilitation, and control of the 88 "most dangerous, assaultive, and anti-social convicts in Michigan," for most of my time there (1978-86; see Documents 1 and 2, United Press International, and Document 3, Richard D. Walter CV, p. 1, 2, 3). The use of food loaf was one of many behavioral modification methods to manage highly disruptive inmates. The MICP was the highest maximum-security prison of the MDOC. It was built on the grounds of the old Marquette Branch Prison after deadly prison riots in Jackson and Marquette and the takeover of Marquette prison by violent inmates in 1973.

Unlike other facilities where inmates could freely move around, the MIPC was a modern, high-tech, X-shaped building with a bubble in the center where the guards observed the inmates down each corridor and electronically "controlled their every move," including all lights, music, and showers (Documents 1, 2). As the chief psychologist, I led the treatments in an innovative new behavioral psychology system of rewards and punishments, a cutting-edge treatment at the time initially designed to replace solitary confinement to achieve behavioral improvement.

This occurred in my group therapy and individual therapy sessions with each inmate. They had all proved unmanageable at other state prisons and were extremely violent, including Richard Goodard, who was "the most dangerous convict in Michigan because of the bruises, broken bones, and stab wounds he's inflicted on staff and inmates during 19 years in prison," (Document 4, *Detroit Free Press*), and was convicted of murdering a Marquette guard, stabbing him eight times with a 10-to-12-inch knife. In my role as the treatment administrator of the housing wings, I advised and assisted the medical, treatment, and custody staff about the needs of each prisoner, including psychological evaluations for the parole board. As part of my administrative security duties, I spoke daily with the guards I supervised and participated in restricting showers and assigning food loaf for violent inmates in segregation as a control and behavior modification method for protection of other prisoners and staff. As the MIPC head psychologist and treatment administrator my ability to wield the system's behavioral controls was implicit and well-known to inmates in my therapy sessions even in cases where I did not advise food or shower modifications.

The use of food loaf in Michigan prisons was a well-established practice for decades at MDOC, including the MIPC. (Please see the Document marked "Affidavit 8-9-23[84]", an affidavit from retired MDOC psychologist Ed Bujdos, whose career started in 1981 and overlapped mine, confirming that "the use of Food loaf" for control of troublesome segregation inmates was "a long-term standard policy established long before you and I found employment with the MDOC. When a prisoner acted out…his next meals were a baked loaf of the day's menu: bread, meat, fish, milk, dessert, etc., placed in a mixer, then baked for consumption by the prisoner." In an addendum marked Document 5, Bujdos writes: "all Administrative Segregation units in the state used the "Food Loaf", including Marquette Branch Prison and Ionia Prison." Bujdos attests that "food loaf" for disruptive inmates was an MDOC policy during his entire career (1981-2008), and that a retired MDOC psychologist colleague, Gary Rutledge, said the policy was in place before he was hired in 1977.

Please also see:

- Document 6: an October 1, 2019 MDOC Policy Directive Number 04.07.100 on Offender Meals and Food Quality Assurance that contains policy F: "An offender in segregation or a special management housing unit may be fed food loaf in lieu of his/her regular meals as set forth in PD 04.05.120 "Segregation Standards."

- Document 6a: The above October 1, 2019 Policy Directive Number 04.07.100 on Offender Meals and Food Quality Assurance permitting food loaf with policy F ("An offender in segregation or a special management housing unit may be fed food loaf in lieu of his/her regular meals as set forth in PD 04.05.120 "Segregation Standards") is still

in current effect according to an August 7, 2023 search of MDOC Policy Directives at this Michigan government site: https://www.michigan.gov/corrections/public-information/statistics-and-reports/policy-directives#categories=1f2a451d7ffb4b7c9c5699e362c4bbc5%2004%20Institutional%20Operations. A search of "Offender meals" under the Category "04 Institutional Operations" yields 53 results, of which the 49th is the October 1, 2019 policy directive that has not been superseded: **04.07.100 Offender Meals and Food Quality Assurance**,

- Document 7: This is the June 1, 2019 Policy Directive Number 04.05.120 (superseding a September 27, 2010 Policy Directive) that was superseded by the October 1, 2019 MDOC Policy Directive Number 04.07.100. This June Policy Directive Number 04.05.120 permitted Food Loaf (policy RR) as follows: "A prisoner in segregation may be fed food loaf in lieu of his/her regular meals for engaging in any of the following behavior, unless the prisoner is on a medically prescribed liquid or pureed diet: 1. Misuse of food, serving tray, or eating utensils.  2. Refusing or failing to return uneaten food, the serving tray, dishes, or eating utensils through the door slot.  3. Destroying a serving tray or throwing a tray or food.  4. Using containers to hold or throw other substances, such as water or human waste products."

- Document 8: the March 3, 1988 opinion by U.S. District Court Judge Richard Enslen, Western District of Michigan (U.S. v. State of Mich.), that permitted the continued MDOC use of food loaf despite the attempt by plaintiffs, the U.S. Department of Justice Civil Rights Division and the National Prison Project of the American Civil Liberties Union, to stop it.  The 1988 opinion cites "the Department's Policy Directive number PD-BCF-50.04 (Jan. 1, 1987)," which "provides that: A prisoner housed in segregation may be immediately placed on the food loaf if he or she is observed engaging in any of the following behavior," and quotes the four offending behaviors that were unchanged in the above-mentioned June 2019 Policy Directive Number 04.05.120. The 1988 federal ruling found food loaf constitutionally protected while enjoining the practice as violating due process rights in limited cases when the inmate was found not guilty of the offending behavior. It was cited in subsequent food loaf cases.

- Document 9: A May 15, 2007 report on the landmark 1988 federal ruling, "Michigan Use of Food Loaf Violates Prisoners' Due Process," by *Prison Legal News,* a widely distributed publication of the Human Rights Defense Center.

**2. Employment at Oklahoma State University.** In Document 10, James D. Hess, Vice Provost of Graduate Programs at the Oklahoma State University Center for Health Sciences, which houses the OSU School of Forensic Sciences, confirms my full-time employment as Visiting Professor for the 2015-2016 year. The salary was $87,504 for teaching one course in each of two semesters within the forensic psychology track of the Forensic Sciences Master of Science program. Dr. Robert Allen, chair of the School of Forensic Sciences, recruited me for my expertise in crime scene assessment after "presentations at the American Academy of Forensic Sciences which members of the OSU faculty had attended and determined his expertise would be beneficial to the OSU Forensic Science program."

**3. Relationship with the FBI Academy in Quantico.** My relationship with the FBI was not based on Gregg McCrary, but on my close relationship and investigative and teaching collaborations for thirty years with pioneering FBI Special Agent Robert Ressler, a principal founder of the FBI's Behavioral Science Unit (BSU).

Ressler was the first "FBI profiler" in the bureau's historic effort to join modern psychology to FBI investigations to understand the alarming new American phenomenon of "serial killers," a phrase he was credited with coining. Ressler was author of the 1988 FBI classic *Sexual Homicide: Patterns and Motives* with Ann Burgess and John Douglas after they toured the country interviewing Ted Bundy, David Berkowitz ("Son of Sam"), John Wayne Gacy, Edward Kemper, Richard Speck, and others seeking to understand these human monsters.

In the depth of his research on serial killers in 1983, Ressler heard me present my paper, "Sadistic Acting Out: A Theoretical Model," at the AAFS Annual Meeting in February 1983 in Orlando, Florida. (Document 3, CV, p. 3). Immediately afterward he invited me to come to the FBI Academy at Quantico and lecture to the BSU on the Helix Model I developed to explain the sadist's learning curve that culminated in the most heinous murders.

At that 1983 lecture at the BSU, I met the BSU staff and a group of prominent agents like Roy Hazelwood, who I consulted with often over the years. I returned to lecture at the FBI Academy in Quantico in 1986 on "Bitemarks: Homosexual Murders" during a course on Advanced Homicide Investigation (Document 3, CV, p. 4).

Ressler invited me to return to the FBI Academy and the BSU numerous times to give lectures and attend lectures and discussions with experts like the psychiatrist Robert Hare, the pioneering Canadian researcher on psychopaths. I heard a remarkable talk at the BSU by Chris Sizemore, the multiple personality who was "Eve" in *The Three Faces of Eve*. I lectured at the BSU about my ground-breaking peer-reviewed paper with Robert D. Keppel on four personality types of killers, *Profiling Killers: A Revised Classification Model for Understanding Sexual Murder*, published in the *International Journal of Offender Therapy and Comparative Criminology,* that extended the FBI typology of rape to murder and was applicable to cases including Ted Bundy and the Green River Killer that Keppel investigated.

Current FBI Special Agent Stephen Mooney says an FBI record shows my role in crime assessment history that I repeatedly discussed at the BSU. "It states in the late 1990's, ROBERT KEPPEL and RICHARD WALTER adopted the rapist typologies originally devised by Groth et al (1977) and converted them into homicide categories (Keppel & Walter, 1999)," Mooney wrote in an email (Document 11). "It discusses different categories of rape-murder; power-assertive rape-murder, power-reassurance rape murder, anger-retaliatory rape murder and anger-excitation rape murderer. The report goes on to say KEPPEL and WALTER confirmed these categories by interviewing a group of incarcerated killers in a state prison system."

Ressler and I spoke on profiling and crime scene assessment at the 12th International Meeting of Forensic Services (IAFS) on October 25, 1990 in Adelaide, South Australia. Five days later, we conducted a four-day workshop for the Association of Australasian and Pacific Area Police Medical Officers (Document 3, CV, p. 6). We did a workshop the next year for Police, Police-

4

Surgeons, Psychiatrists, and Psychologists from the United Kingdom at the University of Dundee (Scotland) Medical School, the first of three workshops we conducted there. (CV, p. 6, 8). We did a workshop together for the AAFS on "Deadly Paraphilia's" in New York in February 1997 (CV, p. 9), and another AAFS workshop on February 20, 2001 on "Violent Sexual Offenses-Past & Present A Call for a Multidisciplinary Understanding and Prevention of Fantasy Driven Serial and Sexual Crimes." (CV, p. 10).

Dr. Richard Shepherd, the British forensic pathologist and AAFS member, described in his bestselling 2021 book, *The Seven Ages of Death*, how (contrary to *New York*) I helped solve a case with Scotland Yard, and he wrote,  "Richard Walter was a founding member of the exclusive Vidocq Society…He has also been involved with the FBI analysis of serial murderers. He was and is one of America's foremost forensic psychologists." (Shepherd, Dr. Richard, *The Seven Ages of Death: Britain's Top Forensic Psychologist Reveals the Hidden Lives of the Dead*, p. 74, 75. Published by Penguin Michael Joseph, 2021; Penguin Books, 2022).

Please see Document 11a:  Dr. Shepherd's statement attesting to our lectures together at the Metropolitan Police and his attendance of lectures by me and Ressler. Ressler, like most of the first FBI profilers from my generation, has died. My copy of his book, *Whoever Fights Monsters: My Twenty Years of Tracking Serial Killers for the FBI*, (New York, St. Martin's Press, 1993), is inscribed, "To Richard Walter, my good friend and fellow monster slayer."

**4. Graduate degree.** The June 30, 2022 deposition lasted eight hours. I was extremely fatigued, having recently recovered from a dangerous bout with covid-19. I was also still recovering from recent lung cancer surgery and a post-operation period where I was unconscious for long periods, fed only intravenously including fentanyl for five weeks, lost a lot of weight and nearly died. This caused severe body and mind problems. Finally, after learning to walk again and think correctly, the Oregon deposition was organized. The deposition was remote, with me and my attorney in a hotel room in Scranton, PA being deposed on Zoom by a lawyer in Oregon. I became confused trying to recall exact details at the beginning of my career forty years ago. My attorney and the plaintiff's attorney both suggested smoking breaks for me to gather my energy and compose my memories.

I recall that while working for the Los Angeles County Medical Examiner's Office as a student professional worker, I was first exposed to the AAFS and perceived that many people in the Academy had high degrees. I thought it wise to go to school (Cal State L.A. in Criminology), and began studying for a Phd with Robert Morneau, a professor of criminal justice and former FBI agent. Shortly afterward, the MSU Alumni letter published a job opening as a psychologist in the MDOC at Marquette Prison. Seeing no room for advancement at the coroner's office, I applied and was hired, making a Ph.D unnecessary. I stayed with the MDOC for 21 years. In the intervening decades I have no memory of studying for a terminal degree at MSU, but in any case that is incorrect.

**5. Student professional work at the Los Angeles County Medical Examiner's office.** There is neither discrepancy in my statements nor misrepresentation of my training and expertise. Please see Document 12, a motion for summary judgement filed by an assistant district attorney in Drake v. Portuondo, United States District Court for the Western District of New York, that

contains a statement from Dr. Ernie Griesemer, my direct supervisor in the LA County coroner's office (p. 9-10), describing my work at the coroner's office and concludes "Mr. Walter's Statements Regarding His Experiences At The Los Angeles County Coroner's Office Were Truthful." Document 13 contains the original affidavit from Dr. Griesemer, sent to the AAFS Ethics Committee, describing my duties at the LA County coroner's office in greater detail. (The document includes a subsequent letter from AAFS Ethics Committee Chairman Don Harper Mills clearing me of any material representation or Code violation in the Drake case).

I made it clear in the June 2022 deposition that I worked for two years at the coroner's office in a learning capacity, and it was a "great learning experience for me." One page later in the deposition transcript I repeated that "I was a lab runner" and "I worked seven days a week at a low wage, but the experience was worth very much to me." To have the rare opportunity as a student professional worker to fulfill my lab worker duties yet also "maintain contact with police, attorneys, prosecutors and forensic staff in solving crimes" in one of the busiest ME offices in the country was a turning point in my life, the bridge between my MSU masters in psychology and the start of my career as a prison psychologist at MDOC.

These statements were grossly twisted by *New York*. There is no discrepancy here. My purpose as a student worker was to learn how investigations progressed. Though I did have low level responsibilities such as cleaning glass tubes, as I readily acknowledged in the deposition, the information on the flood of death cases that came into Los Angeles County, including police reports, crime photos, toxicology and pathologist reports, autopsies, and the bodies themselves with wounds I was able to study, went through my hands. This gave me many opportunities to give my opinion to police officers or pathologists, at their request, about criminological, psychological, or forensic matters on cases. In one murder, case, the pathologist asked why I thought a victim had burn marks on both hands; my analysis that they came from holding onto bare wires connected to a generator proved correct.

As Dr. Griesemer wrote (Document 13): "Walter would read through as many of these reports and review items as he could, and he was continually discussing cases with Coroner's staff members and similarly interested people from outside such as police officers, detectives, and insurance investigators. I always had the feeling he was striving to search out the facts and achieve a more complete understanding of underlying circumstances in individual causes of death for specific Coroner's cases. Mr. Walter also attended the periodic case reviews and scientific discussions including Psychological Profiles held by the Corner. He also attended the scientific departmental discussions in meetings of both the Toxicology Section and Forensic Investigations Section of the Coroner's Department. He sought and was sought after for one-on-one discussions with pathologists working on specific cases and presented materials in some of the meetings. He discussed evidence and case details with Toxicologists and with Forensic Science Investigators in the Department."

I made a conservative estimate that "I worked with the Los Angeles Medical Examiner's Office on approximately 8,000 to 10,000 cases." I must correct the Committee's assumption. I worked not only on homicide cases, but on everything that came into the office, including suicides, drug deaths, vehicular accidents, accidental deaths, and deaths by natural causes. We handled about 16,000 cases a year. According to LA County Chief Medical Examiner-Coroner Thomas N.

Naguchi's Biennial Report covering fiscal years 1975-76 and 1976-77, the LACME investigated 31,767 deaths, an average of 15,883.5 cases a year. In his subsequent report for fiscal years 1977-78 and 1978-79 Noguchi reported the LACME investigated 32,868 deaths—an average of 16,434 deaths per year. (See Document 14 for both reports). I was working on a flood of cases for long hours seven days a week for two years and four months during this period, more focused on the fact it was a time of formative growth for me than on counting cases, but Griesemer advised me that a good estimate of my workload, "to be on the safe side," was to cut the caseload approximately in half. I chose to make an even more conservative estimate.

Thank you for your attention to these issues. I look forward to a prompt resolution of the Committee's concerns.

Sincerely,

*Richard D. Walter*

Richard D. Walter

# U.P. center houses worst convicts

MARQUETTE (UPI) — The most dangerous, assaultive and antisocial convicts in Michigan are kept in a super-maximum security facility with a name that makes it sound more like a hospital than a prison.

The Michigan Intensive Program Center is home for 76 to 90 of the toughest of the state's 15,197 inmates.

The center steps in where Five Block, the detention wing at Southern Michigan Prison, and the "snow train," an inmate term for transfer to the Marquette branch prison, fail.

These are the men who are so dangerous, so disruptive that they cannot live in the general prison population without endangering their fellow inmates.

Unique to the United States, the center is a $1.89 million facility with awesome security features.

The sound system which links it with the outside is so powerful it can pick up seagulls in Lake Superior a half mile away.

The building is constructed in an X-shape with a control bubble in the center.

Everything is electronic: doors, lights and music are controlled from the bubble. Prison officials can listen in to each cell.

Unlike the state's other institutions, where inmates can move about most of the day, center residents are controlled in their every move. They flash a sign outside their cells to catch the control bubble's attention, to turn off a light, change piped in music or request a shower.

The cells contain a bed, toilet, sink and table. Catwalks with peepholes run on the floor atop the cells, enabling employees to check on inmates at will.

Some of the center inmates — one killed nine people — are so violent they take their recreation alone under the eye of an armed guard.

"It doesn't make any difference who you let 'em out with — somebody's gonna get hurt," said Deputy Superintendent Joseph Gregorich.

"They love to harass one another."

The gymnasium's punching bag recently was replaced, having been unhinged.

"Because of the aggression it can relieve, it's very popular," said head psychologist Richard Walter.

The facility is divided into four wings. Three represent a different level of progression in the center rehabilitation program and one is for super detention.

Posted in the wings is a handlettered sign of the do's and don't's. Inmates are asked not to curse one another. They rarely follow that instruction, yelling across the hallway and, occasionally, tossing feces and cups of urine on other prisoners.

"You will be treated with as much respect and consideration as you are worthy of," the signs says. "The past is gone forever and cannot be changed. What you do from now on is the most important to both of us."

"It's probably the most controlled environment in the state of Michigan — if not the most controlled," Gregorich said.

Unlike other institutions, inmates eat alone using plastic utensils.

"It's hard to get a good weapon in here," Gregorich said.

Nonetheless, he said inmates have been known to melt plastic tableware into weapons or use steel shoe shanks as knives. One prisoner shaved a rib bone into a weapon.

The center's inmates, shipped in from other institutions, are "out of control," Walter said.

The relative lack of interaction with other people, the isolation, "forces them to start looking at themselves.

The immediate goal isn't to make them good citizens. It is to enable them to function in the prison community and at least temper their behavior.

"It's very significant, to me, whether when they leave here they stab someone or hit them in the face with their fist," Walter said.

The idea is to give the inmates a chance to control their aggression and their violent tendencies.

"We're not here to make angels, not even necessarily to make good citizens, but to make a start on getting them back on the track," Walter said.

The inmates are young, defiant, hostile and immature.

Some will spend the rest of their lives in jail. Others, in two or three years, will fulfill their maximum terms and be released.

"Hopefully," Walter said, "we will give them an opportunity to improve their situation."

The center was opened in 1971 and had an admittedly inauspicious start. A week before it was to be dedicated inmates somehow managed to take over one wing, burning mattresses and jamming the lock system. They were gassed out.

The initial behavior modification program rewarded inmates for positive behavior with tokens, which could be traded in for privileges, such as television time.

That fell into disfavor, however, for several reasons and has all but been replaced.

Moral questions were raised about the propriety of trying to force change on inmates. The token system, critics argued, was tantamount to pushing prisoners into a Pavlovian state, teaching them behavior through immediate rewards.

Plus, Walter said, there was no proof it worked with the type of inmates sent to the center.

The new program includes more intensive and straight talking counseling in which inmates are told their alternatives are slim: either they shape up or they likely will spend the rest of their sentences in segregation.

"If they reject it, that's their package," Walter said rather matter of factly.

Those who accept it carry with them no guarantee of success once they're back in a regular prison.

The new program still is based on progression from wing to wing of the building, but the token economy is minimized.

The average center resident takes six months to climb through the three stages and progress now is gauged more by basic personality changes than by the mere earning of tokens.

# Inmates here too tough for regular prisons

By JOANNA FIRESTONE

MARQUETTE, Mich. (UPI) — The most dangerous, assaultive and antisocial convicts in Michigan are kept in a supermaximum security facility with a name that makes it sound more like a hospital than a prison.

The Michigan Intensive Program Center is home for 70 to 90 of the toughest of the state's 15,197 inmates.

The center steps in where Five Block, the detention wing at Southern Michigan Prison, and the "snow train," an inmate term for transfer to the Marquette branch prison, fail.

These are the men who are so dangerous, so disruptive that they cannot live in the general prison population without endangering their fellow inmates.

The center is a $1.89 million facility with awesome security features. The sound system which links it with the outside is so powerful it can pick up seagulls in Lake Superior a half mile away.

The building is constructed in an X-shape with a control bubble in the center. Everything is electronic: doors,

lights and music are controlled from the bubble. Prison officials can listen in to each cell.

Unlike Michigan's other institutions, where inmates can move about most of the day, center residents are controlled in their every move. They flash a sign outside their cells to catch the control bubble's attention, to turn off a light, change piped in music or request a shower.

The cells contain a bed, toilet, sink and table. Catwalks with peepholes run on the floor atop the cells, enabling employees to check on inmates at will.

Some of the inmates — one killed nine people — are so violent they take their recreation alone under the eye of an armed guard.

"It doesn't make any difference who you let 'em out with — somebody's gonna get hurt," said Deputy Superintendent Joseph Gregorich. "They love to harass one another."

The gymnasium's punching bag recently was replaced, having been unhinged.

"Because of the aggression it can relieve, it's very popular," said head

psychologist Richard Walter.

The facility is divided into four wings. Three represent a different level of progression in the center rehabilitation program and one is for super detention.

Posted in the wings is a handlettered sign of the do's and don't's.

Inmates are asked not to curse one another. They rarely follow that instruction, yelling across the hallway and, occasionally, tossing feces and cups of urine on other prisoners.

"You will be treated with as much respect and consideration as you are worthy of," the signs says. "The past is gone forever and cannot be changed. What you do from now on is the most important to both of us."

Gregorich said the prison probably is "the most controlled environment in the state of Michigan — if not the most controlled." Unlike other institutions, inmates eat alone, using plastic utensils.

"It's hard to get a good weapon in here," Gregorich said.

Nonetheless, he said, inmates have been known to melt plastic tableware

into weapons or use steel shoe shanks as knives. One prisoner shaved a rib bone into a weapon.

The center's inmates, shipped in from other institutions, are "out of control," Walter said. The relative lack of interaction with other people, the isolation, "forces them to start looking at themselves."

The immediate goal isn't to make them good citizens. It is to enable them to function in the prison community and at least temper their behavior.

"It's very significant, to me, whether when they leave here they stab someone or hit them in the face with their fist," Walter said.

The idea is to give the inmates a chance to control their aggression and their violent tendencies.

"We're not here to make angels, not even necessarily to make good citizens, but to make a start on getting them back on the track," Walter said.

The inmates are young, defiant, hostile and immature.

Some will spend the rest of their lives in jail. Others, in two or three years, will fulfill their maximum terms and be

released.

"Hopefully," Walter said, "we will give them an opportunity to improve their situation."

The center was opened in 1973 and had an admittedly inauspicious start. A week before it was to be dedicated inmates somehow managed to take over one wing, burning mattresses and jamming the lock system. They were gassed out.

The initial behavior modification program rewarded inmates for positive behavior with tokens, which could be traded in for privileges, such as television time. That fell into disfavor, however, for several reasons and has all but been replaced.

Moral questions were raised about the propriety of trying to force change on inmates. The token system, critics argued, was tantamount to pushing prisoners into a Pavlovian state, teaching them behavior through immediate rewards.

Plus, Walter said, there was no proof it worked with the type of inmates sent

to the center.

The new program includes more intensive and straight-talking counseling in which inmates are told their alternatives are slim — either they shape up or they likely will spend the rest of their sentences in segregation.

"If they reject it, that's their package," Walter said rather matter of factly.

Those who accept it carry with them no guarantee of success once they're back in a regular prison.

The new program still is based on progression from wing to wing of the building, but the token economy is minimized.

The average center resident takes six months to climb through the three stages and progress now is gauged more by basic personality changes than by the mere earning of tokens.

Are they mentally ill?

Walter took a deep breath and paused for a long time before answering.

"We transfer out the active psychotics," he said. "I would prefer to call it extreme curricuous in living."

**NEWSPAPER**ARCHIVE

**Fairfield Ledger**, May 07, 1979 Pg. 4, Fairfield, Iowa, US
https://newspaperarchive.com/fairfield-ledger-may-07-1979-p-4/

1

## *PROFESSIONAL VITAE*

Richard D. Walter
425 Lake Avenue
Montrose, Pennsylvania 18801
Email: riwalter@epix.net

*Experience:*

**Present Employment:**

**1-1-17 to Present:** Richard D. Walter, LTD., A Pennsylvania Limited Liability Company. Crime Assessment, Consultant, Lecturer and Trainer.

**1-1-17 to Present:** The Sherry Black Educational Foundation, Salt Lake City, Utah. Consultant and Lecturer for Peace Officers.

**8-1-15 to 8-31-16:** Scholar-in-Residence, Oklahoma State University, Department of Forensic Sciences Graduate Program in Tulsa, Oklahoma.

**2000 to 8-1-15:** Private consultation for Crime Assessment, Profiling, Risk Assessment, and Teaching.

**6-1-1995 to 2000 (Retired):** Forensic Psychologist, Department of Police and Public Safety, Michigan State University, East Lansing, Michigan.

**9/8/86 to 9-1-2000 (Retired)** Transferred from Michigan Intensive Program Center to State Prison of Southern Michigan on September 8, 1986: Conducted intake psychological evaluations for new prisoners processing into the prison system;
- Provide emergency clinical contact services;
- Provide Clinical Psychological Services for the Administrative Segregation/Detention prisoners who have serious behavioral and/or mental disorders

**5/78 to 9/86:** The Michigan Intensive Program Center was a Maximum-Security prison designed to house severe character and personality disordered prisoners with assaultive and violent behavioral histories.

The Psychologist duties include:

- Serve as Treatment Administrator of housing wings and etc.
- Conduct psychological interviews and prepare reports of pertinent diagnostic materials. Advise and assist medical, treatment and custody staff relative to the needs of the

2

prisoner;

♦

Establish, conduct and coordinate ongoing individual and group therapy for assaultive and sexual offenders prepare reports (socio-psychiatric, pre-admission and terminal reports) and letters in the performance of duties described in the M.I.P.C. total treatment plan;

- Prepare clinical evaluations for the Parole Board as to the psychological prognosis of the prisoner

**Previous Experience:**   Los Angeles County Medical Examiner, 1104 North Mission Road, Los Angeles, California 90033.

**12/75 to 4/78:**  As a student professional worker for the Coroner's Office, the duties were identified, as follows:

- Interphase technical laboratory reports to the appropriate person or agency;
- Maintain contact with police, attorneys, prosecutors and forensic staff in dealing and solving crimes;
- Prepare socio/psychological opinions to aid the pathologist in moding cause of deaths;
- Present in-service seminars to the pathologists on related topics (i.e., suicide, sexual perversion, sadism, and etc.).

**Ancillary Professional Activities:**

- Australian Police Agencies - Case consultations and reviews
- British Police Agencies - Case consultations and reviews
- Governmental Law Enforcement Agencies - Case consultations.
- Michigan Department of Social Services, Child Protective Services - Case Consultations (Past)
- Michigan State Police - Case advisory discussions and in-service lectures (Past).
- U.S. Air Force - Case reviews and in-service lectures (Past).
- Parents of Murder Children/National Board of Trustee's (1/98 to 12/02).

**Education:** Master of Arts, Educational Psychology, Michigan State University.

3

**Licensure:** State of Michigan, Board of Psychology, Psychologist Limited License
Number: 2019359.

**Professional Memberships:**

The American Academy of Forensic Sciences, Fellow
The Association of Police-Surgeons of Great Britain, Honorary Member
Royal Society of Medicine/Clinical Forensic Medicine, Fellow
The Vidocq Society/ Charter Member and Co-founder (Resigned 12-31-16.)
Australasian College of Biomedical Scientists, Fellow

**Professional Papers:**

"Some Observations on the Expert Witness", presented at the AAFS, 1981 Annual Meeting,
General Section.

"Sadistic Acting Out: A Theoretical Model", presented at the AAFS, 1983 Annual Meeting,
Psychiatry Division, Orlando, Florida.

"Sex by Murder - A Forensic Quagmire", The Expert and the Law, August, 1982.

"The Sexual Psychopath in Prison", presented at the 2nd World Congress on Prison Health Care,
Ottawa, Canada, 1983.

"Breaking and Entering: A Primer to Rape", The Police Surgeon, Journal of the Association of
Police Surgeons of Great Britain, Number 24, November, 1983, pp.29-37.

"An Examination of the Psychological Aspects of Bite Marks", The American Journal of Forensic
Medicine and Pathology, Volume 5, Number 1, March, 1984, pp.25-29. Also, it was presented at the
AAFS 1982 Annual meeting in the Odontology Section. In addition, it was presented at the First
Inter-American Congress of Forensic Sciences, November, 1982, Odontology Section, Association
of Police Surgeons of Great Britain, 32nd Annual Conference, and May, 1983.

"A Hungry Violence: Meanness and Murder", published in The Police Surgeon, Journal of the
Association of Police Surgeons of Great Britain, Number 25, April, 1984, pp. 21-24. Also it was
presented at the AAFS, 1983 Annual Meeting, and General Section.

"Strangulation in the Medical Model", presented at the 10th Triennial Meeting of the International
Association of Forensic Sciences, Oxford, and September, 1984.

4

Case Consultation with British Arson Investigators concerning a house burning and 23 individual arson/murder cases, while attending IAFS Meeting, Oxford, September, 1984.


"Sex Crimes: Religion and Recidivism", published in The Police Surgeon, Journal of the Association of Police Surgeons of Great Britain, Number 26, November, 1984, pp. 39-43. Also, it was presented at the AAFS, 1983 Annual Meeting, and General Section.

"Sex Murders: Motivations, Intentions and Secondary Mechanisms", The Police Surgeon, Journal of the Association of Police Surgeons of Great Britain, Number 27, April, 1985, pp. 61-71. Presented at the 10th Triennial Meeting of the International Association of Forensic Sciences, Oxford, and September, 1984.

"Lust, Arson and Rape: A Factorial Approach", The Police Surgeon, Journal of the Association of Police Surgeons of Great Britain, Number 27, April, 1985, pp. 16-21. Presented at the 10th Triennial Meeting of the International Association of Forensic Sciences, Oxford, and September, 1984.

"Homosexual Panic and Murder", The American Journal of Forensic Medicine and Pathology, Volume 6, Number 1, September, 1985.

"Anger Biting: The Hidden Impulse", The American Journal of Forensic Medicine and Pathology, Volume 6, Number 1, September 1985.

Case Consultation with Michigan State Police concerning a series of church related fires. Negaunee Post, 1985.

Crime Scene Assessment and profile of victim and intended victim in a planned arson murder - gone awry, Michigan State Police, Gladwin Post, 1985.

"Sex Murders: The Dilemma in Some Crime Scene Evidence", presented to the meeting of the Australian Forensic Society, February 7, 1986.

Case Consultation with Australian Arson Investigators concerning an issue of arson in an attempt to cover a mass murder scene, while attending the meeting of the Australian Forensic Society, Melbourne, and February, 1986.

"Self-Mutilative Behavior: Suicidal and Non-Suicidal Types". Presented to the Australian and Pacific Area Police Medical Officers at the Fifth Biennial Meeting and Conference, February 12, 1986.


"Bitemarks: Homosexual Murders", presented at a course for Advanced Homicide Investigation, FBI Academy, Quantico, Virginia, 1986.

