**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **RICHARD WALTER,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:23-cv-2166** |
| **v.** | : | **(JUDGE MANNION)** |
| **DAVID GAUVEY HERBERT and NEW YORK MAGAZINE,** | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Richard Walter was the subject of a *New York Magazine* article calling him a "fraud." He now sues the author and the magazine for false light invasion of privacy. Defendants move to dismiss Plaintiff's amended complaint.

## I.    BACKGROUND

Because this is a motion to dismiss, the court must "accept all factual allegations as true" and "construe the complaint in the light most favorable to the plaintiff." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016). The court may also "rely upon exhibits attached to the complaint and matters of public record." *Id.* (internal quotations omitted). Plaintiff attaches the magazine article to his amended complaint. (Doc. 18-1 at 3–22, 38–48).

Before his retirement, Plaintiff assisted law enforcement officers in and lectured on "solving cold case crimes of the most heinous nature." (Doc. 18 ¶1). Defendant New York Magazine (the "Magazine") published an article written by Defendant David Gauvey Herbert titled "The Case of the Fake Sherlock" and whose subtitle read:

> Richard Walter was hailed as a genius criminal profiler at murder trials, at forensic conferences, and on true-crime TV. In reality, he was a fraud. How did he get away with it for so long?

(Doc. 18-1 at 40).[1] This article, hereinafter referred to as the "Article," was published online on April 11, 2023 and in the Magazine's April 10–23, 2023 print issue.

## A. The Article

As its title suggests, the Article is critical of Walter. It centers on his role in criminal investigations and his participation in the Vidocq Society, a group that met regularly in Philadelphia to discuss criminal profiling and unsolved murders. An introductory paragraph sets the tone:

> Richard Walter is many things and little that he claims. Since at least 1982, he has touted phony credentials and a bogus work history. He claims to have helped solve murder cases that, in reality, he had no involvement with—and even one murder that may not have occurred at all. These lies did not prevent him from serving as an expert witness in trials across the country. His

---

[1] It appears that the subtitle appearing in the online version of the article read: "Richard Walter was hailed as a genius criminal profiler. How did he get away with his fraud for so long?" (Doc. 18-1 at 3).

specialty was providing criminal profiles that neatly implicated defendants, imputing motives to them that could support harsher charges and win over juries. Convictions in at least three murder cases in which he testified have since been overturned. In 2003, a federal judge declared him a "charlatan."

After briefly chronicling Walter's early career history—which involved of degrees in psychology, a stint as a lab assistant at the Los Angeles County Medical Examiner's office, a staff psychologist position at a Michigan prison, and American Academy of Forensic Sciences conferences—Herbert details the convictions of Robie Drake for the 1981 murder of two New York teenagers and Nick McGuffin of Oregon for the 2000 death of his then-girlfriend. According to the Article, Walter, testifying at Drake's trial as an expert witness, "related an impressive—and fictional—résumé":

> He falsely claimed that at the L.A. County Medical Examiner's Office, he had reviewed more than 5,000 murder cases. Walter said he was an adjunct lecturer at Northern Michigan University (he had spoken there informally, possibly just one), wrote criminology papers (he had never published), and had served as an expert witness at hundreds of trials (he'd testified in two known cases—about a simple chain-of-evidence question and in a civil suit against a car company).

As to the crime at issue, Walter opined that the accused had committed a "lust murder" driven by "piquerism."[2]

---

[2] The Article describes "piquerism" as "an obscure sadistic impulse to derive sexual pleasure from penetrating people with bullets, knives, and teeth."

In McGuffin's case, prosecutors reopened investigation ten years after the murder and consulted with Walter, who the Article says "encouraged the police to focus on McGuffin":

> There was no new physical evidence, but Walter rearranged puzzle pieces that didn't quite fit and crafted his own theory: McGuffin was a jealous boyfriend who hit Leah in the face and dumped her body in the woods.

Although the district attorney disclaimed reliance on Walter's theory, he "parroted" it at trial, and McGuffin was found guilty of first-degree manslaughter.

Both these convictions were later vacated. As the Article recounts, the Second Circuit Court of Appeals granted Drake's petition for writ of habeas corpus on the ground that his conviction was obtained by the knowing use of perjured testimony, namely, Walter's testimony about his qualifications and that he had only learned the facts of the case the night before. *Drake v. Portuondo*, 553 F.3d 230, 238, 243, 241–48 (2d Cir. 2009). As the Article also mentions, the court referred to Walter as "a charlatan" and "picquerism" as "medically speaking, nonsense." *Id.* at 235, 245.