Case Consultation with Michigan State Police concerning a series of arson fires committed in a

5

circle area, Negaunee Post, 1986.

"Homosexual Murders", presented at the 11th Meeting of the International Association of Forensic Sciences, Vancouver, and August 7, 1987.

"Sadism: Selecting the Victim", presented at the First World Meeting of Police Surgeons and Police Medical Officers, August 10, 1987.

"The Functional Fantasy for Murder", presented at the First World Meeting of Police Surgeons and Medical Officers, August 13, 1987.

"Forensic Psychology", speech to the local members of British Medical Society and In-Service Training for local Forensic Physicians, Stroke-on-Trent, United Kingdom, May 11, 1988.

"Personality Profiling", co-presentation with Professor Derrick Pounder and Dr. Peter Franklin at the Association of Police Surgeons of Great Britain, Cardiff, Wales, May 13, 1988.

Consultations with psychologists from the Hong Kong Police Department and Hong Kong prison system, Hong Kong, May 16-20, 1988.

"Arson: Who Burns and Destroys with Design?" Proceedings presented to the meeting of the Australian Forensic Society, May 24, 1988.

"Offender Programming", presented a one-day training program for Queensland Department of Corrections, Brisbane, Australian, and May 30, 1988.

"Justifying Murder through Beasties, Brutes and Braggarts", presented to the Australian and Pacific Area Police Medical Officers, Sixth Biennial Meeting and Conference, Gold Coast, Australia, June 1, 1988.

A three day in-service training program at the Federal Police College, Canberra, Australia, June 3-6, 1988.

"Psychology of Homicide: Motivation/Investigation", presented at the Colonel Henry F. Williams Homicide Seminar - 1988 hosted by New York State Police, Thomas A. Constantine, Superintendent, Albany, New York, October 5, 1988.

"Why call it a Sex Offense?" presented at the Michigan sponsored National Conference, the Mental Health Strategy: Partnerships for the 1990's, held in Cobo Hall, Detroit, Michigan, October 18, 1988.

"Comparing American and British Trends in Violent Crime", presented at the Association of Police-Surgeons of Great Britain, Scotland, and May, 1989.

6

"Forensic Profiling: Reclaiming Old Shadows", co-presented with Frank Bender at the AAFS, 1990, Annual Meeting, Odontology Section.

"Murdered with a Hidden Clue for Identity", presented at the AAFS, 1990, Annual Meeting, Odontology Section.

"Wilding" and "Satanism vs. Sadistic Acting-Out", presented at "Youth Crime and Leisure Time: Making the Connection", United Community Services of Metropolitan Detroit, April 18, 1990.

Crime Assessment and Profile of Arsonist Florencia Gooding, prepared for "America's Most Wanted", Washington, D.C., 1990.

"Psychological Aspects of Autoerotic Death in Contrast to Accidental Fatal Munchausen's Syndrome". Unpublished. Presented at the Association of Police-Surgeons of Great Britain, Peterborough, England, and May, 1990.

"Personality Profiling", co-presentation with Robert Ressler at the 12th International Meeting of Forensic Services (IAFS) in Adelaide, South Australia, October 25, 1990.

"Criminal Personality Profiles and Crime Scene Assessment", a 4-day workshop from October 30th through November 2nd, 1990 sponsored by the Association of Australasian and Pacific Area Police Medical Officers. During this time, a joint session was presented with Robert Ressler and Frank Bender.

"Forensic Evidence and Bitemarks", presented at the Association of Australasian and Pacific Area Police Medical Officers Seventh Biennial Meeting/World Police Medical Officers Second International Conference in Auckland, New Zealand, November 8th, 1990.

"Satanism vs. Sadism", presented to the Michigan Constables and Court Officers: Winter Conference and Training Seminar, Michigan State University, East Lansing, Michigan, December 8, 1990.

"Cults in Parks", presented to the Parks and Recreation Law Enforcement Institute, Michigan State University, East Lansing, Michigan, February 15, 1991
.

"Criminal Personality Profiling and Crime Scene Assessment", a joint 4-day course co-presented with Robert Ressler for Police, Police-Surgeons, Psychiatrists, Psychologists from the United Kingdom at Ninewells Hospital, University of Dundee, Medical School, Dundee, Scotland, May 6-10, 1991.

"Psychological Profiling: Case Assessments", a lecture presented to the Tayside Medicolegal Society in Dundee, Scotland, May 8, 1991.

7

"Asphixial Deaths: A Case Presentation". Presented to the British Police-Surgeons Annual Meeting, Torquay, England, May 16, 1991.

"Profiling the Arsonist", presented to the Wisconsin Chapter of the International Association of Arson Investigators at Stevens Point, Wisconsin, June 6, 1991.

"Psychological Profiling: Tattletales of the Past, Present and Future", Co-presented with Frank Bender at the Masters 4 Advanced Death Investigation Conference, St. Louis, Missouri, July 25, 1991.

"Crime Assessment and Profile of murderer and arsonist William Bradford Bishop, Jr.", developed for the television show "America's Most Wanted", Washington, D.C., 1991.

Emergency Medical Supervisors - 3 hours Round Robin In-Service Training - Crime Scene analysis and Psychological Implications, Higgins Lake, Michigan, October, 1991.

Written opinion to the Court on a case of Munchausen Syndrome by Proxy, Seattle, Washington, and October, 1991.

"Crime Assessment", presented a 3-hour course for the Park and Recreation Law Enforcement Institute (MSU), February, 1992.

Crime Assessment for the New Zealand Police Force, February, 1992.

Testimony in Rogemore vs. Ohio - Rape - Manslaughter, Columbus, Ohio, March, 1992.

"Review and assessment of a British Murder Case", *the opinion was issued after the British Police Agency came to the U.S. and discussed the matter on ember 1991. The final opinion was issued in March, 1992.*

"Consultation and Visit", delivered at The University of London's Guy's Hospital - Forensic Division London, May, 1992.

Privileged visit at Scotland Yard (London), May, 1992.

"Psychiatric Problems Caused by Cessation of Medication", presented to the British Association of Police Surgeons 41st Annual Conference, Newcastle, England, and May, 1992.

"Profiling Arson, Murder and Mayhem", presented to the Parks and Recreation Law Enforcement Institute, Michigan State University, East Lansing, Michigan, March, 1992.

"Use and Misuse of Psychotropic Medications in a Prison Environment", presented to the British Police Surgeons Annual Meeting, Newcastle, England, and May 22, 1992.

8

"Criminal Personality Profiling and Crime Scene Assessment", a joint 5-day course with Robert Ressler presented to police, police-surgeons, psychiatrist, and psychologists at Ninewells Hospital, University of Dundee, Medical School, Dundee, Scotland, and May 25-29, 1992.

"Rape Profiles" and "Profile of Jack the Ripper", presented at the Association of Australasian and Pacific Area Police Medical Officer Biennial Meeting, Hong Kong, October 22-28, 1992.

"Crime Assessment and Profiling", a 3-day course for police officers and probation workers, Department of Criminal Justice, Delta Community College, Saginaw, December 1992; January, March 1993.

"Sadism vs. Satanism", presented to the Parks and Recreation Law Enforcement Institute, Michigan State University, East Lansing, Michigan, February 24, 1993.

"Criminal Personality Profiling and Crime Scene Assessment", a 5-day course with Robert Ressler presented to police, police surgeons, psychiatrists, psychologists at Ninewells Hospital, University of Dundee, Medical School, Dundee Scotland, May 17-21, 1993.

"Crime Scene Assessment", presented to the Metropolitan Police and Associates, London, England, August 31, 1993.

"The Role of Fantasy in Violent Crime", presented at World Police Medical Officer's Association of Police Surgeons Conference in Clinical Forensic Medicine. The Majestic, Harrogate, England, 2nd - 6th September 1993.

"Women Who Kill". Presented to Association of Police Surgeons, 43rd Annual Conference, Bournemouth, England, and May 20, 1994.

"Interview and Interrogation of Violent Sexual Offenders", sponsored by Delta Community College, Michigan State Police, Michigan Association of Polygraph Examiners, May 2-3, 1995.

"Crime Scene Assessment", presented to the Metropolitan Police and Associates, London, England, May 17, 1995.

"Abused and Happy", presented at Breakfast Seminar, Association of Police Surgeons, Annual Conference, Bristol, England, and May 20, 1995.

"Criminal Personality Profiling", an eight hour training course for individuals working within Forensic Sciences. Sponsored by Pacific Northwest Forensic Studies, Eugene, Oregon, and June 23, 1995.

"Unsolved Cases", presented at Parents of Murdered Children, Inc., POMC 9th National Conference, Detroit, Michigan, and August 18, 1995.

"Three Suicides in a Country Town", a joint case presentation with Dr. William Ryan, The

9

Association of Australasian and Pacific Area Police Medical Officers, Triennial Conference, Darwin, Northern Territory, Australia, August 22, 1995.

"Psychological Profiling and Crime Scene Assessment", an eight-hour training course for individuals working in law enforcement, and related fields. Sponsored by JMA Forensics, Columbia, South Carolina, and September 19, 1995.

"Psychology of Fire-Setting", presented at Conference for Fire and Explosion Investigation, University of Dundee, Dundee, Scotland, October 5, 1995.

"Deadly Paraphilia's", a Joint 8-hour workshop presentation with Wade C. Myers, M.D., and Robert Ressler at the American Academy of Forensic Sciences Meeting, New York, New York, February 17-22, 1997.

"Crime Scene Analysis and Investigation Course", presented with Robert D. Keppel, Ph.D, Julian Boon, Ph.D., Richard Badcock, M.D., at St. George's Hospital Medical School, London, England, and September 22-24, 1997.

"Interpreting the Calling Cards of Signature Killers", p joint 8-hour workshop presentation with Robert D. Keppel, Ph.D., American Academy of Forensic Sciences, San Francisco, California, February 9, 1998.

"Crime Assessment ", presented at the Serial/Sexual Predator Conference, Michigan State University, East Lansing, Michigan, April 1-3, 1988.

"Serial Murders in Nowra, Australia", a joint presentation with Bill Ryan, M.D., Sixth Cross Channel Conference in Clinical Forensic Medicine, United Kingdom, May 15, 1998.

"Pennsylvania State Police Investigator's Course on Basic Homicide Investigation and Signature Murders", presented as a Visiting Lecturer with Robert D. Keppel, Ph.D., Two Days, September, 1998.

"Crime Assessment of the Jack the Ripper Case", presented at the Australasian College of Biomedical Scientists, Sydney, Australia, and October 16, 1998.

"Crime Assessment and Profiling", presented at the Hong Kong Medical/Legal Society, October 22, 1998.

"Auto-Eroticism: The Infectious Fantasy", presented at The Fifth International Conference in Clinical Forensic Medicine of the World Police Medical Officers, Vancouver, Canada, August 16-20, 1999.

IACP, 1999, Victims Summit, Planning Sessions for Working Document, 9-30-99 and 10-1-99, is pending publication by IACP.

10

"Crime Scene Assessment Seminar", Sponsored by the Susquehanna County Coroner for area Coroner's, Medical Examiners, Detectives, and Emergency Medical Technician's, Co-Presented with Robert Stoud, October 7, 1999.

"Crime Scene Assessment", A Three-Day Training Course, Multiple Presenter's, Sponsored by The Vidocq Society for Philadelphia Area Law Enforcement Personnel, October 19-22, 1999.

Keppel, R.D., & Walter, R.D. (1999) Profiling Killers: A Revised Classification Model for Understanding Sexual Murder. *International Journal of Offender Therapy and Comparative Criminology*, 43 (4), 417-437.

 "Psychopaths, presented at the Association of Police Surgeons, 49th Annual Conference, Peebles, Scotland, May 11-13, 2000.

"Profiling Killers: A revised Classification Model for Understanding Sexual Murder and Case Illustration and Meta-Sadism versus Clinical Sadism", presented to The CrimTrac 15th International Symposium on the Forensic Sciences, Gold Coast, Queensland, Australia, March 5-10, 2000.

"Crime Scene Assessment and Evidence", presented to the New Jersey Division of the International Association for Identification, 14th Annual Educational Conference, Cape May, New Jersey, and October 24th, 2000.

"Violent Sexual Offenses-Past & Present A Call for a Multidisciplinary Understanding and Prevention of Fantasy Driven Serial and Sexual Crimes". The participants of the day workshop included: Robert K. Ressler, Ronald Angelone, Robert Keppel, Reid Meloy, and Richard Walter. This presentation was before the American Academy of Forensic Sciences on February 20, 2001.

"Crime Assessment and Profiling", presented to Northeast Homicide Conference in Green Bay Wisconsin on March 14, 2001.

"Jack the Ripper Case", presented to the New York Society of Forensic Dentistry at the Medical Examiners Office in New York City, May 12th, 2001.

"Crime Scene Assessment and Personality Profiling", presented to the Nebraska LECC conference in Kearney, Nebraska on May 17, 2001.

"Teaching Inmate Risk Assessment, Preventing Suicide and Self-Mutilation", this two-day program was presented at four Michigan Prisons, Kinross Correctional Facility, Newberry Correctional Facility, Marquette Branch Prison, and Baraga Correctional Facility, June 4th-13th, 2001.

"Crime Assessment and Criminal Profiling", a two-day program presented to Brazoria County Peace Officers Association, August 16-17. 2001, Lake Jackson, Texas.

"Crime Scene Analysis for Serial and Sexual Murders", a two-day Cold Case Homicide Seminar presented The Vidocq Society sponsored by the Kentucky Association of Chiefs of Police, The

11

regional Organized Crime Information Center and U.S. Attorneys' Offices for the Eastern and Western Districts of Kentucky. December 13 and 14, 2001

"Justice Delayed". A Public Forum-Panel Discussion with Richard Walter, Session Chair, John Laycock, Assistant Commissioner of NSW Police, Chris Maxwell, Deputy Senior Crown Prosecutor, NSW, Dr. Rod Milton, Forensic Psychiatrist, NSW, Martha Jabour, Homicide Victim Support Group, NSW, Corporal Robert Stoud, Pennsylvania State Police, and Corporal Howard Sheppard, Pennsylvania State Police. The Session was part of THE Sixth International Conference in Clinical Forensic Medicine of the World Police Medical Officers in Sydney Australia on 17-22 March 2002.

"Profiling", Richard Walter, Corporal Robert Stoud, Pennsylvania State Police, and Corporal Howard Sheppard, Pennsylvania State Police presented this 3-Day Training Course, University of Hong Kong, Centre for Criminology, 25-27 March 2002.

"What is new in Crime Assessment and Profiling", presented to the Hong Kong Medical/Legal Society on 27 March 2002.

"Crime Analysis and Profiling-Part Me", presented to the Philadelphia Prosecutor's Office for CLE Training on July 25, 2002.

"Criminal Case Studies", presented with Frank Bender, Forensic Sculptor, to the Federal Bureau of Prisons-Case Management Coordinator National Training Program, Chicago Hilton Hotel, and August 6, 2002.

"Crime Assessment", presented at the two-day Vidocq Society Seminar, Office of the Medical Examiner, Wilmington, Delaware, on September 23, 2002.

"Crime Assessment-Part II", presented to the Philadelphia Prosecutor's Office for CLE Training on November 25, 2002.

"Meta-Sadism vs. Clinical Sadism", presented at the AAFS Meetings, 55th Annual Meeting, Chicago, Illinois, on February 20th, 2003.

"Crime Assessment and Profiling", the 4-hour lecture was presented to the NSW Police Service, Sydney, Australia, on March 25th, 2003.

"Understanding of Patterns and Motives of Violent Sexual Offenders", the 8-hour workshop was presented at the 3rd European Academy of Forensic Science Meeting, Istanbul, Turkey, on September 23rd, 2003.

"The Killing Room: Gathering Evidence of Fatal Blood Loss". This Academy-Wide Luncheon speech was presented at the 3rd European Academy of Forensic Science Meeting, Istanbul, Turkey, on September 25, 2003.

12

"Meta-Sadism vs. Clinical Sadism", presented at the 3rd European Academy of Forensic Science Meeting, Istanbul, Turkey, on September 26th, 2003.

"Crime Assessment and Cold Cases", presented a 4-hour presentation within the Vidocq Society 3 Day Training for Law Enforcement, sponsored by VOCAL, in Birmingham, Alabama, April 20, 2004.

"Letter from America". Presented a recently solved Cold Case Murder, at the 53rd AFP Annual Conference, Dublin, Ireland, and May 14th, 2004.

"Crime Assessment and Profiling". The 4-hour presentation was given within the 3-Day lecture series "Cold Case Homicide Investigations" by the Vidocq Society and sponsored by the Department of Justice and Ocean County Prosecutors Office, Toms River, New Jersey, October 6, 2004.

"Crime Assessment". The 3-hour presentation was given within the 1-day lecture and 2-day working series "old Case Homicide Investigation by the Vidocq Society and sponsored by V.O.C.A.L., Montgomery, Alabama, April 12-13, 2005.

"Jack the Ripper". A lecture presented, within a 1-day special conference, to the Royal Society of Medicine-Clinical Forensic & Legal Medicine Section, London, England, June 16th, 2005.

"Language of Police and Crime, Pre-Crime, Crime and Post-Crime Systems and Profiling Killers", this 4-hour presentation was given within the 4-day Homicide 2005 Conference that was sponsored by the Arizona Homicide Investigators Association and Rocky Mountain Information Network, Tucson, Arizona, June 20-23, 2005.

"Wrongful Convictions, DNA database, and Forensic Evidence", a 4-hour panel discussion including 8 experts, at the 17th meeting of the International Association of Forensic Sciences, Hong Kong, August 22nd, 2005.

"Inside the Criminal Mind", a two hour presentation to the Pennsylvania Association of Licensed Investigators Meeting, Carlisle, Pennsylvania, October 11th, 2005.

"Crime Assessment", a 4-hour presentation at a 3-day presentation by the Vidocq Society to Homicide Investigator's in Reading, Pennsylvania on June 5th-7th, 2006.

"Mental Illness versus Criminal Cleverness", a two hour presentation at The 19th Annual New York State Police Col. Henry F. Williams Homicide Seminar, Albany, New York, September 16-21, 2006.

"Crime Assessment", a 3-hour presentation and two days of case consultation at The Henry C, Lee Institute of Forensic Science, University of New Haven, New Haven, Connecticut, March 14-16th , 2007.

13

"Crime Assessment", a 6-hour presentation and two days of case consultation at The Henry C. Lee Institute of Forensic Science, University of New Haven, New Haven, Connecticut, March 11-14, 2008.

"Crime Assessment", a two-day presentation for the Wyoming Investigators Association, Cody, Wyoming, May 5th and 6th, 2008.

"Bizarre Sex Cases", a two-day presentation at The Henry C. Lee Institute of Forensic Science, University of New Haven, New Haven, Connecticut, March 8th and 9th, 2008.

"Mental Illness Versus Criminal Cleverness", a keynote address at the 4th International Summer Conference: Research in Forensic Psychiatry, Regensburg, Germany, June 19-21, 2008.

"Criminal Analysis of Sexual Crimes", a 4-hour lecture for the Pennsylvania Polygraph Seminar, New Cumberland, Pennsylvania, October 3, 2008.

"Sexual Murders", a two-day presentation for Homicide Investigators, U.C. Power (multi-agency police organization), Mesquite, Nevada, November 10th and 11th, 2008.

"Crime Assessment", a one-day presentation at the Indiana Polygraph Association, Indianapolis, Indiana, April 13th, 2009.

"Working a Murder Case", this two-day demonstration of assessing the Leah Freeman Case was to assist the local police in a murder investigation. It was filmed by ABC New 20/20 and Primetime in Coquille, Oregon, June 29th and 30th, 2010.

"Investigating Sex-Murder and Mayhem", a 4-hour lecture presented at the Pennsylvania Association of Licensed Investigators Conference, Carlisle, Pennsylvania on October 7th, 2009.

"Crime Assessment", a one-day presentation at Methodist University, Fayetteville, North Carolina, September 30th, 2010.

"Mental Illness v. Criminal Cleverness", and "Interview Strategies for Sexual Deviancies", presented to the Montana Violent Crime Investigator's Association Conference, Missoula, Montana, October 19 and 20th, 2010.

Walter, Richard D. (2011). Co-Author of "Suspect identification Using Pre-, Peri-, and Post Offensive Behaviors." In James M. Adcock and Sarah L. Stein, Cold Cases: An Evaluation Model with Follow-up Strategies for Investigators. CRC Press, Boca Raton, FL.

"Crime Code-Breaking", a two-hour presentation with William Fleisher, Michael Capuzzo for the RSA Conference, Moscone Convention Center, San Francisco, California, February 16th, 2011.

14

"Staged Crime Scenes", a 4-hour workshop presentation with Arthur Chancellor at the American Academy of Forensic Science Meeting, Chicago, Illinois, February, 19th, 2011.

"Crime Assessment", a 4-hour presentation to students in the Criminal Justice Department of Mansfield University, Mansfield, Pennsylvania, March 3rd, 2011.

"Jack-the-Ripper", a two-hour presentation at the American Chemical Society, Anaheim, California, March, 28th, 2011.

"Cracking Crime", an evening lecture to the Inn of Court (250-300 Judges), Overland Park, Kansas, May 13th, 2011.

"Crime Assessment", a one-day presentation to the Kansas City Police Department, Kansas City, Missouri, July 20th, 2011.

"Murder and Violent Crimes Against Children", a one-day presentation at the Idaho Crimes Against Children Investigators Conference, Boise, Idaho, June 6th and 7th.

"Equivocal Death Investigation", a one-day presentation at the Illinois Coroner's Association Meeting, Springfield, Illinois, August 8th, 2011.

"Shadows and Substance: Pursuing the Serial Killer", a 4-hour presentation at the Pennsylvania Association of Licensed Investigators, Harrisburg, Pennsylvania, September 14th, 2011.

"Deviant Sexual Behavior", a 4-hour presentation at the Markle Symposium, Henry Lee Institute, University of New Haven, New Haven, Connecticut, October 11th, 2011.

"Jack-the-Ripper", a keynote speech with Katherine Brown at Drexel University, Philadelphia, Pennsylvania, October 28th, 2011.

"Equivocal Death and Cold Case Seminar", a one-day review of cases with Elizabeth Toomer and Arthur Chancellor, Methodist University, Fayetteville, North Carolina, November 28th, 2011.

"Jack-the-Ripper", presented at the ESU, Philadelphia, Pennsylvania, February 8th, 2012.


"Crime Assessment", this was a 4-day presentation with the Vidocq Society to area law enforcement personnel. In addition, consultation services were provided to 14 Police Departments on cases. Salt Lake City, Utah, March 4th-8th.

"Forensic Psychology" and "Crime Patterns", presented to scheduled Psychology and Criminal Justice classes at Guilford College, Greensboro, North Carolina, March 13th, 2012.

"Profiling and Crime Assessment", a documentary filmed with Smithsonian Television for the "Forensic Firsts", Georgetown, Washington, District of Columbia, April 16th, 2012.

15

Walter, Richard D., Author of Appendix. "Suspect Identification Using Pre-, Peri-, and Post Offense Behaviors." In James M. Adcock and Arthur S. Chancellor, Death Investigation. Jones & Bartlett Learning. Burlington, MA.

"Crimes against Children and the Offenders", will be presented to the Idaho Crimes against Children Conference to be held June 10th-13th, 2012.

"Cyber-Physical Crime Assessment", a Summer Class to be offered in conjunction with Peter Stephenson at Norwich University, Northfield, Vermont, June 18th-22nd, 2012.

"Crime Assessment", to be presented to the North Carolina Homicide Investigator's Association, Carolina Beach, North Carolina, October 31st-November 1, 2012.

"Murder, Mayhem and Misunderstanding", this was a 3-hour presentation before forensic psychology graduate students and criminology experts at Marymount University, Arlington, Virginia, on October 19th, 2012.

"The Facebook Faker-What's Love Got to Do with It: Case Study of an Online Romance Scam Turned Dangerously Physical." Presented by Peter Stephenson, PhD. and Richard Walter, MA at the AAFS, Digital Multimedia Sciences Section, February 21st, 2013.

"Connecting Digital and Physical Crime Scenes Using Cyber-Physical Crime Assessment." Presented by Peter Stephenson, PhD. and Richard Walter, MA at the AAFS, Digital Multimedia Sciences Section, February 21st, 2013.

"Forensics: Solving Crimes the Expert's Way." This was a 1-day presentation by 7 AAFS participants at the Smithsonian Institute, Washington, DC, February 23rd, 2013.

"Crime Assessment, Staged Crime Scenes, Equivocal Death and Mental Illness versus Criminal Cleverness". This training was presented by Patrick Zirpoli, Robert Stoud and Richard Walter, MA a 3-day presentation at the Illinois Coroners Association, Collinsville, Illinois on August 12-15th, 2013.

"Child Death: Accident versus Homicide." This case study was presented at the Pennsylvania Coroner's Meeting on September 26th, 2013 in Bethlehem, PA.

"Criminal Profiling." This training will be (2) 3.5 hours presentations for the Illinois Homicide Investigators Association in Lisle, Illinois on October 16th, 2013.

"Virtual Evidence of Human Behavior: Technology as a Co-Conspirator". This 1-day workshop was presented by Eugene Lee, M.D., Stephenson, Peter, Ph.D., Charles Cash, J.D., Pollitt, Mark, Ph.D., Karen Rosenbaum, M. D., and Richard Walter, M.A. from the Psychiatry and Behavioral Science and Digital Multi-Media Sections of the American Academy of Forensic Science

16

Meetings in Seattle, Washington on March, 20th, 2014.

"Murder, Madness and Mayhem." This 1-day presentation was to the Department of Forensic and Legal Psychology, Marymount University, Arlington, Virginia on March 20th, 2014.

"Murder, Madness and Mayhem." This 90 minute presentation was presented to the Department of Forensic Sciences at Guilford College on March 26th, 2014.

"Crime Assessment Training Course for Vermont Police Agencies." This training was a 3-day course spent 10 hours of classroom lectures on the assessment of violent crimes by Richard Walter and 4 hours of cyber crime by Dr. Peter Stephenson. The third day was devoted to working active cold cases. The course was held at Norwich University on April 21st-24th, 2014.

"Crime Assessment". This two-day course was presented to the FBI Cold Case Working Group in Buffalo, New York, by Richard Walter and Patrick Zirpoli on December 2nd and 3rd, 2014.

"Sadism: Distinguishing Between Criminal Behavior and Offender Analysis ". This one-day workshop, 8:00AM-5:00 PM, provided academic and applied understanding to the differences and similarities of Psychology and Crime Assessment regarding Sadism presented by Klaus Neudecker, MD, Richard Walter, MA, Patrick Zirpoli, Amanda Farrell, PhD., and Lurena Huffman, BS. The workshop was at the 2015 AAFS Meetings held in Orlando, Florida on February 17th, 2015.

"The Role of Fantasy in Investigating Online Predation Cases". This 20-minute presentation to the Digital Forensic Section of the AAFS was presented by Peter Stephenson, PhD and Richard Walter, MA on February 19th, 2015.

"Crime Assessment and Interviewing Strategies". This three-day course was presented to the Pennsylvania State Police-Criminal Investigative Unit at State College, Pennsylvania on March 17th through 19th.

"Crime Assessment". This two-day course was presented for Law Enforcement personnel only at the Suffolk, Virginia Police Department by Richard Walter and Patrick Zirpoli on March 23rd through the 25th, 2015.

"Crime Assessment". This four-hour course was presented to academic and invited LE personnel at Oklahoma State University in Tulsa, Oklahoma on April 3rd, 2015.

"Crime Assessment versus Profiling". This paper was presented by Richard Walter, MA and Julian Boon, PhD, University of Leister with Discussant Lynsey Gozna, PhD, University of Nottingham at the 34th International Congress of Law and Mental Health held at Sigmund Freud University, Vienna, Austria on July 13th, 2015.

"Mental Health versus Criminal Cleverness". Presented by Richard Walter, MA and Discussant

17

Terje Torrissen, Psychiatrist, Ottestad, Norway at the International Congress of Law and Mental Health held at Sigmund Freud University, Vienna, Austria on July 13th, 2015.

"Crime Assessment in Forensic Sciences". This training consisted of 4 separate lectures of two hours each within various disciplines (Anthropology, Biology, and etc.) to graduate and undergraduate student at Guilford College in Goldsboro, North Carolina on February 8th-11th, 2016.

"Crime Assessment: Solving Crime Beyond Profiling". This full day workshop was presented by Richard Walter, Klaus Neudecker, Patrick Zirpoli and Amanda Farrell to attendees at the 2016 AAFS Meetings in Las Vegas, Nevada on February 23rd, 2016.

"Crime Assessment: Murder and Mayhem". This two-day presentation was presented by Richard Walter and Patrick Zirpoli to LE Personnel by Tarleton University, *The Texas A&M University System* at the Fort Worth Police Department Academy on April 27th-28th, 2016.

"Crime Assessment: Murder, Mayhem and Mechanisms". This three-day course was presented by Richard Walter and Patrick Zirpoli to Law Enforcement, Prosecuting Attorneys, and Death Investigators at the OSU Center for Health Sciences, School of Forensic Sciences in Tulsa, Oklahoma on March 16th-18th, 2016.

"Crime Scene and Death Investigation Training". The two-day training course was by Richard Walter and Patrick Zirpoli for LE personnel at the Fort Worth Police Academy Auditorium, Fort Worth, TX on April 27th-28th, 2016.

"Crime Scene and Assessment Training". This was a one-day presentation to the Inspector General Agents, Oklahoma Department of Corrections at the Center for Health Sciences, School of Forensic Sciences in Tulsa, Oklahoma on June 8th, 2016

"Crime Assessment: Murder…and the raised hand". This one-day course was presented to LE Personnel, Prosecutors and Child "Agency Workers that was sponsored by the Ocean County Prosecutors Office in Toms River, New Jersey on June 22nd, 2016.

"Criminal Behavior Assessment". This two-day training was presented by Richard Walter and Patrick Zirpoli at the Pennsylvania State Police, Southeast Training Center on December 8th-9th, 2016.

"Crime Assessment: An Academic and Applied Educational Training Program". This 45-hour hybrid semester course was presented at Guilford College, Greensboro, North Carolina on January 9th through the 16th, 2017.

"Assessing Criminal Behavior: Exploring the Roles of Psychology and Evidence in Solving Crimes". This three-day course and follow-up 2-day segment for case consultation was presented by Richard Walter and Patrick Zirpoli at the Salt Lake Community College Miller Campus on June 26th through 30th.2017

18

Termination of Reporting: Predicated upon the heretofore documentation of work completed, it was determined that the record speaks for itself and needs no further writing. That said, although work continues, nationally and internationally, it simply does not need further explanation.

T.V. Films:

John list-48 Hours
Zoia Assur-Ocean County Prosecutor's Office
Jack the Ripper-Royal Society of Medicine
Leah Freeman, ABC
William Bradford Bishop III, John Walsh (The Hunt)
Murder of Homosexual Male-Presented at Vidocq Meeting
Cannibal Case-London, England
Short Interviews

Newspapers
by ancestry
https://www.newspapers.com/image/99531077

Detroit Free Press (Detroit, Michigan) · Sun, Apr 19, 1987 · Page 11

Printed on Aug 6, 2023

# RICHARD GOODARD

■ Richard Goodard, 36, Shiawassee County.

■ **Background:** He's called the most dangerous convict in Michigan because of the bruises, broken bones and stab wounds he's inflicted on staff and inmates during 19 years in prison.

Goodard was placed in an orphanage at two, reclaimed by his mother at seven, and rejected by the new father his mother met through a lonely hearts club. In 1967, at age 16 and after a stint in a boy's training school, he was sent to prison for truck theft and burglary. He got out in 1968, but was returned for burning a barn.



He wounded a corrections officer at Jackson in 1972, killed an officer in Marquette in 1973, and wounded a federal prison official in 1979 during a brief stay in Illinois. Now, he's serving a life sentence in isolation at Huron Valley Men's Facility near Ypsilanti for the officer's death.

■ **Foltz on Goodard:** "When he came to the Michigan Reformatory, he was very young, very aggressive and hell-bent on making a reputation for himself," Jackson Warden Dale Foltz said, recalling that Goodard once remarked, "I'm going to be the meanest son of a gun you ever met."