McGuffin's conviction was vacated in 2019 based on newly discovered evidence. He thereafter sued Walter, the Vidocq Society, and Oregon, alleging, as the Article relates, "that the state fabricated evidence, coerced witnesses, and withheld exculpatory information." Herbert describes a June

- 4 -

2022 deposition taken of Walter, during which McGuffin's attorney "grilled the profiler about his claim that he worked on cases with Scotland Yard." According to the Article, "Walter could not recall the name of any inspectors he'd worked with there and appeared not to know that Scotland Yard and the Metropolitan Police are, in fact, the same organization." And "[w]hen asked where Scotland Yard was located, the man who claimed to have visited the agency's offices up to 30 times said he didn't know and then offered 'downtown London.'"

The Article also describes the national media attention Walter gained with the Vidocq Society. They were the subject of Michael Capuzzo's 2009 book, *The Murder Room*, which praised Walter and repeated some of his supposed falsehoods. Herbert further relates his own efforts to speak with Walter, who denied the author's interview request at his home in Northeastern Pennsylvania. The Article concludes by remarking that it is "obvious" that "he is a fraud."

### B. The Complaint

Plaintiff asserts that Defendants "filled" the Article "with misleading and outright lies about Mr. Walter." (Doc. 18 ¶4). He offers a list of "nondisclosed facts" which Herbert "knew and withheld." (Id. ¶5). The Complaint further alleges that the Article's falsehoods were made known to Herbert from his

own research, an American Academy of Forensic Sciences report attached to Plaintiff's initial complaint, and comments to the Article written online. (Id. ¶8).

According to the Complaint, Defendants' failure to … disclose[] facts that contradicted the substance of their article … was designed to harm Mr. Walter, place him in a false light, and mislead readers, all causing additional harm." (Id. ¶12). This false light has allegedly caused "significant damages and harm to" Plaintiff, has resulted in him being "now and forever labeled as a 'fraud,'" and has "stained" "his decades of work." (Id. ¶13–14).

## II.  LEGAL STANDARD

### A. Motion to Dismiss

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). So a complaint that contains only "labels and conclusions," or a "formulaic recitation of the elements of a cause of action" does not comply with Rule 8. *Id.*

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. Facial plausibility is achieved "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility does not require probability but "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "merely consistent with" liability do not satisfy this standard. *Id.*

As noted above, the court at this stage accepts the complaint's factual allegations as true. But this tenet "is inapplicable to legal conclusions." *Id.* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). And "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

The federal pleading standard just described requires that district courts "conduct a two-part analysis." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to show such an entitlement with its facts.

*Fowler*, 570 F.3d at 210–11 (internal citations and quotations omitted).

## B. Governing Law

"A federal court sitting in diversity must apply state substantive law and federal procedural law." *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000). The parties here agree that Pennsylvania substantive law applies.

## C. False Light

"Pennsylvania has adopted the definition of false light invasion of privacy from the Restatement (Second) of Torts, which imposes liability on a person who publishes material that 'is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity.'" *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (quoting *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988) (en banc)). To create liability, such publication must also "cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Larsen*, 543 A.2d at 1188.

The Superior Court has understood this cause of action to lie even "where true information is released[,] if the information tends to imply falsehoods." *Santillo v. Reedel*, 634 A.2d 264, 267 (Pa. Super. Ct. 1993) (citing *Larsen*, 543 A.2d at 1189). So "[l]iteral accuracy of separate statements will not render a communication 'true' where the implication of the communication as a whole was false." *Id.* Stated otherwise, "false light invasion of privacy offers redress not merely for matters that are provably false, but also for those that, although true, are selectively publicized in a manner creating a false impression." *Krajewski v. Gusoff*, 53 A.3d 793, 806 (Pa. Super. 2012).

This tort "applies only when the publicity given to the plaintiff has placed him in a false light before the public, of a kind that would be highly offensive to a reasonable person." *Id.* (quoting Restatement (Second) of Torts §652 cmt. c).

> In other words, it applies only when the defendant knows that the plaintiff, as a reasonable man, would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity. Complete and perfect accuracy in published reports concerning any individual is seldom attainable by any reasonable effort, and most minor errors, such as a wrong address for his home, or a mistake in the date when entered his employment or similar unimportant details of his career, would not in the absence of special circumstances give any serious offense to a reasonably person … It is only when there is such a major representation of his character, history, activity or beliefs that serious offense may reasonably be expected to be taken by a

reasonable man in his position, that there is a cause of action for invasion of privacy.