At Jackson, shortly after he had killed the officer, Goodard asked for Foltz's help. Foltz refused, telling Goodard he finally had achieved the status of meanest inmate. "You made it," Foltz said. "You're the most dangerous person I've got in the institution."

■ **Goodard:** In a 1978 interview, he said of his past, "This is about the only thing I can say about it: If a person's messed over, he's going to retaliate, in some way. They say I'm like an animal, some kind of vicious animal. But all the trouble I got into, there had to be a reason. I mean, there had to be something to cause it. Nobody's born like that, right?"

Copyright © 2023 Newspapers.com. All Rights Reserved.





**From:** riwalter@epix.net
**Subject:** Fw: Addendum
**Date:** July 12, 2023 at 11:15 AM
**To:** Capuzzo Michael mikec@mountainhomemag.com

-----Original Message----- From: Edward Bujdos
Sent: Tuesday, July 11, 2023 4:12 PM
To: Richard Walter
Subject: Addendum

Richard: I was told at the time in the 1980's, all Administrative Segregation units in the state used the the "Food Loaf", including Marquette Branch Prison and Ionia Prison.

Ed

| MICHIGAN DEPARTMENT OF CORRECTIONS | EFFECTIVE DATE 10/01/2019 | NUMBER 04.07.100 |
|---|---|---|
| **POLICY DIRECTIVE** | | |
| SUBJECT OFFENDER MEALS AND FOOD QUALITY ASSURANCE | SUPERSEDES 04.07.100 (05/20/2019) | |
| | AUTHORITY MCL 289.1101 et. seq., MCL 791.203; U.S. Food and Drug Administration Food Code 2013 | |
| | PAGE 1    OF    4 | |

**POLICY STATEMENT:**

Michigan Department of Corrections (MDOC) correctional facilities shall follow the standards for offender meals and food quality as set forth in this policy to ensure that offender dietary needs are met.

**RELATED POLICIES:**

| | |
|---|---|
| 02.04.105 | Meals Provided to Employees and Guests |
| 04.05.120 | Segregation Standards |
| 04.07.101 | Therapeutic Diet Services |
| 05.03.150 | Religious Beliefs and Practices of Prisoners |

**POLICY:**

DEFINITIONS

A.    Offender:   Prisoners, parolees, and probationers housed in an MDOC facility.

GENERAL INFORMATION

B.    Therapeutic diets shall be provided to offenders as set forth in PD 04.07.101 "Therapeutic Diet Services."

C.    Offenders who are being transported off-site under custody shall be provided meals during the transport as required by PD 04.04.135 "Custodial Transportation of Offenders."   The meals shall be provided by the sending facility utilizing the approved ride-out bagged menu and shall meet all caloric and nutritional standards set forth in this policy.   Beverages shall be provided in a manufactured sealed container.

D.    Offenders shall be permitted to abstain from any foods that violate their religious tenets.   Religious menus shall be developed and religious meals provided as set forth in PD 05.03.150 "Religious Beliefs and Practices of Prisoners."   The Food Services Program Manager shall ensure religious meals training is developed and provided to offenders and staff who work in Food Service.   Receipt of the training shall be documented on a Prisoner Worker Safety Training Record (CAJ-900) and Employee Safety Training Record (CAJ-1018) as appropriate.

E.    Meals shall not be withheld or otherwise used as a disciplinary sanction.

F.    An offender in segregation or a special management housing unit may be fed food loaf in lieu of his/her regular meals as set forth in PD 04.05.120 "Segregation Standards."

G.    At least three meals shall be served to offenders at the facility at regular meal times during each 24-hour period with no more than 14 hours between the evening meal and breakfast, except during an emergency when it is not possible to serve a meal.   Hot food must be offered at least at two of the daily meals served, except in an emergency, including when proper food temperatures cannot be maintained (e.g., malfunctioning hot carts).   The Warden shall ensure the total number of all meals served each month, including meals not served in the facility's dining room, are documented in the electronic Meal Tracker Program.

H.    All menus and all meals as actually served at a correctional facility shall satisfy the nutritional and caloric recommendations set forth in the dietary reference intakes approved by the National Research Council.   The current edition of "The Dietary Guidelines for Americans" by the United States

| DOCUMENT TYPE POLICY DIRECTIVE | EFFECTIVE DATE 10/01/2019 | NUMBER 04.07.100 | PAGE 2 OF 4 |
|---|---|---|---|

Department of Health and Human Services and Department of Agriculture shall be followed for menu planning.

## REGULAR DIET MENU

I.  The Statewide Standard Menu shall be used to feed all offenders at a facility except during emergencies. Meal delays, substitutions, or significant events (e.g., staffing issues, poor food quality, need to implement emergency menu, facility mobilization) related to Food Service operations will be documented in the Food Service logbook and the Food Service Event Report (CHJ-712). The Warden shall ensure the CHJ-712 is forwarded to the Regional Food Services Administrative Manager within two business days for review and follow-up.

J.  The Food Services Program Manager shall ensure that standardized regular diet menus are issued to be used at all MDOC correctional facilities. The menu shall identify the non-meat entrees offered during the noon and evening meals.

K.  When substitutions occur, a copy of the menu substitution report shall be attached to the standardized menu and retained in accordance with the Department's retention schedule.

## QUALITY FOOD SUPPLY

L.  All food items purchased by the Department shall be received, examined and stored in accordance with public health requirements and regulations of the U.S. Food and Drug Administration (FDA) Food Code. food items produced by horticulture programs or in facility gardens shall not be used in Food Service.

M.  Food shall not be served after the best used by or manufacturer's expiration date. Food that is dated after the best used by or manufacturer's expiration date shall not be stored within the secure perimeter. Food purchased frozen shall not be used after one year of the production or packaging date.

N.  The Food Services Program Manager shall ensure an approved emergency menu plan is provided to all Wardens and Facility Administrative Managers and made available to all Food Service staff.

## FOOD PRODUCTION

O.  Standardized recipes adjusted to yield appropriate number of servings for the size of the facility shall be used in the production of all menu items. Tested quantity recipes, approved by an MDOC Registered Dietician, shall be the basis for the recipe file.

P.  The Food Services Program Manager shall ensure the standardized Food Production Worksheet is prepared for all meals. Recipes for each menu item shall accompany the Production Sheet to the various food preparation areas. Preparation of food shall be closely monitored by qualified staff to ensure that the recipes are followed and that meals are produced in accordance with public health requirements.

Q.  All equipment used to process, prepare, and serve meals must be National Sanitation Foundation (NSF) and/or American National Sanitation Institute (ANSI) certified.

## FOOD EVALUATION

R.  Prior to the shipment of food to a satellite unit, and prior to the service of the noon and evening meals at all facilities, a minimum of three menu items shall be evaluated for flavor, texture or consistency, appearance, tenderness, and overall eating quality. Preservice quality checks shall be made at least 30 minutes before the meal is served. Industry standards for desirable characteristics of food items shall be used as the standard. Preservice quality checks in institutions shall be made by a non-Food Service offender representative and a custodial staff member or other staff member as designated by the Warden.

S.  Menu items identified during the preservice quality checks as needing adjustments shall be modified before the meal is served. Menu items that are unacceptable for service shall not be served unless corrected. The facility Food Service Director or designee shall make the final decision as to whether

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| POLICY DIRECTIVE | 10/01/2019 | 04.07.100 | PAGE 3 OF 4 |

an evaluated item is deemed as poor quality and must be removed from service for the meal. Alternative menu items shall be established so that substitutions can be made with minimum delays in meal time. Those substitutions must be of comparable nutritional value and noted on the menu and on the Facility Substitution Log.

T.    If an offender has a concern with a food item once service of a meal has started and s/he brings that problem to the attention of a Food Service employee, that employee shall immediately assess the concern. If the offender's concern is valid, the employee shall immediately bring that concern to the attention of the ranking Food Service employee who shall make the determination if the item needs to be pulled from the line and an immediate substitution made.

MEAL DISTRIBUTION

U.    Transportation and service of meals shall be consistent with public health requirements regarding thermal and bacterial protection. A production record that indicates the time and temperatures will accompany any Time/Temperature Control for Safety (TCS) food items pursuant to the current MDOC Hazard Analysis and Critical Control Point (HACCP) plan.

V.    The Warden shall ensure that all meals shall be served under the direct supervision of staff to ensure that favoritism, careless serving (e.g., over or under portioning), and waste are avoided.

W.   Food items shall only be portioned or served according to instruction listed on the Statewide Standard Menu.

X.    Appropriate serving ware shall be provided based on the security level.

EXCESS FOOD

Conventional Kitchen With Attached Dining Room

Y.    Food items not served at the meal shall be used within 48 hours or immediately frozen. Leftover food items that were immediately frozen shall be scheduled for service within 30 days. Foods refrigerated or frozen shall be used in accordance with public health requirements. If a leftover food item is used as an ingredient in the preparation of another recipe, that menu item must be discarded at the conclusion of the meal service.

Z.    All TCS foods shall be cooled in accordance with public health requirements that require the foods to be stored in containers no deeper than 4 inches and must be cooled from 135° to 70° within the first 2 hours and from 70° to 41° within an additional 4 hours. All TCS food items saved shall be documented using HACCP procedures and the FDA Food Code.

Satellite Dining Room

AA.   All TCS food items not served at the meal shall be discarded.

Labeling

BB.   Food items not served at the meal shall be labeled pursuant to public health requirements with the production date, last date to use by, and supervisor's signature. The facility Food Service Director or designee shall inspect the Food Service areas on a daily basis to ensure that all food is used by the due date or appropriately discarded.

PROCEDURES

CC.   If necessary, to implement requirements set forth in this policy, Wardens shall ensure that procedures are developed or updated.

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| POLICY DIRECTIVE | 10/01/2019 | 04.07.100 | PAGE  4  OF  4 |

AUDIT ELEMENTS

DD.  A Primary Audit Elements List has been developed and is available on the Department's Document Access System to assist with self-audit of this policy pursuant to PD 01.05.100 "Self-Audits and Performance Audits."


APPROVED: HEW 08/12/2019



**Department of Corrections**

About ⌄    Prisons    Parole & Probation ⌄    Services    Careers    For Employees    Offender Success ⌄    Public Information    Policies    Offender Search

# Policy Directives

🏠 › Public Information › Statistics and Reports › Policy Directives

Offender Meals 🔍

Categories: 1 ⌄    **Clear All Filters**

There are 1 results

## 04.07.100 Offender Meals and Food Quality Assurance

**Tags:** *Prisoner Care* , *04 Institutional Operations*

| MICHIGAN DEPARTMENT OF CORRECTIONS<br>**POLICY DIRECTIVE** | EFFECTIVE DATE<br>06/01/2019 | NUMBER<br>04.05.120 |
|---|---|---|
| SUBJECT<br>SEGREGATION STANDARDS | SUPERSEDES<br>04.05.120 (09/27/2010); DOM 2019-3 | |
| | AUTHORITY<br>MCL 791.203, MCL 791.204, MCL 791.251 et seq., MCL 791.262, MCL 791.264, MCL 791.267; Administrative Rules 791.4401, 791.5501; Prison Rape Elimination Act (PREA) of 2003 | |
| | PAGE   1   OF   14 | |

**POLICY STATEMENT:**

Prisoners shall be given a hearing before placement in any form of segregation other than temporary segregation. All segregation prisoners shall be provided with property, program, and activity access as outlined in this policy.

**RELATED POLICIES:**

| 03.03.105 | Prisoner Discipline |
|---|---|
| 04.05.112 | Managing Disruptive Prisoners |
| 04.06.182 | Mentally Disabled Prisoners in Segregation |

**POLICY:**

DEFINITIONS

A.   Housing Unit Team:   Assistant Deputy Warden (ADW), Resident Unit Manager (RUM), Assistant Resident Unit Supervisor (ARUS), Prison Counselor, and Corrections Officer regularly assigned to a prisoner's specific housing unit.

B.   Qualified Mental Health Professional:   A Physician, Psychiatrist, Nurse Practitioner, Physician's Assistant, Psychologist, Social Worker, or Registered Nurse who meets the requirements set forth in Mental Health Code, MCL 330.1001 et seq., and is trained and experienced in the areas of mental illness or mental disabilities.

C.   Security Classification Committee (SCC):   A committee appointed by the Warden pursuant to PD 05.01.130 "Prisoner Security Classification" that is responsible for ensuring proper prisoner placement at that facility.

GENERAL INFORMATION

D.   For purposes of this policy, detention is referred to as punitive segregation.

E.   For purposes of this policy, "prisoner" includes parolees and probationers housed at the Detroit Reentry Center.

F.   Segregation cells are designated cells used to physically separate prisoners with special management needs from the general population and limit that prisoner's movement inside the institution.   Such confinement is used to achieve effective administrative management, maximum disciplinary control, and individual prisoner protection.

G.   Only those facilities identified in Attachment A shall have segregation cells.   Only authorized segregation cells shall be used to house prisoners who need to be separated from the general population except as otherwise provided by this policy or as specifically authorized by the Correctional Facilities Administration (CFA) Deputy Director.

H.   This policy does not apply to a holding cell or any other holding area within the facility in which a prisoner

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| POLICY DIRECTIVE | 06/01/2019 | 04.05.120 | PAGE  2  OF  14 |

who needs to be immediately separated from the general population may be placed for a few hours while staff determine the appropriate action to be taken (e.g., transfer, placement in temporary segregation, return to general population).  When a prisoner is placed in an area designated for prisoners who refuse to return to their assigned housing unit, the Warden or Duty Administrative Officer shall be immediately notified via e-mail.  Additionally, the prisoner may be issued a disobeying direct order misconduct for refusing to return to his/her cell.  Holding areas shall not be used in lieu of temporary segregation or any other form of segregation.  Any prisoner who needs to be housed in a temporary holding area for longer than a few hours must be transferred to an appropriate facility.

I.     A prisoner is considered classified to administrative segregation on the date SCC formally classifies the prisoner regardless of when the prisoner is physically placed in an administrative segregation unit.  A prisoner classified to administrative segregation remains in that classification regardless of his/her housing placement or any imposed disciplinary sanctions (e.g., detention) until s/he is reclassified.

J.     A prisoner in segregation may be restrained to a chair or seating area during interviews, hearings, programming, and teleconferences to ensure the safety and security of staff, other prisoners, and Department property.  The prisoner shall be under constant staff supervision while secured to the chair or seating area and shall be removed as soon as the interview, hearing, program, or teleconference is over.

K.     A prisoner who was discharged or paroled while on administrative segregation status who is subsequently received as a new commitment at a reception facility shall be screened for appropriate classification in accordance with PD 05.01.130 "Prisoner Security Classification."   However, if the prisoner was in administrative segregation pursuant to Paragraph Q. 6., at the time of discharge, the prisoner shall remain classified to administrative segregation unless otherwise authorized by the CFA Deputy Director and the Chief Medical Officer.

L.     Questions regarding required hearings for classification to segregation may be directed to the Office of Legal Affairs.

TYPES OF SEGREGATION

TEMPORARY SEGREGATION

M.     Temporary segregation is used when it is necessary to remove a prisoner from general population (e.g., pending a hearing for a Class I misconduct violation, classification to administrative segregation, pending an investigation, transfer, etc.).  A prisoner's placement in temporary segregation, including the reason for such placement, shall be documented in writing and approved by the Warden or designee within 72 hours after the prisoner's placement in temporary segregation.  The prisoner does not have to be provided written notice of placement in temporary segregation.  However, once it becomes the intent to classify the prisoner to administrative segregation, a Notice of Intent to Classify to Administrative Segregation (CSJ-447) shall be issued as set forth in Paragraph V.

N.     Prisoners at high risk for sexual victimization or who are alleged to have suffered sexual abuse shall not be placed in involuntary temporary segregation unless an assessment of all available alternatives is completed and a determination has been made that no less restrictive means of separation from likely abusers exists.  If the review cannot be conducted immediately, the prisoner may be held in temporary segregation for up to 24 hours while the review is completed.

O.     If no less restrictive means of separating a prisoner from likely abusers exists, the prisoner shall be assigned to temporary segregation only until an alternative means of separation from likely abusers can be arranged and should not exceed 30 calendar days pending investigation unless extenuating circumstances exist.  If the prisoner is held in temporary segregation for more than 30 calendar days, the facility shall afford the prisoner a review to determine whether there is a continuing need for separation.  The facility shall clearly document the basis for the facility's concern for the prisoner's safety and the reason why no less restrictive means of separation can be arranged.  Prisoners placed in temporary

| DOCUMENT TYPE<br>POLICY DIRECTIVE | EFFECTIVE DATE<br>06/01/2019 | NUMBER<br>04.05.120 | PAGE   3   OF   14 |
|---|---|---|---|

segregation for this purpose shall have access to programs, privileges, education, and work opportunities to the extent possible.   If the facility restricts access to these opportunities, the facility shall document:

    1.    The opportunities that have been limited;

    2.    The duration of the limitation; and

    3.    The reasons for such limitations.

P.    Wardens shall ensure that prisoners are not confined in temporary segregation for more than seven business days except under the circumstances listed in 1-7 below.   The day on which a prisoner is placed in temporary segregation is not counted in this time limit but the day on which the prisoner is released is counted.   Prisoners being housed in temporary segregation longer than seven business days for the following reasons shall have their placement reviewed in accordance with Paragraph FFF:

    1.    An Administrative Law Judge (ALJ) from the Department of Licensing and Regulatory Affairs (LARA) found reasonable cause for delay at a hearing conducted on a Class I misconduct violation or on proposed placement in administrative segregation.

    2.    The prisoner was classified to administrative segregation/higher security level at a facility that does not have such housing and is awaiting transfer to a facility with such housing.   In such cases, the prisoner shall be transferred as soon as possible but no later than 30 calendar days.

    3.    The prisoner is awaiting transfer to a facility that can meet the prisoner's protection or physical/mental health needs.   In such cases, the prisoner shall be transferred as soon as possible.

    4.    The prisoner is part of a Prison Rape Elimination Act (PREA) investigation.   In such cases, the investigation shall be completed as soon as possible.

    5.    The prisoner is awaiting transfer to a facility with detention cells to serve a sanction of detention. In such cases, the prisoner shall be transferred as soon as possible.

    6.    The prisoner is medically quarantined and no other single cell placement is available at the facility.

    7.    A parolee at the Detroit Reentry Center (DRC) is waiting for a parole revocation hearing.

ADMINISTRATIVE SEGREGATION

Q.    Administrative segregation is the most restrictive level of security classification.   A prisoner may be classified to administrative segregation only for the following reasons:

    1.    The prisoner demonstrates an inability to be managed with general population privileges.

    2.    The prisoner is a serious threat to the physical safety of staff or other prisoners or to the good order of the facility.

    3.    The prisoner is a serious escape risk.

    4.    The prisoner is under investigation by an outside authority for suspected felonious behavior and it is reasonably believed that the prisoner needs to be segregated while the investigation is pending.   If classified to administrative segregation for this reason, the prisoner shall be reclassified when it is no longer believed that the prisoner needs to be segregated due to the pending investigation or the investigation is completed, whichever comes first.

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | | |
|---|---|---|---|---|
| POLICY DIRECTIVE | 06/01/2019 | 04.05.120 | PAGE 4 | OF 14 |

5. The prisoner refuses required medical screening, testing, or treatment for a communicable disease and requires medical quarantine pursuant to PD 03.04.110 "Control of Communicable Diseases."

6. The prisoner tests positive for HIV infection and is subsequently found guilty of a misconduct for behavior that presents a significant risk of transmitting HIV infection, as set forth in PD 03.04.120 "Control of Communicable Bloodborne Diseases." The prisoner shall not be reclassified without prior authorization of the CFA Deputy Director in consultation with the Assistant Chief Medical Officer. The prisoner may be placed in a health care inpatient unit if necessary to receive medical care, including mental health care.

R. An administrative segregation cell may be used to house a prisoner with a communicable disease for which medical quarantine has been ordered pursuant to PD 03.04.110 "Control of Communicable Diseases." A prisoner medically quarantined in an administrative segregation cell solely for medical reasons shall not be classified to administrative segregation due to this placement.

S. A prisoner who is on an outpatient corrections mental health services active caseload or who is receiving special education services shall be classified to administrative segregation only after consultation with a Qualified Mental Health Professional, the Mental Health Unit Chief, and/or special education teacher to determine if the prisoner's mental health needs or limitations can be met in administrative segregation. If the prisoner is being considered for reclassification due to Class I misconduct, this shall include reviewing the Misconduct Sanction Assessment (CSJ-331) completed as required by PD 03.03.105 "Prisoner Discipline." SCC shall consider the prisoner's need for correctional mental health services, including additional treatment and medication, in determining whether administrative segregation is the most appropriate placement.

Required Hearings

T. Except as set forth in Paragraph R, a prisoner may not be placed in or classified to administrative segregation without a hearing first being conducted by an ALJ pursuant to LARA Administrative Rule 791.11903.

U. A prisoner may be classified to administrative segregation after being found guilty of a Class I misconduct. In such cases, a second hearing is not required, but the classification shall occur promptly after the misconduct hearing or upon completion of any detention sanction. SCC shall complete a Security Reclassification Notice (CSJ-423) before classification to administrative segregation and indicate the reason for the classification on the form.

V. If the proposed classification is not based on a guilty finding for a Class I misconduct, or behavior for which a Class I or Class II misconduct may be written, appropriate staff shall prepare a Notice of Intent to Classify to Administrative Segregation (CSJ-447). Behavior for which a Class I misconduct may be written shall be addressed through the misconduct process rather than through issuance of a Notice. The Notice shall set forth the facts that are believed to warrant classification to administrative segregation in sufficient detail to provide the prisoner with notice and an opportunity to defend himself/herself at the hearing. The Notice shall be reviewed with the prisoner at least 24 hours before the hearing. The hearing shall be conducted within seven business days after the prisoner's placement in temporary segregation unless the ALJ determines that there is reasonable cause for delay. The day on which a prisoner is placed in temporary segregation is not counted in the seven business day time limit. However, the day on which the hearing occurs is counted. A Notice will not be dismissed for being untimely but will be reported by the ALJ to the Warden and, through the appropriate chain of command, to the Hearings Administrator in the Office of Legal Affairs. The Warden shall be responsible for notifying the appropriate Assistant Deputy Director (ADD) and the CFA Deputy Director.

W. At the hearing, the ALJ will determine whether the facts alleged in the Notice have been established by a preponderance of evidence, consistent with criteria set forth in the Department's Hearings Handbook. SCC shall then decide whether the facts as found by the ALJ establish a need for administrative

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| POLICY DIRECTIVE | 06/01/2019 | 04.05.120 | PAGE 5 OF 14 |

segregation pursuant to the standards set forth in this policy. The ALJ's findings and the SCC decision shall be recorded on the Segregation Classification Hearing Report (CSJ-446), a copy of which shall be provided to the prisoner promptly after the SCC decision has been made.

X.   If the Notice of Intent to Classify to Administrative Segregation (CSJ-447) is not upheld by the ALJ, the prisoner shall not be classified to segregation. The Notice and the Segregation Classification Hearing Report (CSJ-446) shall be retained in the hearing investigator's files, along with the hearing investigator's report if one was prepared, for at least two years after the date of the hearing. The reports shall not be kept in any of the prisoner's commitment files.

Y.   The ALJ'S decision may be appealed by either the prisoner or the Warden by submitting a completed Request for Rehearing (CSJ-418) to the Office of Legal Affairs. The SCC decision, however, may be appealed only through the grievance process.

PUNITIVE SEGREGATION (DETENTION)

Z.   A prisoner shall be placed in punitive segregation only to serve a detention sanction for a Class I misconduct as ordered by an ALJ consistent with PD 03.03.105 "Prisoner Discipline." If administratively feasible, a detention sanction shall be served in a cell designated for punitive segregation rather than in a designated administrative segregation cell. A prisoner shall not remain on detention status for longer than the period of time ordered by the ALJ. The Warden may waive all or any part of a detention period that has not been served by a prisoner as set forth in PD 03.03.105 "Prisoner Discipline."

PROPERTY, PROGRAM AND ACTIVITY ACCESS

AA.  Subject to the restrictions set forth in Attachment B, a prisoner in segregation shall be provided with or allowed to possess the following:

1.   Adequate health care, including prescription medication and medically necessary snacks, as authorized by health care staff.

2.   Wheelchair, walker, hearing aid, prostheses, eyeglasses, and other medically necessary items authorized pursuant to PD 04.06.160 "Medical Details and Special Accommodation Notices."

3.   State-issued clothing, including winter coat and winter gloves, in accordance with PD 04.07.110 "State-Issued Items and Cell/Room Furnishings."

4.   A mirror, as approved by the appropriate Deputy Director, that shall be provided only as part of the cell furnishings.

5.   Sitting surface.

6.   Writing surface.

7.   Toothbrush (short handled only), toothpaste or powder, denture cup if needed, soap, shampoo, deodorant, toilet paper, comb/pick/hairbrush, shaving gear, and, for female prisoners, sanitary napkins.

8.   Three meals per day served from the same menus available to general population prisoners. This includes meals from the therapeutic diet menu and the vegan meal if authorized for religious requirements.

9.   Opportunity to shave and shower at least three times weekly.

10.  Mattress, blanket, pillow, pillow case, and two sheets with weekly linen changes, and a towel and face cloth with changes three times weekly.

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| POLICY DIRECTIVE | 06/01/2019 | 04.05.120 | PAGE 6 OF 14 |

11.  Hair care services commensurate with general population prisoners.

12.  Mail privileges in accordance with PD 05.03.118 "Prisoner Mail," including the receipt of personal correspondence and photographs.

13.  Visits in accordance with PD 05.03.140 "Prisoner Visiting," except when restricted as a sanction for a Class I misconduct. Prisoners may be required to wear restraints if authorized by the Warden or Deputy Warden.

14.  Legal property, including materials pertaining to the prisoner's personal litigation. Access to authorized excess legal property must be provided within 48 hours of the prisoner's request.

15.  Institutional law library services in accordance with PD 05.03.115 "Law Libraries."

16.  Access to institutional general library services in accordance with PD 05.03.110 "Institutional Library Services."

17.  Writing materials including paper and a writing instrument. Writing Instruments shall not exceed four inches in length.

18.  Written copy of segregation unit rules that shall include directions for requesting personal services.

19.  Telephone privileges for verified serious family emergencies, as determined by the Warden or designee, for communicating with the Office of the Legislative Corrections Ombudsman upon request of that Office, and for communicating with an attorney regarding official business of the prisoner, including litigation, upon request of the attorney. Prisoners shall be offered one 15 minute telephone call within seven business days of placement into segregation and one 15 minute telephone call each week thereafter unless s/he is on a telephone restriction or disciplinary sanctions. Prisoners on disciplinary sanctions for more than 30 consecutive days shall receive one 15 minute telephone call during their seven-day sanction break. Prisoners participating in a segregation incentives program shall receive telephone calls in accordance with the program's rules.

20.  Reading materials from the prisoner's personal collection.

21.  A minimum of one hour per day, five days per week of out-of-cell exercise, except that, for reasons of safety or security, a prisoner serving a sanction of detention or loss of privileges that includes the loss of yard may be provided such exercise only after s/he has served a period of time determined by the Warden or Deputy Warden. However, the prisoner shall not be deprived of out-of-cell exercise for more than 30 consecutive days without being provided a seven-day break during which the prisoner shall be given the opportunity for out-of-cell exercise at least one hour per day, five days per week.

22.  Notary public services that shall be provided within two business days of request.

23.  Prisoner store ordering arrangements for postage and envelopes, mandatory health care products, and, as approved by the CFA Deputy Director or designee for purchase by segregation prisoners, other items as identified on the Standardized Store List pursuant to PD 04.02.130 "Prisoner Store."

24.  One ring as authorized by PD 04.07.112 "Prisoner Personal Property."

25.  Personal property necessary to the practice of the prisoner's designated religion, as set forth in PD 05.03.150 "Religious Beliefs and Practices of Prisoners."

| DOCUMENT TYPE POLICY DIRECTIVE | EFFECTIVE DATE 06/01/2019 | NUMBER 04.05.120 | PAGE 7 OF 14 |
|---|---|---|---|

BB.    In addition to the items and privileges identified in Paragraph AA, a prisoner housed in an administrative segregation unit shall be permitted all of the following:

     1.    Recreation, educational programming, and religious programming to the extent they are administratively feasible and can be safely afforded. Such privileges shall not be provided in a group setting.

     2.    Personal property as set forth in the Personal Property section of this policy.

CC.    There shall be at least two calendars and two clocks in each administrative and punitive segregation unit. The clocks and calendars shall be of a size and placed in such a fashion to allow prisoners to readily tell the date and time when outside their cells.

PERSONAL PROPERTY

DD.    Prisoners in temporary or punitive segregation shall not be permitted to possess personal property except as specifically authorized pursuant to Paragraph AA. The Warden also may prohibit prisoners in temporary or punitive segregation from purchasing items they are not authorized to possess.

EE.    Prisoners classified to administrative segregation shall be permitted to possess only those items authorized for general population prisoners in the highest security level of the facility where the segregation unit is located, subject to the following limitations:

     1.    They may not possess any item identified on Attachment B. The Warden also may prohibit prisoners from purchasing such items while in administrative segregation.

     2.    Unless the item is specifically authorized pursuant to Paragraph AA, the Warden may limit the purchase and possession of consumable or expendable items available for purchase through the prisoner store.

     3.    The Warden may restrict the purchase and/or possession of all personal clothing items, except items necessary to the practice of the prisoner's designated religion as identified in PD 05.03.150 "Religious Beliefs and Practices of Prisoners."

FF.    Prisoners housed in an administrative segregation unit shall not have property that exceeds the amount that can be contained in one state issued duffel bag or similarly sized container(s) authorized by the CFA Deputy Director or one footlocker. This includes all personal property of the prisoner and all state-issued clothing issued to the prisoner while in segregation, except for authorized excess legal property and medically necessary non-clothing items as authorized by the appropriate health care provider and approved by the Warden.

GG.    Personal property that a prisoner in segregation is not authorized to possess shall be stored for the prisoner including all authorized excess legal property. The prisoner shall be permitted reasonable access to stored excess legal property within 48 hours after request and shall be permitted to exchange any of it for other legal property in his/her possession. The total amount of property possessed by a prisoner in administrative or punitive segregation, plus property stored for that prisoner, shall not exceed the quantity limit set forth in PD 04.07.112 "Prisoner Personal Property" for general population prisoners in the highest security level of the facility. Property in excess of these limits shall be disposed of as set forth in PD 04.07.112.

ADDITIONAL RESTRICTIONS FOR SAFETY AND SECURITY

HH.    Items and privileges described in Paragraph AA or BB may be withheld from a prisoner in segregation for serious reasons of health, safety, or security related to the item or privilege upon written approval from the Warden or Deputy Warden and in accordance with PD 04.06.160 "Medical Details and Special

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| POLICY DIRECTIVE | 06/01/2019 | 04.05.120 | PAGE 8 OF 14 |

Accommodation Notices." Prisoners shall not be denied adequate health care or meals, and shall receive at least one shower per week. If a restriction on state-issued clothing, cell furnishings, medically necessary items, or hygiene items is approved, the Warden or Deputy Warden shall ensure that an adequate substitution is provided. In all cases, the reason for the restriction shall be documented on the Restriction of Segregation Property and Privileges form (CAJ-687), with reviews as set forth in Paragraph JJ. If the restriction was authorized by the Deputy Warden, a copy shall be forwarded to the Warden.

II.   The segregation window cover of a prisoner shall be kept open at all times except under the following circumstances:

    1.    If a prisoner's ability to view specific staff activity in the unit may create a serious health, safety, or security concern (e.g., cell rush, forced move). The cover shall be reopened at the conclusion of the activity that caused the closure.

    2.    If the prisoner has used the cell window in a manner that may create a serious health, safety, or security concern in the unit. An example of such behavior would include repeated gestures or displays in the window that may cause disruptive activity by other prisoners in the unit due to the specific nature of the gesture or display. In such cases, the reason for the closure shall be documented on a Restriction of Segregation Property and Privileges form (CAJ-687), with reviews as set forth in Paragraph JJ.