*Id.* (quoting Restatement (Second) of Torts §652 cmt. c).

### D. First Amendment

State tort law that imposes liability on the basis of speech must coexist with the First Amendment's guarantees of freedom of speech and freedom of the press.[3] *See Am. Future Sys. v. Better Bus. Bureau*, 923 A.2d 389, 395 (Pa. 2007) (first citing *New York Times v. Sullivan*, 376 U.S. 254, 269 (1964), and then citing *Dunn & Broadstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 755 (1985)) (observing that "the First Amendment limits the reach of state defamation laws"); *Krajewski*, 53 A.3d at 807–08 (explaining that "First Amendment protections" extend "to speech uttered in violation of a plaintiff's state privacy rights). Indeed, the First Amendment constrains causes of action based on a theory of false light invasion of privacy. *See Cantrell v. Forest City Publ'g Co.*, 419 U.S. 245, 249 (1974); *Krajewski*, 53 A.3d at 807–09. The extent of this constraint is discussed further *infra* Section III.C.

---

[3] These guarantees are applied to the States through the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1938); *Near v. Minnesota ex rel.Olson*, 283 U.S. 697 (1931).

### III.   DISCUSSION

#### A. Protected Opinion

Defendants first contend that their characterization of Plaintiff as a "fraud" constitutes opinion shielded from liability by the First Amendment. (Doc. 21 at 17–22). But that such statement is non-actionable does not necessarily render the entire Article protected, for the Article could otherwise contain material which is untrue or which tends to imply falsehoods. And it does not appear that Plaintiff sues based on that statement alone (although it dominates his discussion). So this argument does not provide a basis for dismissing the amended complaint in its entirety.

#### B. Falsity

Defendants also maintain that the amended complaint must be dismissed because Plaintiff has not alleged that the Article is "materially false." (Doc. 21 at 22–25).

Falsity carries the same meaning for false light invasion of privacy as it does for defamation, *Graboff*, 744 F.3d at 137 (citing *Larsen*, 543 A.2d at 1189). In the defamation context, "[t]he law does not require perfect truth, so long as any inaccuracies do not render the substance and 'gist' of the statements untrue. *ToDay's Housing v. Times Shamrock Commc'ns*, 21 A.3d

1209, 1215 (Pa. Super. Ct. 2011) (citing *Masson v. New Yorker Magazine*, 501 U.S. 496, 516, 517 (2011)).

Additionally, the First Amendment requires that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations … where a media defendant is involved." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990).[4] For a false light claim, this standard has been applied against the allegedly false implication of reported statements. *See Krajewski*, 53 A.3d at 804–05. So a plaintiff must plead that the publication implies false *facts*; "false" opinions would not be actionable. An opinion statement may nonetheless imply facts which themselves are provable as false. *See Milkovich*, 497 U.S. at 18–19 ("[E]xpressions of 'opinion' may often imply an assertion of objective fact.").

Defendants contend that because Plaintiff has not challenged a number of statements with the same "gist" as those he disputes, he has not shown that the Article is "materially false." (Doc. 21 at 24–25). First, the Article's "gist"—that Walter is a "fraud"—is not provable as either true or

---

[4] Plaintiff concedes that the Article is on a matter of public concern. (*See* Doc. 23 at 16 ("The pertinent federal constitutional requirement is, simply, this: 'a statement on matters of public concern must be provable as false before there can be liability under state defamation law." (citing *Milkovich*, 497 U.S. at 19))).

false. *Cf. Rubin v. CBS Broadcasting Inc.*, 170 A.3d 560, 567 ("The question remains … whether Rubin will be able to establish that the falsity was material. In other words, was the 'gist' of the publication—that Rubin was fired because of allegations of sexual abuse—sufficiently different from what may prove to be the truth … to have a materially different 'effect upon the viewer?'"). Second, the Article bases its opinion that Walter is a fraud on several specific instances. This is not a case where an overwhelming number of fraudulent occurrences are unchallenged, such that a few falsehoods could not materially affect the Article's "gist." Instead, it is plausible that even one falsehood, if significant, could alter the Article's "effect upon the reader." *ToDay's Housing*, 21 A.3d at 1215.  For these reasons, the court declines to conclude that dismissal is warranted on the basis that Plaintiff has not plead that the Article, *as a whole*, is "materially false."

Still, Plaintiff still must plead that the Article includes material that is not true or that implies a falsehood.

### 1.  "Fraud"

Plaintiff repeatedly posits that the Article's characterization of him as a "fraud" is a falsehood. (See Doc. 23 at 16, 19). He acknowledges that the alleged falsehood must be "provable as false," (Id. at 19), but does not articulate what he thinks the Article states or implies that is provable as false.