JJ.   No item or activity shall be withheld from a prisoner for the purpose of punishment. Restrictions of any kind shall be imposed only as long as is necessary to address a health, safety, or security concern. All such restrictions shall be reviewed at least every seven calendar days, by the Warden or Deputy Warden and a determination made as to whether the restriction needs to be continued. The appropriate ADD shall be notified whenever a restriction exceeds 30 calendar days.

Electricity Restriction

KK.   If a prisoner in segregation is a known fire starter, the electricity in that prisoner's cell may be shut off consistent with the requirements set forth in Paragraphs HH and JJ.

Water Restriction

LL.   A prisoner in segregation may be placed on a water restriction consistent with the requirements set forth in Paragraphs HH and JJ. However, a water restriction shall be imposed only under the most serious water-related circumstances (e.g., flooding cell, excessive consumption of water (polydipsia)) and only after health care staff has been contacted to determine the level of risk to the prisoner's health if the restriction is imposed. The level of risk shall be documented on the Restriction of Segregation Property and Privileges form (CAJ-687). The Warden or Deputy Warden shall consider the level of health risk when determining whether to approve the restriction. If there is a high level of health risk, a water restriction shall be imposed only with written approval of the appropriate ADD.

MM.   Whenever a water restriction is imposed, water in the prisoner's cell shall be turned on at least twice per shift and during meals. However, drinking water shall remain on at all times during a heat alert unless otherwise approved by the appropriate ADD. If the ADD approves keeping drinking water turned off during a heat alert, the drinking water shall be turned on at least hourly. In all cases, the shift commander shall visit each prisoner on a water restriction at least once each shift to determine if additional drinking water needs to be provided. In all cases, a prisoner on a water restriction shall have access to drinking water as necessary to meet documented medical needs. It shall be noted in the Special Housing Unit Record (CAJ-278) whenever drinking water is offered or provided to a prisoner on a water restriction. Whenever staff become aware that a prisoner has not consumed liquids for 24 continuous hours or, during a heat alert, 12 continuous hours, the Warden and health care staff shall be immediately notified to ensure evaluations, counseling, and monitoring are provided as set forth in PD 04.06.120 "Hunger Strike." A prisoner showing any signs of medical or mental decompensation shall be immediately referred for evaluation as set forth in PD 03.04.100 "Health Services," or PD 04.06.180

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| POLICY DIRECTIVE | 06/01/2019 | 04.05.120 | PAGE  9  OF  14 |

"Mental Health Services," as appropriate.

Paper/Combustible Restriction

NN.   A prisoner in segregation may be placed on a paper or combustible restriction consistent with the requirements set forth in Paragraphs HH and JJ.   A paper restriction shall be imposed only for the most serious circumstances (e.g., starting fires; repeated covering of the cell window with paper; fashioning weapons out of paper; damaging sprinkler head) and not for general housekeeping violations (e.g., refusing to pick up or properly store paper).   A combustible restriction shall be imposed only for starting fires or damaging a sprinkler head.

OO.   If a paper restriction is imposed, all paper items shall be removed from the prisoner's cell and retained by the RUM, ARUS, or Prison Counselor during the time the prisoner is on the paper restriction.   If a combustible restriction is imposed, all combustible items other than adequate clothing, bedding, and necessary hygiene items, as determined by the Warden or designee, may similarly be removed from the prisoner's cell subject to the restrictions set forth in Paragraph HH.   A prisoner on either a paper or combustible restriction shall be allowed access to the following items at reasonable intervals under staff supervision:

   1.   Misconduct reports that are pending a hearing or an appeal, and Request for Rehearing forms in accordance with PD 03.03.105 "Prisoner Discipline,"

   2.   Pending grievances and grievance forms in accordance with PD 03.02.130 "Prisoner/Parolee Grievances."

   3.   Documents identified by the prisoner as immediately necessary to meet a court deadline for pending litigation.

   4.   Items from the main law library as set forth in PD 05.03.115 "Law Libraries."

   5.   Mail from an attorney or law firm, a legitimate legal service organization, the Department of Attorney General, a prosecuting attorney's office, a court, a clerk of the court, or a Friend of the Court office.

PP.   Upon request, a prisoner on a paper or combustible restriction also shall be provided access to writing paper, envelopes, and other paper items with approval of the Warden or Deputy Warden.

QQ.   Items that are removed from the prisoner's cell and the dates and times the prisoner is allowed access to the papers authorized in Paragraphs OO and PP shall be documented on the Special Housing Unit Record (CAJ-278).

Food Loaf

RR.   A prisoner in segregation may be fed food loaf in lieu of his/her regular meals for engaging in any of the following behavior, unless the prisoner is on a medically prescribed liquid or pureed diet:

   1.   Misuse of food, serving tray, or eating utensils.

   2.   Refusing or failing to return uneaten food, the serving tray, dishes, or eating utensils through the door slot.

   3.   Destroying a serving tray or throwing a tray or food.

   4.   Using containers to hold or throw other substances, such as water or human waste products.

SS.   A prisoner shall not be fed food loaf without approval of the Warden or designee.   A Food Loaf Request

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | | |
|---|---|---|---|---|
| POLICY DIRECTIVE | 06/01/2019 | 04.05.120 | PAGE 10 OF 14 | |

form (CAJ-689) shall be completed to document the prisoner's behavior and obtain food loaf approval. If food loaf is approved, the Warden or designee shall identify a period of time not to exceed seven calendar days during which the prisoner is to be fed food loaf and ensure that the housing unit and the Food Service Director or designee are notified of that decision. The prisoner shall be fed food loaf only for the period of time authorized by the Warden or designee. If food loaf is approved by other than the Warden, notification of that approval shall be sent to the Warden for review.

TT.   When notified that a prisoner is authorized to be fed food loaf, the Food Service Director or designee shall contact appropriate health care staff to determine if the prisoner has any food allergies or other medical condition that would affect feeding the prisoner a food loaf. The prisoner shall not be fed a food loaf that contains any food item to which the prisoner is known to be allergic or is otherwise medically contraindicated. Unless the prisoner is unable to be fed food loaf for medical reasons, the prisoner shall be provided food loaf in lieu of his/her regular meals beginning at the next scheduled meal and for the duration of the approved period. The food loaf shall be tightly wrapped and sealed and carried to the prisoner's cell on a tray. However, the prisoner shall be given only the wrapped loaf and not the tray. The loaf shall be provided during the regular breakfast, lunch, and dinner times. A prisoner on food loaf shall be provided drinking water in his/her cell through a drinking faucet or "bubbler" where available.

UU.   The Food Services Program Manager shall maintain standardized recipes for food loaves, including meatless recipes. The Food Services Program Manager also shall develop specialized recipes when necessary to meet the religious or medical needs of the prisoner. Food loaves shall meet the nutritional and caloric requirements set forth in PD 04.07.100 "Offender Meals." The Food Services Program Manager shall ensure that the recipes are available to all Food Service Directors of facilities that have segregation units. Only recipes approved by the Food Services Program Manager shall be used to prepare food loaves.

STAFF ROUNDS AND INSPECTIONS

VV.   In order to ensure the prisoner's well-being, housing unit staff shall visually check each segregated prisoner on an irregular schedule at intervals no greater in length than 30 minutes. The exact time of each check and the inspecting staff member's initials shall be recorded on the Segregation Checklist (CAJ-894) or other positive record keeping system (e.g., computerized electronic rounding) as approved by the CFA Deputy Director.

WW.   Rounds shall be made of each segregation unit as set forth in PD 04.04.100 "Custody, Security and Safety Systems."

XX.   Each segregated prisoner shall be seen at least daily by members of the housing unit team. Prisoners who are displaying symptoms of serious mental illness or severe mental disorder shall be promptly assessed in accordance with PD 04.06.182 "Mentally Disabled Prisoners in Segregation."

YY.   Program staff shall visit a segregated prisoner as provided by Department policy. Each visit shall be documented in the unit's logbook.

ZZ.   A logbook for recording significant unit activities, including rounds, shall be maintained for each segregation unit. Relevant information about each prisoner admitted to a segregation unit shall be recorded in the unit's logbook, including the prisoner's name and number, cell assignment, admission date, rule infraction or other reason for admission, and identified special medical or psychiatric needs.

AAA.   Showers, exercise, meals, cell changes, and other pertinent information shall be documented on the Special Housing Unit Record (CAJ-278) maintained for each prisoner. Except at Marquette Branch Prison and the Michigan Reformatory, the Special Housing Unit Record (CAJ-278) shall be kept adjacent to the prisoner's cell and not in a centralized location. At Marquette Branch Prison and the Michigan Reformatory, it shall be kept at the officer's station due to the physical layout of the segregation units. Rounds by health care staff, including those required below, shall be documented using an electronic rounding device. Where an electronic rounding device is not available, the rounds shall be documented

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | | |
|---|---|---|---|---|
| POLICY DIRECTIVE | 06/01/2019 | 04.05.120 | PAGE 11 OF 14 | |

on the Special Housing Unit Record (CAJ-278). Clinical observations and referrals, however, shall be documented in the prisoner health record.

MEDICAL AND PSYCHOLOGICAL/PSYCHIATRIC ROUNDS AND ASSESSMENTS

BBB. Nursing or other appropriate health care staff shall make daily rounds in each segregation unit. During rounds, health care staff shall visit each prisoner, collect written requests for health care services, and follow up on any health care concerns. Rounds also shall be made at least every two weeks by a medical practitioner (i.e., a physician, physician assistant, or nurse practitioner licensed by the State of Michigan). The presence of health care staff shall be announced and documented in the unit's logbook.

CCC. Whenever a prisoner is placed in segregation, health care staff shall be notified and shall provide health care services consistent with PD 03.04.100 "Health Services." The prisoner also shall be screened as set forth in PD 04.06.182 "Mentally Disabled Prisoners in Segregation." A prisoner placed in segregation who is on an outpatient mental health team active caseload and previously successfully completed treatment in an inpatient psychiatric unit or a residential treatment program shall be immediately referred to the CFA Deputy Director or designee as set forth in PD 04.06.182.

DDD. A Qualified Mental Health Professional, shall make rounds in each segregation unit at least weekly for monitoring prisoners' mental health condition. The Unit Chief shall make rounds with the Qualified Mental Health Professional at least every 30 days. All rounds shall be logged in the segregation unit logbook. A prisoner who exhibits signs of serious mental illness or severe mental disorder shall be immediately referred to a Qualified Mental Health Professional for further evaluation and possible treatment in accordance with PD 04.06.182 "Mentally Disabled Prisoners in Segregation."

EEE. A prisoner confined in a segregation unit for longer than 30 consecutive days shall receive a personal interview and psychological assessment by a Qualified Mental Health Professional. A prisoner requiring long-term segregation shall receive subsequent personal interviews and psychological assessments at least two months after the first assessment and at least every three months thereafter. Interviews shall be conducted out-of-cell unless the prisoner chooses not to leave his/her cell for the interview. The results of a psychological assessment shall be recorded in the prisoner health record. If the prisoner chooses not to leave his/her cell for the interview or chooses not to participate, that also shall be recorded in the prisoner health record. If the prisoner chooses not to participate, the Qualified Mental Health Professional shall return within five business days to attempt to conduct the interview and assessment.

REVIEW OF SEGREGATION PLACEMENT

HOUSING UNIT TEAM/SCC REVIEWS

FFF. Housing unit team members and SCC shall regularly review the behavioral adjustment of each prisoner classified to administrative segregation, including prisoners classified to administrative segregation who are serving a detention sanction for misconduct. A housing unit team review shall be conducted within seven calendar days of the prisoner being classified to administrative segregation. SCC shall review the prisoner at least every 30 calendar days thereafter until the prisoner is reclassified to general population status. SCC reviews shall be an out-of-cell personal interview with each prisoner. If the prisoner chooses not to participate in the review, the highest ranking SCC member shall personally visit the prisoner to encourage his/her participation.

GGG. Housing Unit Team and SCC reviews shall include consultation with a Qualified Mental Health Professional for prisoners who are on a corrections mental health services active caseload. All reviews shall be documented on a Segregation Behavior Review form (CSJ-283). If the prisoner chooses not to participate in the SCC interview, that shall also be documented on the form.

WARDEN/ADD REVIEWS

HHH. Confinement in administrative segregation for more than 30 consecutive days requires written approval of

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| POLICY DIRECTIVE | 06/01/2019 | 04.05.120 | PAGE 12 OF 14 |

the Warden. The Segregation Behavior Review form (CSJ-283) shall be used to document the Warden's approval for prisoners in administrative segregation. The Warden shall ensure a copy of the completed Segregation Behavior Review form is forwarded to the appropriate ADD for review for each prisoner confined in administrative segregation for more than 60 consecutive days. The form shall continue to be forwarded each month until the prisoner is reclassified and released from administrative segregation.

III.   Wardens shall personally interview each prisoner in their respective facilities who has been confined in administrative segregation for six continuous months. If the prisoner continues in administrative segregation beyond the first six month period, the Warden shall interview the prisoner every six months thereafter until the prisoner is released from administrative segregation. The interviews shall be conducted out-of-cell unless the prisoner chooses not to participate. If the prisoner chooses not to participate, the Warden shall personally visit the prisoner to encourage his/her participation. The interview, or the prisoner's non-participation, shall be documented on the Segregation Behavior Review form (CSJ-283).

JJJ.   ADDs shall personally interview each prisoner in their respective regions who has been confined in administrative segregation for twelve continuous months. If the prisoner continues in administrative segregation beyond the first twelve month period, the ADD shall interview the prisoner every twelve months thereafter until the prisoner is released from administrative segregation. The interviews shall be conducted out-of-cell unless the prisoner chooses not to participate. The interview, or the prisoner's non-participation, shall be documented on a Segregation Behavior Review form (CSJ-283).

RELEASE FROM SEGREGATION

KKK.   A prisoner shall be reclassified from administrative segregation only with the approval of SCC and the concurrence of the Warden or designee. However, a prisoner confined to administrative segregation as a result of an assault on staff resulting in serious physical injury to staff, escape, or attempted escape may be reclassified only with written approval of the Warden and the appropriate ADD. If the Warden supports reclassification, s/he shall submit a Request for ADD/Deputy Director Approval to Reclassify from Administrative Segregation (CSJ-283b) to the ADD to obtain approval.

LLL.   A decision to reclassify and release a prisoner from administrative segregation shall be based upon the following factors:

1.   Review of the circumstances that necessitated segregation as well as any history of prior behavior that also required segregation;

2.   Assessment of the prisoner's behavior and attitude while in segregation to determine if it is consistent with the behavior and attitude of prisoners in the general population;

3.   Evaluation of the prisoner's potential to honor the trust implicit in less restrictive confinement;

4.   Assessment of the prisoner's need for correctional mental health services, including additional treatment and medication and any need for placement in an in-patient psychiatric unit or any residential treatment program.

MMM. A prisoner who is reclassified to general population shall be placed in a general population cell as soon as administratively feasible. The Manager of the Classification and Placement Section in the Operations Division, CFA, shall be responsible for monitoring bed space availability.

NNN. A prisoner shall be removed from punitive segregation immediately upon termination of the detention sanction. A Warden shall consider a prisoner's behavior in segregation, including as documented on the prisoner's monthly Segregation Behavior Review (CSJ-283), when determining whether to excuse the prisoner's accumulated detention time pursuant to PD 03.03.105 "Prisoner Discipline."

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| POLICY DIRECTIVE | 06/01/2019 | 04.05.120 | PAGE  13  OF  14 |

STAFF

OOO.   Segregation unit operations shall be supervised by staff of at least the rank of Assistant Deputy Warden.

PPP.   Qualities of professionalism, experience, and work effectiveness demonstrated while under stressful conditions shall be considered when selecting staff for segregation unit assignments.  If possible, segregation unit staff shall be rotated to a non-segregation unit assignment as often as needed to ensure effective segregation unit management.

INCENTIVES IN SEGREGATION PROGRAM (IISP)

QQQ.   Prisoners classified to administrative segregation may be afforded the opportunity to participate in the IISP.  Facilities that have Start programs may be excluded from the IISP with the approval of the CFA Deputy Director.  The IISP program is a six stage progression of behavior expectations and incentives to encourage appropriate conduct by the prisoner.  Prisoners in the program will have a clear understanding of the conduct that is expected from them for successful progression through and completion of the program.  Staff shall look at the prisoner's progress in meeting these expectations when making behavior-based recommendations for or against the prisoner's reclassification.  Prisoners who have satisfactorily completed the program shall be considered for reclassification.  Reclassification decisions shall be made as set forth in Paragraph LLL.

RRR.   While in IISP, each prisoner's behavior shall be evaluated daily during each shift and any positive or negative behavior shall be documented.  The housing unit team shall review each evaluation at least weekly to assist in determining the prisoner's progression through the program.  Prisoners whose behavior does not meet minimum expectations or who abuse the incentives provided may be placed at a lower stage of the program by the housing unit team.

SSS.   The CFA Deputy Director shall ensure that a manual is maintained detailing the operation of the program.  This shall include identifying behavior expectations for each stage of the program and the incentives that may be offered at each stage.  At a minimum, prisoners in the program shall be provided with or allowed to possess the property, programs, and activities identified in Paragraphs AA unless restricted for reasons of safety and security or due to disciplinary sanction.  However, appliances (e.g., televisions, radios) shall be permitted only as identified in the manual.  If an appliance is used as an incentive, the appliance may be loaned to a prisoner in the program who neither owns nor has adequate funds to purchase the appliance.  If loaned, the appliance may be one that a prisoner no longer wants and has turned over to the facility for disposal or a contraband appliance that the prisoner has agreed may be destroyed in accordance with PD 04.07.112 "Prisoner Personal Property." However, the appliance must be in good repair and thoroughly searched before being loaned for use by a prisoner in the program.  Property, programs, and activities beyond the minimum standards set forth in this policy shall be afforded only as set forth in the manual.

PROCEDURES

TTT.   If necessary, to implement requirements set forth in this policy directive, Wardens shall ensure that procedures are developed or updated.

AUDIT ELEMENTS

UUU.   A Primary Audit Elements List has been developed and is available on the Department's Document Access System (DAS) to assist with self-audit of this policy pursuant to PD 01.05.100 "Self-Audits and Performance Audits."

ATTACHMENTS

VVV.   This policy directive contains the following attachments:

| DOCUMENT TYPE POLICY DIRECTIVE | EFFECTIVE DATE 06/01/2019 | NUMBER 04.05.120 | PAGE 14 OF 14 |
|---|---|---|---|

1.     Attachment A - Facilities With Segregation Cells

2.     Attachment B - Items Not Allowed in Segregation

APPROVED: HEW 03/12/2019

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| PD ATTACHMENT | 08/22/2022 | 04.05.120A | PAGE 1 OF 1 |

## ATTACHMENT A

## FACILITIES WITH SEGREGATION CELLS

### ADMINISTRATIVE SEGREGATION

Only the following facilities shall have administrative segregation cells:

Alger Correctional Facility (LMF)
Baraga Correctional Facility (AMF)
Bellamy Creek Correctional Facility (IBC)
Chippewa Correctional Facility (URF)
Ionia Correctional Facility (ICF)

Marquette Branch Prison (MBP)
Oaks Correctional Facility (ECF)
St. Louis Correctional Facility (SLF)
Women's Huron Valley Correctional Facility (WHV)

### PUNITIVE SEGREGATION (DETENTION)

Only the following facilities shall have punitive segregation (detention) cells:

Alger Correctional Facility (LMF)
Baraga Correctional Facility (AMF)
Bellamy Creek Correctional Facility (IBC)
Carson City Correctional Facility (DRF)
Chippewa Correctional Facility (URF)
Earnest C. Brooks Correctional Facility (LRF)
G. Robert Cotton Correctional Facility (JCF)
Gus Harrison Correctional Facility (ARF)
Ionia Correctional Facility (ICF)
Lakeland Correctional Facility (LCF)
Macomb Correctional Facility (MRF)

Marquette Branch Prison (MBP)
Michigan Reformatory (RMI)
Muskegon Correctional Facility (MCF)
Oaks Correctional Facility (ECF)
Richard A. Handlon Correctional Facility (MTU)
Saginaw Correctional Facility (SRF)
St. Louis Correctional Facility (SLF)
Thumb Correctional Facility (TCF)
Women's Huron Valley Correctional Facility (WHV)

### TEMPORARY SEGREGATION

Only the following facilities shall have temporary segregation cells:

Alger Correctional Facility (LMF)
Baraga Correctional Facility (AMF)
Bellamy Creek Correctional Facility (IBC)
Carson City Correctional Facility (DRF)
Chippewa Correctional Facility (URF)
Earnest C. Brooks Correctional Facility (LRF)
G. Robert Cotton Correctional Facility (JCF)
Gus Harrison Correctional Facility (ARF)
Ionia Correctional Facility (ICF)
Lakeland Correctional Facility (LCF)
Macomb Correctional Facility (MRF)

Marquette Branch Prison (MBP)
Michigan Reformatory (RMI)
Muskegon Correctional Facility (MCF)
Newberry Correctional Facility (NCF)
Oaks Correctional Facility (ECF)
Richard A. Handlon Correctional Facility (MTU)
Saginaw Correctional Facility (SRF)
St. Louis Correctional Facility (SLF)
Thumb Correctional Facility (TCF)
Women's Huron Valley Correctional Facility (WHV)

APPROVED: HEW 07/19/2022

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| PD ATTACHMENT | 06/01/2019 | 04.05.120B | PAGE 1 OF 1 |

## ATTACHMENT B

## ITEMS NOT ALLOWED IN SEGREGATION

For security reasons, prisoners in segregation shall <u>not</u> be allowed to possess the following items:

1. A/C adapters
2. Appliances operated only by A/C adapters and/or batteries
3. Athletic supporters
4. Batteries - AA, AAA, C and D
5. Belts
6. Cassette tapes, if not allowed to have tape player or combination radio/tape player under no. 2 above
7. Cassette tape cases
8. Dental floss in excess of 18 inch maximum length
9. Drawstrings
10. Extension cords
11. Hangers
12. Hard-soled shoes
13. Hobbycraft materials
14. Nail clippers – this does not apply to state-issued nail clippers
15. Neck chains
16. Needles and pins
17. Padlocks
18. Paper bags
19. Paper clamps, paper clips, metal clips, staples, rubber bands
20. Portable media players and accessories
21. Shoelaces
22. Squirt bottles - this does not apply to prescription eye drops
23. Strings, ropes, cords, strips of leather
24. Sunglasses
25. T.V. converter boxes
26. Thumb tacks/push pins
27. Tweezers
28. Typewriters

<u>Religious Items</u>

1. Crosses/crucifixes
2. Moorish Science Temple of America badges
3. Moorish Science Temple of America lapel pins
4. Oms
5. Pentagrams/Pentacles
6. Star and Crescent pendants
7. Stars of David
8. Tefillins
9. Thor's hammers
10. Turbans

The attachments to PD 05.03.150 "Religious Beliefs and Practices of Prisoners" identify materials necessary to the practice of a prisoner's religion.  The following materials are only required during group religious services; therefore, prisoners in segregation shall <u>not</u> be allowed to possess the following items:

1. Bow ties
2. Fez/fez bag

No. G84-63
United States District Court, W.D. Michigan, S.D

# U.S. v. State of Mich.

680 F. Supp. 270 (W.D. Mich. 1988)
Decided Mar 3, 1988

No. G84-63.

271 March 3, 1988. *271

Andrew J. Barrick, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., for plaintiff.

National Prison Project of the American Civil Liberties Union by Elizabeth Alexander and Adjoa Aiyetoro, Washington, D.C., and Patricia A. Streeter, Detroit, Mich., as amicus curiae.

Frank J. Kelly, Atty. Gen., State of Mich. by Thomas Nelson and Brian MacKenzie, Lansing, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

The issue to be addressed in this opinion is whether the defendants' use of food loaf for prisoners in segregation units violates either the standards created by the Consent Decree and the State Plan for Compliance or constitutional 272 standards. Food loaf *272 is a substance prepared by grinding up and combining the various components of a regular prison meal.[1] This substance is formed into a loaf and baked. The baked loaf is then tightly wrapped in plastic and served to the inmate without tray or utensils. The only liquid provided to a prisoner placed on food loaf is water, which is made available through drinking fountains installed in segregation cells. All parties appear to agree that the caloric and nutritional content of the food loaf is substantially similar to the caloric and nutritional content of

normal prison meals. Indeed, there could be little dispute on that issue, since the food loaf is prepared, as I have indicated, by combining the various items which make up a regular meal.

[1] As *amicus* points out, food loaf is prepared from a limited number of menus. Thus, the contents of a food loaf do not necessarily coincide with the items served to prisoners receiving regular meals on a given day. However, the food used to prepare food loaf does not differ from the food used to prepare regular meals, and while there is not as much variety in the content of food loaf as there is in the content of regular meals, it is clear that food loaf menus do change from day to day. Food loaf is not always prepared from the same "recipe."

At present, the Department's Policy Directive number PD-BCF-50.04 (Jan. 1, 1987) provides that:

A prisoner housed in segregation may be immediately placed on the food loaf if he or she is observed engaging in any of the following behavior:

1. Misuse of food, serving tray, or eating utensils.

2. Refusing or failing to return uneaten food, the serving tray, dishes or eating utensils to the door slot. . . .

3. Destroying a serving tray or throwing a tray or food.



4. Using containers to hold or throw other substances, such as human waste products.

Upon observing such behavior, staff must complete a misconduct report. The inmate is then placed on food loaf beginning with the next meal. The diet continues, three meals a day, for fourteen days, unless a hearing officer determines that the prisoner did not engage in the conduct as charged. Prisoners with special diet restrictions are given food loaf prepared within those restrictions, with certain notable exceptions. Prisoners with food allergies that do not require dietary restrictions or prisoners who are lactose-intolerant do not receive food loaf which omits those foods. Nothing in the policy restricts the number of times a prisoner may be placed on food loaf, nor does the policy require a period of normal meals between impositions of food loaf.

Defendants maintain that this policy was instituted not as a punitive measure, but as an administrative measure to control certain behavior which has become a serious problem in the segregation units at the consent decree institutions — the throwing of food, utensils and human waste by prisoners.[2] Testimony at the previous compliance hearing indicated that this behavior is a relatively serious problem in the segregation units at the decree institutions, and one which contributes to the explosive environment that presently exists in those units. It also appears that the behavior is more frequently targeted toward guards, although prisoners are also subjected to it.

[2] Witnesses and parties frequently referred to food loaf as a "behavior modification" device.

As indicated above, prisoners are placed on food loaf without the benefit of a prior hearing to determine whether the behavior charged actually occurred. A disciplinary hearing is held, however, sometime after the prisoner is placed on food loaf.[3] The policy directive provides that the hearing officer may make one of three determinations. First, the hearing officer may

determine that the prisoner did not engage in the conduct as charged. In this instance, the prisoner is immediately returned to normal meals. Second, the hearing officer may determine that the prisoner *273 is guilty *273 of misconduct as charged. In this instance, the food loaf diet continues for fourteen days. Finally, the hearing officer may determine that the misconduct charge must be dismissed for "procedural reasons," but that the prisoner in fact engaged in the conduct as charged. In this event, the prisoner remains on food loaf for the entire fourteen day period, although the misconduct charge is deleted from his file.

[3] There was no evidence indicating the length of time between the deprivation of regular meals and the hearing. I will, therefore, assume that the hearings are held on a reasonably prompt schedule.

The use of food loaf in segregation units raises at least three questions. First, the Court must determine whether its use violates the Consent Decree and the State Plan for Compliance. Second, I must determine whether food loaf constitutes a cruel and unusual punishment within the meaning of the Eighth Amendment. And finally, I must determine whether its use implicates the due process rights of prisoners in segregation units.

1. *The Consent Decree.* As the parties and *amicus* agree, the starting point for any discussion of this issue must be the Consent Decree and the State Plan for Compliance entered in this case. Neither document addresses the use of food loaf itself.[4] The State Plan for Compliance, however, provides that, "Prisoners in segregation and RGC shall continue to be served three meals per day, which are essentially the same meals as those served to general population." State Plan for Compliance § J(2). In evaluating whether food loaf violates the Consent Decree, then, the Court must determine whether food loaf is "essentially the same" as the meals served to prisoners in the general population.

U.S. v. State of Mich.    680 F. Supp. 270 (W.D. Mich. 1988)

4  It appears that defendants began using food loaf in segregation units only after the entry of the Consent Decree and the State Plan.

*Amicus* argues strenuously that food loaf is not the same as the food served to the general public, pointing out that, "One could as easily argue that a child's water colors are 'essentially the same' as those of Claude Monet because both creations are formed from the same materials." *Amicus* Brief in Support of an Order Banning Food Loaf at 2. While the argument is not without some logical appeal, I must disagree.

Food loaf is prepared from the same food items as meals served to the general population. While the contents of food loaf on any given day may be different from the contents of the regular prison meal, the food loaf is prepared using "normal" ingredients, and its contents, like the contents of a regular prison meal, differ from day to day. The caloric content of a food loaf meal is similar to the caloric content of a meal comprised of separate food items, and the nutritional value of the loaf is comparable to the nutritional value of the regular meals. The primary difference between food loaf and the regular meal is in its preparation, not its content. But that difference is not so striking as to make food loaf not "essentially the same" as the regular prison meal, at least not as the food loaf policy is presently written.[5] Moreover, food loaf is not the "normal" meal inside the segregation units. It is given to inmates who have engaged in certain prohibited behavior, and it is given to them for a relatively short period of time, at least in most instances. Because the content of the food loaf is essentially similar to the content of normal prison meals, and because it is not fed to prisoners as a matter of course, but rather only as a result of the prisoner's negative conduct, I can find no grounds for holding that its use violates either the Consent Decree or the State Plan.[6] *274

274

5  I would not be prepared, for example, to hold that food loaf could be served to every prisoner in segregation, for every meal and

for an extended period of time without violating the Consent Decree and the State Plan. If that were the defendants' practice, then the argument that similarity among meals should be judged more by the method of food preparation than by the meal's content would carry more weight. But that is not the issue presented. Rather, the issue is whether the use of food loaf for the reasons, and within the guidelines established by the present policy directive violates the consent decree.

6  Because the use of food loaf complies with the standards set in the Consent Decree and the State Plan, the defendants had no duty to report their decision to implement policy directive PD-BCF-50.04, either to the Court or to the parties. Similarly, no modification of the Decree or Plan is necessary to allow its continued use.

2. *The Eighth Amendment.* The fact that food loaf does not violate the Consent Decree would not sanction its use if the practice constituted cruel and unusual punishment within the meaning of the Eighth Amendment. I have no trouble characterizing the use of food loaf as a "punishment," despite the defendants' protestations to the contrary. Defendants characterize the practice as "an administrative action taken to maintain a clean and healthy environment," and have repeatedly claimed that food loaf is not used as a "sanction for misconduct," but rather as a method for removing "the opportunity for such behavior." Policy Directive PD-BCF-50.04. An analysis of the actual imposition of food loaf, however, indicates that it is, indeed, a punishment.

Food loaf is imposed only for specific types of misconduct. Its use is always accompanied by a misconduct report and disciplinary charge. There can be no doubt that eating food loaf is less pleasant than eating a regular prison meal, and thus, it is not difficult to conclude that inmates placed on food loaf consider it to be a punishment for misconduct. Moreover, the purpose of food

U.S. v. State of Mich.   680 F. Supp. 270 (W.D. Mich. 1988)

loaf, as described by the policy directive, indicates its punitive character. It is specifically designed to prevent the throwing of food, utensils and human waste by removing the opportunity to engage in that behavior and also, hopefully, by impressing inmates with the understanding that extremely unpleasant results will occur whenever they engage in the prohibited behavior.[7]

> [7] As I understand the theory behind behavior modification techniques, it is to prevent repeated instances of negative behavior by consistently reacting to that behavior in an unpleasant manner. Thus, the subject is trained to associate the behavior with the unpleasant response and will hopefully avoid the behavior in order to avoid its consequences. Regardless of its name, there appears to me to be no difference between this sort of "treatment" and any operable definition of "punishment."