If it is Plaintiff's position that the Article's "fraud" characterization itself is a provable falsehood, the court disagrees; that characterization is incapable of being proven true or false. Plus, the Article discloses the facts underlying this opinion, and "readers can easily judge the facts for themselves." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020).

Plaintiff offers a dictionary definition of "fraud" and asserts that "the article is replete with misinformation and withheld known facts that, if presented would destroy the entire improper premise of the article." (Doc. 23 at 19). But this assertion does nothing to specify what provably false implication is created by such "improper premise."

Plaintiff also observes that courts have considered "[a]scribed derogatory traits" as "actionable." (Doc. 23 at 21 (first citing *Milkovich*, 497 U.S. at 18–19), and then citing *Smith v. Wagner*, 588 A.2d 1308, 1311 (Pa. Super. Ct. 1991) (statements that the plaintiff was "a liar, a thief and a crook" were "capable of defamatory meaning")). *Milkovich* explained that "[i]f a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth." 497 U.S. at 18. And "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment

- 14 -

of them is erroneous, the statements may still imply a false assertion of fact." *Id.* at 18–19.

Like calling someone a "liar," calling him a "fraud" *may* imply that he has told an untruth (though the latter term is arguably less precise and more typically understood as hyperbole). When done in the context of a discussion of the subject's profession, it may imply particularly that he has lied about his background or qualifications.

But Plaintiff does not identify what provable falsehood "fraud" implies here, nor does he claim that he has never exaggerated his professional background. So even assuming that the "fraud" characterization *can* imply a falsehood, Plaintiff has not alleged that it *has* implied a falsehood. Simply proclaiming that he is not a "fraud" is insufficient, for one cannot prove that he is not a "fraud" any more than he can prove he is not a "fake" or a "phony." *See Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 (1st Cir. 1992) ("Whether [the appellant's stage production] is 'fake' or 'phony' is … unprovable, since those adjectives admit of numerous interpretations."); *see also McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) ("The lack of precision makes the assertion 'X is a scam' incapable of being proven true or false"); *Greenbelt Co-op Publ'g Ass'n v. Bressler*, 398 U.S. 6, 14 (1970) ("[E]ven the most careless reader must have perceived that the word

['blackmail'] was no more than rhetorical hyperbole, a vigorous epithet"); *Rapaport v. Barstool Sports, Inc.*, 2024 WL88636 (2d Cir. 2024) ("Barstool's accusations of racism and fraud are non-actionable because they lack a clearly defined meaning, and, in this context, are incapable of being objectively proven true or false.").

The court thus concludes that Defendants' characterization of Plaintiff as a "fraud" forms no basis for his false light invasion of privacy claim.

### 2. Withholding Plaintiff's accomplishments

Plaintiff also suggests that Defendants created a false impression because they "ignored and withheld from the reader facts that confirmed Mr. Walter's reputation as an effective, qualified, and successful forensic profiler." (Doc. 23 at 7). But that Mr. Walter is not "effective, qualified," or "successful" is unprovable as true or false. And withholding facts such that the subject is portrayed in a *bad* light cannot constitute a tort, the withholding must work to portray him in a *false* light. Nowhere does Plaintiff specify how any selective publication of his accomplishments implied a provable falsehood.

### 3. Picquerism

Plaintiff next frames the Article's discussion of "picquerism" as advancing a falsehood. (See Doc. 23 at 10–11). The Article describes

"picquerism" as "an obscure sadistic impulse to derive sexual pleasure from penetrating people with bullets, knives, and teeth," and states that before Robie Drake's trial, his attorney "could not find any expert who had ever heard of picquerism." It also quotes the Second Circuit's remark that Walter's testimony about picquerism was "medically speaking, nonsense." *Drake v. Portuondo*, 321 F.3d 338, 346 (2d Cir. 2003). That picquerism is "obscure" is an opinion and not disproven by Plaintiff's assertion that "Picquerism is an accepted, peer reviewed, well understood subset of behaviors" or the facts that it is mentioned in journals and that Walter has published studies on the topic. (Doc. 18 ¶52). And the Article's characterization of picquerism as "obscure" cannot be said to imply that "picquerism" has never been discussed in journals or that Plaintiff has not published studies on the topic. The court therefore concludes that the Article's discussion of picquerism does not form a basis for Plaintiff's false light claim.

### 4.  Specific Falsehoods

Among his various non-actionable objections, Plaintiff does identify two specific implied falsehoods.