Finally, witnesses at the most recent compliance hearing testified that food loaf was a necessary measure in order to maintain staff morale within the segregation units. *See also,* Defendants' Memorandum of Law Regarding Food Loaf, at 4. As Ms. Burke testified, staff subjected to such repulsive behavior by inmates must be given some professionally sanctioned outlet for their very understandable feelings of anger toward the misbehaving inmate. Defendants point out in their brief that, "It is both unrealistic and unreasonable to expect any human being to maintain professional detachment under a daily barrage of food and human waste." *Id.* While I completely agree that staff must have an immediate, yet professional, response to this sort of behavior, it seems to me that this recognition in itself identifies food loaf as a punishment. The administration might consider food loaf a "behavior modification device," or an "administrative measure," but if staff impose it in order to respond to negative and personally offensive behavior, as they appear to do, then they must consider it a punishment. *Cf. Molton v. City of Cleveland,* 839 F.2d 240 (6th Cir. 1988)

(whether condition is a punishment depends, in part, upon the purpose of maintaining that condition).

Having decided that food loaf is a punishment in fact, if not in name, the next question is whether that punishment may be considered cruel and unusual within the meaning of the Eighth Amendment. I hold that it may not. Since the general standards to be employed in discussing Eighth Amendment issues are well understood,[8] I

275   *275 see no reason to repeat them at length here. Turning to the specific issue at hand, it appears to this Court that the Eighth Amendment requires no more than that prison officials provide inmates with a diet which is nutritionally adequate for the maintenance of normal health. *Cunningham v. Jones,* 567 F.2d 653, 656, 660 (6th Cir. 1977) ("deliberate and unnecessary withholding of food essential to normal health can violate the Eighth Amendment"). *See also Hamm v. DeKalb County,* 774 F.2d 1567, 1575 (11th Cir. 1985) ("The Constitution requires that prisoners be provided `reasonably adequate food'. . . . The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant does not amount to a constitutional deprivation."); *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir. 1983); *Jones v. Diamond,* 636 F.2d 1364, 1378 (5th Cir. 1981); *Smith v. Sullivan,* 553 F.2d 373, 380 (5th Cir. 1977) ("A well-balanced meal, containing sufficient nutritional value to preserve health, is all that is required."). Where food is prepared and served in a sanitary manner and is nutritionally adequate to maintain normal health, the fact that it is unappetizing will not, standing alone, state a constitutional claim. *See, e.g., Falter v. Veterans Administration,* 632 F. Supp. 196, 210-11 (D.N.J. 1986).

> [8] *See eg., Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (Punishments involving the

U.S. v. State of Mich.    680 F. Supp. 270 (W.D. Mich. 1988)

"wanton infliction of pain" violate the Eighth Amendment); *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("deliberate indifference to serious medical needs constitutes 'unnecessary and wanton infliction of pain'"); *Trop v. Dulles,* 356 U.S. 86, 100-01, 78 S.Ct. 590, 594-98, 2 L.Ed.2d 630 (1950); *Weems v. United States,* 217 U.S. 349, 373, 30 S.Ct. 544, 551, 54 L.Ed.2d 793 (1910); *Cunningham v. Jones,* 567 F.2d 653 (6th Cir. 1977); *LaBatt v. Twomey,* 513 F.2d 641 (7th Cir. 1975); *French v. Heyne,* 547 F.2d 994 (7th Cir. 1976); *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854 (4th Cir. 1975); *Sostre v. South Carolina Department of Corrections,* 529 F.2d 854 (4th Cir. 1975); *Sostre v. McGinnis,* 442 F.2d 178 (1971); *Wright v. McMann,* 387 F.2d 519 (2d Cir. 1967); *Hancock v. Avery,* 301 F. Supp. 786 (M.D.Tenn. 1969).

At least one court has held that food which is minimally adequate to sustain normal health, yet "tasteless [and] unappetizing" might present a constitutional issue. In *Finney v. Arkansas Board of Correction,* 505 F.2d 194, 207-08 (8th Cir. 1974), the Eighth Circuit remanded a prison conditions case to the district court after reversing that court's decision to terminate its continuing jurisdiction over the Arkansas prison system. The circuit court found "dubious" the district court's conclusion that "grue," a "tasteless, unappetizing paste-like food which is served to prisoners in solitary confinement as a form of further punishment," was a nutritionally sufficient diet. *Id.* at 207. On remand, the district court reconsidered use of "grue," and concluded that its use as a steady diet for prisoners in segregation violated the Eighth Amendment. *Finney v. Hutto,* 410 F. Supp. 251 (E.D.Ark. 1976). The district court noted:

While the evidence is to the effect that "grue" . . . will not only sustain life but is adequate nutritionally for an inmate who is not leading an active life, the evidence also discloses that some inmates simply will not eat the "grue" or will not eat much of it, and that practically all inmates lose weight while in punitive isolation. . . .

410 F. Supp. at 276 notes 12. As both the Eighth Circuit and the district court noted, the prison's practice of alternating grue with regular meals and of conducting a medical examination of each prisoner being fed "grue" indicated that its use posed a threat to the health of the prisoners in segregation.

I find it significant, if not controlling, that there was no evidence in this case indicating either that prisoners fed food loaf refused to eat it, or that they sustained abnormal weight losses or other adverse health effects while on the food loaf diet. It thus appears that the health dangers which caused the Eighth Circuit to ban the use of "grue" are not presented by food loaf. Moreover, unlike "grue," food loaf is prepared from the same ingredients which make up a regular prison meal, and its contents vary from day to day. While it is certainly not as appealing as a meal made up of separate food items, and while it may be unappetizing, it is not so deficient that it poses a risk to the health of the prisoners receiving it. Thus, it appears to the Court that food loaf does not, as a matter of law, in every case, violate the Eighth Amendment's prohibition against cruel and unusual punishment.

This is not to say that the use of food loaf could never pose a constitutional question in a particular case. As *amicus* point out, placing a particular prisoner on the food loaf diet may indeed constitute "deliberate indifference" to that prisoner's medical needs. For example, it may be deliberately indifferent to place a prisoner 276 compromised *276 by AIDS infection on such a diet, or to impose food loaf upon a prisoner with

certain food allergies or other medical problems which do not require that the prisoner be placed on a special diet. But the question presented here is whether the use of food loaf at all times and for all prisoners violates the Eighth Amendment. While it may constitute a violation for some specific prisoner, I cannot hold that its use always constitutes cruel and unusual punishment.

My opinion also should not be interpreted to say that the use of food loaf as a sanction for certain relatively innocuous misbehaviors would not pose a constitutional question. In *Moss v. Ward,* 450 F. Supp. 591 (W.D.N.Y. 1978), a prisoner was deprived of all food for four days because he failed to return a plastic cup following the completion of a meal. The prisoner indicated that he needed the cup to store his dentures. While the court refused to find that denial of food "is a per se violation of a prisoner's Eighth Amendment rights," it found that the denial of food under those facts was such a violation because there was "no showing that the prisoner [engaged] in the conduct the rule is designed to prevent." *Id.* at 596. The court specifically noted that:

> Although being deprived of one or two meals might not be cruel and unusual punishment, prison officials cannot impose such severe sanctions for breaking a disciplinary rule, as occurred in the instant case, on prisoners when there is no showing that the prisoner is engaging in the conduct the rule is designed to prevent.

*Id.* at 596. Such a punishment would contravene the Eighth Amendment because it would be grossly disproportionate to the offense for which it is being imposed and because it would go beyond what is necessary to achieve a legitimate aim. *Id.* at 597.

The same standards would, in all likelihood, apply to the use of food loaf. Without some showing that the prisoners consigned to such a diet engaged in the behavior sought to be controlled — i.e., the throwing of food or human waste — the

imposition of food loaf might indeed violate the Eighth Amendment because it would be grossly disproportional to the offense committed and because it would go far beyond what is necessary to achieve the state's legitimate needs. But again, this is a judgment which could only be made in a specific case, with regard to a specific prisoner. The fact that food loaf may, in some instances, constitute a cruel and unusual punishment is not enough to hold that it violates constitutional standards in every case. *See, e.g., Hutto v. Finney,* 437 U.S. 678, 686-87, 98 S.Ct. 2565, 2571-72, 57 L.Ed.2d 522 (1978).

3. *The Due Process Clause.* The final issue to consider is whether the use of food loaf implicates the due process rights of prisoners in the segregation units. As the Sixth Circuit recently noted in *Beard v. Livesay,* 798 F.2d 874 (6th Cir. 1986), "A state, by its own actions, may create liberty interests protected by the due process clause." *Id.* at 876. *See also, Hewitt v. Helms,* 459 U.S. 460, 469, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983); *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747-48, 75 L.Ed.2d 813 (1983); *Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976); *Bills v. Henderson,* 631 F.2d 1287 (6th Cir. 1980); *Williams v. Lane,* 548 F. Supp. 927 (N.D.Ill. 1982) (prison regulation created liberty interest in segregation meals comparable to those provided for the general population). Prison officials may create liberty interests by policy statements, regulations, or other official promulgations. *Beard,* 798 F.2d at 877; *Walker v. Hughes,* 558 F.2d 1247, 1255 (6th Cir. 1977). The Sixth Circuit explained the criteria for determining whether a prison policy or regulation creates an enforceable liberty interest in *Bills v. Henderson,* 631 F.2d 1287 (6th Cir. 1980). In that case, the court held:

Where statutes or prison policy statements have limited prison officials' discretion by imposing a specific prerequisite to the forfeiture of benefits or favorable living conditions enjoyed by a prisoner, an expectation or entitlements has been created which cannot be taken away *277 without affording the prisoner certain due process rights. On the other hand, when prison officials have complete discretion in making a decision that will affect the inmate, no expectation or protected liberty interest has been created.

*Id.* at 1292-93. As the Supreme Court succinctly stated in *Olim,* "If the decisionmaker is not `required to base its decisions on objective and defined criteria,' but instead `can deny the requested relief for any constitutionally permissible reason or for no reason at all,' the State has not created a constitutionally protected liberty interest." 461 U.S. at 249, 103 S.Ct. at 1747. While the creation of procedural guidelines or requirements, standing alone, will not be sufficient to establish a liberty interest, *Hewitt,* 459 U.S. at 471, 103 S.Ct. at 871, where the state goes beyond such guidelines "by using `mandatory language' in connection with `specific substantive predicates,' a liberty interest may be found." *Beard,* 798 F.2d. at 877.

Applying these criteria to the case at hand, the Court finds that Policy Directive PD-BCF-50.04 creates a constitutionally protected liberty interest in not being deprived of regular prison meals or, alternatively, in not being placed on food loaf. The policy directive contains the necessary mandatory language, and clearly places substantive limitations upon the discretion of prison officials to order that a particular inmate be placed on food loaf diet. First, the policy directive defines the specific types of misbehavior for which food loaf may be imposed. An inmate may be placed on food loaf only if he engages in the behaviors indicated in the policy, and the policy creates a relatively narrow class of behavior meriting this

particular punishment. Second, it indicates that any instance of the listed misbehavior will be punished by the use of food loaf.[9] Finally, the policy directive purports to constrain the discretion of the hearing officer reviewing the imposition of food loaf by defining the instances in which a prisoner may be made to continue receiving these meals.[10] Thus, I find that this policy does more than create procedural requirements — it confers upon prisoners a liberty interest by specifically defining the behaviors for which food loaf may be imposed and the conditions under which its use may continue.

[9] At some points the policy states that a prisoner "may" be placed on food loaf, apparently indicating that the staff member observing such behavior has discretion to decide whether to impose that punishment. However, the policy also notes that, "A Staff member who observes *will immediately* write a misconduct report containing the appropriate charge or charges based upon the behavior which has been observed. It *shall* be noted on the misconduct report that the prisoner has been placed on food loaf." The policy further requires staff members to immediately notify their shift commander of such misbehavior, it requires the shift commander to notify Food Service and its requires Food Service to serve the prisoner food loaf beginning with the next meal. The fact that the policy at some points uses discretionary language does not negate the existence of a liberty interest where the policy is so clearly intended to be mandatory and to place substantive limitations on the use of this particular punishment.

[10] As indicated earlier, the hearing officer may order the prisoner returned to normal meals only if he or she finds that the prisoner did not engage in the conduct as charged. If the hearing officer finds that the charge is merited, or that the behavior in fact occurred, then the prisoner remains on

food loaf for fourteen days. Thus, the policy places substantive limitations upon the hearing officer in the same way as it limits the discretion of other staff members.

Having determined that prisoners in segregation have a liberty interest in not being deprived of regular prison meals, the question to be answered is what process is due those prisoners in this context. See, Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Walker v. Hughes, 558 F.2d 1247 (6th Cir. 1977). As the Supreme Court noted in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), that inquiry, "must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by government action." Id. at 481, 92 S.Ct. at 2600. In this case, it appears to the Court that the state's interest in preventing the throwing of food items and human waste by prisoners in segregation is strong indeed. Not only does such behavior pose a threat to the safety of guards and *278 prisoners, but it contributes to the myriad difficulties associated with providing a sanitary living environment inside the segregation units. On the other hand, it must be remembered that food loaf is only one of a number of punitive measures available to prison officials to curb such negative behavior. And, while the behavior at issue is relatively common, it is only one of a number of disciplinary problems which have combined of late to create an atmosphere of tension and violence within the segregation units. While the problem of food and waste throwing is certainly serious, it is not as serious as, for example, the recurring problem of prisoner assaults on guards.

Finally, in evaluating the state interest at stake, I cannot disregard the clear evidence that food loaf has been unsuccessful in curbing this extremely negative behavior. The choice of a particular punitive measure, among constitutionally acceptable alternatives, is a matter to be left to the discretion of prison officials and, barring some constitutional difficulty, this Court may not substitute its judgment for that of the prison officials on such an issue, no matter how wrong-headed or ineffectual their chosen policies appear to be. See, e.g., Hewitt v. Helms, 459 U.S. at 470, 103 S.Ct. at 870-71; Meachum v. Fano, 427 U.S. at 225, 96 S.Ct. at 2538-39; Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1977). But in weighing the state's interest in imposing food loaf upon a prisoner, I think it does no violence to the doctrine of judicial deference to take notice of the fact that a chosen policy is, at best, ineffective, and at worst a contributing factor in the escalating tension within the segregation units. Thus, while the state interest in maintaining discipline and sanitation within the segregation units is great, its interest in using food loaf in order to achieve those goals is less weighty.

The private interest to be balanced against the state interest is also great. There can be no doubt that eating food loaf for an extended period of time is unpleasant. Further, given the severe restrictions already placed upon these prisoners, from restricted access to out-of-cell activities to restrictions upon the possession of personal property, it is also obvious that the food served to these prisoners takes on a significance for them that it might not have for prisoners in other settings. Finally, the Court cannot ignore the fact that the use of food as a punishment is disfavored, both by courts and by corrections experts themselves. See, Moss v. Ward, 450 F. Supp. 591, 594 (W.D.N Y 1978); American Correctional Association Correctional Standard 2-4223-1 (January, 1988). This indicates a clear awareness of psychological impact food related punishments have upon prisoners, and of their strong interest in not being subjected to such punishments arbitrarily. Thus, I conclude that the state and private interests at stake are roughly equal. The prisoners' stake in not being deprived of regular meals is great, and while the state's interest in maintaining discipline and sanitary conditions in

segregation units may be considered greater, the state's interest in imposing this particular sanction for misbehavior must be discounted because the sanctions appears to be so ineffectual.

Although I have concluded that the private interest at stake is great, I do not find that it is so great as to require a prior hearing before the imposition of food loaf. To begin with, we must keep in mind that we are only talking about food, and a temporary deprivation of certain kinds of food at that. We are not considering far greater impositions upon liberty interests such as being placed in segregation or having one's parole revoked. Second, the state's argument that food loaf must be imposed quickly and consistently in order to be effective carries some weight. A prisoner who engages in food or waste throwing is highly likely to be agitated and violent. He is also likely to engage in that behavior again, at the very next opportunity. Even if food loaf is ineffective at preventing prisoners from throwing food or waste when they have the opportunity to do so, it must be considered effective at preventing that behavior, while the prisoner is on the food loaf diet, simply because it removes the prisoner's opportunity to engage in the *279 behavior. I find that the state's interest in removing that opportunity, at least temporarily, while the prisoner is most likely to repeat the behavior, outweighs the chance of an erroneous or arbitrary deprivation of the prisoner's right to receive regular meals.

What I do find objectionable about the present policy is the provision which allows the hearing officer to continue the food loaf punishment, even if that officer decides that the misconduct charge is unwarranted. This provision only makes sense if one continues to view food loaf as something other than a punishment. Once we admit that food loaf is a punishment for a particular type of misconduct, it appears clear that such a punishment cannot be imposed if the misconduct charge against the prisoner is without merit. To allow a hearing officer to impose this punishment,

even though the misconduct charge must be dismissed for "procedural reasons," so increases the possibility of arbitrary punishment and erroneous deprivations that it must be held to violate the prisoners' due process rights. Either the prison is justified in punishing a prisoner for misconduct or it is not. But it cannot find the prisoner innocent of misconduct, or find that the charge filed against the prisoner must be dismissed, and also punish him. Such an alternative raises to an unacceptable level the prospect of arbitrary government action, the very prospect which the due process clause seeks to avoid. *See, Walker*, 558 F.2d at 1257.

To conclude, I find that the use of food loaf does not violate the Consent Decree or the State Plan for Compliance. I further find that it does not, in all cases, constitute cruel and unusual punishment within the meaning of the Eighth Amendment. I further find that Policy Directive PD-BCF-50.04 confers a liberty interest on prisoners in not being placed on food loaf unless they have engaged in the behavior identified in that policy. While the private interest at stake is great, it is not so great as to require defendants to conduct a disciplinary hearing prior to the imposition of food loaf upon a particular prisoner. I do find, however, that the policy directive, as currently written, violates the due process rights of prisoners in segregation units to the extent that it permits the use of food loaf as a punishment even when the misconduct charge upon which that punishment is based has been dismissed. Thus, I will enjoin the use of food loaf as a punishment for misconduct in any case where the misconduct charge upon which that punishment is based is dismissed by the hearing officer, for whatever reason, or where the hearing officer finds the prisoner not guilty of the misconduct as charged.

281 *281

 casetext

You have no more free articles available this month. **Subscribe today (/subscribe/digital/)**.          ×

# ❄ (/subscribe/digital/) Michigan Use of Food Loaf Violates Prisoners' Due Process Rights

Loaded on MAY 15, 2007
Filed under: Conditions of Confinement (/search/?selected_facets=tags:Conditions%20of%20Confinement), Food (/search/?selected_facets=tags:Food). Location: Michigan (/search/?selected_facets=locations:1495).

The U.S. District Court, W.D. Michigan, Southern Division, held that the use of "food loaf" as punishment even when prisoners' misconduct charges were dismissed, violated their right to due process.

The United States brought action against the State of Michigan, Department of Corrections (DOC), for using food loaf as a punishment for prisoners in segregation units. The plaintiffs argued, (1) that the use of food loaf violated a consent decree entered into by the prison to serve meals to prisoners in segregation units which were similar to the meals served to prisoners in regular population; (2) that the food loaf was cruel and unusual punishment; and (3) that the use of food loaf to feed prisoners who had not yet been found guilty of any misconduct, or the prisoners who were found not guilty of the alleged misconduct, violated their due rights.

The DOC argued that the food loaf contained similar caloric and nutritional content of normal prison meals, but that the food loaf was prepared from a limited number of menus by grinding up the various components of a meal, and baking it into a loaf form. The DOC testified that the use of food loaf as punishment was a necessary measure in order to maintain staff morale within the segregation units.

The district court held that, in evaluating the use of food loaf as punishment, it was clear that it was unsuccessful in stopping negative behavior. However, the court found that the use of food loaf did not violate the consent decree, and that the use of food loaf as punishment did not constitute cruel and unusual punishment within the meaning of the Eighth Amendment. The court did however, find that the use of food loaf on prisoners who had their misconduct charges dismissed, or were found not guilty, violated their due process rights. The court issued an injunction on the DOC, enjoining them from the use of food loaf as a punishment in any case where the misconduct charge upon which that punishment is based is dismissed, or where the hearing officer finds the prisoner not guilty of the charge. See: United States v. State of Michigan, 680 F.Supp. 270 (WD MI 1988).

As a digital subscriber to Prison Legal News, you can access full text and downloads for this and other premium content.

Subscribe today (/subscribe/digital/)

Already a subscriber?    Login (/users/login/)

# Related legal case

## United States v. State of Michigan

| | |
|---|---|
| **Year** | 1988 |
| **Cite** | 680 F.Supp. 270 (WD MI 1988) |



OKLAHOMA STATE UNIVERSITY
CENTER FOR HEALTH SCIENCES

July 18, 2023

John J. Lentini, Chair
AAFS Ethics Committee
American Academy of Forensic Sciences
410 N 21st St.
Colorado Springs, CO 80904
Via email: scientific.fire@yahoo.com

Dear Mr. Lentini,

I am writing to provide information regarding the employment of Mr. Richard Walter
with the OSU Center for Health Sciences during the 2015–2016 academic year.  As a
point of background information, it should be noted that the OSU School of Forensic
Sciences is housed within the OSU Center for Health Sciences in Tulsa, Oklahoma. The
Center for Health Sciences is an institution within the Oklahoma State University
System.

Dr. Robert Allen, Chair of the OSU School of Forensic Sciences, contacted Mr. Walter
during the spring of 2015 to determine if he was interested in serving as a Visiting
Professor for the coming 2015-2016 year. Visiting Professors are often used by
universities to provide specialized expertise and to expose students to experts and/or
scholars in a specific discipline. The request of Mr. Walter was made in recognition of
his career experience in crime scene analysis. It is important to note that Mr. Walter had
made previous presentations at the American Academy of Forensic Sciences which
members of the OSU faculty had attended and determined his expertise would be
beneficial to the OSU Forensic Science program. Mr. Walter accepted the invitation and
was employed as a Visiting Professor for the coming academic year, beginning in
August of 2015. Mr. Walter relocated to Tulsa and began his full-time employment as a
Visiting Professor on August 1, 2015, and was paid an annualized salary of $87,504
divided in monthly payment increments.

While serving as a Visiting Professor, Mr. Walter taught one course in each of two semesters within the forensic psychology track of the Forensic Sciences Master of Science program and also provided advice to students within the program who were working on theses and formal reports. During his time in Tulsa, Mr. Walter also provided consultation to the Tulsa County Sheriff's Cold Case Unit and developed a concept for the future development of an OSU Center for Crime Scene Assessment.

In addition to his academic responsibilities Mr. Walter was also gracious enough to give informal seminar presentations on crime scene analysis which were greatly enjoyed by the faculty and staff.  Mr. Walter's presence as a Visiting Professor enriched the experience of our Forensic Science students, and we were grateful for his service. Should you have any questions regarding Mr. Walter's employment with us, please feel free to contact me.

Sincerely,

James D. Hess, Ed.D.
Vice Provost of Graduate Programs
Simmons Bank Endowed Professor of Healthcare Administration
Riata Fellow in Entrepreneurship

**From:** Stephen Mooney
**Sent:** Monday, May 08, 2023 2:50 PM
**To:** riwalter@epix.net
**Subject:** Re: Last Saturday chat at Club

Hi Richard,

Nice talking to you on Saturday night. It states in the late 1990's, ROBERT KEPPEL and RICHARD
WALTER adopted the rapist typologies originally devised by Groth et al (1977) and converted
them into homicide categories **(Keppel & Walter, 1999)** . It discusses different categories of
rape-murder; power-assertive rape-murder, power-reasurrance rape murder, anger-retalitory
rape murder and anger-excitation rape murderer. The report goes on to say **KEPPEL and
WALTER** confirmed these categories by interviewing a group of incarcerated killers in a state
prison system.
Does any of that sound familiar to you?
I believe Vito Roselli retired. He was the supervisor of the South Jersey Resident Agency out of
Philadelphia

Stephen

**RICHARD SHEPHERD BSC, MB, BS, DMJ, FRCPATH, FFFLM**

**CONSULTANT FORENSIC PATHOLOGIST**

*email : cheshireforensic@aol.com*

**Re: Richard Walter**                                                    8th August 2023

I'm happy to confirm that, on many occasions, Richard Walter has attended - and often lectured as an invited speaker - at forensic meetings in the UK that I have also attended. With this distance in time I am not immediately able to determine specific dates many now decades ago but I am fully aware (at the least) of his attendance at meetings of the Clinical and Forensic Medicine Section of the The Royal Society of Medicine of London and also meetings organised at my own department at St Georges Hospital, University of London. I think it is also highly likely that I would have invited him to speak to a conference of The British Association of Forensic Medicine.

That he spoke at a conference of The Association of Police Surgeons of Great Britain in 1989 has already been documented in the disputed article and, given that early date, this clearly shows the length of his association with established professional bodies in the UK - clinical, pathological and forensic.

It is my personal memory that together we lectured to members of the Metropolitan police (and most probably other professionals). I think that this was most likely to have been associated with a review of the forensic psychological errors by another psychologist of the UK murders of Rachael Nickell and Samantha Bissett. This meeting is highly likely to have involved both specific and more general lectures (by Richard Walter and by others) and also more general discussions. And a tour of the (then called) Black Museum (now the Crime Museum) was almost *de rigeur* for any visit to Scotland Yard! I think that this would have been in the early 2000's.

I am also aware that Richard consulted me over a death in Texas (? Scott Dunne) and, as I document in my book Seven Ages of Death, (NB : the case name was changed by my publishers to Clare Romeril for legal reasons) I have consulted him on a personal basis regarding the death of a young girl in a town on the outskirts of London. Over the years we have I think discussed and shared (and possibly argued over) many cases.

In addition, during my 30+ years membership of AAFS I have attended many lectures, seminars and workshops given by you (sometimes in association with others - Bob Ressler / Bob Keppel / etc). I am also aware that he has lectured to many other professional forensic groups and also Police not only in the UK but also in Australia and most probably in many other countries.

Yours Sincerely,
Richard Shepherd.

UNITED STATES DISTRICT COURT

Robie J. Drake,

          Petitioner,                         Motion   for   Summary
                                              Judgment

     v.                                        99-CV-0681E

L.A. Portuondo,

          Respondent.

-----------------------------------------------------------

       This memorandum is filed in support of the Respondent's motion for summary judgment in the above captioned habeas corpus proceeding.

## Statement Of Facts

       On the night of December 5-6, 1981, teenagers Amy Smith and Stephen Rosenthal were in Rosenthal's 1969 Chevy Nova in the parking lot of a factory in the City of North Tonawanda, New York. The factory parking lot was adjacent to a junkyard with abandoned vehicles. It is undisputed that Petitioner Robie Drake, herein referred to as the defendant,  shot  Smith and Rosenthal a combined 19 times, to death, shortly after midnight. (Trial transcript at 482-95).

       The only issue at trial was whether Drake had the requisite intent for second-degree murder.  Drake's theory of defense was that he did not know the two victims were in the car.

       At trial, the prosecution called Mr. Richard Walter to testify about a syndrome known as "picquerism," where one commits violent acts as a means of effectuating a perverted sexual urge.  Upon hearing all of the evidence, a jury found Drake guilty of second-degree murder.  Drake is incarcerated, having received two consecutive terms of 20 years to life.

After years of unsuccessful appeals, Drake alleges that Walter may have committed perjury during his testimony in regards to his credentials and qualifications.

**Procedural History**

A judgment was entered against the defendant in  Niagara County Court on December 1, 1982, convicting the defendant, after a jury trial, of two counts of Murder in the Second Degree [N.Y.P.L. § 125.25 (1)]("intent to cause the death of another person").  In connection with these convictions, the defendant was sentenced to two consecutive indeterminate terms of imprisonment of twenty (20) years to life (DiFlorio, J.).  The defendant appealed his conviction to the Fourth Department of the Appellate Division of the New York State Supreme Court.  On April 3, 1987, the Appellate Division affirmed the conviction. *People v. Drake*, 129 N.Y.A.D.2d 963 (4th Dept. 1987).  Leave to appeal to the New York State Court of Appeals was denied on March 3, 1987. *People v. Drake*, 71 N.Y.2d 895 (1987). The defendant subsequently brought a writ of error coram nobis before the Appellate Division on the basis of the ineffective assistance of appellate counsel. The defendant was denied coram nobis relief on June 9, 1995. *People v. Drake*, 216 N.Y.A.D.2d 968 (4th Dept. 1995).  A motion for reargument was subsequently denied on September 29, 1995.

The defendant then brought a motion to vacate the instant judgment pursuant to N.Y.C.P.L. Section 440.10 on the basis of newly discovered evidence.  The newly discovered evidence presented by the motion was that the testimony offered by the State's psychological expert, Richard D. Walter, was false and known to be false by the prosecution and, further, that the prosecution

had withheld from the defense at the time of trial a police report which contained exculpatory material. On August 1, 1996, the Niagara County Court denied the defendant's motion without a hearing (Fricano, J.)  The summary denial was reviewed by the Appellate Division, Fourth Department, and affirmed on December 31, 1998. *People v. Drake*, 256 N.Y.A.D.2d 1159 (4th Dept. 1998). Leave to appeal to the Court of Appeals was denied on June 25, 1999. *People v. Drake*, 93 N.Y.2d 969 (1999).

A petition dated September 13, 1999, was filed with the District Court on September 21, 1999. In that petition, the defendant presented several grounds for relief including the issues briefed herein. The District Court denied the defendant's habeas corpus relief, ruling that the any possible perjury did not affect the verdict. The defendant appealed the denial of relief to the Second Circuit Court of Appeals. The Court of Appeals granted the defendant a certificate of appealability on December 17, 2001.

In its decision dated January 31, 2003, the Court of Appeals "held that: (1) the trial court's refusal to grant petitioner's request for continuance was not an unreasonable application of federal law, and (2) remand to the district court was required to determine whether the prosecution knew or should have known of its psychological expert's perjured testimony." *Drake v. Portuondo*, 321 F.3d 338 (2003).

Thus, the issues to be resolved by this Court are whether the expert, Mr. Walter, committed perjury at the original trial, whether the prosecution knew, or should have known about the perjury, and whether the perjury was harmless error.

3

### Summary Judgment Standard

The standard for summary judgment is well-established. FRCvP 56(c) requires that a motion for summary judgment be denied unless the court determines, after reviewing all the evidence presented, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 585-588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party seeking a summary judgment must demonstrate the absence of a genuine issue respecting any material fact. *Celotex,* at 325. A genuine issue of fact requires such evidence that a reasonable jury could thereupon return a verdict for the non-moving party and, when determining if a genuine factual issue exists, the court must consider the substantive evidentiary burdens assigned to each party. *Anderson,* 248, 254. All reasonable inferences must be drawn and all ambiguities must be resolved favorably to the non-moving party. *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Sutera v. Schering Corp.,* 73 F.3d 13, 16 (2d Cir.1995). However, the non-moving party may not rest upon unsubstantiated allegations, conclusory assertions or mere denials of the adverse party's pleading, but must set forth and establish specific facts showing that there is a genuine issue for trial. FRCvP 56(e).

Summary judgment must be granted against a party in instances when he fails to adequately establish an essential element on which he bears the burden

of proof. *Celotex,* at 322. A metaphysical or other whimsical doubt concerning a material fact does not establish a genuine issue necessitating a trial. *Matsushita Elec. Industrial Co.,* at 586. The "mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. *Anderson,* at 252." *Lockwood v. Coughlin*, 1997 WL65888 (W.D.N.Y. 1997).

### Standard For Limited Review In Habeas Corpus Cases

In *Williams v. Taylor*, 529 U.S. 362, 412 (2000), the Supreme Court addressed the grounds for a writ as established by the 1996 Antiterrorism and Effective Death Penalty Act (the AEDPA) in habeas corpus cases that deal with claims adjudicated on the merits in state court. According to the Court:

> "the writ may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* at 362

Under both the "contrary to" and "unreasonable application" standards, a federal habeas corpus court may not issue the writ simply because that court concludes in its independent judgment that the state court reached the wrong

conclusion. Rather, the court's "inquiry should ask whether the state court's application of clearly established law was objectively unreasonable." *Williams v. Taylor*. "Thus, a federal habeas court is not empowered to grant the writ when, in its independent judgment, it determines that the state court incorrectly applied the relevant federal law. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000). Additionally, the AEDPA requires that "a determination of a factual issue made by a State court shall be presumed to be correct" and the Petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(i).