### a.  Scotland Yard

Plaintiff contends that Defendants "falsely portrayed that Walter lied about" having worked at Scotland Yard.  (Doc. 23 at 12; Doc. 18 ¶¶5, 27).

The Article describes a deposition taken of Plaintiff in which Nick McGuffin's lawyer "grilled him about his claim that he worked on cases with Scotland Yard."

> Walter could not recall the name of any inspectors he'd worked with there and appeared not to know that Scotland Yard and the Metropolitan Police are, in fact, the same organization. When asked where Scotland Yard was located, the man who claimed to have visited the agency's offices up to 30 times said he didn't know and then offered "downtown London."

The court agrees with Plaintiff that publication of this passage (even if literally true) without any further discussion of Plaintiff's involvement with Scotland Yard implies that Plaintiff had lied about ever working there. And Plaintiff unequivocally maintains that such implication is false.

The court additionally finds that such an implication, in this context, would be highly offensive to a reasonable person. That one had entirely and repeatedly fabricated as significant a career achievement as working at Scotland Yard is a fact which, if published, would do serious harm to his professional reputation. And it could alter the "gist" of this Article. So at the instant procedural juncture, this implication is actionable.

### b. Michigan Prison System

Discussing Michael Capuzzo's *The Murder Room*, Herbert writes that "[t]he book repeated and expanded on dozens of falsehoods in Walter's résumé."

> In the Michigan prison system, [Capuzzo] wrote, Walter could shut off hot water and put inmates on a diet of "prison loaf," with three meals a day blended and baked into a tasteless brick. "You will learn to control yourself or I will control you," he allegedly told them. But a prison spokesman disputes that a psychologist could leverage showers and meals in that way. "Maybe in *Shawshank* or something," he says, "But not in real life."

Plaintiff alleges that "Herbert knew—and withheld from the readers— … that may of the techniques used in the Michigan State Prison System to manage and control the most violent criminals were indeed employed by Mr. Walter, as part of his duties as a psychologist … responsible for the treatment, rehabilitation, and control" of inmates. (Doc. 18-1 ¶5, 54).

Assuming *arguendo* that the above-quoted paragraph implies that Plaintiff did not employ the tactics described, the court finds that an implication that he embellished his experience at Michigan prisons would not be highly offensive to a reasonable person.

### c. Michigan State University

Plaintiff also references "Herbert's false presentation of Mr. Walter's work in … Michigan State University." (Doc. 18 ¶54). Discussing *The Murder Room*, the Article states:

> Walter also claims in the book that Michigan State hired him as an adjunct professor and that he collaborated with the university police to investigate gay twin brothers who fondled football fans without their consent inside Spartan Stadium. But a

Michigan State spokesman denied that Walter has ever been employed by the school.

Plaintiff's bare reference to a "false presentation" is inadequate to state a claim, for it does not inform us what the falsehood is.

### C. Actual Malice

Having determined that Plaintiff has adequately plead that Defendants published material implying a falsehood that would be highly offensive to a reasonable person, the court must also determine whether he has plead that they did so with the requisite state of mind. Defendants contend that he has failed to plead actual malice. (Doc. 21 at 25–33).

At the outset, Plaintiff disputes that actual malice is an element of a false light claim against a non-public figure. (Doc. 23 at 22). He relies on *Smith v. Borough of Dunmore*, 633 F.3d 176, 182 (3d Cir. 2011), which noted that the Appellant there had cited *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa. Super. Ct. 1997) for the element of a false light claim: "(1) publicity, (2) given to private facts, (3) which could be highly offensive to a reasonable person, and (4) which are not of legitimate concern to the public." Neither *Smith* nor *Strickland* reached the question of actual malice or held

that it was *not* required.[5] *Rush v. Phila. Newspapers, Inc.*, 732 A.2d 648 (Pa. Super. Ct. 1999) (also relied on by Plaintiff), cited *Strickland* for these elements and opined that, for a false light claim, "the person making the statement that is accused of rendering another in a false light must act with 'knowledge of or in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'" 732 A.2d at 654 (quoting *Larsen*, 543 A.2d 1181, 1188 (1988)). *Rush* did not explicitly cabin this holding to public figures, though at least one of the plaintiffs in *Rush* was, as a member of the Philadelphia School Board, a public figure. *See* 732 A.3d at 650, 654.