In the case at hand, the above standards for summary judgment and habeas corpus review are to be applied to three main issues: whether Mr. Walter committed perjury, whether the prosecution knew or should have known about the perjury, and whether the perjury prejudiced the defendant.

### A.   Mr. Walter Did Not Commit Perjury

"In determining what constitutes perjury, we rely upon the definition that has gained general acceptance and common understanding under the federal criminal perjury statute, 18 U.S.C. §§ 1621. A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. See §§ 1621(1); *United States v. Debrow*, 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92 (1953); *United States v. Norris*, 300 U.S. 564, 574, 576, 57 S.Ct. 535, 539, 540, 81 L.Ed. 808 (1937). This

federal definition of perjury by a witness has remained unchanged in its material

respects for over a century. See *United States v. Smull,* 236 U.S. 405, 408, and

n. 1, 35 S.Ct. 349, and n. 1, 59 L.Ed. 641 (1915)." *U.S. v. Dunnigan*, 113 S.Ct.

1111, 1116 (S.Ct. 1993).

As explained below, there was no perjury in defendant's trial. There is no

evidence that Mr. Walter intentionally gave any false testimony during the trial.

At most, Mr. Walter's statements may have been confusing or mistaken.

However, in all cases, his statements were factually based.

### 1. Mr. Walter's Statements Regarding His Experiences At The Los Angeles County Coroner's Office Were Truthful

Walter testified that, during his time as a **student professional worker** at

the Los Angeles County Coroner's Office, approximately 40,000 cases came

through the office (Trial Testimony 789).  Mr. Walter then testified to his

involvement in those cases:

> "District Attorney Broderick: How many of those cases did you have anything to do with yourself?
> Mr. Walter: Between 7,500 to 10,000.
> Broderick: When you say that you didn't handle those cases yourself, did you?
> Walter: No. I had **personal involvement** with at least five thousand seventy-five hundred of **some capacity** in terms of investigation. (Emphasis added).
> Broderick: And that would be advisory?
> Walter: Right.
> Broderick: How many of those cases could you estimate for us in just a ballpark figure would be homicide, that is, murder or manslaughter cases?
> Walter: The best estimate would be about five thousand.
> Broderick: And again what—what information were you given in connection with making the determinations that you made in the preparation of these profiles?
> Walter: Well, you not only had the police report in terms of what they found at the scene.  You also had the crime photos, and then you also had the deceased and the body and the

7

autopsy findings that were coming forth. So you had some
basis to make some opinion on.
Broderick: Did you have access to lab results?
Walter: Right.
Broderick: Witness's statements?
Walter: Right.
Broderick: Did you have an opportunity to view the actual victim of
the homicide?
Walter: Yes.
Broderick: Study their wounds, injuries?
Walter: Yes.
Broderick: Consult with pathologists?
Walter: Right.
Broderick: In conjunction therewith did you have an opportunity to
review other evidence collected in these cases?
Walter: Yes.
Broderick: And as I understand it, then you would prepare the
profile?
Walter: Right." (T. 789-791)

When Walter was questioned under oath, pursuant to the  Second Circuit
court-ordered discovery proceedings, about these previous in-court statements,
Mr. Walter affirmed that during his time at the L.A. County Coroner's office, he
crossed paths with 5,000 to 7,500 cases (Walter Deposition on July 30, 2003,
p.90).  Mr. Walter went on to say that while he did have low level responsibilities
such as cleaning glass tubes and filling bottles, he would constantly be looking at
cases and inquiring with detectives to learn as much as possible (Walter Dep., p.
94-95). All the information that came into the Coroner's Office, police
investigation, toxicology and pathologist reports went through Walter's hands.
Lots of times, Mr. Walter would give his opinion to police officers or pathologists,
at their request, about criminological, psychological or forensic matters on cases,
although he never produced any written reports (Walter Dep., p. 95-96, 117).
When the defendant's attorney asked Walter to giving an example, Walter readily
recounted a  case where a sexual assault/murder victim had burn marks on her

hands. The pathologist who was working on the case asked Walter for his opinion and Walter told the pathologist that he thought the burn marks came from the victim holding onto bare wires connected to a generator. Subsequent investigation proved Walter correct. (Walter dep., p. 96)

The defendant contends that a June 11, 1993 statement from Dr. Griesemer is proof of Walter's perjury. Dr. Griesemer was Mr. Walter's supervisor during his time at the Los Angeles County Coroner's office. Dr. Griesemer, in a written statement **prepared by the defendant** (in which Griesemer's name was spelled wrong), said that Mr. Walter "did laboratory support: He control (sic) the identification and storage of specimens. Prepared containers with labels and powders. Cleaned glassware and stored supplies." (Griesemer June 11, 1993 Statement, p.2). Dr. Griesemer also stated that Mr. Walter did not perform any psychodynamic analysis or crime scenes or suspects, nor perform any work psychological in nature while at that office. *Id.* at 3.

A much more detailed account by Dr. Griesemer, prepared by Griesemer himself on Octobeer 16, 1995,, presents a complete picture of Walter's duties at the Coroner's Office. According to Dr. Griesemer, Walter:

> would read through as many of these reports and review items as he could and he was continually discussing cases with Coroner's staff members and similarly interested people from outside such as police officers, detectives, and insurance investigators. I always had the feeling he was striving to search out the facts and achieve a more complete understanding of underlying circumstances in individual causes of death for specific Coroner's cases. Mr. Walter also attended the periodic case reviews and scientific discussions including Psychological Profiles held by the Corner. He also attended the scientific departmental discussions in meetings of both the Toxicology Section and Forensic Investigations Section of the Coroner's Department. He sought and was sought after for one-on-

9

one discussions with pathologists working on specific cases and presented materials in some of the meetings. He discussed evidence and case details with Toxicologists and with Forensic Science Investigators in the Department.

A copy of Dr. Griesemer's October 16, 1995, letter is attached hereto as exhibit A.

Dr. Griesemer's statement shows that Walter was part of the support staff at the Coroner's office.  While Walter was not someone who would have a great deal of structured input in the cases that came into that office, the purpose of him being there as a student intern was to become acquainted with the manner in which those investigations progressed, and to familiarize himself about that line of work when the opportunity was present.  It is clear that Walter was at the Coroner's office in a learning capacity and he made that clear in his testimony at the defendant's trial.

It is also important to take into consideration what Mr. Walter did *not* say. At no point in his trial testimony did Mr. Walter state that he was the one writing any reports for the Coroner's office, that he was leading any investigations, that he was testifying before the grand jury, or that he was testifying before a petit jury. Instead, the testimony at the defendant's trial shows that Mr. Walter's time at the Coroner's office was not spent as a supervisor or as a lead case officer, rather he "was a *student* professional worker at the time, while [he] was taking an academic course work in criminal justice." (Trial transcript at 788).

On cross-examination during the trial, the defense counsel never bothered to inquire further into the subject of Mr. Walter's experience with the Coroner's office. The defense never developed what Mr. Walter meant when he said he

had "participated" in 7,500 cases while with the Coroner's office, nor did the defense develop what Walter meant when he said he had an "advisory" role. Further, the defense never asked Walter if he testified in court for the Coroner's office about profiling or if he had written any reports. This is a subject that the defense had an opportunity to explore and develop during cross-examination; it was not the prosecutor's job.

As it stands, however, Mr. Walter's original in-court statements were, in fact, truthful as to what he did and to what his role was while employed with the L.A. County Coroner's office. [1]

---
[1]

The American Academy of Forensic Sciences, Ethics Committee, investigated the complaint from the defendant concerning Walter's testimony. The Committee determined that there was no violation of the Academy's *Code of Ethics and Conduct*. A copy of the Committee's decision is attached hereto as exhibit B.

### 2.   Mr. Walter Did Lecture At Northern Michigan University

The next issue regarding Mr. Walter's qualifications is his testimony at trial

that he was an adjunct lecturer at Northern Michigan University. At the original

trial, Mr. Walter did state that he was an "adjunct *lecturer* at Northern Michigan

University."(Trial transcript at 784)  In his later deposition on July 30, 2003, he

stated that he lectured at Northern Michigan University as a guest of a professor

(Walter Dep., p.75), thus he could be considered an adjunct lecturer (Walter

Dep., p. 73).  In fact, Mr. Walter testified that the professor for whom he was

lecturing referred to him as an adjunct lecturer (Walter Dep., p.73), and Mr.

Walter produced a letter from that professor, who states that Walter was an

adjunct in his course (Walter Dep., p.68, deposition exhibit 29).  Additionally, at

no point in his trial testimony did he state that he was a professor, nor that he

was employed by the University.

### 3.   Mr. Walter Was A Limited Psychologist At The Michigan Department Of Corrections And He Never Stated Otherwise

The next issue regarding Mr. Walter's qualifications is whether he

wrongfully represented himself at trial as a psychologist while he was employed

at the Michigan Department of Corrections.  According to his licensing, Mr.

Walter was a "limited psychologist" and, according to the relevant Michigan Law,

the limitations on that license "shall prohibit advertising or other representation to

the public which will lead the public to believe the individual is engaging in the

practice of psychology." Michigan Comp. Laws Ann. § 333.18223(2).   However,

at no point did Mr. Walter state that he was a psychologist.  Rather, when asked

his profession, Walter responded that he was a "prison psychologist" (Trial

transcript at 783), an answer that was correct, since at the time he was employed

12

at a Michigan prison as a limited psychologist, and was licensed as a limited psychologist (Michigan Board of Psychology License). Further, at the original trial on cross-examination, Mr. Walter made it clear that he had earned only a Masters Degree, and not a Ph.D. in psychology:

> "Mr. Perry: Mr. Walter, did you say you had a Masters Degree?
> Mr. Walter: Yes
> Perry: Ph.D. in psychology. Is there one or do you have one, do you have one?
> Walter: No, I do not." (Trial transcript at 805)

It is clear from this testimony that Mr. Walter did not present himself as being in a position with the Michigan Department of Corrections that was incorrect in any way.

### 4. Mr. Walter Truly Believed He Had Testified Previously As An Expert

Finally, there is a question as to whether Mr. Walter wrongfully represented himself by misstating his previous expert testimony. At the original trial, Mr. Walter offered that he had previously testified as an expert in Los Angeles County and in Pasadena:

> "Broderick: Have you ever been qualified to testify as an expert witness in any criminal court?
> Walter: Yes
> Broderick: And what states and jurisdictions, if you would, please.
> Walter: In California, Los Angeles County and in Pasadena." (Trial transcript at 785),

According to the later deposition, there is a discrepancy as to whether Mr. Walter stated that he was qualified in two locations, Los Angeles County *and* in Pasadena, or whether it was one location, Los Angeles County in Pasadena (Walter Dep., p.85). As Pasadena is a locality within Los Angeles County, it is

13

possible to be qualified as an expert in Pasadena and in Los Angeles County in one instance.

Also, it now appears that Mr. Walter was never actually qualified as an expert back in Los Angeles County. Instead, the testimony Mr. Walter gave was regarding the chain of evidence procedures within the Coroner's office:

> "Mr. Jay: Where had you been qualified to testify as an expert witness in a Criminal Court in 1982 before October 17th – or 22nd, pardon me?
>
> Mr. Walter: That's what we were talking about earlier. I said in Pasadena, not as an expert in psychology. It was the expert on the chain of evidence on that particular case.
>
> Mr. Jay: But, sir, when a chain of evidence person testifies, they're not testifying as an expert, are they?
>
> Mr. Walter: I believe they were.
>
> Mr. Jay: You believe they are?
>
> Mr. Walter: Yeah." (Walter Dep., p.84-85)

While Mr. Walter believed that he was testifying as an expert, that he had scientific expertise and knowledge beyond that of a layperson, he was incorrect in interpreting that this was a situation in which he could be deemed an expert by the Court. Mr. Walter made no attempt to deceive or mislead the Court in that instance.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court stated, "The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science....The term 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" 509 U.S. 579, 589, 113 S.Ct. 2786 (1993). While Mr. Walter testified to the scientific procedures used by the Coroner's office, he did not testify to anything that should be seen as an immutable truth or a scientific fact. Mr. Walter may have seen

14

himself as a scientist, but he did not realize that what he was testifying to did not constitute expert testimony.

In this circumstance, we clearly have a case of confusion rather than one of willful intent to mislead. As Mr. Walter thought he had been qualified as an expert within each of those geographic regions, he therefore believed the testimony he gave was factual.

It is easy to misunderstand exactly what Walter said when he originally testified at trial. Even the Second Circuit Court of Appeals got the facts regarding Walter's testimony incorrect in their decision. The Court stated that Walter claimed that he had "an adjunct professorship at Northern Michigan University;...and expert testimony given at hundreds of criminal trials in Los Angeles and Michigan." *Drake v. Portuondo*, 321 F.3d 338 at 342 (2d Cir. 2003). Unmistakably, nowhere in his testimony did Walter state that he was an adjunct *professor* at Northern Michigan, and at no point did Walter mention that he had previously testified at *hundreds* of trials. If the Second Circuit is getting some of the facts wrong, then part of the testimony is easily misconstrued. However, this does not imply that Walter was perjuring himself on the stand, and upon a closer inspection of the testimony, the evidence shows that perjury did not occur.

### 5.    Walter Did Not Invent the Diagnosis of Picquerism

Contrary to the defendant's assertions, Walter did not invent the diagnosis of picquerism. Although the term does not appear in the DSM manuals, the term appears in numerous, serious, criminal investigative works, including:

> V. Geberth, Practical Homicide Investigation, Tactics, Procedures and Forensic Techniques, 470, 765-6 (3rd ed. 1996).

Arrigo and Purcell, *Explaining Paraphilias and Lust Murder: Toward and Integrated Model,* 45 International Journal of Offender Therapy and Comparative Criminology 1 (2001).

R. Morneau and R. Rockwell, Sex, Motivation and the Criminal Offender, 146-153 (1980).

J. DeRiver, Crime and the Sexual Psychopath, 46-9 (1958).

**B.   Even If Mr. Walter's Testimony Was Perjurious,
The Prosecution Did Not Know, Nor Should the
Prosecution Have Known, That The Statements Were False.**

Not only did the prosecution not know that Walter's testimony might have been perjurious, there was no reason for the prosecution to have known that the testimony was anything but truthful.

**1.   The Prosecution Did Not Know Of Any Possible
Perjury By Mr. Walter**

There is no evidence indicating that the prosecution, at any time, knew that Mr. Walter may have committed perjury.  At no time did Walter indicate to the prosecutor, now Honorable Peter E. Broderick, that he was not telling the truth.  Prior to heading into court, while questioning Mr. Walter about his qualifications, the prosecutor discovered and was impressed by the fact that Walter was a member of the American Academy of Forensic Sciences. (Nov. 26, 2003, Broderick, pp. 28-9).  Once in court and under oath, the prosecutor questioned Mr. Walter about his educational background and his prior testimony as an expert.  Mr. Walter responded to these inquiries by stating his degrees (Trial transcript at 783), and that he had been qualified as an expert in court before. (Trial transcript at 785).

The prosecutor stated that he did not go into great detail about an expert's education and experience prior to the in-court testimony because that expert would be testifying under oath anyway and be subject to perjury charges. (Nov. 26, 2003, Broderick, p.52). When it came to questioning experts about their credentials, the prosecutor testified that this was something that he never did for his own experts, so here he followed his normal procedure and did not call anyone to check on Walter's credentials. *Id.* at 31   Because Walter did not tell the prosecutor that Walter was lying and because the prosecutor did not learn from any outside sources that Walter was lying, the defendant has failed to prove that the prosecutor knew that Walter was committing perjury.

The defense argues that an inference can be made regarding the prosecution's knowledge of Mr. Walter's possible perjury because Mr. Walter was called at the last minute with little notice to the defense and because there was no written report provided ahead of time. As explained below, neither of these inferences are supported by the facts in the case.

Mr. Walter's testimony was not deemed necessary by the prosecution until shortly before the trial, and in fact, the prosecution did not even know of Mr. Walter until just before the trial. An initial report prepared by a pathologist at the Erie County Medical Examiner's Office indicated the presence of sperm in the female victim's rectum. The prosecutor was relying upon the presence of sperm in the rectum to provide a motive and evidence of intent. As the prosecutor put it "at that point in time I had no need for anybody to explain this case. I had the explanation because I had a slide that said there was sperm in her rectum." (Nov. 6, 2003, Broderick p. 48).

17

Several weeks before trial started on October 19th, perhaps during September, the defense made a supplemental motion to inspect the slides which contained the material taken from the female victim's rectum. The prosecutor contacted Dr. Uku at the Medical Examiner's Office in Erie County to obtain the slides. Dr. Uku indicated that he did not know where the slides were and that the pathologist who had been working on them had been let go. The next day, Dr. Uku called the prosecutor and told him that he had found the slides but that the slides did not contain any sperm. The prosecutor then called the defendant's trial attorneys to inform them.   (Aug. 21, 2003, Broderick, p. 36; Nov. 26, 2003, Broderick, p. 50).

Shortly thereafter, perhaps around of the first of October, the prosecutor talked with Dr. Levine, a forensic odontologist who had previously testified in a sensational case in Erie County. (Nov. 26, 2003, Broderick, pp. 41, 45, 49). Dr. Levine was scheduled to testify in the defendant's case about the bite marks on the female victim's breast. The prosecutor told Dr. Levine that he had lost the rectal sperm evidence and Dr. Levine told him that he should talk with Walter. (Aug. 21, 2003, Broderick, p. 38). Dr. Levine told the prosecutor that Walter, like Levine, was a member of the American Academy of Forensic Sciences and he worked in a Michigan state prison where his job was to debrief serious sex offenders, their families  and the probation department in an effort to determine why they did what they did. (Aug. 21, 2003, Broderick, p. 38 – 39).   The prosecutor contacted Walter, with the first contact on October 7th, just 12 days before opening statements on October 19th. Id.

Around October 1st, the prosecutor called Walter for the first time and gave him a thumbnail sketch of the case. Walter told the prosecutor that he would need some time to think about it. Sometime later that afternoon or the following morning, Walter called the prosecutor back and told the prosecutor that he thought picquerism was involved. The prosecutor had never heard of the term. Walter explained what picquerism meant and told the prosecutor that he had several books and he would send them. A couple of days later, the prosecutor received a green, hard-covered book, entitled *Sex, Motivation & the Criminal Offender* by Dr. Robert Morneau. Morneau's book had a chapter on picquerism. Walter also sent a second book which had some information on picquerism. (Aug. 21, 2003, Broderick, pp. is 43-47).

The night before Walter testified, the prosecutor picked Walter up at the airport. During the drive from the airport, Walter, based on his psychological insights, told the prosecutor facts about the case that the prosecutor had not disclosed to Walter. First, Walter told the prosecutor that oftentimes individuals who engage in this kind of conduct are so exhausted at the conclusion that they fall asleep. According to the prosecutor, when detective Giles transported the defendant to the police station from the scene of the crime, the defendant was asleep. (Nov. 26, 2003, Broderick, p. 28). Second, Walter told the prosecutor that people with picquerism often start out as Peeping Toms. According to the prosecutor, the defendant either had a charge or conviction for such an offense. *Id.* at 35. Third, Walter told the prosecutor that people with picquerism often subscribe to soldier of Fortune/commando type of magazines. According to the prosecutor, "the evidence in the case, which I didn't consider relevant at the time,

19

was that his room had a significant number of those types of magazines and that I had never related that fact to him and it wasn't important in my mind at the time and when he [Walter] said that to me it suddenly like hit me right between the eyes that here's a piece of the case that fit the profile." *Id.* at 36.

Walter's insights into the case gave the prosecutor confidence in Walter's ability, qualifications and expertise to testify at trial. According to the prosecutor, "it just convinced me that he was correct in his opinion." *Id.* at 38.   It was at that point that the prosecutor decided that he could present Walter to the court. *Id.* at 31. After the drive from the airport, the prosecutor gave Walter the grand jury testimony and police reports.   Walter testified the next day.

The above sequence of events explains why the prosecutor did not tell the defense about Walter before the trial and why there was no written report.  The Court should note that under New York's Criminal Procedure Law, there is no requirement to produce a written report, only a requirement to provide a copy if a written report is produced.  Finally, Niagara County Court, Hon. Amy J. Fricano, dismissed the defendant's CPL Article 440 proceeding ruling that the defendant failed to prove that the prosecutor knowingly allowed false testimony.  Under AEDPA and the above chronology, Judge Fricano's ruling was not an unreasonable application of federal law.

## 2. The Prosecution Should Not Have Known of Any Possible Perjury by Walter

Not only did the prosecution not know of any perjury by Walter, there was no reason that the prosecution should have known of any perjury. First, Walter was recommended by Dr. Levine, a respected forensic odontologist, who had

previously testified in a high visibility case in Erie County and the prosecutor relied upon this referral when looking at Walter's qualifications. (Nov. 26, 2003, Broderick, pp. 41, 45, 49);(Aug. 21, 2003, Broderick, p. 38).

Second, as explained above, the prosecutor discussed the case with Walter to get a feel for him. Upon discussing this case with Mr. Walter, the prosecutor found that Mr. Walter was aware of facts that he would not have known without the understanding and insight of being a psychological expert. (Nov. 26, 2003, Broderick, pp. 28, 35-6. ).

Third, Walter, like Levine, was a member of the American Academy of Forensic Sciences, an organization that the prosecutor had heard of. *Id.* at 29. Since Walter was a member of this respected national organization, it would naturally lead one to believe that he was a reputable source of information in his area of expertise.

Fourth, Walter supplied the prosecution with a book entitled *Sex, Motivation & the Criminal Offender* by Dr. Robert Morneau. This book, a copy of which was made available at the deposition of Walter, confirmed the specifics of the condition of picquerism, and supported Walter's testimony. The book was not "pulp fiction," but rather an academic work on psychological conditions. (Aug. 21, 2003, Broderick, pp. is 43-47; deposition exhibit, 17).

Fifth, the prosecution did not know, and should not have known, that Walter may have embellished the number of cases that he dealt with during his year at the L.A. County Coroner's office, as well as the detail in which he dealt with those cases. The prosecutor testified that he had not questioned this number with Walter during the trial because he had no idea what Walter's

caseload may have been at that office (Nov. 26, 2003, Broderick, pp. 38-9).  The prosecutor had no basis for knowing what the caseload of the L.A. County Coroner's office would be in a given time period, nor would he have any idea of the normal duties and responsibilities of a given employee in that office.  Also, the prosecutor should not have known that these numbers may have been an embellishment because it was facially possible for that many files to cross one's desk in the two and-a-half years that Walter spent at the Coroner's office, assuming that person looks at approximately 8-12 files per day.

Sixth, all of the above comported with the prosecutor's normal method of dealing with experts.   The prosecutor had never previously telephoned or written an expert's employer to verify the expert's credentials, and he did not do so in this case.  (Nov. 26, 2003, Broderick, pp. 32-5).

Seventh, no Supreme Court case has ever imposed an obligation on a prosecutor to contact an expert's employer to verify the expert's credentials. Habeas corpus petitions can be granted only if the state court's decision "was contrary to…clearly established Federal law, as determined by the Supreme Court of the United States,…" (see *Williams v. Taylor*, supra).

### C.        Even If Walter Committed Perjury,
### the Judgment Should Not Be Vacated

As explained below, even if Walter committed perjury, there was overwhelming evidence of the defendant's guilt and this Court should not vacate his judgment of conviction.

### 1.        Standard for Reversal

Beginning in *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), and continuing through *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392 (1976), the Supreme Court has held that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." The Supreme Court and the Second Circuit have both applied this rule, **in dicta**, to cases where the prosecution should have known about perjury. *Id.; see Su v. Filion,* 335 F.3d 119 (2d Cir. 2003). However, the Second Circuit has drawn a distinction between intentional and unintentional use of perjury. If a witness perjures himself, but the government is unaware of the perjury during trial, "a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *United States v. Moreno,* 181 F.3d 206, 213 (2d Cir.) (citations omitted), *cert. denied,* 528 U.S. 977, 120 S.Ct. 427, 145 L.Ed.2d 334 (1999). As explained below, even under the more stringent standard of intentional use of perjury, the Court should not vacate the judgment of conviction.

## 2. There Is No Reasonable Likelihood That the False Testimony Could Have Affected the Judgment of the Jury

Walter's testimony went to motive and intent. However, Walter was not the only source of evidence that pointed to the defendant's intent. The overwhelming volume of evidence indicates the intent of the defendant. As explained below, even without the testimony of Mr. Walter, there was an ample basis for the jury to conclude that the killings were intentional, rather than

23

accidental as the defendant claimed that he did not know there was anyone in the car.

There was testimony by a firearms examiner that, due to the gun powder residue recovered from the sweatshirt of one of the victim's sweatshirt, the defendant stood no more than eight (8) feet away from the victim's car while shooting, although a strong wind could have carried the gunpowder particles, and could make the shooter seem closer to the target than he actually was (Trial transcript at 569, 595, 598).

There was evidence that the defendant described the windows as "fogged up" to the police (Trial transcript at 278), a condition that only would have occurred if the vehicle were occupied.

There was testimony that the car in which the victim's were killed, although in poor condition, was clearly not abandoned due to the presence of the license plates and registrations sticker, which would have been visible due to the lighting in the dump (Trial transcript at 225).

There was evidence that the car was parked just off the road and not in an isolated area (Trial transcript at 289, 1024).

There was evidence that, despite the defendant's statement that he merely wanted to destroy the car (Trial transcript at 275), the only bullet holes in the car were in the passenger's side window (Trial transcript at 69, 268, 1027).

There was evidence that one of the victims suffered two bullet wounds to the head, and the other victim suffered 15 bullet wounds to the head, face and chest, and 2 stab wounds to the back of his body (Trial transcript at 482-495).

There was testimony that showed the defendant stabbed one of the victims after shooting him and hearing moans from the car he was in (Trial transcript at 700).

There was evidence showing that the defendant bit the left breast of one of the victims after shooting her (Trial transcript at 639, 656, 683).

There was evidence that the defendant may have known the victims from school (Trial transcript at 556, 624-626), and may have had a problem with one (Trial transcript at 557-559).

There was evidence that the defendant told a fellow prisoner that he had seen one of the victims while he was firing and that he meant to kill him when he stabbed him (Trial transcript at 723-724).

The cumulative weight of the above evidence would have been more than enough for a jury to find that the defendant intended to kill the victims when he began shooting at them.

Mr. Walter's testimony was offered to explain why the defendant committed these acts, a motive. He provided an explanation that the jury could have accepted or disregarded, yet still have come to the same guilty verdict because of the gravity of the volume of other evidence. Mr. Walter's testimony offered nothing that the jury needed to rely upon in order to come to the conclusion that the defendant knew the victims were in the car at the time he started shooting. The Supreme Court has stated that "Proof of motive is never indispensable to conviction for crime." *Pointer v. U. S.*, 151 U. S. 396, 14 S.Ct. 410 (1896). Thus, even without Mr. Walter's testimony, the jury could have found that the killings were intentional.

3.        **The Defendant Failed to Use Due Diligence
             to Discover the Perjury**

In *United States v. Helmsley*, 985 F.2d 1202, 1208 (2d Cir.1993), the Second Circuit held that, "at least for purposes of a collateral attack, a defendant is normally required to exercise due diligence in gathering and using information to rebut a lying prosecution witness."   The Second Circuit has made it clear that one way a defendant can rebut a lying prosecution witness is through effective cross-examination. Unlike the case in *Su v. Filon*,  335 F.3d 119 (2d Cir. 2003), where a lying prosecutor made effective cross-examination impossible, in defendant's case, defendant's  trial counsel failed to ask any of the questions that his present counsel now asserts the prosecution should have asked its own witness.      The defendant cannot have it both ways. He cannot fault the prosecution for not asking the same questions that he failed to ask.

### Conclusion

Based on the above, the Respondent respectively requests this Court to grant the Respondent's motion for summary judgment.

Dated:        September 24, 2004

                                   Respectfully submitted,

                                   BY: s/Thomas H. Brandt
                                   _____

                                   THOMAS H. BRANDT
                                   Assistant District Attorney
                                   MATTHEW J. MURPHY, III
                                   Niagara County District Attorney
                                   Niagara County Courthouse
                                   (716) 439-7085
                                   Lockport, New York  14094
                                   tombrandtlkpt@yahoo.com

26

TO:   CLERK,
      UNITED STATES DISTRICT COURT
      David Jay, Esq.

Exhibit A

I HEREBY CERTIFY THIS TO
BE A TRUE AND CORRECT COPY

*Ernest C Griesemer*

October 16, 1995


Don Harper Mills, M.D., J.D.
Chairman, Ethics Committee
American Academy of Forensic Sciences
911 Studebaker Road, Suite 250
Long Beach, CA  90815

*RE:  Richard Walter*

Dear Dr. Mills:

Richard Walter worked in the Forensic Sciences Laboratories of the
Department of Coroner, Los Angeles County, Los Angeles, California for
two and a half years from 1/76 to 8/78.  He was employed as a Student
Professional Worker and worked with the Forensic Sciences, Toxicology
and Histopathology Laboratories.  He had a major responsibility for
the chain of evidence control for all items submitted to the
Laboratories and their storage.  These items included, but were not
limited to:  blood samples, medical evidence including drugs,
solutions, powders, heart pacemakers, blood purification equipment and
other forensic evidence items such as stained clothing, household
equipment suspected of containing residues; for example, eating
paraphernalia.  This list is only representative due to the limits of
space.  A comprehensive list would be exhaustively long.

Associated with the cases that involved these several items, all of
which were accessible to Mr. Walter:  Pathologist's evaluation reports
concerning the circumstances and cause of death; also, Coroner's
investigation reports, consulting physician reports, hospital reviews,
police reports, and other related data and reviews directly related to
individual death cases.  All of these constituted extensive and often
vast amounts of background information related to the death of an
individual human being.  While he was working here, I noted that Mr.
Walter would read through as many of these report and review items as
he could and he was continually discussing cases with Coroner's staff
members and similarly interested people from outside such as police
officers, detectives, and insurance investigators.  I always had the
feeling he was striving to search out the facts and achieve a more
complete understanding of underlying circumstances and individual
causes of death for specific Coroner's cases.

Mr. Walter also attended the periodic case reviews and scientific
discussions including Psychological Profiles held by the Coroner.  He
also attended the scientific departmental discussions in meetings of

28

Don Harper Mills, M.D., J.D.
RE:  Richard Walter
October 16, 1995
Page # 2

both the Toxicology Section and Forensic Investigations Section of the
Coroner's Department.  He sought and was sought after for one-on-one
discussions with pathologists working on specific cases and presented
materials in some of the meetings.  He discussed evidence and case
details with Toxicologists and with Forensic Science Investigators in
the Department.

I know that Mr. Walter had extensive experience in mentally digesting
background information of a very large number of Coroner's cases to
which he was exposed while he was working here in the Coroner's
Department of Los Angeles County, Los Angeles, California.  In recent
years, this county's case load was over 17,000 cases and he would have
had direct understanding of the situation and cause of death in many
of them.

Sincerely,

*Ernest C. Griesemer*

E. C. Griesemer, Ph.D.
1716 Edgecomb St.
Covina, CA  91724

**I HEREBY CERTIFY THIS TO
BE A TRUE AND CORRECT COPY**

*Ernest C. Griesemer*

STATE OF  California  )
                                            ) SS:
COUNTY OF  Orange  )

On this  13th day of  Aug , 2004, before me a Notary Public, the undersigned office
personally appeared  E.C. GRIESEMER , known to me (or satisfactorily proven) to be the
person whose name is subscribed to the within instrument, and acknowledged that he ex
the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand ans official seal.

*Taline Estrada*
NOTARY PUBLIC
ADDRESS:
2781 W. MacArthur Blvd. B
Santa Ana, CA 92704
COMMISSION EXPIRES:
9-20-07

TALINE ESTRADA
Commission # 1435783
Notary Public - California
Orange County
My Comm. Expires Sep 20, 2007

United States District Court
Western District of New York

_____

Robie J. Drake,

                                                                                    **Affidavit**

                                            Petitioner,

          v.

L.A. Portuondo

                                            Respondent.

_____

State of California )
County of Orange  ) ss:

Ernest C. Griesemer, being duly sworn, deposes and says:

1.      I am retired from my employment in the Los Angeles County Department of Coroner
        and make this affidavit in support of the respondent's motion for summary judgment.