Plaintiff also cites *Lawson v. Pennsylvania SPCA*, 124 F. Supp. 3d 394, 410 (E.D. Pa. 2015), which quotes *Commonwealth v. Hayes*, 414 A.2d 318, 325 n.18 (Pa. 1980) for the rule that "[t]he tort of placing the plaintiff in a false light consists of … malice on the part of the defendant where the published matter is in the public interest." By his citation to this language, Plaintiff appears to conflate public figures and matters of public interest: while

---

[5] *Krajewski v. Gusoff*, 53 A.3d 793, 806 n.4 (Pa Super. Ct. 2012) later characterized *Strickland*'s elements statement as *dicta*, which *Strickland* had extracted from *Harris v. Easton Publ'g Co.*, 483 A.2d 1377, 1387 (1984), which had confined its discussion to a *different* invasion of privacy tort. *Krajewski* expressly "disavow[ed] any suggestion that a lack of 'legitimate public concern' should be an element of section 652E claim for false light invasion of privacy." 53 A.3d at 806 n.4.

Plaintiff asserts that he is "private figure," (Doc. 23 at 22), he concedes that the Article is on a matter of public concern. (See Doc. 23 at 16 ("The pertinent federal constitutional requirement is, simply, this: 'a statement on matters of public concern must be provable as false before there can be liability under state defamation law." (citing *Milkovich*, 497 U.S. at 19))). The Article deals with Plaintiff's professional work in assisting with criminal prosecution and investigation. Surely the public has an interest in evaluating the credibility of those the State enlists to enforce criminal law.

Defendants in reply do not mention the public–private figure distinction posited by Plaintiff, but instead simply assert that "'Pennsylvania has adopted the definition of false light invasion of privacy from the Restatement (Second) of Torts, which imposes liability on a person who publishes material with knowledge or in reckless disregard of its falsity,' *i.e.*, actual malice." (Doc. 26 at 7 (quoting *Graboff*, 744 F.3d at 136 (quoting *Larsen*, 543 A.2d at 1188))). *Graboff* quoted *Larsen*, in which the plaintiff was a justice of the Pennsylvania Supreme Court. *Larsen*, in turn, quoted the Restatement, which, although facially requiring "knowledge of" or "reckless disregard as to … falsity," also includes this "caveat":

> The [American Law] Institute takes no position on whether there are any circumstances under which recovery can be obtained under this Section if the actor did not know of or act with reckless disregard as to the falsity of the matter publicized and

the false light in which the other would be placed but was negligent in regard to these matters.

Restatement (Second) of Torts §652E caveat.

This caveat emanates from the Supreme Court's holding in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335, 347 (1974) that the constitutional limitation prohibiting public officials or public figures from recovering for defamatory falsehoods absent proof of actual malice does not extend to claims brought by private individuals. Instead, "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Gertz*, 418 U.S. at 347. Though *Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967) applied the actual malice limitation to false light claims,[6] the Second Restatement recognized that, owing to *Gertz*, the "full extent of the authority of [*Time v. Hill*] is presently in some doubt." Restatement (Second) of Torts §652E cmt. d. It therefore, "[p]ending further enlightenment from the Supreme Court," "provide[d] that liability for invasion of privacy for placing the plaintiff in a false light may exist if the defendant

---

[6] The Court in *Cantrell v. Forest City Publ'g. Co.*, 419 U.S. 245, 249 (1974) explicitly declined to consider "whether a State may constitutionally apply a more relaxed standard of liability for a publisher of false statements injurious to a private individual under a false-light theory of invasion of privacy, or whether the constitutional standard announced in *Time, Inc. v. Hill* applies to all false-light cases."

acted with knowledge of the falsity of the statement or in reckless disregard as to truth or falsity," but left "open the question whether there may be liability based on a showing of negligence as to truth or falsity." *Id.*

Pursuant to *Gertz*, the Pennsylvania Supreme Court has recognized a distinction between the fault required in defamation actions brought by public officials or public figures versus that required for private figures.  *Am. Future Sys. v. Better Bus. Bureau*, 923 A.2d 389, 400 (Pa. 2007):

> If the plaintiff is a public official or public figure, and the statement relates to matters of public concern, then to satisfy the First Amendment strictures the plaintiff must establish that the defendant made a false and defamatory statement with actual malice.  In contrast, states are free to allow a private-figure plaintiff to recover by establishing that the defendant acted negligently rather than maliciously …. [W]e … find this to be the appropriate standard relative to a private-figure plaintiff.

923 A.2d at 400 (internal citations omitted).[7] Similarly, some states have, considering *Gertz*, held that private figure plaintiffs need only show negligence to sustain a false light claim.[8]

---

[7] Importantly, *American Future Systems* also imposed the actual malice limitation, as *Gertz* did, on a "limited purpose public figure," which is one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.* at 401, 405 (quoting *Gertz*, 418 U.S. at 351). No argument has been presented here whether Plaintiff is a limited purpose public figure.