2.      Attached to this affidavit is a letter that I authored on October 16, 1995 in connection
        with the allegations that Richard Walter had testified untruthfully at the petitioner's
        criminal trial concerning his qualifications and work experience while he was working
        in the Los Angeles County Department of Coroner.

3.      The letter was submitted to the American Academy of Sciences, which was
        investigating the allegations.

4.      The letter was true and accurate on October 16, 1995, and it remains true and
        accurate as of today's date.

                                                        _Ernest C. Griesemer_

                                                        Ernest C. Griesemer, Ph.D.


Sworn to before me
the 28th day of AUg. , 2004
Notary Public
_Taline Estrada_

                                        TALINE ESTRADA
                                        Commission # 1435783
                                        Notary Public - California
                                        Orange County
                                        My Comm. Expires Sep 20, 2007

Exhibit B



## AMERICAN ACADEMY OF FORENSIC SCIENCES

P.O. Box 669 • Colorado Springs • CO 80901-0669 • 719/636-1100 • Fax 719/636-1993

911 Studebaker Road, Suite 250
Long Beach, CA 90815
Phone: (310) 431-7272 Fax: (310) 431-2009

**OFFICERS 1995-1996**

PRESIDENT
Haskell M. Pitluck, J.D.
Woodstock, IL

PRESIDENT-ELECT
Richard Rosner, M.D.
New York, NY

PAST PRESIDENT
Steven C. Batterman, Ph.D.
Cherry Hill, NJ

VICE PRESIDENTS
Frankie E. Fraire, M.F.S.
San Bruno, CA

Patricia J. McFeeley, M.D.
Albuquerque, NM

SECRETARY
Barry A.J. Fisher, M.S., M.B.A.
Los Angeles, CA

TREASURER
Michael A. Peat, Ph.D.
Overland Park, KS

**BOARD OF DIRECTORS**

CRIMINALISTICS
Ronald L. Singer, M.S.
Fort Worth, TX

ENGINEERING SCIENCES
David J. Schorr, P.E.
Abington, PA

GENERAL
Mary Fran Ernst, B.S.
St. Louis, MO

JURISPRUDENCE
Carol Henderson, J.D.
Ft. Lauderdale, FL

ODONTOLOGY
Jeffrey R. Burkes, D.D.S.
New York, NY

PATHOLOGY/BIOLOGY
Edmund R. Donoghue, M.D.
Chicago, IL

PHYSICAL ANTHROPOLOGY
Michael Finnegan, Ph.D.
Manhattan, KS

PSYCHIATRY & BEHAVIORAL SCIENCE
Robert Weinstock, M.D.
Los Angeles, CA

QUESTIONED DOCUMENTS
A. Lamar Miller, M.S.
Birmingham, AL

TOXICOLOGY
Graham R. Jones, Ph.D.
Edmonton Alberta, Canada

**EXECUTIVE DIRECTOR**

Anne H. Warren, B.S.
Colorado Springs, CO

## CONFIDENTIAL
MEMORANDUM

February 2, 1996

Mrs. Marlene V. Drake
19 East Park MHC
Hyde Park, N Y 12538

            RE:    Richard D. Walter

Dear Mrs. Drake:

The Committee has reviewed your complaints and transcripts and has sought
additional comments from Michigan and California. Most of the issues do not
involve the Academy's Code of Ethics. Though Mr. Walter's representation of
status in Michigan and of experiences in California do fall within the purview of
the Code, the Committee has concluded unanimously that there was no material
misrepresentation and therefore no Code violation.

Very truly yours,

Don Harper Mills, M.D., J.D.
Chairman, Ethics Committee

DHM/sdh

Street Address:
410 North 21st Street • Suite 203
Colorado Springs, CO 80904-2798

Federal I.D. Number 87-0787045



1975—76,  1976—77

# BIENNIAL REPORT

## of the

# CHIEF MEDICAL EXAMINER-CORONER



THOMAS T. NOGUCHI, M.D.

*Chief Medical Examiner-Coroner*

*County of Los Angeles*

County of Los Angeles

BIENNIAL REPORT

of the

CHIEF MEDICAL EXAMINER-CORONER



Thomas T. Noguchi, M.D.

Chief Medical Examiner-Coroner

FISCAL YEARS

July 1, 1975 - June 30, 1976

July 1, 1976 - June 30, 1977

BOARD OF SUPERVISORS

Peter F. Schabarum...First District
Kenneth Hahn.........Second District
Edmund D. Edelman....Third District
James A. Hayes.......Fourth District
Baxter Ward.........Fifth District

CHIEF ADMINISTRATIVE OFFICER

Harry L. Hufford



### COUNTY OF LOS ANGELES
#### DEPARTMENT OF CHIEF MEDICAL EXAMINER-CORONER

1104 NO. MISSION RD, LOS ANGELES, CALIFORNIA 90033

(213) 226-8024 OFFICE HOURS
(213) 226-8001 AFTER HOURS

THOMAS T. NOGUCHI, M.D.
CHIEF MEDICAL EXAMINER-CORONER

Honorable Board of Supervisors
County of Los Angeles
Hall of Administration
500 West Temple Street
Los Angeles, CA  90012

Gentlemen:

Submitted herewith is the Chief Medical Examiner-Coroner's
Biennial Report, covering fiscal years 1975-1976 and
1976-1977.

As the report indicates, the Department's heavy workload
continued, but this has also been a period of change and
considerable progress.

During this time, 117,911 deaths were recorded in Los Angeles
County of which 31,767 were inquired into by this Office.

The Los Angeles County Department of Chief Medical
Examiner-Coroner is regarded as one of the most effective
and professional coroner's offices in the United States
and is known throughout the world.  This reputation is
invaluable in maintaining our high level of scientific
expertise through a close interchange of information and
current developments in forensic science.

Our reputation also enables us to attract excellent
personnel.  Their hard work and enthusiasm is reflected
in this report.

With the continuing support of the Board and the Chief
Administrative Office, we will continue to progress in
our unrelenting efforts to serve the people of Los Angeles
County.

Respectfully submitted,

Thomas T. Noguchi, M.D.
Chief Medical Examiner-Coroner

TTN:vw
Enc.



1977-78, 1978-79

# BIENNIAL REPORT

## of the

## CHIEF MEDICAL EXAMINER-CORONER



THOMAS T. NOGUCHI, M.D.

*Chief Medical Examiner-Coroner*

*County of Los Angeles*

County of Los Angeles

BIENNIAL REPORT

of the

CHIEF MEDICAL EXAMINER-CORONER



Thomas T. Noguchi, M.D.

Chief Medical Examiner-Coroner

## FISCAL YEARS

July 1, 1977 - June 30, 1978

July 1, 1978 - June 30, 1979

## BOARD OF SUPERVISORS

Peter F. Schabarum ....... First District
Kenneth Hahn ............. Second District
Edmund D. Edelman ........ Third District
Deane Dana ............... Fourth District
Michael D. Antonovich .... Fifth District

CHIEF ADMINISTRATIVE OFFICER

Harry L. Hufford



**COUNTY OF LOS ANGELES**
DEPARTMENT OF CHIEF MEDICAL EXAMINER-CORONER

1104 NO. MISSION RD, LOS ANGELES, CALIFORNIA 90033

(213) 226-8024 OFFICE HOURS
(213) 226-8001 AFTER HOURS

THOMAS T. NOGUCHI, M.D.
CHIEF MEDICAL EXAMINER-CORONER

Honorable Board of Supervisors
County of Los Angeles
Hall of Administration
500 West Temple Street
Los Angeles, CA  90012

Gentlemen:

Submitted herewith is the Chief Medical Examiner-Coroner's
Biennial Report, covering fiscal years 1977-78 and 1978-79.

The Department's workload continued to expand, not only in
quantity but also in cases of increased complexity.  There
was a significant increase in deaths caused by violence and
in deaths involving new drugs such as phencyclidine, commonly
known as PCP or "Angel Dust."  New and improved methods were
developed to detect these drugs, as well as handle the over-
all heavy burden of work.

During this time, 114,203 deaths were recorded in Los Angeles
County of which 32,868 were inquired into by this Office.

The Los Angeles County Department of Chief Medical Examiner-
Coroner is one of the most progressive, effective, and pro-
fessional coroner's offices in the world.  Our reputation
is invaluable in maintaining a high level of scientific
expertise through close interchange of information and current
developments in forensic science.

With the continuing support of the Board and the Chief Admin-
istrative Office, we will continue to progress in serving the
people of Los Angeles County.

Respectfully submitted,

Thomas T. Noguchi, M.D.
Chief Medical Examiner-Coroner

TTN:vw
Enc.

# Affidavit of Edward J. Bujdos, Jr.

State of Michigan

County of Calhoun

Edward J. Bujdos, Jr., being duly sworn, deposes and states as follows under penalty of perjury:

1. My name is Edward J. Bujdos, Jr. I am presently 76 years old, and my current address of residence is 412 Allen Road, Marshall, Michigan 49068.

2. The purpose of this Affidavit is to verify the use of "Food Loaf" by the MDOC.

3. Richard: Per our recent phone contact, I vividly recall the use of "Food Loaf" with administrative segregation prisoners within the MDOC. I began my employment with MDOC in February 1981, covering all the custody levels in the State Prison of Southern Michigan, (SPSM). The various custody levels included Reception and Guidance Center (R&GC), Trustee Division, (Custody Level 2), Northside (Level 3), Closed Custody (Level 4), and Administrative Segregation (Cell Block 5). Cell Block 5 housed the prisoners who were found guilty of breaking major custody rules, including assault on staff, assault on other prisoners, possession of drugs, attempts at insurrection and rioting. A long-term standard policy established long before you and I found employment with the MDOC was the use of "Food Loaf." When a prisoner acted out while in Cell Block 5, his next meals were a baked loaf of the day's menu: bread, meat, fish, milk, dessert, etc., placed in a mixer, then baked for consumption by the prisoner. Three meals a day, with each meal a blended concoction. This added for the prisoner to eat with his fingers and not with table utensils. As you know, often prisoners would steal the eating utensils from the cafeteria "Big Top". This was done for the protection of other segregation prisoners and custody staff. My recall is 475-500 prisoners in Cell Block 5. I believe this was standard practice initiated by the administration and custody, and not the Psychology staff. I don't recall ever being told how and who initiated the policy. When I transferred to the G. Robert Cotton Correctional Facility across the street from SPSM in October 1986, this policy was not implemented in the Cotton Administrative Segregation Unit. The cell doors were solid, with a tray slot. I can testify to such, as my office was in the Administrative Segregation Unit for many years. In Cell Block 5, the cell doors were bars.

The front of Block 5 cells faced the outer wall and the floor where staff
walked rounds. Also, the higher gallery cells (floors 1-4) where staff, doing their
rounds, would be open to attacks/assaults by prisoners within arm reach and/or
articles/substances being thrown. I can attest to this, as often during our schedule for
emergency contact interventions (ECI), entering Cell Block 5, with prisoners yelling
and throwing objects out their bar doors onto anyone on the base from the upper
gallery cells. For clarification, I was with the Cotton facility from 10/1986 to 9/2008.
I attended staff meetings, as scheduled at R&GC, and covered emergency referrals on
Friday afternoons 12:00 p.m. to 4:30 p.m., 1993 to 1997. Often in Cell Block 5. An
additional note that "food loaf" for disruptive inmates was an MDOC policy during
my entire career (1981-2008) and my MDOC colleague, Gary Rutledge, said the
policy was in place before he arrived in 1977. Should any additional information or
verification required, please contact me.

I hereby swear or affirm that the information above is true, accurate and complete to the best of
my knowledge, and that no relevant information has been omitted.

Dated:

_8/9/2023_

Signature of Individual:

Notary Public

ANITA ROBINSON
Notary Public - State of Michigan
County of Calhoun
My Commission Expires Jan. 29, 2027
Acting In The County of _Calhoun_

Title and Rank

Members First Rep

Date of Commission Expiry

01/29/2027

# EXHIBIT "C"

# Profiling Killers: A Revised Classification Model for Understanding Sexual Murder

Robert D. Keppel
Richard Walter

**Abstract:** *Generally, murder classifications have failed to be useful for investigators in identifying perpetrators of murders. Based on the experience of the authors, this article extends the definitions of four previously recognized rape-offender typologies (power-assertive, power-reassurance, anger-retaliatory, and anger-excitation) into classifications for sexually oriented killers. These types of murderers and their crime scenes are described through the dynamics of their behaviors, homicidal patterns, and suspect profiles. Each typology is followed by an actual case example that fits that particular type of killer. By identifying crime scene and behavioral factors of these killers, the homicide investigator will be more equipped to process murder scenes, prioritize leads, and apprehend killers. Unlike earlier efforts at crime scene classification, the present work addresses the behaviors, motivational continuum, and the effects of experiential learning by the perpetrators. The relative frequency of the four types within a population of murderers at the Michigan State Penitentiary is revealed.*

When the motivation for a murder is unknown and the identity of the killer has not been established, it is hard to explain the critical questions of who, what, when, where, why, and how. Without such information, the public is left with the uneasy feeling that the police have not caught the killer and another murder is possibly forthcoming. This lack of knowledge has created a forensic investigative dilemma since the beginning of police inquiries.

Past efforts to address unsolved murders by developing theories of investigations have not been empirically studied (Keppel & Weis, 1994). Researchers and investigative practitioners have attempted to analyze murder and the people who commit it by constructing self-styled categories of killers that were hypothetical inferences developed from some individual case studies of convicted murderers and limited experience at investigating violent crimes. In their *Crime Classification Manual*, Douglas, Burgess, Burgess, and Ressler (1992) discussed a wide range of information focused on concept identification. The killers were categorized into groups in which one expected outcome became the single and significant identifier. For example, a lust killing is described as a sexually oriented killing. Similarly, a murder arising from a business dispute was called a power or greed killing.

International Journal of Offender Therapy and Comparative Criminology, 43(4), 1999   417-437
© 1999 Sage Publications, Inc.

417

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

Unfortunately, although their typologies of murderers have descriptive value, they have failed to provide investigators with the elements necessary for crime scene assessment. For example, greed may have been the original motivation for killing an elderly woman and classified as such. This type of characteristic does not explain the motivation if the woman was also severely beaten, stabbed, and placed into a sexually degrading and posed position. Although general indicators may apply to a myriad of circumstances, the static descriptors of these types of classification systems only address the obvious. They do not address the hidden and inferred behavior of the killer.

In addition, other authorities, such as Holmes and Holmes (1996), cited typologies of serial murderers that were labeled *visionary, mission, hedonistic*, and *power/control*. These categories have a wide range of function, are of limited service to investigative work, and are unsupported by empirical study.

Very few police investigators use the typologies in the *Crime Classification Manual* (Douglas et al., 1992) or those developed by Holmes and Holmes (1996) to generalize about a population of murderers. In fact, the major homicide tracking systems such as the Federal Bureau of Investigation's (FBI) Violent Criminal Apprehension Program (VICAP); the Homicide Investigation Tracking System (HITS) in Washington, Oregon, and Idaho; and the Royal Canadian Mounted Police's (RCMP) Violent Crime Linkage Analysis System (VICLAS), which are centralized data bases for homicide information, do not use either typology to classify murderers (*HITS Murder Form*, 1995; Johnson, 1994; *VICAP Form*, 1991). The reason is that because the *Classification Manual*'s and Holmes and Holmes's characteristics of killers and crime scenes are not rich in detail, their utility in aiding investigators to apprehend killers is limited.

Homicide investigators have noted generally that crime classification systems have provided little assistance in solving a particular murder (Copson, 1995; Copson, Badcock, Boon, & Britton, 1997; Geberth & Turco, 1997; Keppel, 1995; Keppel & Birnes, 1995; Morneau & Rockwell, 1980). This is the problem! That is, despite a general description of incidents of murder, the information from homicide classification systems currently mentioned in the literature does not address the key issues relating to the offender's identity. Also, this information does not affect his apprehension. Accordingly, when the logical flow is broken or incomplete between theories and reality, the direction and function of the classification concepts become defused, limited, and sometimes meaningless. Therefore, despite best intentions, the end result may be that the homicide investigator is left with some abstract notions, a dead body, and an unknown offender.

Given the dynamic and synergetic components of two or more murders committed over time by the same person, a systematic look at a viable murder continuum offers the opportunity to explore elements left at the crime scene by the killer. Here, the investigator can assign meaning to (a) the presence or absence of evidence, (b) methods of operation, (c) signature, (d) the comfort zone of the killer (the place the killer feels at ease), and (e) an inferred motive for the murder. In addition, there may be indicators for emotional intensity, rationale for the murder,

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

and a constellation of additional factors associated with the known and specific type of killer responsible for a certain murder. If used properly, a dynamic classification system can be applied to the murder. The system can then provide information that could be further analyzed to determine methods of approach in the investigative process of the murder. It also may provide reasons for inaccuracies, additional crime scene analysis, and behavioral indicators of the killer.

The intent of criminal profiling, crime scene assessment, or psychological profiling, as it is sometimes called, is to identify the key crime scene and behavioral factors related to the killer, thereby enabling the homicide investigator to more effectively analyze murder scenes, interview killers, prioritize leads, and apprehend killers (Warren, Hazelwood, & Dietz, 1996). It is the focus of this article to (a) identify and define certain typologies within a rape-murder classification, (b) explain the homicidal pattern of the killer within that typology, (c) offer profile characteristics of the killer within each typology, and (d) give a specific example of a murder case scenario that typifies the killer within each typology. Therefore, the investigator will be informed of specific crime scene indicators that describe clearly each of the categories or typologies of killers. In turn, those very indicators will help homicide detectives perform their own crime scene assessment without the long wait sometimes associated with obtaining a profile from an outside expert.

In 1977, Groth, Burgess, and Holmstrom developed a classification system for rapists based on empirical research, and Hazelwood and Burgess (1987) refined and used those same categories for analyzing rape cases 10 years later. Although only addressing issues within a classification of rapists, not rape-murderers, their dynamic model focused on the purpose and style of attack and the conceptual and emotional factors of the behaviors of rapists.

Hazelwood and Burgess (1987) originally described four categories of rapists with their classification: (a) power-assertive (PA), (b) power-reassurance (PR), (c) anger-retaliatory (AR), and (d) anger-excitation (AE). Although these categories at the time related only to rapists and their behavior, the authors expanded those same categories to the crime of rape-murder.

## BACKGROUND

Based on their experience in analyzing and investigating many murder and rape-murder cases and interviewing numerous rape-murderers, the authors undertook a project to add to Hazelwood and Burgess's (1987) preexisting rapist categories that would, in turn, enable homicide detectives to use the descriptions of the homicidal pattern and profile for each type of killer in their murder cases. This was accomplished by taking known examples of murder cases that fell within each category and describing their crime scenes in detail.

The major problem in the project was to develop meaningful characteristics in each category that dealt with the deceased victim. When Hazelwood and Burgess (1987) created their categories, they based them largely on what the offender said

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

**TABLE 1**
COMPARISON OF THE DYNAMIC
CHARACTERISTICS OF THE FOUR CLASSIFICATIONS

| *Power-Assertive* | *Power-Reassurance* | *Anger-Retaliatory* | *Anger-Excitation* |
|---|---|---|---|
| Rape is planned; murder is not planned | Rape is planned; murder is not planned | Rape and murder are planned | Rape and murder are planned |
| Power interest | Power interest | Anger driven | Anger driven |
| Increasing aggression with the victim ensures control power | Acts out fantasy and seeks reassurance from the victim | Seeks revenge for his anger toward another person by attacking a symbolic victim | Engages in prolonged torture, exploitation, and/or mutilation; this energizes the killer's fantasy life |

or did not say to the living victim/witness. In the case of murder, very few, if any, words exchanged between the offender and the victim are known to investigators. Therefore, the crime scene detail, which reflects the behavior of the offender, is vital to each of the new rape-murder categories.

What follows is detailed information about each category. The categories are divided into three different sections: dynamics, homicidal pattern, and suspect profile. Then, each category will be accompanied by an example of a known rape-murder case for that specific category. See Table 1 for a comparison of the dynamic characteristics of the four categories.

## POWER-ASSERTIVE RAPE-MURDER

### DYNAMICS

The power-assertive rape-murder is a series of acts in which the rape is planned, whereas the murder is an unplanned response of increasing aggression to ensure control of the victim. The acts within the rape-assault are characterized by forceful aggression and intimidation. Specific to the expression of virility, mastery, and dominance, a direct and overpowering assault is necessary and often results in multiple antemortem rapes of the victim.

For the homicide itself, the central issue becomes one of maintaining control over a vulnerable victim by an exaggerated machismo overreaction. To quickly overcome a victim's resistance, the killer may say, "You don't want to get hurt. Just give up." Characteristically, the killer demonstrates mastery by taking charge or command by the use of an assertive image and dominating violence. For the individual killer or his followers, the finality of the killing ensures the success of

Downloaded from iijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

the killer's power and control through the elimination of the threat posed by the victim and the secrecy of the performed acts. Because of the satisfaction that the rape-murder gives the killer, he analyzes, plans, and seeks methods to improve his aggressive and masculine image in his everyday life and in times of murder.

## HOMICIDAL PATTERN

The homicidal pattern in the power-assertive murder is characterized by the sating of power needs through sexual assault and murder. Once the perpetrator has decided to commit either the initial or a repeat rape-murder, the methods for victim selection and acting out will be determined by previous experience, the stress of internal pressures, and opportunity. Accordingly, in selecting the victim, the perpetrator may choose one by opportunity and surprise. Often, the victim is a stranger who is available by surprise on the street or through a breaking and entering into a home. If the rape-assault occurs in a home and the husband is present, he may be required to watch the assault or participate.

When the victim has been assaulted on his/her own territory, the body is left undisturbed. Alternately, when the victim has been abducted from an outside location, the killing and disposal sites vary. That is, when the killing was perpetrated elsewhere, the body was generally dumped.

If the perpetrator has coconspirators, there is often evidence of multiple sexual assaults. That evidence in or around the victim's body can be found in the recovery of ejaculate that is later analyzed and determined to come from several persons.

Consistent with his need to overpower and portray an image of the military warrior, detectives will find that clothing is torn off the victim. In addition, the killer will brandish weapons of symbolic importance to him. Generally, his preferred weapon is part of his normal image. The weapon may be a knife or rope or something else and is easily concealed. He views weapons as an extension of his own power and therefore will bring them to the crime scene and take them with him after the murder.

The victim, male or female, may show evidence of bruises from beating and pummeling at the death scene. When the perpetrator senses a challenge to his control and masculine image—or a revelation of his internal weaknesses—he may become even more violent. Here, extreme forms of violence will occur short of what he, in his own mind, considers to be deviant, perverse, and atypical of his self-image. Although violence inflicted on the victim may have been severe, there is generally no mutilation of the body; that would be perverse in his mind. With this in mind, investigators must be cautious when interviewing the power-assertive killer. If the perpetrator senses that he may be seen as a pervert, he may instantly turn off during the interview process and refuse any further contact with authorities.

After the killing has occurred, the perpetrator does not maintain contact with the victim. On departing from the crime scene, he often will leave an organized crime scene—as defined by the FBI behavioral scientists and Geberth (1996)—in

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

an effort to cover up and protect his identity. Because the crime scene reflects his image of being in the clear from suspicion, he can emotionally exculpate himself from any responsibility for the murder and repeat it within a short time span. Although he remains intellectually precocious and alert, his desire for power will demand credit for the killing. That is, the murder does not count unless someone knows or suspects him of the killing. Therefore, due to his need for glory and recognition, he may betray his secret to a bar patron, fellow worker, admirer, cellmate, and sometimes the police.

## SUSPECT PROFILE

In the power-assertive type of killer, the offender is usually in his early 20s and somewhat emotionally primitive. He is primarily preoccupied with projecting a macho image and orients his life accordingly. Despite a wide range of physical characteristics and types, the power-assertive offender is sensitive to his characteristics of masculinity. Therefore, he often is a body builder and portrays a muscular image and/or displays tattoos for a show of machismo and power. In addition to displaying a confident body posture, the offender cruises in his well-attended car, carries weapons, and shows an arrogant and condescending attitude to others. Although a heavy use of alcohol and drugs may be used to bolster the offender's courage and power, he does not abuse these substances to the point of blacking out.

Although the offender may associate with people, he is not seen as a team player. Socially, he may not be a hermit but at times because of his level of frustration with social contacts, he lives on the edge of being a loner. Although he may have an active interest in sports, they are generally limited to individual contact events such as wrestling, judo, and karate. For the most part, he seeks to gain power and displays a winner-take-all attitude. Although he may have a history of multiple marriages and relationships, he does not view them as successful.

In demonstrating his potential for power, he has a history of perpetrating crimes such as burglary, theft, and robbery. Unless the criminal history has resulted in a mental health referral, he may have had no contact with mental health workers.

Educationally, he is typically a school dropout. Based on the limits of the masculine image, his sexual preferences will not accommodate the variety of materials contained in hard-core pornographic literature. He is especially conflicted over unconventional sexual interest and may display a strong antihomosexual attitude. For the most part, if he reads magazines, they will likely be *Playboy* and *Penthouse* types of literature.

Although he may have served in the Marines or the Navy, his service record is generally poor, and he may have terminated his service prematurely. He is generally viewed as antisocial.

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

## CASE EXAMPLE

In 1986, a 40-year-old woman began walking down a Sydney, Australia, street in the early evening. Suddenly, she was grabbed by an unknown male who pulled her head back by the hair and said to an unseen accomplice, "What about this one?" In response, the coconspirator said, "No, she's too old." The aggressor then retorted, "You said long black hair." Again, the unseen voice said, "She's too old." At this point, the woman was set free. She reported this incident to the police.

Later that night, an Australian beauty queen with long black hair was scheduled to return by train from a visit with her sister. She failed to return. The next day, she was discovered in a fenced field on the outskirts of Sydney. Her body was found about 150 yards from a gravel road. The body was face down with its arms crisscrossing the head as though carried and dropped into that position. Her legs were spread open. The body was nude and no clothing was found in the surrounding area. There were three major cuts on the ventral side of the neck. The head was nearly severed from the body. The ventral side of the hands showed severe defense wounds from a knife. The forensic examination of the body revealed anal, oral, and vaginal sexual assaults. There was no evidence of any postmortem mutilation.

In this case, there is evidence of a planned assault on a preselected type of victim. Although long black hair appeared to be a criteria for selection, the age of the victim may have also been an influence. Although the first woman was rejected, the criminals continued to search for a woman who would meet their criteria.

In part, the follow-up investigation may have targeted a specific individual. But because of the evidence of multiple rape assaults, all of which were antemortem, investigators must also consider that the victim was abducted and sexually assaulted by multiple offenders.

Although the victim suffered severe defense wounds, there were no significant signs of beating or pummeling of the body. Based on the report of the first victim, multiple sexual assaults, and pattern style, the investigation indicated that probably three to five persons committed the murder. Although each member of the group has the obligation to surmount the victim in sexual assault, it is likely that the leader of the group would save the ultimate act of cutting the victim's throat for himself. Here, he rises above equals. Of note, he did not remove the head . . . that would have been perverse.

Based on this information regarding the power-assertive type, the New South Wales Police were advised that the leader and his associates would likely brag about the killings at the local bar. Again, a suspect profile was given to the investigators. After 11 days of investigation, a total of five suspects confessed to the killing. The leader of the group had a criminal history of exploitative crimes, confident body posture, use of alcohol, and ill-fated relationships. In addition, he was an educational dropout and needed to be validated by followers. Finally, because his followers also needed to validate their victory, they revealed their crime through bar talk, thus tipping the police onto them.

Downloaded from iijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

## POWER-REASSURANCE RAPE-MURDERER

### DYNAMICS

In the power-reassurance rape-homicide, a planned, single rape attack is followed by an unplanned overkill of the victim. Motivated by an idealized seduction and conquest fantasy, the killer focuses on acting out a fantasy and seeks verbal reassurance of his sexual adequacy. When the victim does not yield to the killer's planned seduction scenario, a sense of failure and panic thrust him into a murder/assault. In the murder/assault, he gains control and lessens the threat over the situation in which the victim was not compliant. After killing his unrequited lover, the murderer may act out his sexual fantasies through exploratory postmortem mutilation.

The power-reassurance type tries to express his sexual competence through seduction. When that fails, the subsequent killing permits him to reintroduce the fantasy system for further sexual exploration that he was not allowed to do prior to the killing. The quest for sexual competency and personal adequacy dominates any fantasy drawings he may do.

### HOMICIDAL PATTERN

In planning the rape, the power-reassurance type selects and watches a female victim. He may choose a casual acquaintance, neighbor, or stranger. No matter which type of victim, he applies his fantasies to that victim. In the power-reassurance rape-homicide, the murder occurs after the attempted rape has failed and the perpetrator feels a need for emotional catharsis and victim control. Although the offender has no intent to harm or degrade the victim, the failure of the rape-assault and the rejection from the victim panics him into a homicide overkill. Believing that he can act out sexual fantasy and reality, he prepares a scenario of misbeliefs designed to seduce the victim into validating his sexual competence. When the victim does not follow his plan, he feels threatened and attacks the victim.

Often, the selected victim is 10 or 15 years older or younger than the perpetrator. If the victim is the same age as the killer or outside his preferred age range, she may be considered damaged goods.

The power-reassurance type uses threats and intimidation to gain initial control and sometimes enters the crime scene with a weapon. But, usually the first time he attacks, a weapon is not preselected and brought to the scene. The second time, he may bring a gun and display it but will not fire it due to the noise. The third time, the weapon may be a knife.

After the initial attack on the victim, the offender tries to act out the preprogrammed fantasy. In this respect, he has been called the *polite and gentleman rapist* due to the verbal dialogue that he tries to carry on with the victim. During the assault, he may ask the victim to remove her clothing and be quite polite with other

Downloaded from iij.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

such requests. While assuring her that he is not going to hurt her, he seeks reassurances of his sexual competency from her. Typically, he may ask, "Is this nice; do you like this; is this pleasing to you; am I better than . . . ?"

When the killer finds his sexual competence threatened through ridicule, challenge, and counterattack, he loses control of the situation and kills the victim through pummeling and manual strangulation. Because he fears the revelation of his failure at sex, he initiates the homicidal attack to control the victim and protect his self-image.

Because the incomplete sexual assault does not validate his sexual competency, he will often explore the mysteries and curiosities of sex on the postmortem body. Consequently, there is sometimes mutilation of the body coupled with evidence of ritualism. Because his fantasies have been shunted by the unsuccessful rape, there often is not any evidence of sperm at the murder crime scene. Nevertheless, the postmortem activities and ritualisms can satisfy and reinforce him. From his point of view, the killing was a success. Therefore, when the need arises, it can be acted out repeatedly until his needs are satisfied.

As a result, the behavior of the power-reassurance murderer may be episodic in nature with one or more killings within a cluster of similar offenses. Notably, when the offender views the murder as successful, he may attempt to extend the relationship with that victim by collecting small souvenirs and newspaper clippings to enhance his imagined relationship. Finally, the reader should be aware that nighttime is the friend of fantasy development. Therefore, the offender acts out in the nighttime hours because that's when he feels most comfortable.

SUSPECT PROFILE

In considering the age of the power-reassurance murderer, the general acting out age is in the mid-20s range. Of course, the age can be variable and conditional on circumstances such as the incarceration of the offender for other crimes during his mid-20s. Although intellectually equal to other types of offenders, the murderer relies excessively on fantasies that allow opposing ideas to come in close proximity. This often makes the offender appear dull and somewhat emotionally scattered. He prefers to satisfy his needs through certain fantasies rather than risk rejection. As a consequence, he is often plagued by an inadequate sex life and uses sexual fantasies and relationships to overcome the dysfunction and pain of reality.

In developing his extensive repertoire of rape fantasies, he borrows notions from erotic pornography and a long history of substitutions for sexual activity such as window peeping, fondling of clothing, and obsessive daydreaming. Developmentally, the onset of absorbing fantasies may have started in the early juvenile years. Because his fantasies have taken him into a private world, he is generally viewed as socially isolated with no male or female friends. He is viewed as a loner and a weirdo. Generally, he is an unmarried person without a history of normal sexual activities.