[8] *Compare, e.g.*, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 89 (W.Va. 1983) ("[T]he test to be applied in a false light invasion of privacy action by a private individual against a media defendant is what a reasonably

*(footnote continued on next page)*

But the Pennsylvania Supreme Court has yet to dispense with the requirement of actual malice in false light claims brought by private figures on matters in the public interest. *See Commonwealth v. Hayes*, 414 A.2d 318, 433 n.18 (Pa. 1980). Absent a definitive answer from the Pennsylvania Superior Court,[9] this court cannot predict that the Pennsylvania Supreme Court would do so.

And the Superior Court has given no definitive answer. Instead, it has continued to require actual malice without explicit regard to the plaintiff's status as a public or private figure. *See Rubin v. CBS Broadcasting Inc.*, 170 A.3d 560, 567, 568 n.9 (Pa. Super. Ct. 2017) ("The required standard of fault in a false light claim is … actual malice.") Federal courts, too, have required actual malice without discussing whether the plaintiff was a public or private

_____

prudent person would have done under the same or similar circumstances."), *with Lovgren v. Citizens First Nat'l Bank of Princeton*, 534 N.E.2d 987, 991 (Ill. 1989) ("We conclude … that in false-light cases it is not necessary to distinguish between private and public figures, as is required in some defamation cases, and we, accordingly, adopt the 'actual malice' approach of the Restatement."). Still others have dispensed with the actual malice requirement for private figures only when the claim involves matters of private concern. *See, e.g.*, *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 647–48 (Tenn. 2001).

[9] In predicting how a state supreme court would decide on unresolved questions, "[t]he opinions of intermediate appellate state courts are 'not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Nationwide Mut. Ins. Co.*, 230 F.3d 634, 637 (3d Cir. 2000) (quoting *West v. AT&T Co.*, 311 U.S. 223, 237 (1940)).

- 25 -

figure. *See, e.g.*, *Taha v. Bucks County*, 9 F. Supp. 3d 490, 494 (E.D. Pa. 2014).   And Pennsylvania standard jury instructions include actual malice without differentiation between public and private figures. *See* Pa. Suggested Standard Civil Jury Instructions §17.220(4).

The court will therefore require that Plaintiff plead actual malice. *See Time, Inc. v. Hill*, 385 U.S. at 390–91; *Hayes*, 414 A.2d at 433 n.18; *Rubin*, 170 A.3d 560, 568 n.9. The court agrees with Defendants that Plaintiff has not done so.

Actual malice is not "ill will or malice in the ordinary sense of the term." *Joseph v. Scranton Times, L.P.*, 129 A.3d 404, 436–37 (Pa. 2015). Nor is it shown "by virtue of the fact that the media defendant published the material to increase its profits, or the failure to investigate before publishing … although the purposeful avoidance of the truth is in a different category." *Id.* (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666–92 (1989)). Actual malice may be proven, however, by circumstantial evidence. *Id.* at 437.

Though the Complaint does allege that Herbert "knew that Mr. Walter had indeed lectured at … Scotland Yard," (Doc. 18 ¶5), pleadings have been required to contain more than generalized assertions to establish actual malice. *See McCafferty*, 955 F.3d at 359; *Tucker v. Phila. Daily News*, 848

A.2d 113, 131–36 (Pa. 2004); *Monge v. Univ. of Pennsylvania*, 674 F. Supp. 3d 195, 212 (E.D. Pa. 2023); *Patrick v. Daily Beast Co., LLC*, 674 F. Supp. 3d 159, 163 (E.D. Pa. 2023); *Earley v. Gatehouse Meda Pa. Holdings, Inc.*, 3:12-1886, 2015 WL 1163787, at *3 (M.D. Pa. 2015). And Plaintiff has supplied no factual allegations (that is, allegations beyond conclusory statements that Defendants "knew" or "had been made well aware of," falsehoods; "had absolutely no basis for" certain implications; "fabricated" statements; or "intentionally disregard[ed]" facts, (Doc. 18-1 ¶¶5, 38, 41, 43, 46, 50)), which would plausibly indicate that Plaintiffs knew or purposefully avoided knowing any falsehood at the time they published the Article.