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

Educationally, he may be identified as an underachiever who suffers from a learning disability but who still squeaks through the system. His military service will not be marked with unusual problems. He will simply be viewed as a nonachieving passive soldier who takes orders.

Because he does not have any interest in athletic activities, he will often compensate for his lack of machismo through compulsive behaviors. Mentally, he may have had a professional referral because he does not live up to what is capable of achieving.

Due to the dominating influences of fantasy activities, his life tends to leave him an immature person who views life as a spectator not a participant. In other words, he lacks the confidence to participate. He feels inferior and cannot tolerate criticism of team members. Again, because his activities are dominated by compressed and edited illusions, he often bypasses the social intermediate steps in developing normal social-sexual interactions.

Given the excessive energies directed toward his own self-stimulation, the offender may live at home and try to subsist on little income. If income is not available, he may perform menial labor to support basic needs. Accordingly, he often lives, works, and plays in a neighborhood familiar to him. A common form of transport would be walking. However, if the subject does have a car, it would likely be an older model in need of repair and care.

The subject's criminal record may reflect his interest in fetish activities, unlawful entry, and larcenies. Basically, the killer is fantasy driven and once the satisfaction is over, he leaves the disorganized crime scene (Geberth, 1996) laden with very valuable evidence.

## CASE EXAMPLE

A 24-year-old subject had a 10-year history of alcoholism and unemployment. During a summer evening, the subject was drinking in a local park and chanced upon a 14-year-old female. After a brief encounter, he wrestled her to the ground and sexually assaulted her. Later, when the victim reported the incident to police, she denied that he sexually penetrated her. When the subject was interviewed by the police, he insisted that penetration had taken place.

Subsequently, the subject was convicted of criminal charges and given a brief prison sentence. Prior to parole, the subject was interviewed about the offense. Amongst many issues discussed, he reported his sexual interest in women who were in their 50s, 60s, or 70s. Against advice, the subject was paroled.

Approximately 1 month after parole, he was jailed for drunk and disorderly. Following his release from jail, he resumed a lifestyle pattern of drinking, minimal employment, and socially floating in a fantasy world.

At age 26, the subject found himself in a bar admiring a 65-year-old woman. During the course of the evening, he watched her and made several unsuccessful attempts to make conversation with her. After the bar closed, the woman said goodbye to her friends and started to walk the eight blocks to her home. En route,

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

the subject approached the victim and expressed interest in having sex with her. In response, she refused his offer by chiding and laughing at him. He persisted and followed her to her home. Once there, he again reiterated his dream of having sexual relations with her. According to the subject, she reportedly stated, "Fuck off! Go home and grow a penis, little boy!" At that time, he forced his way into the house and beat the victim into unconsciousness. He then searched the premises and found a shovel with which to chop her body. After inflicting wounds to her body and head with the shovel, he put her in the closet and left the scene.

Following the discovery of the body, the police investigation led to the subject. After explaining to the detectives that he only intended to "love her," he confessed and explained the murder. On returning to prison with a life sentence for murder, the subject stated, "It's your fault! You knew my fantasy for older women and should not have released me!" Soon after his return to prison, the subject began experimenting with asphyxial autoeroticism and bloodletting. These behaviors were basically his efforts at self-mutilation.

In this example, the subject sat in the bar and activated an overidealized seduction and conquest of a 65-year-old female. Although he planned a sexual rendezvous that would reassure his sexual competence against a history of inadequacy, the implementation of the plan met with unaccounted-for resistance. Faced with failure and the fractured fantasy scenario, he exploded into a rage. He pummeled the victim with his fist into death or a near-death state. Following the combative stage of the killing, he then mutilated the body with a shovel. He then left the crime scene. As in his first offense, although semen was not at the crime scene, the subject reported feeling sexually sated and satisfied. That is, from his point of view, the killing was an unfortunate necessity on the way to fantasy satisfaction.

## ANGER-RETALIATORY RAPE-MURDERER

### DYNAMICS

In the anger-retaliatory rape-murder, the rape is planned and the initial murder involves overkill. It is an anger-venting act that expresses symbolic revenge on a female victim. Nettled by poor relationships with women, the aggressor distills his anguish and contempt into an explosive revenge on the victim. Although the assault is not predicated on a fantasy system, it is often precipitated by a criticism or scolding from a woman with power over him. In the attempt to express revenge and retaliation for being disciplined, the aggressive killer will either direct his anger at that woman or redirect his anger to a substitute woman. Because the latter type of scapegoating retaliation does not eliminate the direct source of hate, it is likely that it will be episodically repeated to relieve internal stresses. Dynamically, the rape-homicide is committed in a stylized violent burst of attack for the purposes of retaliation, getting even, and revenge on women (Keppel, 1997).

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

HOMICIDAL PATTERN

The homicidal pattern is characterized by a violent sexual assault and overkill of a victim. Inasmuch as the actual source of the killer's anger is a woman who belittles, humiliates, and rejects the subject, the fatal hostility may not be directed at a mother, wife, or female supervisor but at an unsuspecting substitute victim whom the killer has sought out. In these instances, it is likely that the victim would come from his own age group or older. Often, the substitute victim comes from areas in which the aggressor may live or work. That is, while conducting routine, everyday living, the aggressor may find a potential victim who reminds him of his mother or girlfriend. A chance meeting could occur at a grocery store or through general cruising of a neighborhood. When a potential victim is selected, he will keep in mind the location and living circumstances of the victim.

Alternatively, the aggressor tends to act out against the actual victim directly rather than through a substitute when that actual (targeted) victim is a younger person. The selection of this type of victim may be a dismissive female clerk who says "no" and/or a child who threatens to expose inappropriate sexual behaviors. Again, the perpetrator tends to choose victims from familiar areas. Once angered by the intended target, the perpetrator may choose a preselected substitute victim as a symbolic vehicle for resolving his internal stresses.

In approaching the crime scene, the killer usually walks. However, if necessary, he may drive to the crime scene area and approach the last 200 feet on foot. The anger-retaliatory killer may have some type of ruse to get inside the victim's door, but once the victim is isolated, he confronts her.

Armed with a barrage of accusations, he responds to the victim's denial of him by hitting her in the mouth and about the face. As the assault becomes more combative, the aggressor may use weapons of opportunity (knives, statuary, etc.) to brutalize the victim.

Depending on the aggressor's age, experience, and internal stresses, the rape-assault may be incomplete because of an inability to get an erection. Therefore, semen may not be found at the crime scene. In either case, the subject is intent on sating his anger through percussive acts of assault with fists, blunt objects, or a knife.

Regardless of whether the victim is alive or dead, the assault continues until the subject is emotionally satisfied. As his anger begins to cool, he places the body into a submissive position by placing it on its side away from the door, face down, putting an artifact or cloth across the eyes, or placement in a closet with the door closed. Generally, following the intense expression of anger, the subject tends to leave a disorganized crime scene, and the improvised murder weapon may be found within 15 feet of the body. Just prior to leaving the crime scene, the perpetrator often takes a small trinket or souvenir.

When the subject views the sexual assault and murder as a success, he often leaves the crime scene with a feeling of having been cleansed and renewed. Because the subject has transferred the blame of the murder onto the victim, he

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

does not experience any sense of guilt. Accordingly, he does not own any feelings of wrongdoing. In fact, quite the contrary is true. That is, he can develop a sense of sentimentality over the victim and help search for the victim with tears in his eyes.

## SUSPECT PROFILE

In the anger-retaliatory type, the offender is usually in the mid-to-late-20s and somewhat younger than his victims. He is seen as an explosive personality who is impulsive, quick-tempered, and self-centered. In dealing with people, he is not reclusive but a loner in the midst of a crowd. Generally, his social relations are superficial and limited to many drinking buddies. Socially, he is a person whom no one really knows. Although a sportsman, he prefers playing team contact sports.

Conflicted over his relationship with women, he may often feel dependent and aggressively resistant to them. When challenged by women, he may use various forms of aggression to get even and degrade them. If he has been married, his marital relationship may have been ill-fated or may be in some phase of estrangement. In the marriage, there has generally been a history of spousal abuse. Rather than dealing with the problems in the marriage, he will often avoid them by seeking extramarital liaisons. For the most part, these relationships are unsatisfactory.

Sexually, he is frustrated and may be impotent. Often, he links eroticized anger with sexual competence. Although he may use *Playboy* and similar types of magazines for curiosity, he does not use pornographic materials for stimulation.

When his aggressive feelings toward women are linked with impulsive behavior, he may develop a history of committing crimes such as assault and battery, wife beating, felonious assault, and reckless driving. Humiliated by disciplinary violations, he is usually a school dropout who has not lived up to his potential. If he has joined the military services, his unsettled behavior often results in a discharge from service. Consistent with these behaviors, his free-floating anger is the cause of many difficulties with authority. Mentally, his unpredictable behavior may have resulted in his being referred to a mental health worker.

## CASE EXAMPLE

In 1990, a 28-year-old female victim and her three children had lived for 2 years with the 28-year-old male subject. The victim was aware that the subject had a history of felonious assault and several domestic violence charges made by girlfriends that were later dismissed. As for her own relationship, she reported to friends that the subject was becoming more violent and would choke her. For her own protection, she advised her three children that if need be, they should call 911.

On one day, the victim allowed her three children to visit at a friend's home. Later that evening, the victim and subject visited at the home of the victim's husband and girlfriend. While there, they ran out of liquor and the men offered to go to

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

the store. While away, the victim expressed concerns about her boyfriend to her husband's girlfriend.

When the men returned, the subject suggested that they sneak around and see what the women were talking about. When the victim discovered the men were eavesdropping, she was not amused and began to insult the men. Reportedly, she insinuated that the men had had sex with one another while they were out getting the alcohol. They were not amused. Nevertheless, the evening continued until approximately 2 in the morning, at which time the victim and subject returned to their residence. Later, according to the subject, he and the victim got into bed and began the usual foreplay of ripping off each other's underwear. He claimed that she continued to hit and scratch him. Noting that he only had one arm because of a failed suicide attempt, he claimed that to protect himself, he placed both of her arms on her stomach and laid on top of her. After several minutes, she said, "I'm sorry." Accepting that as an invitation to sexual behavior, he claimed that he entered the vagina for a period of time. This was followed by anal intercourse and a return to the vagina. Following the completion of the sexual act, he claimed that the victim did not appear to be breathing. He then dragged her into the bathtub and splashed water to revive her. She did not revive. He then called an alternative girlfriend and indicated that he may have hurt the victim quite badly. He then asked the alternative girlfriend if he could come over and visit her. She said no. He then expressed a feeling of depression and decided to commit suicide by drowning. He claimed that he drove to a lake 1 1/2 hours away from home and walked into the water up to his neck. He then had second thoughts and thought the victim might still be alive. Therefore, he returned but found her dead. He then called 911 and reported the circumstances to the police.

When police arrived, they asked him what happened. He responded, "I guess I just fucked her to death." When police examined the scene, they found the victim's nude body on its side facing the inner wall. The body had bruise marks, a large vaginal tear, and tunneled rectum. There was dried blood between the body and the drain of the bathtub. Inasmuch as the forensic evidence challenged the subject's description, the police made a search of the scene for a weapon of opportunity. Following much discussion, a baseball bat was ruled out. Ultimately, it was determined that the subject had placed his fist inside her and caused an internal rupture. Eventually, at trial, he admitted anger at the victim and sexually assaulting her. However, the defense counsel insisted that it was an accident due to the size of his phallus rather than a fist. The subject was convicted. He later appealed and received a reduced sentence.

In this case, the victim and subject were the same age. The subject had a record of assaults against women. The instant offense appears to have been sparked by the victim's challenge of his masculinity with her husband. When given the ability to link anger and sexuality, the subject burst into a violent attack and overkill of the victim. Although it is unknown whether he actually got an erection, it is known that he used a weapon of opportunity: his only fist and arm. The placement of the body was consistent with an absolute demand for submission. The subject left a

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

disorganized crime scene. Following the assault and killing, the subject called a girlfriend for help rather than the police. During the police investigation, the subject expressed sentimental concern for the victim.

## ANGER-EXCITATION RAPE-MURDER

### DYNAMICS

The planned sexual assault and homicide are designed to inflict pain and terror on the victim for gratification by the perpetrator. The prolonged torture of the victim energizes the killer's fantasies and temporarily satisfies a lust for domination and control. Precipitated by highly specialized fantasies, the perpetrator selects the victim, male or female, and escalates violence through various acquired and learned incremental levels of ritualistic carnage. Dynamically, the approach of the victim, exploitation of naivete, torture, and mutilation all serve to appease the perpetrator's insatiable appetite for the process of killing.

For unlike other murderers, the luxury of sadism is found in the art and process of killing, not the death. In some instances, the actual death may be anticlimactic. However, in the execution of crimes, the excitement is heightened by the realization of a rehearsed scenario of eroticized anger and power that has been building in his fantasy life until he steps across the line into the reality of murder. Again, sadistic murder is comprised of a series of recognizable deviancies that coalesced into a ritualistic satisfaction. Inasmuch as the development of the process requires an investment of acquired skills, energy, and time, the intent becomes one of indulgent luxury rather than the end goal of a dead body.

### HOMICIDAL PATTERN

In the anger-excitation rape-homicide, the homicidal pattern is characterized by a prolonged, bizarre, ritualistic assault on the victim. Sponsored by a plan of action, the fantasy of the assault is put into action with an equipped murder kit. Often, the victim may be a stranger who fits his needs for a symbol, such as a nurse, a prostitute, a child, a student, or a matriarch. Also, he may be attracted to victims who meet certain criteria such as long blond hair, specialized shoes, or a tramp image. When preparing to encounter the victim, the organized offender can invoke a disarmingly charming manner and dispel most immediate fears from the victim.

To activate the assault process, the subject will use a con or ruse to dupe the victim from the time of contact until the victim is isolated. At that time, he will begin to display vacillating mood shifts that confuse the victim. He then will drop the mask. He may tell her in a very matter-of-fact, monotone voice "I'm going to kill you" just to watch the look of terror on the victim's face. When he sees the victim becoming terrorized, he goes into a fantasy, and a methodical love for torture is

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

demonstrated through acts of sexual ritual and experimentation. Here, while showing variant forms of dependency, dread, and degradation, the offender is only limited by imagination. Most commonly, bondage and domination play a significant role in the killing process.

In addition, there may be evidence of antemortem cuttings, bruises, and various forms of incomplete strangulation, body washing, shaving, and burns. Although some offenders may attempt perimortem sex, the evidence of ejaculate in the body is not likely at this stage. After the victim has been bludgeoned and strangled, the likelihood for postmortem experimental sexuality increases. Here, it is most likely that one will find evidence of secondary sexual mechanisms. The evidence of sexual exploration is revealed by localized brutalization, skin tears, and inserted objects into the body. In addition, he may leave the body in a bizarre state of undress after possibly cutting the clothing off. In some cases, the clothing could be fetish items that he would take as souvenirs. In some cases, the perpetrators will leave clothing neatly folded alongside the body. In others, they may harvest the body of parts. These parts and souvenirs taken from the crime scene may provide materials for later extravaganzas of masturbation. (Generally, this type of perpetrator divides the murder into phases in which the first part documents the art of killing and the second phase is a later reverie of masturbation with souvenirs.)

Eventually, when the crime has been completed and the perpetrator has been satisfied, he will carefully repack his ropes, knives, and specialized tools of torture into his murder kit for safekeeping. Alert to not leaving any signs at the crime scene, he may move the body to a second location to conceal it. Again, to distance himself from detection, he may bury the body in a shallow grave or dump it in a location familiar to him where he is comfortable. Again, to avoid detection, the organized offender tends to commit offenses distant from his usual activities. Accordingly, when he needs added stimulation, he may attempt to interject himself into the criminal investigation.

## SUSPECT PROFILE

In the anger-excitation type, the age range of the perpetrator is considered somewhat variable. Although most perpetrators commit their first homicide by the age of 35, it is possible that a late bloomer or an undetected perpetrator could do so earlier. Characteristically, the organized offender is often a well-appearing person who is bright and socially facile with others. Based on the ability to appear conventional and law abiding, he can cunningly deceive others. Because he has the ability to separate a general lifestyle from his criminal interest, he may enjoy a good marriage. In the marriage, he may perform as a dutiful and conventional husband. Financially, he is identified as an adequate provider. His work history may be tumultuous until he finds a position with minimum supervision. Sometimes, he may show a penchant for mechanical interest and working with his hands. If so, he may seek employment in the semiskilled trades such as auto mechanics, carpentry, or a specialty factory position. In his daily habits, he is often compulsive and

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

structurally organized. Educationally, he may have 2 years of college and/or graduated. On serving in the military services, he will be identified as doing well. Often, his military success may have resulted in his being identified as "good officer material."

Based on his exceptional ability to organize, he can successfully segment his criminal interest into a private world of protected ritualisms. Often, his ritual for paraphernalia and souvenirs are contained in a private chamber of horrors. This specialty place may be a dark closet, room, basement, or hole in the ground. Also, he may use an abandoned barn, cabin, or garage. Inside the specialty area, he will keep the victim's souvenirs, murder kit, and favored pornographic materials. Characteristically, the pornographic materials will depict a look of terror and scantily dressed victims. Most often, the literature shows bondage and sadism. Because the specialty area is designed to help the perpetrator manufacture and refine fantasies, it may contain a wide range of masochistic and sadistic clues. Although alcohol is not indicated, it is possible that the perpetrator will use chemical drugs to fuel his fantasies.

## CASE EXAMPLE

While hiking along a ridge of low mountains above a large city, a surprised witness looked down a cliff and saw a nude body trussed in ropes. When police arrived, they found a 21-year-old female nursing assistant tied in a crouched position. When they turned the body over, they saw a nylon cord tied to the right wrist and both ankles. The head had been cut off cleanly at the base of the neck. The fingers had been cut off both hands in the area of the knuckles. A bone-colored Playtex bra and similarly colored blouse was wound around both arms. A crime scene search of the immediate area could not locate the head or missing fingers. Several months later, they were found approximately 6 miles away. The body parts and jewelry were comingled into several plastic bags.

Meanwhile, after some difficulty in identifying the body, the police traced the victim's known whereabouts. Based on accounts from friends and witnesses, police learned that the victim and a female friend had gone to a bar for an evening's entertainment. While there, a friend noticed a man looking in their direction. Eventually, that man was identified. The subject was a handsome 22-year-old male scheduled to be married in 1 week to a chaste bride-to-be. As he became a focus of police attention, the subject became nervous and withdrew $2,000 from a joint account held with his girlfriend. He also borrowed her car and disappeared for several months. Later, her car was found parked in front of a police station. Eventually, after consulting a lawyer and his family, he appeared at the police station.

Meanwhile, the car revealed a number of forensic specimens linking him to the murder. In addition, police went to his home and found that it had been thoroughly cleaned. Nevertheless, they were able to locate the victim's blood in the bathtub and other samples of her blood throughout the apartment. When confronted with a

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

number of forensic specimens linking him to the murder, he told police that the victim voluntarily went with him to his home from the bar. While there, drug dealers arrived and killed the victim. He was then forced by drug dealers to behead the victim and dispose of her body. Consequently, after the beheading and draining of the victim's blood down the bathtub drain, he tied her and tossed her over the cliff. He then disposed of her head and fingers away in another location. He reported that this was necessary because the drug dealers had threatened to kill him if he did not cooperate. Needless to say, his story could not be corroborated. Instead, the crushed skull, scratches from a knife in the bathtub, blood stains, pliers, hacksaw tool marks, evidence of a massive cleanup effort, and the attempt to hide other evidence convinced police and the jury that he acted alone in committing the diabolical murder. While in prison, he repeated his prepared story, and a number of people supported him. Consequently, despite many objections, he was recently paroled. (Prior to the instant offense, there is circumstantial evidence that he may be linked to two nurses who have gone missing and have never been discovered.)

In this example, there is evidence of targeting a nurse, use of a con or ruse, and the isolation of the victim before acting out the crime. While in the comforts of his own home and available tools, he acted out a planned attack of terror and pain on the victim. There was also evidence of bondage, domination, submission, and *picquerism*. Picquerism is a secondary sexual mechanism in which satisfaction is gained by penetrating the body through cutting, slicing, and tearing of the body parts. In the postmortem activities, there was evidence of trussing up the body, disposal in a neutral location, and the separation of the head with fingers and jewelry in a separate location. Evident from the description, the satisfaction did not end with the death but extended into postmortem activities and beyond. Certainly the subject derived a great deal of satisfaction at avoiding police, leaving the suspect vehicle with evidence in front of the police station, and the effort at surmounting them by creating a phantom scenario. Finally, this killing not only satisfied internal needs but it also helped protect him from a pending marriage and the expectation to perform conventional sexual practices. For him, sadistic sexual fantasies were an art form and a lifestyle.

## SUMMARY AND DISCUSSION

For many years, the authors have performed crime scene assessments for homicide investigators based on the rape-murderer classifications mentioned earlier. Another important question about the four categories is: How widespread is each of the four categories among a population of murderers? To answer this question, the authors examined the frequency of the four categories within the population of murderers incarcerated in the Michigan state prison system. Having that information would assist law enforcement officers in knowing how common each type of rape-murderer is.

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

For a point of reference, in October 1995, the Michigan Department of Corrections reported a prison population of 41,584 prisoners. At that time, the number of prisoners serving sentences for homicide was 5,928 (14%). This figure represented only those prisoners serving homicide sentences at that particular time and did not account for the total number who have served throughout history. Of the total number of homicide offenders in prison, 2,476 or 42% had committed sexually related murders.

Within that aggregate number of homicides, a survey was conducted to determine the frequency for each category among convicted murderers. This was accomplished by assessing each inmate on entry or reviewing the intake files of previously committed inmates to determine their most appropriate rape-murderer category. The findings of the research revealed the following results: power-assertive = 38% ($n = 904$), anger-retaliatory = 34% ($n = 807$), power-reassurance = 21% ($n = 599$), and anger-excitation = 7% ($n = 166$).

Based on the assumption that most murderers have the capacity for rational thought in a variety of emotional responses, there exists choice, determination, and a foundation for behavior patterns. Given their ability to learn, interpret, and modify behaviors, their characteristics and details of their crimes are formed into specific patterns. When individual idiosyncrasies and levels of social maturity are factored into their violent behavior, the result may be a complex mixture of knowledge, intentions, and behavioral outcomes. Therefore, when an investigator examines a crime scene, the presence or absence of evidence may reveal recognizable patterns that are indicative to that specific offender.

The rape-murder classification system described here was built on an interactive and dynamic template of conceptual and emotional constructs. Infused with the learning from factually based cases and perpetrator interviews, there existed a wide range of information related to precrime, crime, and postcrime behaviors. These behaviors were recognized within the continuums of the four typologies: power-assertive, power-reassurance, anger-retaliatory, and anger-excitation. Within each one of these rape-murderer types, a number of recognizable factors became evident and interrelated to cause and effect.

In addition, depending on their motivation and internal inhibitions, the perpetrators in each typology may and do regulate the rate of murder. In some instances, the perpetrator may simply kill one person. However, when fueled by power and anger, the use of murder can become a preferred mode of problem resolution for the perpetrator.

In the case of the repeat offender, each typology has a pattern of reoccurrence consistent with its killer's individual fantasies. For instance, the repeat power-assertive may show an increase in violence and/or systematic decrease in time between offenses. As for the power-reassurance, the schedule depends on fantasy preparation time, satisfaction, and feeding off the memory. If any one of these factors has changed, it is likely that the perpetrator will commit repeat offenses to gain satisfaction. Under these conditions, one may find a cluster of activity followed by a long absence before the murders are repeated. Alternately, the anger-

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

retaliatory is emotionally driven and conditioned to the expression of anger. When a particular victim and/or set of circumstances does not fill the need, the perpetrator may commit cluster killings until his needs are fulfilled. Generally, the timing between clusters lessens with experience. In reference to anger-excitation, the repeat offender is the most fickle and sanguine in killing. It can be said that as a lengthy predatory jackal who refines skills of hunting to eat better, so it is for the anger-excitation rape-murderer. Accordingly, when the satisfaction from the killings become brief and situational, the killing rate increases.

Finally, the earlier described murder classification system offers the investigator an ability for understanding the behavioral parameters of the perpetrator of an unsolved rape-murder. That is, given a set of circumstances, analysis of facts, inferences, and patterns, the details of the classification system can give the detective an informed direction for further investigation. The common rape-murderer is characteristically a repeat offender and this behavior is consistent with his rapist equivalent in sexual assault cases. Both have patterns that can be recognized within the rape continuum. Here, the crime scene itself becomes the initiation point for pattern recognition, evidence collection, decision making for follow-up, and strategy planning for interviews with suspects. If the category for a particular rape-murderer is identified correctly, the perpetrator can be his own accuser.

# REFERENCES

Copson, G. (1995). *Coals to Newcastle? Part 1: A study of offender profiling* (Police Research Group Special Interest Series, Paper 7). London: Home Office Police Department.

Copson, G., Badcock, R., Boon, J., & Britton, P. (1997). Articulating a systematic approach to clinical crime profiling. *Criminal Behaviour and Mental Health, 7*, 13-17.

Douglas, J. E., Burgess, A. W., Burgess, A. C., & Ressler, R. K. (1992). *Crime classification manual*. Lexington, MA: Lexington Books.

Geberth, V. J. (1996). *Practical homicide investigation: Tactics, procedures, and forensic techniques* (3rd ed.). Boca Raton, FL: CRC Publishing.

Geberth, V. J., & Turco, R. N. (1997). Antisocial personality disorder, sexual sadism, malignant narcissism, and serial murder. *Journal of Forensic Sciences, 42*(1), 49-60.

Groth, A. N., Burgess, A. W., & Holmstrom, L. L. (1977). Rape: Power, anger, and sexuality. *American Journal of Psychiatry, 134*, 1239-1243.

Hazelwood, R. R., & Burgess, A. N. (1987). *Practical aspects of rape investigation: A multidisciplinary approach*. New York: Elsevier North-Holland.

*HITS murder form*. (1995). Seattle, WA: Washington State Attorney General's Office.

Holmes, R. M., & Holmes, S. T. (1996). *Profiling violent crimes: An investigative tool*. Thousand Oaks, CA: Sage.

Johnson, G. (1994). VICLAS: Violent crime linkage analysis system. *RCMP Gazette, 56*(10), 5-22.

Keppel, R. D. (1995). Signature murders: A report of several related cases. *Journal of Forensic Sciences, 40*, 658-662.

Keppel, R. D. (1997). *Signature killers*. New York: Pocket Books.

Keppel, R. D., & Birnes, W. J. (1995). *The riverman: Ted Bundy and I hunt the Green River killer*. New York: Pocket Books.

Keppel, R. D., & Weis, J. P. (1994). Time and distance as solvability factors in murder cases. *Journal of Forensic Sciences, 39*, 386-401.

Downloaded from *ijo.sagepub.com* at PENNSYLVANIA STATE UNIV on September 19, 2016

Understanding Sexual Murder                                                437

Morneau, R., & Rockwell, R. (1980). *Sex, motivation, and the criminal offender.* Springfield, IL: Charles C Thomas.

*VICAP form*. (1991). Washington, DC: Federal Bureau of Investigation.

Warren, J. I., Hazelwood, R. R., & Dietz, P. E. (1996). The sexually sadistic killer. *Journal of Forensic Sciences, 41*, 970-974.

**Robert D. Keppel, Ph.D.**
President
Institute for Forensics
800 Fifth Avenue
Suite 4100
Seattle, WA 98104
USA


**Richard Walter, M.A.**
Psychologist, Michigan State Prison
710 South Dexter Drive
Lansing, MI 48910
USA

Downloaded from ijo.sagepub.com at PENNSYLVANIA STATE UNIV on September 19, 2016

# EXHIBIT "D"

*Society of Professional Journalists*

# CODE *of* ETHICS

## PREAMBLE

Members of the Society of Professional Journalists believe that public enlightenment is the forerunner of justice and the foundation of democracy. Ethical journalism strives to ensure the free exchange of information that is accurate, fair and thorough. An ethical journalist acts with integrity.

The Society declares these four principles as the foundation of ethical journalism and encourages their use in its practice by all people in all media.

## SEEK TRUTH AND REPORT IT

Ethical journalism should be accurate and fair. Journalists should be honest and courageous in gathering, reporting and interpreting information.

Journalists should:

► Take responsibility for the accuracy of their work. Verify information before releasing it. Use original sources whenever possible.

► Remember that neither speed nor format excuses inaccuracy.

► Provide context. Take special care not to misrepresent or oversimplify in promoting, previewing or summarizing a story.

► Gather, update and correct information throughout the life of a news story.

► Be cautious when making promises, but keep the promises they make.

► Identify sources clearly. The public is entitled to as much information as possible to judge the reliability and motivations of sources.

► Consider sources' motives before promising anonymity. Reserve anonymity for sources who may face danger, retribution or other harm, and have information that cannot be obtained elsewhere. Explain why anonymity was granted.

► Diligently seek subjects of news coverage to allow them to respond to criticism or allegations of wrongdoing.

► Avoid undercover or other surreptitious methods of gathering information unless traditional, open methods will not yield information vital to the public.

► Be vigilant and courageous about holding those with power accountable. Give voice to the voiceless.

► Support the open and civil exchange of views, even views they find repugnant.

► Recognize a special obligation to serve as watchdogs over public affairs and government. Seek to ensure that the public's business is conducted in the open, and that public records are open to all.

► Provide access to source material when it is relevant and appropriate.

► Boldly tell the story of the diversity and magnitude of the human experience. Seek sources whose voices we seldom hear.

► Avoid stereotyping. Journalists should examine the ways their values and experiences may shape their reporting.

► Label advocacy and commentary.

► Never deliberately distort facts or context, including visual information. Clearly label illustrations and re-enactments.

► Never plagiarize. Always attribute.

## MINIMIZE HARM

Ethical journalism treats sources, subjects, colleagues and members of the public as human beings deserving of respect.

Journalists should:

► Balance the public's need for information against potential harm or discomfort. Pursuit of the news is not a license for arrogance or undue intrusiveness.

► Show compassion for those who may be affected by news coverage. Use heightened sensitivity when dealing with juveniles, victims of sex crimes, and sources or subjects who are inexperienced or unable to give consent. Consider cultural differences in approach and treatment.

► Recognize that legal access to information differs from an ethical justification to publish or broadcast.

► Realize that private people have a greater right to control information about themselves than public figures and others who seek power, influence or attention. Weigh the consequences of publishing or broadcasting personal information.

► Avoid pandering to lurid curiosity, even if others do.

► Balance a suspect's right to a fair trial with the public's right to know. Consider the implications of identifying criminal suspects before they face legal charges.

► Consider the long-term implications of the extended reach and permanence of publication. Provide updated and more complete information as appropriate.

## ACT INDEPENDENTLY

The highest and primary obligation of ethical journalism is to serve the public.

Journalists should:

► Avoid conflicts of interest, real or perceived. Disclose unavoidable conflicts.

► Refuse gifts, favors, fees, free travel and special treatment, and avoid political and other outside activities that may compromise integrity or impartiality, or may damage credibility.

► Be wary of sources offering information for favors or money; do not pay for access to news. Identify content provided by outside sources, whether paid or not.

► Deny favored treatment to advertisers, donors or any other special interests, and resist internal and external pressure to influence coverage.

► Distinguish news from advertising and shun hybrids that blur the lines between the two. Prominently label sponsored content.

## BE ACCOUNTABLE AND TRANSPARENT

Ethical journalism means taking responsibility for one's work and explaining one's decisions to the public.

Journalists should:

► Explain ethical choices and processes to audiences. Encourage a civil dialogue with the public about journalistic practices, coverage and news content.

► Respond quickly to questions about accuracy, clarity and fairness.

► Acknowledge mistakes and correct them promptly and prominently. Explain corrections and clarifications carefully and clearly.

► Expose unethical conduct in journalism, including within their organizations.

► Abide by the same high standards they expect of others.

The SPJ Code of Ethics is a statement of abiding principles supported by additional explanations and position papers (at spj.org) that address changing journalistic practices. It is not a set of rules, rather a guide that encourages all who engage in journalism to take responsibility for the information they provide, regardless of medium. The code should be read as a whole; individual principles should not be taken out of context. It is not, nor can it be under the First Amendment, legally enforceable.