He does allege that Herbert "was specifically informed … that he had to … provide a balanced story on Mr. Walter" and "include those facts that revealed the truth about Mr. Walter." (Doc. 18 ¶9). But this allegation misses the mark. It matters not whether Herbert knew sound journalistic practices; he must have known or recklessly disregarded a falsehood and then stated or implied that falsehood. Plaintiff also alleges that

> Defendants' malicious claim that Mr. Walter is a fraud intentionally ignored all of the easily obtainable proof of Mr. Walter's decades of experience and insightful work in scores of cold cases that have brought the most dangerous criminals to justice; this was done so because these defendants entertained serious doubts as to the truthfulness of their "fraud" claims.

(Id. ¶32). Again, Plaintiff confuses the opinion that he is a "fraud" with a fact that is provable as false. This allegation does not identify a falsehood known or recklessly disregarded by Defendants. Nor are allegations that Herbert violated a journalistic code of ethics, (Doc. 18 ¶55), or exhibited "ill will towards Mr. Walter", (id. ¶7–8, 31), sufficient. *See McCafferty*, 955 F.3d 352, 359 ("[E]ven an extreme departure from professional standards, without more, will not support a finding of actual malice."); *id.* ("Actual malice … does not connote ill will or improper motivation.").

Plaintiff's brief does not compel a different conclusion. It consists primarily of citations to authority followed by bare assertions that this element is satisfied. (See Doc. 23 at 23 ("[T]his is precisely why … that the implication of malice in the pleadings is sufficient to permit the case to proceed."), 24 ("That is more than adequately plead in the Amended Complaint"). Even if it were clear to what "this" and "that" referred, Plaintiff has omitted any explanation *why* the cited legal principles dictate a ruling in his favor.

Plaintiff further cites Defendants' "republication" of the Article as evidence of malice. (Doc. 23 at 24 (citing *Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899, 905 (Pa. 2007)). First, Plaintiff's indirect allegations of "republication" (Doc. 18 ¶¶5. 40, 44, 46), are insufficiently specific to be considered. He mentions no date or medium. His vague reference to

"republication" does not adequately put Defendants on notice of the claim against them. *See, e.g.*, *Garamendi v. Golden Eagle Ins. Co.*, 27 Cal. Rptr.3d 239, 260 (Cal. Ct. App. 2005). Second, to the extent he refers to the magazine and print versions, (Doc. 18-1 at 3–14, 39–48), as separate publications, there is no indication in the attachments to the complaint that the magazine version was published *after* the online version. The online version is dated April 11, 2023, (Doc. 18 at 3), while the print version appeared in the April 10–23 issue. (Id. 18-1 at 42). At any rate, Plaintiff's reliance on online commentary posted to the Article by anonymous internet users as demonstrating knowledge, (Doc. 18 ¶¶5, 45, 46, 53; Doc. 18-1 at 14–22; Doc. 23 at 11–13), is plainly unpersuasive and merits no further discussion. And the American Academy of Forensic Sciences Ethics Committee report he attaches, (Doc. 18-1 at 30–37), is dated September 10, 2023, well after the Article was published. It thus is not relevant to Defendants' awareness at the time of publishing, as Plaintiff suggests. (Doc. 18 ¶38).

Finally, Plaintiff's assertion that the omission of several "context-critical facts admittedly known to Defendants" "confirms … that Defendants published the core smear here knowing that they had no basis for it," (Doc. 23 at 25), identifies no *falsehood* allegedly known to Defendants. Again, the

"smear" that Plaintiff is a "fraud" is not capable of being proven true or false. The First Amendment shields Defendants from liability on the ground that their opinion of Plaintiff is negative, even if unduly so.

Accordingly, the court concludes that Plaintiff has not satisfied the element of actual malice and has thus failed to state a claim for false light invasion of privacy.

### D. Amendment

"[I]n the event a complaint fails to state a claim, unless amendment would be futile, the District Court must give a plaintiff the opportunity to amend her complaint." *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The court cannot say at this stage that amendment would be futile, so dismissal will be with leave to amend if Plaintiff can allege facts plausibly showing actual malice.

An amended complaint should exclude irrelevant allegations, such as those related solely to opinions or to occurrences after publication (unless they somehow touch on Defendants' state of mind at the time of publication).

### E. Transcript

Finally, Plaintiff objects to Defendants' attachment of a deposition transcript from the McGuffin civil suit. (Doc. 26 at 19–20; Doc. 21-1 at 13–303). But the court has not considered this exhibit in addressing Defendants'

motion. In any event, Plaintiff had actual notice of this document as it transcribes *his* deposition and is discussed in the Article. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss will be granted and Plaintiff's amended complaint dismissed with leave to amend. An appropriate order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: May 14, 2024**
23-2166-01